# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **Vince G. Meyer, as Trustee of the Vince G. Meyer Trust,** derivatively on behalf of Fifth Third Bancorp,<br><br>Plaintiff,<br><br>vs.<br><br>**Greg D. Carmichael, Tayfun Tuzun, Nicholas K. Akins, Jorge L. Benitez, Katherine B. Blackburn, Emerson L. Brumback, Jerry W. Burris, C. Bryan Daniels, Thomas H. Harvey, Gary R. Heminger, Jewell D. Hoover, Eileen A. Mallesch, Michael B. McCallister, and Marsha C. Williams**<br><br>Defendants,<br><br>and<br><br>**Fifth Third Bancorp**, Nominal Defendant | **Case No. 20-CV-4244**<br><br><br><br>**Jury Trial Demanded** |

**Verified Shareholder Derivative Complaint**

Plaintiff Vince G. Meyer, as Trustee of the Vince G. Meyer Trust ("Plaintiff") alleges

that the directors and/or officers of Fifth Third Bancorp ("Fifth Third" or "the Company")

breached their fiduciary duties to the company, were unjustly enriched, wasted corporate assets,

and committed violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of

1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants—

Carmichael, Tuzun, Akins, Benitez, Blackburn, Brumback, Burris, Daniels, Harvey, Heminger,

Hoover, Mallesch, McCallister, and Williams—Plaintiff alleges the following based upon

personal knowledge as to Plaintiff's and Plaintiff's own acts, and information and belief as to all

1

other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Fifth Third, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**Nature of the Action**

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Fifth Third's directors and/or officers from February 26, 2016 through the present (the "Relevant Period").

2. Fifth Third is an Ohio-based diversified financial services company founded in 1975. The Company is organized as a banking holding company and is the indirect holding company of Fifth Third Bank, National Association ("Fifth Third Bank" or the "Bank").

3. Fifth Third and/or the Bank are subject to regulation and supervision by certain regulatory agencies, including the Consumer Financial Protection Bureau (the "CFPB").

4. Prior to the beginning of the Relevant Period, Fifth Third Bank operated with a toxic sales culture that rewarded and/or disciplined employees based on their securements (or lack thereof) of sales to consumers and existing customers. The Company specifically utilized a "cross-sell" strategy, in which employees could meet aggressively set sales targets only by selling services and/or products to existing customers.

5. To meet these aggressive sales targets, from as early as 2008, Fifth Third Bank employees engaged in unauthorized transactions with customer accounts, without respective

customer knowledge and/or permission. These unauthorized practices included, *inter alia*, opening new deposit accounts, credit cards, enrolling customers in online banking services, and opening "Early Access" credit lines. The Bank's improper and abusive practices exposed numerous consumers to unnecessary risks and harms, such as unjustified fees, data theft, improper use of personal data, and negative effects on customer information provided to consumer reporting agencies (collectively, the "Customer Account Misconduct").

6. The Bank, and the Company by extension, knew of the Customer Account Misconduct and the aggressive sales culture that encouraged it for several years before its exposure. Yet, the Individual Defendants engaged in and/or allowed the Customer Account Misconduct to continue unremedied and undisclosed. Simultaneously, the Company's annual reports filed on Form 10-Ks with the SEC, and other Company filings touted Fifth Third's "robust" compliance systems and controls, among other misrepresentations.

7. It was not until March 2, 2020 that the investing public was given some insight into the widespread misconduct affecting the Company. On that day, in its annual report filed with the SEC for the fiscal year ended December 31, 2019 (the "2019 10-K"), the Company disclosed that it had received notice from the CFPB of its intent to file an enforcement action "in relation to alleged unauthorized account openings." The same 2019 10-K downplayed the forthcoming action as unnecessary but provided no details about the CFPB's allegations.

8. As news of the impending CFPB enforcement action spread throughout the market, the Company's stock declined $0.76, approximately 3%, over the following trading sessions, from closing at $24.44 per share on March 3, 2020, to close at $23.68 per share on March 5, 2020.

9. Finally, on March 9, 2020, after an extensive three-year investigation, the CFPB

3

issued a press release announcing that it had filed a complaint against Fifth Third Bank captioned *Bureau of Consumer Financial Protection v. Fifth Third Bank, National Association*, Case No. 1:20-cv-01683 (N.D. Ill.) (the "CFPB Action"). The CFPB press release revealed previously undisclosed details regarding its investigation into the Company, including that, "for several years [until 2016, at least] Fifth Third, without consumers' knowledge or consent: opened deposit and credit-card accounts in consumers' names; transferred funds from consumers' existing accounts to new, improperly opened accounts; enrolled consumers in unauthorized online-banking services; and activated unauthorized lines of credit on consumers' accounts." The press release further revealed the CFPB's allegations about Fifth Third Bank's "cross-sell" strategy, and that, "despite knowing since at least 2008 that employees were opening unauthorized consumer-financial account, Fifth Third took insufficient steps to detect and stop the conduct and to identify and remediate harmed consumers." As a result, the CFPB announced in the press release that the Bank had allegedly, "violated the Consumer Financial Protection Act's prohibition against unfair and abusive acts or practices as well as the Truth in Lending Act and the Truth in Savings Act and their implementing regulations."

10.	On this news, the Company's stock price fell approximately 3.5%, from closing at $18.30 per share on March 9, 2020, to close at $17.66 per share on March 11, 2020, two trading sessions later. The Company's stock price further declined by $1.76 the following trading session, to close at $15.90 per share on March 12, 2020, representing a total decline of approximately 13%.

11.	During the Relevant Period, the Individual Defendants breached their fiduciary duties by participating in or facilitating the Customer Account Misconduct and by failing to maintain internal controls.

4

12.     Also during the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company's aggressive efforts to promote its cross-sell strategy, including utilizing incentive-based programs tied to unrealistic sales targets, caused employees to engage in the Customer Account Misconduct; (2) Fifth Third Bank, and the Company by extension, were aware of the Customer Account Misconduct and its resultant illegality and harm to consumers as early as 2008; (3) despite this awareness, the Company neglected to employ and monitor its cross-sell program appropriately in a manner that would identify and prevent the Customer Account Misconduct and ensure affected consumers were identified and made whole; (4) the foregoing exposed Fifth Third to a foreseeable risk of heightened regulatory scrutiny and/or inquiries, like the three-year extensive CFPB investigation; (5) consequently, the Company's profits and prospects were unsustainable, as they were at least partially produced through illicit and improper conduct; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

13.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

14.     Furthermore, during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual

Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while three of them engaged in improper insider sales, netting proceeds of over $6.1 million. Approximately 216,504,051 shares of the Company's common stock were repurchased during the Relevant Period for over $5.6 billion. As the Company's stock was actually only worth $15.90 per share during that time, the price at closing on March 12, 2020, the Company overpaid by over $2.1 billion in total.

15.     In light of the Individual Defendants' misconduct, which has subjected Fifth Third, its President and Chief Executive Officer ("CEO"), and its Executive Vice President and Chief Financial Officer ("CFO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of Illinois (the "Securities Class Action"), and has further subjected Fifth Third Bank to being named in the CFPB Action, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefited from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

16.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Fifth Third's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of

disinterestedness and independence.

## Jurisdiction and Venue

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

18.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

22.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

23.     Venue is proper in this District because Fifth Third and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

### Parties

#### Plaintiff

24. Plaintiff is a current shareholder of Fifth Third common stock. Plaintiff has continuously held Fifth Third common stock at all relevant times.

#### Nominal Defendant Fifth Third

25. Fifth Third is an Ohio corporation with its principal executive offices at 38 Fountain Square Plaza, Cincinnati, Ohio 45263. Fifth Third's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "FITB."

#### Defendant Carmichael

26. Defendant Greg D. Carmichael has served as the Company's President and CEO since November 2015 and has served as elected Chairman of the Board since 2018. Defendant Carmichael previously served as First Bank's Chief Operating Officer from June 2006 to September 2012, and as its Chief Information Officer from June 2003 to June 2006. According to the Company's Schedule 14A filed with the SEC on March 4, 2020 (the "2020 Proxy Statement"), as of December 31, 2019, Defendant Carmichael beneficially owned 1,336,633 shares of the Company's common stock, which represented 0.1883% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on December 31, 2019 was $30.74, Defendant Carmichael owned approximately $41 million worth of Fifth Third stock.

27. For the fiscal year ended December 31, 2019, Defendant Carmichael received $8,999,237 in compensation from the Company. This included $1,100,070 in salary, $4,462,507 in stock awards, $787,498 in option awards, $2,200,000 in non-equity incentive plan compensation, and $449,162 in all other compensation.

8

28. During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Carmichael made the following sales of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| October 29, 2019 | 55,251 | $29.59[1] | $1,634,877.09 |
| February 13, 2018 | 87,613 | $32.37 | $2,836,032.81 |
| November 16, 2016 | 36,821 | $25.11 | $924,575.31 |
| November 10, 2016 | 17,689 | $23.45 | $414,807.05 |

Thus, in total, before the fraud was exposed, he sold 197,374 Company shares on inside information, for which he received approximately $5.8 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

29. The Company's website[2] states the following about Defendant Carmichael:

Greg D. Carmichael serves as chairman, president and chief executive officer of Fifth Third Bancorp, the ninth-largest U.S.-based consumer bank. Since Greg became CEO, the Company has grown in assets to $185 billion* and is recognized as one of the most innovative banks in the country. It has approximately 20,000 employees and about 1,123 banking centers across 10 states. Its four main businesses are Commercial Banking, Branch Banking, Consumer Lending and Wealth & Asset Management. The Bank has commercial and consumer lending presence across the United States.

In more than 16 years of service to the Company, Greg has provided outstanding direction and vision, and his leadership has helped drive the Bank's transformation and overall success. Greg joined Fifth Third Bank in June 2003 as executive vice president and chief information officer. He was named chief operating officer in 2006, then president in September 2012. He was appointed to the Board of Directors in July 2015, became CEO in November 2015 and was elected chairman of the Board in January 2018.

Before coming to Fifth Third, Greg served for seven years as chief information officer for Emerson Electric, a worldwide provider of technology and energy

---

[1]These shares were sold in multiple transactions at prices ranging from $29.59 to $29.625. Thus, the proceeds from the executed sales on this date were at least $1.6 million.
[2]https://www.53.com/content/fifth-third/en/personal-banking/about/corporate-governance/cg-executive-officers.html. Last visited June 3, 2020.

9

solutions. His background also includes leadership roles in information technology with General Electric.

Greg and his wife live in Cincinnati. They have three adult sons.

*Education*[3]

Greg earned a bachelor's degree in computer science from the University of Dayton and a master's degree from Central Michigan University.

*Professional and Civic*

In January 2020, Greg joined the board of directors of Encompass Health. He also serves on the board of trustees of Bethesda Inc. and the boards of directors of the American Bankers Association, Cincinnati Business Committee and Ohio Business Roundtable Executive Committee. Greg is a member of the Bank Policy Institute's board and BITS, its digital policy forum, and he is president of the Commercial Club of Cincinnati. In 2019, Greg was named to the American City Business Journals' "Influencers: Finance" list of 100 U.S. executives with the biggest impact on business.

**Defendant Tuzun**

30.     Defendant Tayfun Tuzun has served as the Company's Executive Vice President and CFO since 2013. Prior to his promotion, he served as the Company's treasurer since 2011 and as its structured finance manager from 2007. According to the 2020 Proxy Statement, as of December 31, 2019, Defendant Tuzun beneficially owned 329,256 shares of the Company's common stock, which represented 0.0464% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on December 31, 2019 was $30.74, Defendant Tuzun owned approximately $10.1 million worth of Fifth Third stock.

31.     For the fiscal year ended December 31, 2019, Defendant Tuzun received $2,797,182 in compensation from the Company. This included $602,913 in salary, $1,215,493 in

---

[3] For formatting reasons, Plaintiff has italicized bolded headings from the Company's website and Proxy Statements in the Parties section of this Complaint.

stock awards, $214,500 in option awards, $635,000 in non-equity incentive plan compensation, and $129,276 in all other compensation.

32.     The Company's website[4] states the following about Defendant Tuzun:

Tayfun Tuzun is executive vice president and chief financial officer, responsible for Finance, Treasury, Business Planning and Analysis, Corporate Tax, Investor Relations and Accounting for Fifth Third Bancorp.

He previously served as treasurer, overseeing funding and liquidity, capital management, asset liability and balance sheet management, among other roles. He was promoted to treasurer in 2011.

Tayfun joined Fifth Third in 2007 as a structured finance manager and later served as assistant treasurer.

Tayfun began his private-sector career at Provident Bank in Cincinnati as asset liability manager in 1993 and worked in various senior positions in treasury and finance at that bank. In 2004, upon the sale of Provident Bank to National City, he joined FSI Inc., a multiplatform hedge fund specializing in the financial services sector. Before joining Provident, he was a faculty member at the University of New South Wales in Sydney, Australia.

He and his wife live in Cincinnati with their two daughters.

*Education*

Tayfun holds both a master's degree and a doctorate in economics from the Ohio State University and a bachelor's degree in economics from Bosphorus University in Istanbul, Turkey.

*Professional and Civic*

Tayfun is a member of the Financial Services Roundtable and is on the board of directors of the Cincinnati Shakespeare Company.

---

[4]https://www.53.com/content/fifth-third/en/personal-banking/about/corporate-governance/cg-executive-officers.html. Last visited June 3, 2020.

11

**Defendant Akins**

33.     Defendant Nicholas K. Akins has served as a Company director since 2013. He also serves as Chair of the Nominating and Corporate Governance Committee, and as a member of the Finance Committee and Human Capital and Compensation Committee. According to the 2020 Proxy Statement, as of December 31, 2019, Defendant Akins beneficially owned 31,455 shares of the Company's common stock, which represented 0.0044% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on December 31, 2019 was $30.74, Defendant Akins owned approximately $966,926 worth of Fifth Third stock.

34.     For the fiscal year ended December 31, 2019, Defendant Akins received $230,000 in compensation from the Company. This included $105,000 in fees earned or cash paid and $125,000 in stock awards.

35.     The 2020 Proxy Statement stated the following about Defendant Akins:

*Experience*:

Mr. Akins' qualifications for service as a director include business expertise as the Chief Executive Officer of a large, multi-state electric utility where he focuses on local operating utilities, community involvement, government relations, and regulations at the state, local, and federal levels. Mr. Akins has experience in all facets of operational, financial, and compliance-related activities in a heavily regulated business and industry. He also has experience overseeing cyber-related activities in business systems and critical infrastructure.

*Skills and Attributes*:

Accounting/Financial Reporting, Compensation and Benefits, Corporate Governance, Cybersecurity, ESG, Executive Management, Legal and Regulatory, Risk Management, and Strategic Planning

12

**Defendant Benitez**

36.      Defendant Jorge L. Benitez has served as a Company director since 2015. He also serves as a member of the Audit, Nominating and Corporate Governance, and Risk and Compliance Committees. According to the 2020 Proxy Statement, as of December 31, 2019, Defendant Benitez beneficially owned 19,276 shares of the Company's common stock, which represented 0.0027% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on December 31, 2019 was $30.74, Defendant Benitez owned approximately $592,544 worth of Fifth Third stock.

37.      For the fiscal year ended December 31, 2019, Defendant Benitez received $230,000 in compensation from the Company. This included $105,000 in fees earned or cash paid and $125,000 in stock awards.

38.      The 2020 Proxy Statement stated the following about Defendant Benitez:

*Experience*:

Mr. Benitez's qualifications for service as a director include extensive experience developing and executing business strategies across a range of industries, particularly consumer products and travel and transportation services. He also has significant experience implementing large-sale systems integration programs, as well as experience running operating units within a large multinational publicly-traded corporation.

*Skills and Attributes*:

Accounting/Financial Reporting, Compensation and Benefits, Corporate Governance, Cybersecurity, Digital Innovation and FinTech, ESG, Executive Management, Risk Management, and Strategic Planning

**Defendant Blackburn**

39.      Defendant Katherine B. Blackburn has served as a Company director since 2014. She also serves as a member of the Nominating and Corporate Governance Committee and the Risk and Compliance Committee. According to the 2020 Proxy Statement, as of December 31,

13

2019, Defendant Blackburn beneficially owned 45,807 shares of the Company's common stock, which represented 0.0065% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on December 31, 2019 was $30.74, Defendant Blackburn owned approximately $1.4 million worth of Fifth Third stock.

40.    For the fiscal year ended December 31, 2019, Defendant Blackburn received $220,000 in compensation from the Company. This included $95,000 in fees earned or cash paid and $125,000 in stock awards.

41.    The 2020 Proxy Statement stated the following about Defendant Blackburn:

*Experience*:

Ms. Blackburn's qualifications for service as a director include business experience in running operations for the Cincinnati Bengals professional football franchise. She has extensive experience with human resource and personnel matters, cost and efficiency management, and business negotiations. Ms. Blackburn also has extensive experience with management of diversity and inclusion initiatives for large organizations through her role on the National Football League's Diversity Committee. Additionally, Ms. Blackburn holds a law degree and brings to the Board knowledge and familiarity of Fifth Third and the City of Cincinnati.

*Skills and Attributes*:

Compensation and Benefits, Corporate Governance, Digital Innovation and FinTech, ESG, Executive Management, Legal and Regulatory, Risk Management, and Strategic Planning

**Defendant Brumback**

42.    Defendant Emerson L. Brumback has served as a Company director since 2009. He also serves as Chair of the Audit Committee and as a member of the Finance Committee. According to the 2020 Proxy Statement, as of December 31, 2019, Defendant Brumback beneficially owned 55,981 shares of the Company's common stock, which represented 0.0079%

14

of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on December 31, 2019 was $30.74, Defendant Brumback owned approximately $1.7 million worth of Fifth Third stock.

43. For the fiscal year ended December 31, 2019, Defendant Brumback received $255,000 in compensation from the Company. This included $130,000 in fees earned or cash paid and $125,000 in stock awards.

44. During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Brumback made the following sale of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| March 5, 2018 | 3,000 | $33.44 | $100,320.00 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

45. The 2020 Proxy Statement stated the following about Defendant Brumback:

*Experience*:

Mr. Brumback's qualifications for service as a director include banking expertise through his 30 years of experience in the financial services industry with several banking organizations. He has gained valuable insight through his experience in executive positions overseeing many aspects of the banking field, including retail banking, commercial banking, banking operations, and systems. Mr. Brumback also brings his experience as a former board member with another financial services company.

*Skills and Attributes*:

Accounting/Financial Reporting, Compensation and Benefits, Corporate Governance, Executive Management, Financial Services Industry, Legal and Regulatory, Risk Management, and Strategic Planning

15

**Defendant Burris**

46.     Defendant Jerry W. Burris served as a Company director from 2016 until he retired in June 2020. He also served as a member of the Risk and Compliance Committee and the Audit Committee during the Relevant Period. According to the 2020 Proxy Statement, as of December 31, 2019, Defendant Burris beneficially owned 10,670 shares of the Company's common stock, which represented 0.0015% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on December 31, 2019 was $30.74, Defendant Burris owned approximately $327,995 worth of Fifth Third stock.

47.     For the fiscal year ended December 31, 2019, Defendant Burris received $230,000 in compensation from the Company. This included $105,000 in fees earned or cash paid and $125,000 in stock awards.

48.     The 2020 Proxy Statement stated the following about Defendant Burris:

*Experience*:

Mr. Burris' qualifications for service as a director include management expertise as the President and Chief Executive Officer of Associated Materials and as a division president with General Electric. Mr. Burris's expertise includes strong technical marketing skills, a sound understanding of how to best integrate technology, rapid innovation, mergers and acquisitions, and cost and efficiency management. He also brings experience from his service on a public company board's compensation and governance and audit committees.

*Skills and Attributes*:

Compensation and Benefits, Corporate Governance, ESG, Executive Management, Risk Management, and Strategic Planning

**Defendant Daniels**

49.     Defendant C. Bryan Daniels has served as a Company director since 2019. He also serves as a member of the Audit Committee and Risk and Compliance Committee.

16

According to the 2020 Proxy Statement, as of December 31, 2019, Defendant Daniels beneficially owned 236,931 shares of the Company's common stock, which represented 0.0334% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on December 31, 2019 was $30.74, Defendant Daniels owned approximately $7.2 million worth of Fifth Third stock.

50. For the fiscal year ended December 31, 2019, Defendant Daniels received $176,075 in compensation from the Company. This included $42,500 in fees earned or cash paid and $133,575 in stock awards.

51. The 2020 Proxy Statement stated the following about Defendant Daniels:

*Experience*:

Mr. Daniels's qualifications for service as a director include extensive and varied experiences as an executive, director, and investor in the financial services industry. As a founder of Prairie Capital, he brings to the Board a rich and multi-faceted understanding of many different industries, companies, and business practices. Mr. Daniels also has substantial experience with technology in several industries, including financial services.

*Skills and Attributes*:

Corporate Governance, Cybersecurity, Digital Innovation and FinTech, Executive Management, Financial Services Industry, Risk Management, and Strategic Planning

**Defendant Harvey**

52. Defendant Thomas H. Harvey has served as a Company director since 2019. He also serves as a member of the Risk and Compliance Committee and the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of December 31, 2019, Defendant Harvey beneficially owned 178,418 shares of the Company's common stock, which represented 0.0252% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on

17

December 31, 2019 was $30.74, Defendant Harvey owned approximately $5.4 million worth of Fifth Third stock.

53. For the fiscal year ended December 31, 2019, Defendant Harvey received $176,075 in compensation from the Company. This included $42,500 in fees earned or cash paid and $133,575 in stock awards.

54. The 2020 Proxy Statement stated the following about Defendant Harvey:

*Experience*:

Mr. Harvey's qualifications for services as a director include 25 years of experience in the financial services industry. His experience in executive positions with multiple foundations and other organizations provides him with strong organizational and leadership skills and extensive investment experience and makes him particularly well-suited to serve on Fifth Third's Board of Directors. Mr. Harvey also has unique and diverse knowledge and experience with the emergence and growth of technology in the banking industry.

*Skills and Attributes*:

Accounting and Financial Reporting, Corporate Governance, ESG, Executive Management, Financial Services Industry, and Strategic Planning

**Defendant Heminger**

55. Defendant Gary R. Heminger has served as a Company director since 2006. He also serves as Chair of the Finance Committee and as a member of the Human Capital and Compensation Committee and the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of December 31, 2019, Defendant Heminger beneficially owned 52,934 shares of the Company's common stock, which represented 0.0075% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on December 31, 2019 was $30.74, Defendant Heminger owned approximately $1.6 million worth of Fifth Third stock.

56. For the fiscal year ended December 31, 2019, Defendant Heminger received

$265,000 in compensation from the Company. This included $140,000 in fees earned or cash paid and $125,000 in stock awards.

57.     The 2020 Proxy Statement stated the following about Defendant Heminger:

*Experience*:

Mr. Heminger's qualifications for service as a director include valuable business knowledge gained from his responsibilities in overseeing all operations, performance, reporting, and financial metrics for Marathon's refining, marketing, transportation, and Speedway business. He has financial experience through his oversight of all financial data, working capital, and merger and acquisition activity.

*On October 31, 2019, Marathon Petroleum Corporation announced Mr. Heminger's plans to retire as Chairman and Chief Executive Officer of Marathon Petroleum Corporation and as Chairman of MPLX GP LLC to be effective at the conclusion of Marathon Petroleum Corporation's 2020 Annual Meeting scheduled for April 29, 2020. Mr. Heminger will not stand for reelection to the Marathon Petroleum Corporation Board of Directors at the 2020 Annual Meeting.

*Skills and Attributes*:

Accounting and Financial Reporting, Compensation and Benefits, Corporate Governance, ESG, Executive Management, Risk Management, and Strategic Planning

**Defendant Hoover**

58.     Defendant Jewell D. Hoover has served as a Company director since 2009. She also serves as Chair of the Risk and Compliance Committee, and as a member of the Audit Committee and Finance Committee. According to the 2020 Proxy Statement, as of December 31, 2019, Defendant Hoover beneficially owned 44,875 shares of the Company's common stock, which represented 0.0063% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on December 31, 2019 was $30.74, Defendant Hoover owned approximately $1.3 million worth of Fifth Third stock.

19

59. For the fiscal year ended December 31, 2019, Defendant Hoover received $265,000 in compensation from the Company. This included $140,000 in fees earned or cash paid and $125,000 in stock awards.

60. During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Hoover made the following sales of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| June 3, 2019 | 3,739 | $26.51 | $99,120.89 |
| February 12, 2018 | 3,700 | $32.40 | $119,880.00 |
| April 28, 2017 | 2,000 | $24.82 | $49,640.00 |

Thus, in total, before the fraud was exposed, she sold 9,439 Company shares on inside information, for which he received approximately $268,640. Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

61. The 2020 Proxy Statement stated the following about Defendant Hoover:

*Experience*:

Ms. Hoover's qualifications for service as a director include 28 years of service with the Office of the Comptroller of the Currency, including service as the Deputy Comptroller of the agency's Western District. Ms. Hoover also has gained valuable banking experience and knowledge as a bank consultant for corporate governance, director training, and problem bank resolution matters. Additionally, she has first-hand knowledge of Fifth Third through her service as a director of its North Carolina affiliate and a predecessor banking organization. Ms. Hoover is also a National Association of Corporate Directors ("NACD") Board Leadership Fellow.

*Skills and Attributes*:

Accounting/Financial Reporting, Corporate Governance, Financial Services Industry, Legal and Regulatory, Risk Management, and Strategic Planning

**Defendant Mallesch**

62.     Defendant Eileen A. Mallesch has served as a Company director since 2016. She also serves as a member of the Audit, Human Capital and Compensation, and Risk and Compliance Committees. According to the 2020 Proxy Statement, as of December 31, 2019, Defendant Mallesch beneficially owned 16,241 shares of the Company's common stock, which represented 0.0023% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on December 31, 2019 was $30.74, Defendant Mallesch owned approximately $499,248 worth of Fifth Third stock.

63.     For the fiscal year ended December 31, 2019, Defendant Mallesch received $220,000 in compensation from the Company. This included $95,000 in fees earned or cash paid and $125,000 in stock awards.

64.     The 2020 Proxy Statement stated the following about Defendant Mallesch:

*Experience*:

Ms. Mallesch's qualifications for service as a director include financial management experience from her roles as Chief Financial Officer for both Nationwide Mutual Insurance Company and Genworth Financial Life Insurance/Service Co. She has more than 25 years of broad finance and strategy experience in a variety of industries, ranging from insurance and telecommunications to consumer products and manufacturing. In addition, Ms. Mallesch brings vast knowledge in enterprise resource planning and large-scale technology integrations, strategic planning, and managing acquisitions, divestitures, and risk and compliance management. Ms. Mallesch is also a National Association of Corporate Directors ("NACD") Governance Fellow.

*Skills and Attributes*:

Accounting/Financial Reporting, Compensation and Benefits, Corporate Governance, Cybersecurity, ESG, Executive Management, Financial Services Industry, Legal and Regulatory, Risk Management, and Strategic Planning

21

**Defendant McCallister**

65.     Defendant Michael B. McCallister has served as a Company director since 2011. He also serves as Chair of the Human Capital and Compensation Committee and as a member of the Finance Committee. According to the 2020 Proxy Statement, as of December 31, 2019, Defendant McCallister beneficially owned 48,025 shares of the Company's common stock, which represented 0.0068% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on December 31, 2019 was $30.74, Defendant McCallister owned approximately $1.4 million worth of Fifth Third stock.

66.     For the fiscal year ended December 31, 2019, Defendant McCallister received $235,000 in compensation from the Company. This included $110,000 in fees earned or cash paid and $125,000 in stock awards.

67.     The 2020 Proxy Statement stated the following about Defendant McCallister:

*Experience*:

Mr. McCallister's qualifications for service as a director include 39 years of experience in the health care sector at Humana, Inc. combined with an intimate knowledge of Humana's operational, financial, and strategic development. Beyond Humana, Mr. McCallister plays a leadership role in key business advocacy organizations. He served on the board of the Business Roundtable and is the past chair of the organization's Health and Retirement Task Force.

*Skills and Attributes*:

Accounting/Financial Reporting, Compensation and Benefits, Corporate Governance, ESG, Executive Management, Financial Services Industry, Legal and Regulatory, Risk Management, and Strategic Planning

**Defendant Williams**

68.     Defendant Marsha C. Williams has served as a Company director since 2008. She also serves as a member of the Finance Committee and Nominating and Corporate Governance

22

Committee. According to the 2020 Proxy Statement, as of December 31, 2019, Defendant Williams beneficially owned 64,550 shares of the Company's common stock, which represented 0.0091% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on December 31, 2019 was $30.74, Defendant Williams owned approximately $1.9 million worth of Fifth Third stock.

69.     For the fiscal year ended December 31, 2019, Defendant Williams received $300,000 in compensation from the Company. This included $150,000 in fees earned or cash paid and $150,000 in stock awards.

70.     The 2020 Proxy Statement stated the following about Defendant Williams:

*Experience*:

Ms. Williams's qualifications for service as a director include her extensive experience in financial matters including 42 years in finance and her service as the Chief Financial Officer of Orbitz and Equity Office Properties Trust as well as her service on the board of directors of other publicly traded corporations and mutual funds. Ms. Williams also possesses knowledge and experience in the financial services industry gained through her 15 years of service with other banking organizations.

*Skills and Attributes*:

Accounting/Financial Reporting, Compensation and Benefits, Corporate Governance, Digital Innovation/FinTech, Executive Management, Financial Services Industry, Legal and Regulatory, Risk Management, and Strategic Planning

**Fiduciary duties of the Individual Defendants**

71.     By reason of their positions as officers, directors, and/or fiduciaries of Fifth Third and because of their ability to control the business and corporate affairs of Fifth Third, the Individual Defendants owed Fifth Third and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Fifth Third in a fair, just, honest, and equitable manner. The Individual Defendants

23

were and are required to act in furtherance of the best interests of Fifth Third and its shareholders so as to benefit all shareholders equally.

72. Each director and officer of the Company owes to Fifth Third and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

73. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Fifth Third, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

74. To discharge their duties, the officers and directors of Fifth Third were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

75. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Fifth Third, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Fifth Third's Board at all relevant times.

76.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

77.     To discharge their duties, the officers and directors of Fifth Third were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Fifth Third were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Illinois and the United States, and pursuant to Fifth Third's own Code of Business Conduct & Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Fifth Third conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Fifth Third and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Fifth Third's operations would comply with all applicable laws and Fifth Third's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

78. Each of the Individual Defendants further owed to Fifth Third and the shareholders the duty of loyalty requiring that each Defendant favor Fifth Third's interest and that of its shareholders over his or her own while conducting the affairs of the Company and refrain from using his or her position, influence, or knowledge of the affairs of the Company to gain personal advantage.

79. At all times relevant hereto, the Individual Defendants were the agents of each

26

other and of Fifth Third and were at all times acting within the course and scope of such agency.

80. Because of their advisory, executive, managerial, and directorial positions with Fifth Third, each of the Individual Defendants had access to adverse, non-public information about the Company.

81. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements made by Fifth Third.

## Conspiracy, Aiding and Abetting, and Concerted Action

82. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

83. The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets.

84. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by engaging in or allowing the Customer Account Misconduct and by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board,

27

each of the Individual Defendants who are directors of Fifth Third, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

85. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

86. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Fifth Third and was at all times acting within the course and scope of such agency.

**Fifth Third's Code of Conduct**

87. The Company's Code of Conduct "applies to all officers, directors, employees and contractors of Fifth Third Bancorp, our subsidiaries and our affiliates." The Code of Conduct provides that "[k]eeping the customer at the center of everything we do and delivering a world-class customer experience every time are paramount to our success." According to the Code of Conduct, "every employee plays a part in building and maintaining a strong culture at Fifth Third, a culture in which ethics and compliance are the standard."

88. In addition to adhering with the Code of Conduct, "[e]very employee has a responsibility to . . . raise issues when you become aware of misconduct or other violations of our Code."

89. In a section titled "A Safe and Healthy Work Environment," the Code of Conduct

28

states, in relevant part, that:

> Fifth Third is committed to providing a workplace where employees and visitors feel safe. It is the responsibility of our managers and all of our employees to maintain a workplace free from threats and acts of violence. Fifth Third prohibits the use of violence or threats of violence in the workplace and takes such actions very seriously. We do not tolerate threatening, intimidating or physically harmful behavior by employees, customers, contractors, vendors, suppliers, partners or anyone else.

90.    The Code of Conduct further provides in a section titled "Fair and Honest Business Practices," that:

> Unethical business practices are strictly prohibited. Examples of such activities include, but are not limited to:
>
> - Incentive gaming.
> - Falsifying documents or inflating performance results.
> - Manipulating records.
> - Opening bogus or fake accounts.
> - Opening accounts or selling products without customer authorization.
> - Offering customers unnecessary products.
> - Falsifying records or applications in order to benefit yourself or other Fifth Third employees.

91.    In the same section, the Code of Conduct maintains that "Fifth Third is committed to providing customers with financial products and services in ways that avoid any practices that could be deemed predatory, unfair, deceptive or abusive."

92.    The Code of Conduct provides that Fifth Third is committed to "minimizing the impact of internal and external fraud to both Fifth Third and our customers. Every employee at every level of the Bancorp is accountable and expected to do his or her part to protect Fifth Third and our customers from fraudulent activity." Moreover, the Code of Conduct states that there "is zero tolerance for internal fraud within Fifth Third's organization and internal fraudulent activity must be referred to Bank Protection when suspected. Failure to report fraudulent activity exposes Fifth Third to regulatory and compliance violations and could lead to significant financial

penalties and additional fraud losses."

93.     The Code of Conduct also provides that "[y]ou may not buy, sell or recommend the securities (or derivatives in respect thereof) of any issuer (including Fifth Third) for any proprietary, customer, employee, or other account while in possession of material, non-public information (MNPI)."

94.     The Code of Conduct contains an entire chapter dedicated to "Protecting Fifth Third and Our Customers." In a section titled, "Maintaining Accurate Records and Accounts," the Code of Conduct provides that:

> Business and financial records are critical to Fifth Third Bancorp's operations. We rely on the integrity and accuracy of those records for both internal decision-making and for the benefit of our investors, government agencies, regulators and others to whom we report. It is imperative that all records and public communications, including, but not limited to, those fled or produced with the Securities Exchange Commission, are complete, fair, accurate, timely, clear and transparent.

95.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight over the Company's internal controls over public reporting and of the Company's engagement in the Customer Account Misconduct and the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Moreover, three of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

**Individual Defendants' Misconduct**

**Background**

96.     Fifth Third is an Ohio-based diversified financial services company founded in 1975. The Company is organized as a banking holding company and is the indirect holding company of Fifth Third Bank.

97.     The Company operates 1,149 full-service banking centers and 2,481 branded ATMs across the Midwest. As of December 31, 2019, the Company had $169 billion in assets. Through its subsidiaries, the Company offers a wide range of financial products and services to the commercial, financial, retail, governmental, educational, energy and healthcare sectors, including checking, savings and money accounts, credit cards, and wealth management solutions.

98.     Fifth Third and/or the Bank are subject to regulation and supervision by certain regulatory agencies, including the CFPB.

**The Customer Account Misconduct**

99.     For nearly ten years, Fifth Third Bank operated with a toxic sales culture that rewarded and/or disciplined employees based on their securements (or lack thereof) of sales to consumers and existing customers. The Company specifically utilized a "cross-sell" strategy, in which employees could "sell" services and/or products to existing customers to meet aggressive sales targets. Such sales were supported and awarded through various incentive programs. Employees who failed to perform in accordance with the hostile sales culture risked low performance evaluations and even termination. The sales targets set by the Bank were often unrealistic and unattainable. To meet such lofty targets, employees were encouraged and/or pressured into utilizing sales tactics that were improper and even predatory. Such practices

31

included "gaming."

100. According to a 2017 transcript of an interview taken with a Fifth Third Bank employee/affiliate, offered in the CFPB Action, and attached as Exhibit 1, the Bank defined gaming as "[t]he concealment or manipulation of accounts to deceive the customer and the bank." The witness interviewed described an example of gaming as follows:

> Customer alleges or complains that they received a credit card and they didn't apply for the credit card. We conduct the investigation, and it was determined a credit card was sold to the customer but the customer didn't realize, and it was sold as, let's say, overdraft protection. The customer didn't realize that the overdraft protection was in the form of a credit card. That would be an example of gaming.

101. Other examples of "gaming" included the Customer Account Misconduct, whereby the Individual Defendants allowed, engaged in, maintained, and encouraged improper sales practices that incentivized unlawful misconduct against consumer accounts, exposing numerous consumers to harmful risks. Employees were either penalized or rewarded for their participation, or lack thereof, in the Company's improper sales practice programs. For example, the Bank used internal employee pressure tactics, including conditioning continued employment and/or employee performance ratings upon management and subordinates to conform to lofty sales goals. Fifth Third Bank further incentivized managers through compensation programs that awarded benefits based on certain performance goals—i.e. selling new products and services to existing customers (cross-selling). Sales goals were often set at a level higher than the anticipated sales for thousands of employees. Fifth Third used the achievement or nonachievement of sales goals as a key component in performance ratings. Low performance ratings could result in disciplinary action, including termination.

32

102. Application of these programs resulted in a toxic culture that incentivized widespread employee misconduct to meet performance goals and/or achieve incentive awards. As outlined in the CFPB Action:

> Fifth Third's employees, without consumers' knowledge or consent, opened deposit accounts in consumers' names; transferred funds from consumers' existing accounts to new, improperly opened accounts; issued credit cards; enrolled consumers in online-banking services; and opened lines of credit on consumers' accounts. *In short, Fifth Third focused on its own financial interests to the detriment of consumers.*

(Emphasis added).

103. Fifth Third Bank employees engaged in these unauthorized transactions with customer accounts, without respective customer knowledge and/or permission.

104. According to the complaint filed in the CFPB Action, the Customer Account Misconduct included the following:

### *Unauthorized Deposit Accounts*

105. The Bank enforced belligerent sales targets for employees to open new deposit accounts, which were funded with a minimum amount that was specified within a particular period. This practice took place from 2010 until 2016, at least. Some unauthorized accounts were temporarily "funded" with transferred amounts from the customer's authorized account for purposes of meeting set sales goals or qualifying for incentive programs— and then transferred back to that customer's account.

106. This particular practiced exposed consumers to harmful risks, including failures to meet their own financial obligations, incurring costs or fees, and/or negative effects on consumer-reporting agency information.

107. Moreover, Fifth Third Bank improperly passed on fees to numerous customers on these unauthorized deposit accounts.

33

### *Unauthorized Credit Cards*

108. Employee sales targets for credit card sales were similarly aggressive. Employees were rewarded based on the amount of new credit cards they sold. In order to meet these unreasonable sales goals, employees issued numerous new cards to existing customers without their knowledge or consent. According to the CFPB Action, the Bank noticed a spike in credit card sales to existing customers by 2009, at the latest. Yet, Fifth Third Bank, and the Company by extension, continued to underscore credit card sales goals and maintain related incentive programs.

109. These practices exposed customers to actual harm, and additional risks, including unjustified fees, and negative effects on consumer-reporting agency information.

### *Unauthorized Enrollment in Online Banking*

110. The Bank further imposed aggressive sales goals for employees to enroll consumers in online-banking services and, similar to the aforementioned, employees were provided incentive compensation for enrolling consumers in these programs. Consequently, customers were enrolled in online banking services without their knowledge/consent from 2010-2016, at least.

111. This practice exposed customers to risks of harm, including data theft, money theft, and improper usage of their personal data.

### *Opening Early Access Lines of Credit*

112. Prior to the Relevant Period, Fifth Third Bank offered a fee-based line of credit that allowed customers to withdraw funds before funds were available in a deposit account, known as "Early Access." Fifth Third bank also imposed aggressive sales goals for employees to sell these lines of credit and provided incentive based compensation for enrolling consumers in "fee-based products," that included Early Access. According to the CFPB Action, the Bank was

34

aware that unauthorized Early Access lines of credit were being opened by employees by June 2010, when senior management was informed of the increasing calls to the Company's internal whistleblower hotline (maintained by Fifth Third) about the practice. Yet, employees continued to open new Early Access lines of credit until 2014, at least, and maintained unauthorized accounts even after new accounts were no longer offered by Fifth Third Bank.

113. From as early as 2008, and from 2010, at the latest, the Bank, and the Company by extension, were aware of the above-mentioned unauthorized practices employed and the aggressive sales culture that encouraged the Customer Account Misconduct. Yet, the Individual Defendants engaged in and/or allowed the Customer Account Misconduct to continue unremedied and undisclosed for several years.

114. In a letter sent in connection with a former employee's resignation before the beginning of the Relevant Period,[5] offered in the CFPB Action, and submitted herewith as Exhibit 2, the Bank's the former employee had expressed concerns about the Fifth Third Bank's toxic culture through the Bank's ethics hotline, but the concerns remained unaddressed. In addition to allegations of widespread sexual harassment throughout the Bank, the letter outlined numerous instances of "unethical" and "predatory" practices at Fifth Third Bank, including instilling policies such as, "'everyone should have 2-3 checking accounts', or people 'upgrading' (switching existing MasterCard customers to Visa rewards) credit cards for customer without telling them they are applying for new credit[.]'" The letter further stated, in relevant part:

> Every week I come across at least 1 or 2 customers that have been taken advantage of. The most common thing I see is customers that have 2 or 3 other checking accounts that they didn't even know they had . . . . I come across Hispanic customers that don't understand or speak English that were sold

---

[5] The former employee served at the Bank between 2008 until resigning on/around September 20, 2010.

products they don't understand by individuals that don't speak Spanish.

* * *

. . . . Uneducated customers of ours are being targeted to get sales; this is subsequently causing more unnecessary overdrafts by spreading out a customer's funds and also service fees for many customers.

115. According to the letter, the motivation to engage in the Customer Account Misconduct was simple, "if you don't meet your goal you get fired."

116. Despite knowing of the Customer Account Misconduct since 2010, at the latest, Fifth Third Bank and the Company failed to take appropriate measures to prevent these acts/practices and to identify, communicate, and redress affected consumers and moreover, misrepresented the true state of the Company's risk exposure, internal controls, and compliance management systems.

### False and Misleading Statements

***2015 10-K***

117. On February 25, 2016, after market hours, the Company filed its annual report with the SEC for the fiscal year ended December 31, 2015 on a Form 10-K (the "2015 10-K"), which was signed by Defendants Carmichael, Tuzun, Williams, Akins, Benitez, Blackburn, Brumback, and McCallister, and non-parties: Mark D. Hazel , James P. Hackett, B. Evan Bayh III, Ulysses L. Bridgeman, Jr., Kevin T. Kabat, and Hendrik G. Meijer.

118. The 2015 10-K outlined First Third's financial and operating results for the year ended December 31, 2015 and reported net income of $1.71 billion ($2.01 per diluted share), on net revenues of $6.54 billion. With respect to Fifth Third's "cross-selling" strategy, the 2015 10-K signified that the Company profited from creating, "cross-selling opportunities for [its] commercial products." The 2015 10-K further maintained that Fifth Third's "business segments form synergies by taking advantage of cross-sell opportunities."

36

119. The 2015 10-K highlighted Fifth Third's purportedly comprehensive compliance and risk management systems, stating that "Fifth Third focuses on managing regulatory compliance risk in accordance with [its] integrated risk management framework, which ensures consistent processes for identifying, assessing and monitoring, and reporting risks[.]" The 2015 10-K further touted that in order to "mitigate compliance risk, Compliance Risk Management provides independent oversight to ensure consistency and sufficiency, and ensures that lines of business, regions and support functions are adequately identifying, assessing and monitoring compliance risks and adopting proper mitigation strategies" and that "Compliance Risk Management implements key compliance programs and processes including but not limited to, risk assessments, key risk indicators program, issues tracking, [and] regulatory compliance testing and monitoring[.]"

120. The 2015 10-K also emphasized the Company's internal reporting systems for overseeing and addressing compliance concerns and Fifth Third management's commitment to and involvement with ongoing compliance concerns found within the Company and its affiliates, stating in relevant part that, "Fifth Third . . . focuses on reporting and escalation of compliance issues to senior management and the Board[.]" Further, the 2015 10-K assured that "[t]he Management Compliance Committee addresses Fifth Third-wide compliance issues, industry best practices, legislative developments, regulatory concerns, and other leading indicators of compliance risk"; and "reports to the Enterprise Risk Management Committee, which reports to Risk and Compliance Committee of the Board of Directors."

121. The risk factors outlined in the 2015 10-K consisted of broad and boilerplate provisions that generally stated that the Company was subject to certain risks connected with regulatory oversight, from, among others, the CFPB, stating that "the CFPB . . .ha[s] the

authority to compel or restrict certain actions by Fifth Third and its banking subsidiary." The risk

disclosures were generalized warnings that failed to specify the Company's actual and ongoing

violations of consumer protection laws governed by the CFPB. The 2015 10-K specifically stated

in relevant part:

> Fifth Third, as well as other financial institutions more generally, have recently
> been subjected to increased scrutiny from government authorities, including bank
> regulatory authorities, stemming from broader systemic regulatory concerns,
> including with respect to stress testing, capital levels, asset quality, provisioning,
> AML/BSA, consumer compliance and other prudential matters and efforts to
> ensure that financial institutions take steps to improve their risk management and
> prevent future crises. In this regard, government authorities, including the bank
> regulatory agencies, are also pursuing aggressive enforcement actions with
> respect to compliance and other legal matters involving financial activities, which
> heightens the risks associated with actual and perceived compliance failures[.]

122.    Attached to the 2015 10-K were certifications pursuant to Rule 13a-14(a) and

15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by

Defendants Carmichael and Tuzun, attesting to the accuracy of the 2015 10-K.

### *2016 10-K*

123.    On February 24, 2017, the Company filed its annual report with the SEC for the

fiscal year ended December 31, 2016 on a Form 10-K (the "2016 10-K"), which was signed by

Defendants Carmichael, Tuzun, Williams, Akins, Benitez, Blackburn, Brumback, Burris,

Heminger, Hoover, Mallesch, and McCallister, along with non-parties Hazel and Bayh.

124.    The 2016 10-K reported net income of $1.56 billion ($1.93 per diluted share), on

net revenue of $6.31 billion and made substantially the same representations about Fifth Third's

cross-selling strategy, the Company's seemingly robust internal compliance systems and

policies, and the boilerplate regulatory risks and exposure of Fifth Third as those outlined above

in the 2015 10-K.

125.    Attached to the 2016 10-K were SOX certifications signed by Defendants

38

Carmichael and Tuzun attesting to the accuracy of the 2016 10-K.

### *2017 Form 10-K*

126.    On February 28, 2018, the Company filed its annual report with the SEC for the fiscal year ended December 31, 2017 on a Form 10-K (the "2017 10-K"), which was signed by Defendants Carmichael, Tuzun, Williams, Benitez, Blackburn, Brumback, Burris, Heminger, Hoover, Mallesch and McCallister, along with non-parties Hazel and Bayh.

127.    The 2017 10-K reported net income of $2.18 billion ($2.81 per diluted share), on net revenue of $7.02 billion and made substantially the same representations about Fifth Third's cross-selling strategy, the Company's seemingly robust internal compliance systems and policies, and the boilerplate regulatory risks and exposure of Fifth Third as those outlined above in the 2015 10-K.

128.    Attached to the 2017 10-K were SOX certifications signed by Defendants Carmichael and Tuzun, attesting to the accuracy of the 2017 10-K.

### *2018 Proxy Statement*

129.    On March 6, 2018, the Company filed its Schedule 14A with the SEC (the "2018 Proxy Statement"). Defendants Carmichael, Akins, Benitez, Blackburn, Brumback, Burris, Heminger, Hoover, Mallesch, McCallister, and Williams solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[6]

---

[6] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

130. With respect to the Company's Code of Conduct, the 2018 Proxy Statement stated, "[t]he Board of Directors has also adopted the Fifth Third Bancorp Code of Business Conduct and Ethics which applies to our directors; Chief Executive Officer, Chief Financial Officer, and Controller; and our other employees."

131. The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the Customer Account Misconduct, the numerous false and misleading statements alleged herein, the insider trading engaged in by three of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

132. The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including linking incentive awards, that "provide[d] executives with balanced incentive to increase the absolute level of earnings growth, ensure[d] that shareholder capital is used efficiently to generate competitive returns, and assesse[d] the cost efficiency of the Company's operations[,]" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

133. The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company's aggressive efforts to promote its cross-sell strategy, including utilizing incentive-based programs tied to unrealistic sales targets, caused employees to engage in the Customer Account Misconduct; (2) Fifth Third Bank, and the Company by extension, were aware of the Customer Account Misconduct and its resultant illegality and harm to consumers as early as 2008; (3) despite this awareness, the Company neglected to employ and monitor its cross-sell program appropriately in a manner that would identify and prevent the Customer Account

Misconduct and ensure affected consumers were identified and made whole; (4) the foregoing exposed Fifth Third to a foreseeable risk of heightened regulatory scrutiny and/or inquiries, like the three-year extensive CFPB investigation; (5) consequently, the Company's profits and prospects were unsustainable, as they were at least partially produced through illicit and improper conduct; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### 2018 Form 10-K

134.     On March 1, 2019, the Company filed its annual report with the SEC for the fiscal year ended December 31, 2018 on a Form 10-K (the "2018 10-K"), which was signed by Defendants Carmichael, Tuzun, Akins, Benitez, Blackburn, Brumback, Burris, Heminger, Hoover, Mallesch and McCallister, along with non-parties Bayh and Hazel.

135.     The 2018 10-K reported net income of $2.19 billion ($3.06 per diluted share), on net revenue of $6.93 billion and made substantially the same representations about Fifth Third's cross-selling strategy, the Company's seemingly robust internal compliance systems and policies, and the boilerplate regulatory risks and exposure of Fifth Third as those outlined above in the 2015 10-K.

136.     Attached to the 2018 10-K were SOX certifications signed by Defendants Carmichael and Tuzun, attesting to the accuracy of the 2018 10-K.

### 2019 Proxy Statement

137.     On March 6, 2019, the Company filed the 2019 Proxy Statement. Defendants Carmichael, Akins, Benitez, Blackburn, Brumback, Burris, Heminger, Hoover, Mallesch,

41

McCallister, and Williams solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[7]

138.    With respect to the Company's Code of Conduct, the 2019 Proxy Statement stated, "[d]irectors receive annual ethics training and directors must review and acknowledge the Code of Business Conduct and Ethics[]"; and that "[t]he Board of Directors has adopted the Fifth Third Bancorp Corporate Governance Guidelines and the Fifth Third Bancorp Code of Business Conduct and Ethics which applies to our directors; Chief Executive Officer, Chief Financial Officer, and Controller; and our other employees."

139.    The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the Customer Account Misconduct, the numerous false and misleading statements alleged herein, the insider trading engaged in by three of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

140.    The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including linking incentive awards, that "provide[d] executives with balanced incentive to increase the absolute level of earnings growth, ensure[d] that shareholder capital is used efficiently to generate competitive returns, and assesse[d] the cost efficiency of the Company's operations[,]" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

---

[7] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

141.    The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company's aggressive efforts to promote its cross-sell strategy, including utilizing incentive-based programs tied to unrealistic sales targets, caused employees to engage in the Customer Account Misconduct; (2) Fifth Third Bank, and the Company by extension, were aware of the Customer Account Misconduct and its resultant illegality and harm to consumers as early as 2008; (3) despite this awareness, the Company neglected to employ and monitor its cross-sell program appropriately in a manner that would identify and prevent the Customer Account Misconduct and ensure affected consumers were identified and made whole; (4) the foregoing exposed Fifth Third to a foreseeable risk of heightened regulatory scrutiny and/or inquiries, like the three-year extensive CFPB investigation; (5) consequently, the Company's profits and prospects were unsustainable, as they were at least partially produced through illicit and improper conduct; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *January 30, 2020 Press Release and Form 8-K*

142.    On January 30, 2020, the Company issued a press release, also filed as an exhibit to a current report on a Form 8-K filed with the SEC the same day. The press release announced, "changes to certain senior leadership roles in order to position the Company for continued success in executing its key strategic priorities." The press release discussed the promotion and retirement of certain members of First Third's senior leadership, including Frank Forrest, the Company's long-time executive vice president and Chief Risk Officer ("CRO"). Specifically, the press release stated in relevant part:

Frank Forrest, who has served as executive vice president and chief risk officer since 2014, moves into a new role as special advisor for risk and regulatory matters until December 31, 2020, at which time he will retire from the company. In this role he will continue reporting to Greg Carmichael, Fifth Third chairman, president and CEO.

Jamie Leonard, who has worked at the Company for more than 20 years, succeeds Forrest as chief risk officer. Leonard most recently served as executive vice president and treasurer for the past six years. During his tenure as treasurer, he managed capital, liquidity and interest rate risk. Leonard also served on the corporate credit committee. In this role he will report to Carmichael.

143.    The press release provided no explanation for the CRO's transitory role and retirement, and touted the CRO's "success[]" leading Fifth Third in its risk management over the years, stating in relevant part:

Frank has successfully led our risk management transformation and conversion to a national charter, and we look forward to his continued counsel and contributions as we move through 2020," said Carmichael. "At the same time, Jamie's depth of knowledge about our Company, our financials, our risk appetite and our strategic priorities, makes him a great fit for this role. His leadership over the past six years as treasurer to deliver strong results with a focus on through-the-cycle outperformance, as well as his leadership throughout the MB Financial integration, highlights the confidence we have in his capabilities in his new role.

**The Truth Begins to Emerge While**
**False and Misleading Statements Continue**

*2019 Form 10-K*

144.    Not long after the Company's announced that its CRO would be retiring, on March 2, 2020, the Company filed the 2019 10-K, which was signed by Defendants Carmichael, Tuzun, Williams, Akins, Benitez, Blackburn, Brumback, Burris, Daniels, Harvey, Heminger, Hoover, Mallesch and McCallister, along with non-parties Bayh and Hazel.

145.    The 2019 10-K stated that CFPB had notified Fifth Third Bank, that "it intends to file an enforcement action in relation to alleged unauthorized account openings." The 2019 10-K did not provide other details related to the CFPB's impending action. On the contrary, the 2019

44

10-K downplayed any cause for concern, assuring investors that "Fifth Third believes that the facts do not warrant an enforcement proceeding and intends to defend itself vigorously if such an action should be filed. The impact of this potential enforcement action has been reflected in our reasonably possible losses."

146. Attached to the 2019 10-K were SOX certifications signed by Defendants Carmichael and Tuzun, attesting to the accuracy of the 2019 10-K.

147. Although the 2019 10-K failed to fully disclose the widespread misconduct that had occurred at Fifth Third Bank until 2016, at least and the "facts" uncovered by the extensive CFPB investigation, as the investing public processed the disclosure of the upcoming CFPB enforcement action, the Company's stock price declined by approximately 3%, or $0.76 over the following three trading sessions, from closing at $24.44 per share on March 3, 2020, to close at $23.68 per share on March 5, 2020. As the Company continued to make false and misleading statements, however, Fifth Third's stock price remained artificially inflated.

148. The statements in ¶¶117-128, 134-136, and 142-146 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company's aggressive efforts to promote its cross-sell strategy, including utilizing incentive-based programs tied to unrealistic sales targets, caused employees to engage in the Customer Account Misconduct; (2) Fifth Third Bank, and the Company by extension, were aware of the Customer Account Misconduct and its resultant illegality and harm to consumers as early as 2008; (3) despite this awareness, the Company neglected to employ and monitor its cross-sell program appropriately in a manner that would identify and prevent the Customer Account Misconduct and ensure affected consumers were identified and made whole;

45

(4) the foregoing exposed Fifth Third to a foreseeable risk of heightened regulatory scrutiny and/or inquiries, like the three-year extensive CFPB investigation; (5) consequently, the Company's profits and prospects were unsustainable, as they were at least partially produced through illicit and improper conduct; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### 2020 Proxy Statement

149. On March 4, 2020, the Company filed the 2020 Proxy Statement. Defendants Carmichael, Akins, Benitez, Blackburn, Brumback, Burris, Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister, and Williams solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[8]

150. With respect to the Company's Code of Conduct, the 2020 Proxy Statement stated, in relevant part that, "[d]irectors receive annual ethics training and directors must review and acknowledge the Code of Business Conduct and Ethics[]"; Fifth Third's compensation program was supported by certain "best practices" such as a "[r]obust code of business conduct and ethics"; and that, "[t]he Board of Directors has adopted the Fifth Third Bancorp Corporate Governance Guidelines and the Fifth Third Bancorp Code of Business Conduct and Ethics which applies to our directors; Chief Executive Officer, Chief Financial Officer, and Controller; and our other employees."

---

[8] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

151. The 2020 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the Customer Account Misconduct, the numerous false and misleading statements alleged herein, the insider trading engaged in by three of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

152. The Individual Defendants also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including linking incentive awards, that "provide[d] executives with balanced incentive to increase the absolute level of earnings growth, ensure[d] that shareholder capital is used efficiently to generate competitive returns, and assesse[d] the cost efficiency of the Company's operations[,]" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

153. The 2020 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company's aggressive efforts to promote its cross-sell strategy, including utilizing incentive-based programs tied to unrealistic sales targets, caused employees to engage in the Customer Account Misconduct; (2) Fifth Third Bank, and the Company by extension, were aware of the Customer Account Misconduct and its resultant illegality and harm to consumers as early as 2008; (3) despite this awareness, the Company neglected to employ and monitor its cross-sell program appropriately in a manner that would identify and prevent the Customer Account Misconduct and ensure affected consumers were identified and made whole; (4) the foregoing exposed Fifth Third to a foreseeable risk of heightened regulatory scrutiny and/or inquiries, like the three-year extensive CFPB investigation; (5) consequently, the Company's profits and prospects were unsustainable, as they were at least partially produced through illicit and

47

improper conduct; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

154. On March 9, 2020, the CFPB issued a press release titled, "Consumer Financial Protection Bureau Files Suit Against Fifth Third Bank, National Association for Allegedly Opening Unauthorized Accounts and Enrolling Consumers in Unauthorized Products and Services" (the "CFPB Press Release"). The CFPB Press Release announced that the CFPB had filed the CFPB Action against Fifth Third Bank in the federal district court in the Northern District of Illinois for violating, "the Consumer Financial Protection Act's prohibition against unfair and abusive acts or practices as well as the Truth in Lending Act and the Truth in Savings Act and their implementing regulations."

155. The CFPB Press Release revealed that Fifth Third Bank allegedly: (1) opened deposit and credit-card accounts in consumers' names; (2) transferred funds from consumers' existing accounts to new, improperly opened accounts; (3) enrolled consumers in unauthorized online-banking services; and (4) activated unauthorized lines of credit on consumers' accounts, all without the consumers' knowledge or consent. These allegations dated back several years and continued until 2016, at least.

156. The CFPB Press Release further exposed that, "Fifth Third used a 'cross-sell' strategy to increase the number of products and services it provided to existing customers; used an incentive-compensation program to reward selling new products; and conditioned employee-performance ratings and, in some instances, continued employment on meeting ambitious sales goals." The CFPB Press Release maintained that, "despite [Fifth Third Bank—and the Company

by extension] knowing *since at least 2008* that employees were opening unauthorized consumer-financial accounts, Fifth Third took insufficient steps to detect and stop the conduct and to identify and remediate harmed consumers." (Emphasis added).

157. The CFPB Press Release further stated, in relevant part:

Reasonable sales goals and performance incentives are not inherently harmful. But when such programs are not carefully and properly implemented and monitored, as the Bureau alleges here, they may create incentives for employees to engage in misconduct in order to meet goals or earn additional compensation.

The Bureau seeks an injunction to stop Fifth Third's unlawful conduct, redress for affected consumers, and the imposition of a civil money penalty.

158. The CFPB Press Release provided a link to the complaint filed in the CFPB Action, which detailed the manner in which employees engaged in the Customer Account Misconduct and Fifth Third Bank's harmful sales culture.

159. The same day, on March 9, 2020, the Company issued a press release denying the charges in the CFPB Action, stating in relevant part:

Fifth Third's compensation and employee incentive structure does not reward retail employees for opening unauthorized accounts, nor does it give them sales quotas or product- product-specific targets. Our controls are designed to prevent and detect unauthorized account openings. For almost a decade, our incentive compensation system has focused on account quality. In fact, it claws back compensation from employees for accounts that are unused or closed shortly after they were opened.

160. However, in the same press release, in its effort to downplay the CFPB Action, Fifth Third also admitted, in part, to the Customer Account Misconduct, stating in pertinent part:

After an investigation spanning more than three years and involving nearly half a billion pieces of data produced by the Bank, the CFPB has not informed us of any unauthorized accounts beyond the fewer than 1,100 accounts that the Bank itself identified out of 10 million – or approximately 0.01 percent of accounts opened between 2010 and 2016. These accounts involved less than $30,000 in improper customer charges that were ultimately waived or reimbursed to customers years ago. While even a single unauthorized account is one too many, we took appropriate and decisive action to address each situation.

161. On this news, the Company's stock price fell approximately 3.5%, from closing at $18.30 per share on March 9, 2020, to close at $17.66 per share on March 11, 2020, two trading sessions later. The Company's stock price further declined by $1.76 the following trading session, to close at $15.90 per share on March 12, 2020, representing a total decline of approximately 13%.

### Repurchases During the Relevant Period

162. During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $5.6 billion to repurchase approximately 216,504,051 shares of its own common stock at artificially inflated prices from March 2016 through the end of February 2020.

163. As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the Company overpaid approximately $2.1 billion in total for these repurchases.

164. According to the Company's quarterly report on Form 10-Q filed with the SEC on May 6, 2016, during the month of March 2016, the Company purchased 12,721,622 shares of its common stock for approximately $205.8 million at an average price of $16.18 per share.

165. As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the month of March 2016 was approximately $3.5 million.

166. According to the Company's quarterly report on Form 10-Q filed with the SEC on August 5, 2016, during the three-month period ended June 30, 2016, the Company purchased 4,496,881 shares of its common stock for approximately $78.2 million, at an average price of

50

$17.41 per share.

167. As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended June 30, 2016 was approximately $6.7 million.

168. According to the Company's quarterly report on Form 10-Q filed with the SEC on November 9, 2016, during the three-month period ended September 30, 2016, the Company purchased 11,269,837 shares of its common stock for approximately $209.6 million, at an average price of $18.60 per share.

169. As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended September 30, 2016 was approximately $30.4 million.

170. According to the 2016 10-K, during the three-month period ended December 31, 2016, the Company purchased 6,554,479 shares of its common stock for approximately $167.9 million, at an average price of $25.63 per share.

171. As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended December 31, 2016 was approximately $63.7 million.

172. According to the Company's quarterly report on Form 10-Q filed with the SEC on May 5, 2017, during the three-month period ended March 31, 2017, the Company purchased 1,630, 221 shares of its common stock for approximately $42.8 million at an average price of $26.26 per share.

173. As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock

51

during the three-month period ended  March 31, 2017 was approximately $16.8 million.

174. According to the Company's quarterly report on Form 10-Q filed with the SEC on August 8, 2017, during the three-month period ended June 30, 2017, the Company purchased 12,889,657 shares of its common stock for approximately $321.9 million, at an average price of $24.98 per share.

175. As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended June 30, 2017 was approximately $117 million.

176. According to the Company's quarterly report on Form 10-Q filed with the SEC on November 6, 2017, during the three-month period ended September 30, 2017, the Company purchased 34,061,844 shares of its common stock for approximately $915.5 million, at an average price of $26.88 per share.

177. As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended September 30, 2017 was approximately $373.9 million.

178. According to the 2017 10-K, during the three-month period ended December 31, 2017, the Company purchased 12,309,373 shares of its common stock for approximately $358.8 million, at an average price of $29.15 per share.

179. As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended December 31, 2017 was approximately $163 million.

180. According to the Company's quarterly report on Form 10-Q filed with the SEC on May 4, 2018, during the three-month period ended March 31, 2018, the Company purchased

11,551,101 shares of its common stock for approximately $368.3 million at an average price of $31.89 per share.

181. As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended March 31, 2018 was approximately $184.7 million.

182. According to the Company's quarterly report on Form 10-Q filed with the SEC on August 8, 2018, during the three-month period ended June 30, 2018, the Company purchased 8,424,794 shares of its common stock for approximately $261.7 million, at an average price of $31.07 per share.

183. As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended June 30, 2018 was approximately $127.8 million.

184. According to the Company's quarterly report on Form 10-Q filed with the SEC on November 6, 2018, during the three-month period ended September 30, 2018, the Company purchased 17,071,551 shares of its common stock for approximately $503.6 million, at an average price of $29.50 per share.

185. As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended September 30, 2018 was approximately $232.1 million.

186. According to the 2018 10-K, during the three-month period ended December 31, 2018, the Company purchased 15,074,877 shares of its common stock for approximately $404.3 million, at an average price of $26.82 per share.

187. As the Company's stock was actually worth only $15.90 per share, the price at

closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended December 31, 2018 was approximately $164.6 million.

188.    According to the Company's quarterly report on Form 10-Q filed with the SEC on May 10, 2019, during the three-month period ended March 31, 2019, the Company purchased 32,850,392 shares of its common stock for approximately $807 million at an average price of $24.57 per share.

189.    As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended March  31, 2019 was approximately $284 million.

190.    According to the Company's quarterly report on Form 10-Q filed with the SEC on August 8, 2019, during the three-month period ended June 30, 2016, the Company purchased 10,149,506 shares of its common stock for approximately $279.6 million, at an average price of $27.55 per share.

191.    As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended June 30, 2019 was approximately $118.2 million.

192.    According to the Company's quarterly report on Form 10-Q filed with the SEC on November 8, 2019, during the three-month period ended September 30, 2019, the Company purchased 13,680,801 shares of its common stock for approximately $358.1 million, at an average price of $26.18 per share.

193.    As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended September 30, 2019 was approximately $140.6 million.

194. According to the 2019 10-K, during the three-month period ended December 31, 2019, the Company purchased 10,614,510 shares of its common stock for approximately $312.8 million, at an average price of $29.47 per share.

195. As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the three-month period ended December 31, 2019 was approximately $144 million.

196. According to the Company's quarterly report on Form 10-Q filed with the SEC on May 8, 2020, during the month of January 2020, the Company purchased 333,737 shares of its common stock for approximately $9.7 million at an average price of $29.10 per share.

197. As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the month of January 2020 was approximately $4.4 million.

198. According to the Company's quarterly report on Form 10-Q filed with the SEC on May 8, 2020, during the month of February 2020, the Company purchased 818,868 shares of its common stock for approximately $23.7 million at an average price of $28.98 per share.

199. As the Company's stock was actually worth only $15.90 per share, the price at closing on March 12, 2020, the amount the Company overpaid for repurchases of its own stock during the month of February 2020 was approximately $10.7 million.

200. Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $2.1 billion.

**Damages to Fifth Third**

201. As a direct and proximate result of the Individual Defendants' conduct, Fifth Third has lost and expended, and will lose and expend, many millions of dollars.

202.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and certain of its current and former officers, and the CFPB Action filed against Fifth Third Bank, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto, including in connection with the extensive three-year investigation that led to the CFPB Action.

203.    Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

204.    Such losses include the Company's overpayment by approximately $2.1 billion for repurchases of its own stock during the Relevant Period, during which the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

205.    As a direct and proximate result of the Individual Defendants' conduct, Fifth Third has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## Derivative Allegations

206.    Plaintiff brings this action derivatively and for the benefit of Fifth Third to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Fifth Third, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, as well as the aiding and abetting thereof.

207.    Fifth Third is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

208.    Plaintiff is, and has continuously been at all relevant times, a shareholder of Fifth

56

Third. Plaintiff will adequately and fairly represent the interests of Fifth Third in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

### Demand Futility Allegations

209.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

210.    A pre-suit demand on the Board of Fifth Third is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following fourteen individuals: Defendants Carmichael, Akins, Benitez, Blackburn, Brumback, Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister, and Williams (the "Director-Defendants"), along with non-parties Bayh and Mitchell S. Feiger (together, the "Directors"). Plaintiff needs only to allege demand futility as to seven of these fourteen Directors.

211.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact while three of them engaged in insider sales based on material non-public information, and, at the same time, to cause the Company to overpay by over $2.1 billion for repurchases of its own stock, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

212.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*,

intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

213. Demand on Defendant Carmichael is particularly futile. Defendant Carmichael has served as Fifth Third's President, CEO and as a Company director since 2015. He has also served as the elected Chairman of the Board since 2018. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Carmichael with his principal occupation, and he receives handsome compensation as described above, including $8,999,237 during the fiscal year ended December 31, 2019. Defendant Carmichael was ultimately responsible for the false and misleading statements and omissions made during his tenure, including those contained in the 2015, 2016, 2017, 2018 and 2019 10-Ks, which he signed and signed SOX certifications for and the January 30, 2020 press release. As the Company's highest officer and as a trusted director, Defendant Carmichael conducted little, if any, oversight of the Customer Account Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded at least $5.8 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Carmichael is a defendant in the Securities Class Action. Thus, for these reasons, too, Defendant Carmichael breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

214. Similarly, demand on Defendant Akins is also especially futile. Defendant Akins has served as a Company director since 2013. He also serves as Chair of the Nominating and

Corporate Governance Committee, and as a member of the Finance Committee and Human Capital and Compensation Committee. Defendant Akins has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Customer Account Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Akins signed, and thus personally made the false and misleading statements in the 2015, 2016, 2018, and 2019 10-Ks. For these reasons, too, Defendant Akins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

215. Similar reasons for demand futility apply to Defendant Benitez. Defendant Benitez has served as a Company director since 2015. He also serves as a member of the Audit, Nominating and Corporate Governance, and Risk and Compliance Committees. Defendant Benitez has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Customer Account Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Benitez signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, 2018, and 2019 10-Ks. For these reasons, too, Defendant Benitez breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

216. Demand is also futile specifically as to Defendant Blackburn. Defendant

Blackburn has served as a Company director since 2014 She also serves as a member of the Nominating and Corporate Governance Committee and the Risk and Compliance Committee. Defendant Blackburn has received and continues to receive compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the Customer Account Misconduct and the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Blackburn signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, 2018, and 2019 10-Ks. For these reasons, too, Defendant Blackburn breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

217. Demand on Defendant Brumback is futile, too. Defendant Brumback has served as a Company director since 2009. He also serves as Chair of the Audit Committee and as a member of the Finance Committee. As a trusted Company director, he conducted little, if any, oversight of the Customer Account Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Brumback signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, 2018, and 2019 10-Ks. His insider sale before the fraud was exposed, which yielded at least $100,320 in proceeds, demonstrates his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Brumback breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

218. Demand on Defendant Daniels is futile. Defendant Daniels has served as a Company director since 2019. He also serves as a member of the Audit Committee and the Risk and Compliance Committee. Defendant Daniels has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Customer Account Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Daniels signed, and thus personally made the false and misleading statements in the 2019 10-K. For these reasons, too, Defendant Daniels breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

219. Demand on Defendant Harvey is futile. Defendant Harvey has served as a Company director since 2019. He also serves as a member of the Nominating and Corporate Governance Committee and the Risk and Compliance Committee. Defendant Harvey has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Customer Account Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Harvey signed, and thus personally made the false and misleading statements in the 2019 10-K. For these reasons, too, Defendant Harvey breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

220. Demand on Defendant Heminger is futile. Defendant Heminger has served as a Company director since 2006 He also serves as Chair of the Finance Committee and as a member of the Human Capital and Compensation Committee and the Nominating and Corporate Governance Committee. Defendant Heminger has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Customer Account Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Heminger signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018 and 2019 10-Ks. For these reasons, too, Defendant Heminger breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

221. Demand on Defendant Hoover is futile. Defendant Hoover has served as a Company director since 2009. She also serves as Chair of the Risk and Compliance Committee, and as a member of the Audit Committee and Finance Committee. Defendant Hoover has received and continues to receive compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the Customer Account Misconduct and the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Hoover signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, and 2019 10-Ks. Her insider sales before the fraud was exposed, which yielded at least $268,640 in proceeds, demonstrate her motive in facilitating and participating in the fraud. For these

reasons, too, Defendant Hoover breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

222.   Demand on Defendant Mallesch is futile. Defendant Mallesch has served as a Company director since 2016. She also serves as a member of the Audit, Human Capital and Compensation, and Risk and Compliance Committees. Defendant Mallesch has received and continues to receive compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the Customer Account Misconduct and the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Mallesch signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, and 2019 10-Ks. For these reasons, too, Defendant Mallesch breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

223.   Demand on Defendant McCallister is futile. Defendant McCallister has served as a Company director since 2011. He also serves as Chair of the Human Capital and Compensation Committee and as a member of the Finance Committee. Defendant McCallister has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the Customer Account Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant McCallister signed,

63

and thus personally made the false and misleading statements in the 2015, 2016, 2017, 2018 and 2019 10-Ks. For these reasons, too, Defendant McCallister breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

224. And Demand on Defendant Williams is futile. Defendant Williams has served as a Company director since 2008. She also serves as a member of the Audit Finance Committee and the Human Capital and Compensation Committee. Defendant Williams has received and continues to receive compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the Customer Account Misconduct and the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Williams signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, and 2019 10-Ks. For these reasons, too, Defendant Williams breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

225. Additional reasons that demand on the Board is futile follow.

226. Each of the Director-Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of unnecessary and harmful repurchases that caused the Company to overpay by millions of dollars for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a

substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

227. Furthermore, non-party Bayh served as a director throughout the Relevant Period, along with the Director-Defendants, approved of the aforementioned repurchases, and signed the aforementioned Form 10-Ks. Moreover, non-party Mitchell S. Feiger served as the CEO and Chairman of Fifth Third Bank, the subject of this action, the CFPB Action, and the Securities Class Action. Thus, even demand upon the non-party Directors would be futile, and thus excused.

228. Defendants Mallesch, Benitez, Daniels, and Hoover (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Charter of the Audit Joint Committee of the Board of Fifth Third and Fifth Third Bank, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's accounting and financial reporting processes, the Company's significant risk exposures, the adequacy and effectiveness of Fifth Third's internal controls, and the Company's compliance with legal and regulatory requirements. Notably, the Audit Committee was responsible for overseeing the administration of the Code of Conduct, and for handling ethics concerns brought through the Company's ethics hotline. The Audit Committee Defendants failed to adequately execute these responsibilities and to ensure the integrity of the Company's accounting and financial reporting processes, as they are charged to do under the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

229. Defendants Brumback, Benitez, Blackburn, Daniels, and Harvey (the "Risk and Compliance Committee Defendants") served as members of the Risk and Compliance

Committee during the Relevant Period. Pursuant to the Charter of the Risk and Compliance Joint Committee of the Board of Fifth Third and Fifth Third Bank, the Risk and Compliance Committee Defendants are responsible for overseeing, among other things, management's compliance with all of Fifth Third's regulatory obligations arising under applicable federal and state banking laws, rules and regulations, development and implementation of a global risk management framework, the fiduciary activities and policies of the Company and its subsidiaries, and the Company's and the Bank's risk processes and governance structure. The Risk and Compliance Committee Defendants failed to uphold these responsibilities, as evinced by the long-standing misconduct plaguing the Company and the Bank discussed herein that ultimately led to the CFPB Action. Thus, the Risk and Compliance Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

230. The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendant Blackburn is and has been a party to related transactions with the Company. Defendant Blackburn is the Executive Vice President of the Cincinnati Bengals, which the Company paid $1.8 million for sponsorship arrangements, tickets, and advertising expenses. Even before Defendant Blackburn became a Board member, the Company was engaged in and signed a five-year extension contract with the sports team that called for total payments to the Cincinnati Bengals during that time period that totaled over $7.9 million. According to the 2020 Proxy Statement, "[b]y virtue of Ms. Blackburn's being an executive officer and a principal owner of the Cincinnati Bengals, she is deemed to be a related party having a direct material interest in these arrangements." These conflicts of interest precluded the Director-Defendants from adequately monitoring the

Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

231.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting, and of the Company's engagement in the Customer Account Misconduct and the Individual Defendants' scheme to issue materially false and misleading statements to the public and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

232.    Fifth Third has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Fifth Third any part of the damages Fifth Third suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

233.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf

67

of the shareholders of the Company. Accordingly, demand is excused as being futile.

234.    The acts complained of herein constitute violations of fiduciary duties owed by Fifth Third officers and directors, and these acts are incapable of ratification.

235.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Fifth Third. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Fifth Third, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

236.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Fifth Third to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

237.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least seven of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**First Claim**

**Against Individual Defendants for Violations of
Section 14(a) of the Exchange Act**

238.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

239.     The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

240.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

241.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

242.     Under the direction and watch of the Directors, the 2018, 2019 and 2020 Proxy

69

Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) the Company's aggressive efforts to promote its cross-sell strategy, including utilizing incentive-based programs tied to unrealistic sales targets, caused employees to engage in the Customer Account Misconduct; (2) Fifth Third Bank, and the Company by extension, were aware of the Customer Account Misconduct and its resultant illegality and harm to consumers as early as 2008; (3) despite this awareness, the Company neglected to employ and monitor its cross-sell program appropriately in a manner that would identify and prevent the Customer Account Misconduct and ensure affected consumers were identified and made whole; (4) the foregoing exposed Fifth Third to a foreseeable risk of heightened regulatory scrutiny and/or inquiries, like the three-year extensive CFPB investigation; (5) consequently, the Company's profits and prospects were unsustainable, as they were at least partially produced through illicit and improper conduct; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

243. The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements including linking incentive awards, that "provide[d] executives with balanced incentive to increase the absolute level of earnings growth, ensure[d] that shareholder capital is used efficiently to generate competitive returns, and assesse[d] the cost efficiency of the Company's operations[,]" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein. while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

70

244. Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them, their insider trading, and their engagement in the Customer Account Misconduct and the scheme to issue false and misleading statements and omissions of material fact.

245. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including election of directors, advisory approval of executive compensation, and ratification of the Company's independent auditor.

246. The false and misleading elements of the Proxy Statements led to the re-election of Defendants Carmichael, Akins, Benitez, Blackburn, Brumback, Burris, Heminger, Hoover, Mallesch, McCallister, and Williams during the Relevant Period, which allowed them to continue breaching their fiduciary duties to Fifth Third.

247. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

248. Plaintiff on behalf of Fifth Third has no adequate remedy at law.

### Second Claim

### Against the Individual Defendants for
### Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

249. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

250. The Individual Defendants participated in a scheme to defraud with the purpose

and effect of defrauding Fifth Third. Not only is Fifth Third now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon Fifth Third by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices during the Relevant Period due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially-inflated prices, damaging Fifth Third.

251. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's periodic reports filed with the SEC while engaging in and/or allowing the Customer Account Misconduct.

252. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Fifth Third not misleading.

253. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Fifth Third. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations

72

and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

254. In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, they made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

255. By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

256. Plaintiff on behalf of Fifth Third has no adequate remedy at law.

### Third Claim

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

257. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

258. The Individual Defendants, by virtue of their positions with Fifth Third and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Fifth Third and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Fifth Third and the other Individual Defendants to engage in the illegal conduct and practices complained of herein and violate §

73

10(b) of the Exchange Act.

259. Plaintiff on behalf of Fifth Third has no adequate remedy at law.

**Fourth Claim**

**Against Individual Defendants for Breach of Fiduciary Duties**

260. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

261. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Fifth Third's business and affairs.

262. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

263. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Fifth Third.

264. In breach of their fiduciary duties owed to Fifth Third, the Individual Defendants willfully or recklessly engaged in and/or facilitated the Customer Account Misconduct, and made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's aggressive efforts to promote its cross-sell strategy, including utilizing incentive-based programs tied to unrealistic sales targets, caused employees to engage in the Customer Account Misconduct; (2) Fifth Third Bank, and the Company by extension, were aware of the Customer Account Misconduct and its resultant illegality and harm to consumers as early as 2008; (3) despite this awareness, the

74

Company neglected to employ and monitor its cross-sell program appropriately in a manner that would identify and prevent the Customer Account Misconduct and ensure affected consumers were identified and made whole; (4) the foregoing exposed Fifth Third to a foreseeable risk of heightened regulatory scrutiny and/or inquiries, like the three-year extensive CFPB investigation; (5) consequently, the Company's profits and prospects were unsustainable, as they were at least partially produced through illicit and improper conduct; and (6) the Company failed to maintain internal controls.

265.    As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

266.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

267.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

268.    The Individual Defendants also breached their fiduciary duties by causing the Company to waste its corporate assets, repurchasing over 216 million shares of its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while three of them engaged in improper insider sales, netting proceeds of approximately $6.1 million.

269.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the

75

misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities, and disguising insider sales.

270. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities, and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

271. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

272. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Fifth Third has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

273. Plaintiff on behalf of Fifth Third has no adequate remedy at law.

### Fifth Claim

### Against Individual Defendants for Unjust Enrichment

274. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

275. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Fifth Third.

276. The Individual Defendants either benefited financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Fifth Third that was tied to the performance or artificially inflated valuation of Fifth Third, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

277. Plaintiff, as a shareholder and a representative of Fifth Third, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

278. Plaintiff on behalf of Fifth Third has no adequate remedy at law.

### Sixth Claim

### Against Individual Defendants for Waste of Corporate Assets

279. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

280. As a result of the foregoing, and by failing to properly consider the interests of the

77

Company and its public shareholders, Defendants have caused Fifth Third to waste valuable

corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful

actions, and to lose financing from investors and business from future customers who no longer

trust the Company and its products. In addition, the Individual Defendants caused the Company

to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the

Company's assets.

281.    As a result of the waste of corporate assets, the Individual Defendants are each

liable to the Company.

282.    Plaintiff on behalf of Fifth Third has no adequate remedy at law.

## Prayer for Relief

283.    For all the above reasons, Plaintiff demands judgment in the Company's favor

against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Fifth Third

and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and

abetted the breach of their fiduciary duties to Fifth Third;

(c)     Determining and awarding to Fifth Third the damages sustained by it as a

result of the violations set forth above from each of the Individual Defendants, jointly and

severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Fifth Third and the Individual Defendants to take all necessary

actions to reform and improve its corporate governance and internal procedures to comply with

applicable laws and to protect Fifth Third and its shareholders from a repeat of the damaging

events described herein, including, but not limited to, putting forward for shareholder vote the

78

following resolutions for amendments to the Company's Code of Regulations or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

  1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

  2. a provision to permit the shareholders of Fifth Third to nominate at least seven candidates for election to the Board; and

  3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

  (e) Awarding Fifth Third restitution from the Individual Defendants, and each of them;

  (f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

  (g) Granting such other and further relief as the Court may deem just and proper.

**Jury Demand**

  Plaintiff demands a trial by jury on all issues so triable.

Dated: July 17, 2020       Respectfully submitted,

             /s/Matthew T. Heffner
             Matthew T. Heffner
             **HEFFNER HURST**
             30 North LaSalle Street, 12th Floor
             Chicago, IL 60602
             Tel: (312) 346-3466
             Fax: (312) 346-2829
             mheffner@heffnerhurst.com

             *Liaison Counsel for Plaintiff*

79

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, New York 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
pkim@rosenlegal.com

*Counsel for Plaintiff*

# EXHIBIT 1

Case 1:20-cv-02084 Document #: 50-4 Filed: 07/27/20 Page 83 of 92 PageID #:491

there could be an allegation of forgery.

Q.   Forgery of what?

A.   Of a bank document.  Allegations of theft.

Q.   Would this include what the bank refers to as gaming?

A.   Yes.

Q.   So does the bank take steps to try to detect employee integrity issues?

A.   Be more specific when you say employee integrity issues.

Q.   So, for instance, gaming; does the bank take steps to try to detect employee gaming?

A.   We don't have a systematic way of detecting gaming.

Q.   What do you mean by systematic way?

A.   System.  Technology.  A system that shoots out alerts.

MR. REIFERSON:  How does the bank define gaming?

THE WITNESS:  The concealment or manipulation of accounts to -- concealment or manipulation of accounts to deceive the customer

**EXHIBIT 5 (EXCERPT)**                                    **PAGE 1**

Case 1:20-cv-02084-DLC Document 59-4 Filed 07/27/20 Page 84 of 92 PageID #:502

and the bank.

MR. REIFERSON:  Are there examples of those, or can you describe a few examples of gaming?

THE WITNESS:  Yes.

MR. REIFERSON:  Please do.

THE WITNESS:  Customer alleges or complains that they received a credit card and they didn't apply for the credit card.  We conduct the investigation, and it was determined a credit card was sold to the customer but the customer didn't realize, and it was sold as, let's say, overdraft protection.  The customer didn't realize that the overdraft protection was in the form of a credit card.  That would be an example of gaming.

BY MS. POWELL:

Q.   So when the bank gets a complaint like that, a customer alleging they received a credit card that they didn't request be opened, what steps are taken for that investigation?

A.   It first starts with, A, being referred into the department specifying the allegation.

Q.   What department?

A.   Corporate Investigations.

**EXHIBIT 5 (EXCERPT)**                                    **PAGE 2**

Case 1:20-cv-02034 Document #: 50-4 Filed 07/27/20 Page 85 of 92 PageID #:513

abbreviations.  This is an entire market.  So Chicago -- FTCH Chicago.  FTCI is Cincinnati.

Q.    Thank you.  So for those -- for example, Chicago shows up as having the highest number of cases on both of these charts.  Was there any further investigation into Chicago and potential problems there as a result of the numbers that are reflected here?

A.    Without looking at the individual investigation associated with the cases in these regions, I couldn't answer that question.

Q.    So there wouldn't have been anything outside of the individual investigations that are reflected here?

A.    Correct.

Q.    On sub number six the last bullet point says that case findings are documented on a shared tracking spreadsheet.  Who puts information into the spreadsheet?

A.    It's a shared spreadsheet between Bank Protection and Employee Relations.

Q.    Did anyone else use the spreadsheet?

A.    I mean, the information is sent to the compliance team, so they see a snapshot of

**EXHIBIT 5 (EXCERPT)**                                    **PAGE 3**

# EXHIBIT 2

To:

CC:

I'm writing this letter to bring to your attention issues that I'm quite sure you are not aware of. I'm not sure you are the one I should be sending this email too, but I've tried bringing things to attention within my own ranks unsuccessfully. It appears people are too intimidated to escalate concerns that they have. I've been working at Fifth Third since October of 2008. I really enjoyed working here for the first few months but after a while things started getting worse and worse. I'm speaking on my own behalf in this email, however I know of many who share the same sentiment. We work in a hostile environment. From being disrespected on conference calls, being told I can be replaced, being accused of "cruising" the internet, witnessing sexual harassment, and witnessing unethical and predatory banking practices. Everything is negative. For these reasons on 09/20/2010 I have submitted my notice of resignation.

I have tried to raise concerns through the ethics hotline, however it doesn't appear that anything has come of it. I have notified them on numerous occasions. I have notified my FCM and CSM as well, and they have forwarded my concerns to their management team never to receive a response as well. My management team supports me 100%, and operates as I do with a high degree of integrity. Their support is the sole reason I have lasted here for 2 years and I owe them a great deal of respect.

**Sexual Harassment**

On numerous occasions I have witnessed the men in this organization treating woman with gross disrespect. This was the main reason I never participated in the social gatherings, I didn't want to expose my wife to that type of behavior. I have a picture of my wife on my desk; my desk has been used by other individuals in the region on occasion. I have received comments of "I heard your wife is pretty hot", "hey if you coming to the picnic bring your hot wife I'd love to meet her"; I always been the bigger person and shrugged off these comments.

There was a personal banker meeting at the Niles Oakton location a few months ago. A couple branch managers and a few of the PB's were talking back and forth about some of the female customers. Making completely inappropriate comments about their bodies, and what they were wearing. How when she walks in everyone stares at her "behind" and how "so and so" leans over the side of his chair to stare at her, and mind you this entire discussion was happening in front of a female coworker, who had a look of disgust on her face, and is no longer with the company.

We had a small break halfway through the meeting; a couple of the FCM's and Bankers were congregating in the hallway that overlooks the CSR line in the branch. They then called the Regional Manager out to the halfway as if they had something important to discuss. There was a young lady at a CSR window doing a transaction. She was wearing tight jeans and

**EXHIBIT 2**                                                                                      **PAGE 1**

FOIA Confidential Treatment Requested                                      FTBSALES00031051

thought that all the guys should stand over the balcony and stare at her while making inappropriate comments.

Another incident occurred when one of the Investment Advisor managers was conducting an interview in the office that's in front of my desk. One of my regular clients came in to work on some issues at my desk. As soon as she sat down both the Interviewer and Interviewee started staring at her, she was wearing short shorts and a tank top, it was a hot day. My client did notice and mentioned it to me; I apologized on the banks behalf, and was incredible embarrassed, as was she.

**Unethical behavior**

Prior to Fifth Third I worked for Countrywide Home Loans. I was the Operations Manager for a sales office. I prided myself on ensuring that my staff operated with integrity and honesty 100% of the time. My policy was if you have to question whether something is right or wrong it's most likely wrong. Countrywide has since become the poster child of the "mortgage meltdown". I can only speak on behalf of my region, but I would consider many of the sales practices and tactics used to be predatory. Many of these sales practices were brought to us by regional and market management. They are openly discussed on our conference calls. Policies such as "everyone should have 2-3 checking accounts", or people "upgrading" (switching existing MasterCard customers to Visa rewards) credit cards for customer without telling them they are applying for new credit". We are becoming a "predatory" institution.

Every week I come across at least 1 or 2 customer that have been taken advantage of. The most common thing I see is customers that have 2 or 3 other checking accounts that they didn't even know they had. Some customers have secure checking accounts only to be used for ID Alert. When they can simply add ID alert to the DDA they already have. Some customers have the Secure Checking account as a secondary and are paying for ID alert on their primary checking account. I come across Hispanic customers that don't understand or speak English that were sold products they don't understand by individuals that don't speak Spanish. I have

One of the "plays"(sales tactics) in our region is to get everyone to have a second or third checking account. During our close out conference call people discuss ways to get people to open secondary checking accounts. I came across one customer who I know quite well. I know her because she's overdrawn on a regular occasion and she has a tough time managing her money. She's paid almost 10k in overdraft fees over the last year. A banker's suggestion was to open up 3 more checking accounts to help her manage her funds. She already had a free checking account with ID alert, the banker opened up 2 additional Secure checking accounts and a Club 53. So in addition to her overdraft fees, she's paying $7.50 for each secure account and $5.00 for the Club 53 per month in service fees. I can repeat similar stories like this a few dozen times. Uneducated customers of ours are being targeting to get sales; this is subsequently causing more unnecessary overdrafts by spreading out a customer's funds and also service fees for many customers.

**EXHIBIT 2**      **PAGE 2**

FOIA Confidential Treatment Requested      FTBSALES00031052

The motivation for these practices is simple, if you don't meet your goal you get fired. That's what I've been told, and that's what other employees have been told, they are pushing the ethical envelope in order to save their jobs. I do not open as many accounts as some of my peers and the main reason is I refuse to partake in the practices. I brought specific issues to the attention of my manager and the regional manager, on numerous occasions. Being able to open and close accounts existing customer accounts or adding 3 ddas to existing customers is being perceived as production. We aren't gaining new households; we're simply rotating our existing customer base for numbers, in fact we're losing more customers than we're gaining, and costing the banking money. Many customers are frustrated with the sales practice and subsequently leaving the bank.

**Perception**

My regional manager talks about perception quite a bit. He's perceived things about me on a few separate occasions. There was an incident one time where I was on the phone and etrade.com. He called me into my manager's office to discuss why I was "cruising" the internet and on a personal phone call. If he had asked questions prior to assuming he would have known I was on the phone with a customer trying to get her info on how she can electronically transfer funds from her E*TRADE checking account to her 5/3 Checking account. I explained that to him and went onto his speech about perception. I was a manager in my previous job, and it's natural to make negative assumptions. However in order to protect yourself and your organization from liability it is imperative that you know all the facts prior to accusation.

There is a standing policy in the region set forth my Regional manager that he believes in employee engagement. If you are a teller and you want to be an FCM then he will support you and provide advice. He will get you in contact with other FCM and do whatever he can to help you reach your goal. My background is lending, I ran an operations team for 4 years with my previous employer. I know and understand lending operations better than most. I have asked my regional manager for assistance, but it never came. When I know others in the region received the assistance and are actively pursuing their career goals.

Perception is something reserved for the media, customers, family and friends. It isn't a tool that should be used by management to discipline and manage staff. Our customers will eventually react to the way business is being done. Ad we will be perceived as a predatory institution by friends, family, customers and the media.

In Closing, I apologize for this lengthy email. The preceding information is just a glimpse of what we deal with on a daily basis, and there are many instances and specific accounts I could notate. I doubt upper management truly knows the scope of what's happening in the organization. It might just be isolated in my region, but I believe it's a systemic issue in the market. The culture is hostile, negative and breeds unethical behavior. I believe Fifth Third is potentially exposed to a great deal of legal liability, from both employees and customers and can perceived negatively in the press, especially during times like today where anyone behaving badly can labeled the bad guy and be hung out to dry.

**EXHIBIT 2**                                                                                      **PAGE 3**

FOIA Confidential Treatment Requested                                          FTBSALES00031053

When I was first hired at Fifth Third I was excited. It was a chance for me to join a new organization and work my way up in my career as I did in my last job. That excitement was short lived. I remember that March of last year I met my production goal, 1 week later my regional and market manager were in my managers office trying to get me fired. What's the point of trying to be successful when they still want to get rid of you after you meet your goal? That is when I knew I would never be successful at Fifth Third. I'm sad about the position that I'm in. I thought I would have a career at Fifth Third. The benefits are great, from tuition reimbursement to health insurance costs. I was a year from being fully vested in the 401k. However I think the culture on the retail side is set to fail, and I can't in good conscious be part of a culture that functions with no regard to integrity.

Thank You,

**EXHIBIT 2**                                                                                                     **PAGE 4**

FOIA Confidential Treatment Requested                                                                 FTBSALES00031054

## VERIFICATION

I, Vince G. Meyer, as Trustee of the Vince G. Meyer Trust, am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on *July 17, 2020*

*Vince G. Meyer*
_____
Vince G. Meyer, as Trustee of the Vince G. Meyer Trust

# CIVIL COVER SHEET

ILND 44 (Rev. 09/07/18)

The ILND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(See instructions on next page of this form.)*

## I. (a) PLAINTIFFS

Vince G. Meyer, as Trustee of the Vince G. Meyer Trust, derivatively on behalf of Fifth Third Bancorp,

**(b)** County of Residence of First Listed Plaintiff    Hamilton County, Ohio
*(Except in U.S. plaintiff cases)*

**(c)** Attorneys *(firm name, address, and telephone number)*

Matthew T. Heffner, Heffner Hurst, 30 N. LaSalle Street, Suite 1210, Chicago, IL 60602; Tel: 312-346-3466

## DEFENDANTS

Greg D. Carmichael, Tayfun Tuzun, Nicholas K. Akins, Jorge L. Benitez, Katherine B. Blackburn, Emerson L. Brumback, Jerry W. Burris, C. Bryan Daniels, Thomas H. Harvey, Gary R. Heminger, Jewell D. Hoover, Eileen A. Mallesch, Michael B. McCallister, and Marsha C. Williams, Defendants and Fifth Third Bancorp, Nominal Defendant

County of Residence of First Listed Defendant
*(In U.S. plaintiff cases only)*

Note: In land condemnation cases, use the location of the tract of land involved.

Attorneys *(if known)*

## II. BASIS OF JURISDICTION *(Check one box, only.)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government not a party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate citizenship of parties in Item III.)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(For Diversity Cases Only.)*
*(Check one box, only for plaintiff and one box for defendant.)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place of Business in This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business in Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. NATURE OF SUIT *(Check one box, only.)*

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

### TORTS
**PERSONAL INJURY**
- 310 Airplane
- 315 Airplane Product Liability
- 320 Assault, Libel & Slander
- 330 Federal Employers' Liability
- 340 Marine
- 345 Marine Product Liability
- 350 Motor Vehicle
- 355 Motor Vehicle Product Liability
- 360 Other Personal Injury
- 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- [ ] 530 General
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### PRISONER PETITIONS
- 510 Motions to Vacate Sentence
- 530 General
- 535 Death Penalty

**Habeas Corpus:**
- 540 Mandamus & Other
- 550 Civil Rights
- 555 Prison Condition
- 560 Civil Detainee – Conditions of Confinement

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

### PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent – Abbreviated New Drug Application
- [ ] 840 Trademark

### OTHER STATUTES
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729 (a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit
- [ ] 485 Telephone Consumer Protection Act (TCPA)
- [ ] 490 Cable/Sat TV
- [x] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### CIVIL RIGHTS
- 440 Other Civil Rights
- 441 Voting
- 442 Employment
- 443 Housing/ Accommodations
- 445 Amer. w/Disabilities - Employment
- 446 Amer. w/Disabilities - Other
- 448 Education

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### IMMIGRATION
- [ ] 462 Naturalization Application
- [ ] 463 Habeas Corpus - Alien Detainee (Prisoner Petition)
- [ ] 465 Other Immigration Actions

### FORFEITURE/PENALTY
- 625 Drug Related Seizure of Property 21 USC 881
- 690 Other

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAXES
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

## V. ORIGIN *(Check one box, only.)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation
- [ ] 8 Multidistrict Litigation Direct File

## VI. CAUSE OF ACTION
*(Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)*

15USC§§78n,78j(b),78t(a),78t-1,breach of fiduciary duties, unjust enrichment, waste of corporate assets

## VII. PREVIOUS BANKRUPTCY MATTERS
*(For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary.)*

## VIII. REQUESTED IN COMPLAINT:
- [ ] Check if this is a **class action** Under rule 23, F.R.CV.P.

Demand $

Check Yes only if demanded in complaint.
Jury Demand: [x] Yes [ ] No

## IX. RELATED CASE(S) IF ANY
*(See instructions)*    Yes

Judge    Joan B. Gottschall

Case Number    1:20-cv-04115

## X. Is this a previously dismissed or remanded case?
[ ] Yes  [x] No   If yes, Case #    Name of Judge

Date    7/17/2020

Signature of attorney of record    /s/ Matthew T. Heffner