UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| HEAVY & GENERAL LABORERS' LOCAL 472 & 172 PENSION AND ANNUITY FUNDS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) | Case No. 1:20-cv-02176 <br><br> <u>CLASS ACTION</u> <br><br> Judge Sara L. Ellis |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| FIFTH THIRD BANCORP, et al., | ) ) | |
| Defendants. | ) ) ) | |
| _____ | ) | <u>DEMAND FOR JURY TRIAL</u> |

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    JURISDICTION AND VENUE .............................................................................2

III.   PARTIES ...............................................................................................................2

IV.   FACTUAL BACKGROUND .................................................................................4

      A.     The Wells Fargo Fake Account Scandal Is Revealed in September 2016 ..............4

      B.     Fifth Third Receives a CFPB Investigative Demand Notice Regarding Its Own Unauthorized Account Scandal on November 3, 2016 ...................................6

      C.     Defendants Fail to Disclose the CFPB Investigation or Known Problems with Unauthorized Accounts and Credit Card Applications....................................6

      D.     Investors Are Assured About Defendants' Knowledge of Known Risks and the Importance of Fifth Third's Consumer Banking Segment.........................8

      E.     Defendants Take Advantage of the Market Not Knowing About the CFPB Investigation or Fifth Third's Unethical Practices...................................................9

      F.     The Retirement of Fifth Third's Chief Risk Officer Is Announced in January 2020 ..........................................................................................................10

      G.    The Truth About the CSFB Investigation and Fifth Third's Unauthorized Account Scandal Is Revealed in March 2020 .......................................................10

      H.    Documents from the CFPB Action and Confidential Witness Allegations Corroborate the Scope of Fifth Third's Unethical and Illegal Practices................15

V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS MADE DURING THE CLASS PERIOD ............................19

      A.     Defendants' Misleading Statements and Material Omissions Regarding Risks Facing Fifth Third ......................................................................................19

      B.     Defendants' Misleading Statements and Material Omissions Regarding Fifth Third's Risk Management Practices ............................................................24

      C.     Defendants' Misleading Statements and Material Omissions Regarding Fifth Third's Code of Business Conduct and Ethics.............................................27

4833-1164-7178.v1

**Page**

    D.     Defendants' False and Misleading Statements and Omissions Regarding Fifth Third's Product Cross Selling, Consumer Business and Customer Relations ........................................................................................................31

    E.     Defendants' False and Misleading Statements Concerning Fifth Third's Incentive Compensation...........................................................................................35

VI.     THE TRUTH IS REVEALED ........................................................................................37

VII.    ADDITIONAL SCIENTER ALLEGATIONS................................................................42

    A.     Defendants' Admitted Knowledge of Known Risks ............................................42

    B.     Defendants Collect Over $35.4 Million in Incentive Compensation and Insider Trading........................................................................................................47

    C.     Defendants Complete $242 Million Offering of Fifth Third Securities ...............50

    D.     Defendants Issued 131 Million Shares of Fifth Third Common Stock to Complete $4.3 Billion Acquisition of MB Financial...........................................50

VIII.   LOSS CAUSATION AND ECONOMIC LOSS ..............................................................51

IX.     PRESUMPTION OF RELIANCE ..................................................................................54

X.      NO SAFE HARBOR .......................................................................................................55

XI.     CLASS ACTION ALLEGATIONS ................................................................................56

4833-1164-7178.v1

Plaintiff, individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys. This investigation included, among other things: review and analysis of U.S. Securities and Exchange Commission ("SEC") filings by Fifth Third Inc. ("Fifth Third," the "Bank" or the "Company"); Company press releases and earnings call transcripts; public information regarding Fifth Third including information posted on the Company website; analyst reports and media reports about the Company and the industry; litigation involving Fifth Third, including the pending Consumer Financial Protection Board ("CFPB") action against the Bank (*Bureau of Consumer Financial Protection v. Fifth Third Bank, Nat'l Assoc.*, No. 1:20-cv-01683 (N.D. Ill.)); and consultation with former Fifth Third employees. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     INTRODUCTION

1.      This securities class action is brought on behalf of all purchasers of Fifth Third common stock between November 9, 2016 and March 6, 2020, inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

2.      This action centers on Defendants' concealment of Fifth Third's illegal and unethical cross-sell strategies that had been ongoing at the Company from at least 2008, to increase the number of products and services it provided its customers. Defendants further concealed that on November 3, 2016, one of the agencies that regulated Fifth Third, the CFPB, commenced an investigation into Fifth Third's illegal and unethical practices. As a result of their failure to disclose these practices and the ensuing investigation to investors, throughout the Class Period, Defendants

- 1 -

made false and misleading statements and material omissions regarding the regulatory and reputational risks Fifth Third was facing, its ineffective risk management practices, the Company's Code of Business Conduct and Ethics and the Company's product cross-selling and consumer business.

## II.    JURISDICTION AND VENUE

3.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

5.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b)-(c), and §27 of the Exchange Act, 15 U.S.C. §78aa.  Fifth Third transacts business and has two corporate offices in this district, including the Fifth Third Center at 222 S. Riverside Plaza, Chicago, Illinois 60606, and a substantial portion of the acts alleged herein took place in this district.

6.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.   PARTIES

7.      Plaintiff, Heavy & General Laborers' Local 472 & 172 Pension and Annuity Funds, is based in Newark, New Jersey, and was appointed Lead Plaintiff on June 29, 2020.  ECF No. 41. As set forth at ECF No. 20-3, Plaintiff purchased shares of Fifth Third common stock during the Class Period.

8.      Defendant Fifth Third is incorporated in Ohio and has two corporate offices in this district, including the Fifth Third Center at 222 S. Riverside Plaza, Chicago, Illinois 60606.  The

Company's securities trade in an efficient market on the Nasdaq Global Select Market under the ticker symbol "FITB."

9.     Defendant Greg D. Carmichael ("Carmichael") has served as Fifth Third's President and Chief Executive Officer at all relevant times, and as the Company's Chairman of the Board of Directors since January 2018.

10.     Carmichael made or had authority over the content and dissemination of the false and misleading statements and material omissions set forth herein at ¶¶52-55, 58-62, 65-68, 70-76, 79-80, 82-84, and is liable for those false statements and omissions.  Carmichael is also a control person of Fifth Third within the meaning of §20(a) of the Exchange Act.

11.     Defendant Tayfun Tuzun ("Tuzun") has served as Fifth Third's Executive Vice President and Chief Financial Officer at all relevant times.

12.     Tuzun made or had authority over the content and dissemination of the false and misleading statements and material omissions set forth herein at ¶¶52-55, 58-62, 70-72, 82-84, and is liable for those false statements and omissions.  Tuzun is also a control person of Fifth Third within the meaning of §20(a) of the Exchange Act.

13.     Defendants Carmichael and Tuzun sometimes referred to herein collectively as the "Individual Defendants."  The Individual Defendants possessed the power and authority to control the contents of Fifth Third's SEC filings, press releases and other market communications.  The Individual Defendants were provided with copies of Fifth Third's SEC filings and press releases alleged herein to be misleading prior to and shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Fifth Third, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and

were being concealed from the public, and that the representations being made were then materially false and misleading.

## IV.     FACTUAL BACKGROUND

### A.     The Wells Fargo Fake Account Scandal Is Revealed in September 2016

14.     On September 8, 2016, the CFPB published an enforcement action and Consent Order against Wells Fargo & Company.  The CFPB, joined by other regulators, sought to punish Wells Fargo for its "illegal practice of secretly opening unauthorized deposit and credit card accounts." The CFPB's announcement of the enforcement action noted that the underlying facts were known to Wells Fargo prior to the CFPB probe and that an internal investigation had revealed fraudulent practices.  Specifically, the CFPB found that Wells Fargo had:

(1)     opened unauthorized deposit accounts for existing customers and transferred funds to those accounts without the customers' knowledge or consent;

(2)     submitted applications for credit cards in customers' names without the customers' knowledge or consent;

(3)     enrolled customers in online banking services they did not request; and

(4)     ordered and activated debit cards using customers' information without their knowledge or consent.

15.     The CFPB's September 8, 2016 announcement also noted that Wells Fargo had "compensation incentive programs for its employees that encouraged them to sign up existing clients for deposit accounts, credit cards, debit cards, and online banking" and that "Wells Fargo employees illegally enrolled consumers in these products and services without their knowledge or consent in order to obtain financial compensation for meeting sales targets."  CFPB Director Richard Cordray remarked, ""Today's action should serve notice to the entire industry that financial incentive programs, if not monitored carefully, carry serious risks that can have serious legal consequences.""

- 4 -

16.     As a result of the CFPB action, Wells Fargo's stock price dropped $1.18 per share on Friday, September 9, 2016, from $49.90 to $48.72, and then continued dropping the following week.

17.     Following the filing of the CFPB action, a September 16, 2016 *Reuters* article reported that, "A phantom account scandal at Wells Fargo & Co. has put the U.S. bank's disclosure policies under a harsh spotlight."  Under the heading "Material Or Not?" the *Reuters* article noted that, "The tactics deployed in its branches were not a surprise for Wells."  The bank had been looking into them since 2011, but "[n]o mention is made of the bank's internal probe, or authorities' probes in the 'legal actions' section of [Wells Fargo's] latest quarterly or annual securities filings. . . .  Experts said Wells Fargo would have been wise to at least flag the issue earlier."  The article also quoted former SEC Chairman Arthur Levitt saying, "It is a scandal of almost unimaginable proportions" and "'[y]ou cannot hold management immune from its consequences.'"

18.     Later in September 2016, Wells Fargo's CEO, John Stumpf, testified under oath before the Senate Committee on Banking, Housing, and Urban Affairs and the House Financial Services Committee.  During his testimony, Stumpf claimed, "We never directed nor wanted our . . . team members, to provide products and services to customers that they did not want or need."  But under questioning from members of Congress, Stumpf admitted that he and bank executives had been aware of unethical practices in the retail banking segment of Wells Fargo for several years prior to September 2016, as well as regulatory investigations into those unethical practices.

19.     During his testimony, Wells Fargo's CEO also tried to downplay the fake account issue, claiming it "was not a material event" and that the bank just "had some indication that we had one percent of our people who were doing the wrong thing."  But in response to Pennsylvania Senator Pat Toomey's question, "When did you begin to disclose in SEC filings that you had this potentially material adverse set of circumstances that could certainly have huge damage to your reputational value?" Stumpf said, "I don't know."  Senator Toomey continued:  "Well, we haven't

- 5 -

been able to discover such a disclosure and the SEC very clearly requires disclosure of material adverse circumstances. And I don't know how this could not be deemed material. . . . [T]he reputational damage done to the bank is clearly material."

20. Two weeks after his Congressional testimony, Wells Fargo fired Stumpf as CEO and announced he would have to forfeit $41 million in previously awarded compensation.

**B.     Fifth Third Receives a CFPB Investigative Demand Notice Regarding Its Own Unauthorized Account Scandal on November 3, 2016**

21. Less than two months after the Wells Fargo unauthorized account scandal was disclosed, and one month after Wells Fargo's CEO was fired, the CFPB notified Fifth Third that the Bureau was investigating the same activities at the Company. According to a court filing Fifth Third made in the CFPB action, "The Bureau commenced its investigation into Fifth Third's sales practices on November 3, 2016, with a Civil Investigative Demand ("CID") addressed to the Bank's President and CEO [Defendant Carmichael]." The Investigative Demand notice sent to Carmichael identified that it concerned "Specific Sales Practices" at Fifth Third, including "opening an account for any product or service offered by the Company without the knowledge and consent of a consumer," "changing, without the consumer's knowledge and consent, the type of account or service in which the consumer is enrolled," and "engaging in unauthorized transactions on behalf of a consumer." Between 2017 and 2019, the CFPB issued five additional Civil Investigative Demands to Fifth Third regarding the use of unauthorized accounts and predatory consumer practices at the Company.

**C.     Defendants Fail to Disclose the CFPB Investigation or Known Problems with Unauthorized Accounts and Credit Card Applications**

22. Despite previous warnings about the opening of unauthorized accounts at Fifth Third, including credit card applications, and receipt of the CFPB Civil Investigative Demand notice on November 3, 2016, Defendants failed to publicly disclose the existence of either the investigation or

- 6 -

the unethical practices at the Bank. In statements to investors between the end of 2016 and early 2020, Defendants repeatedly spoke about "taking advantage of cross-sell opportunities" generated by synergies formed by the Company's business segments, and they touted the Company's growth strategy for its consumer business – which had included unethical practices – while omitting any mention of the CFPB investigation or the unauthorized accounts that Defendants used to boost the Bank's consumer business.

23. Defendants also routinely touted Fifth Third's robust compliance risk management, claiming that "Fifth Third focuses on managing regulatory compliance risk in accordance with [its] integrated risk management framework, which ensures consistent processes for identifying, assessing, managing, monitoring, and reporting risks"; that "[t]o mitigate compliance risk, Compliance Risk Management provides independent oversight to ensure consistency and sufficiency, and ensures that lines of business, regions and support functions are adequately identifying, assessing and monitoring compliance risks and adopting proper mitigation strategies"; and that "[a]dditionally, Compliance Risk Management implements key compliance programs and processes including but not limited to, risk assessment, key risk indicators, issues tracking, [and] regulatory compliance testing and monitoring." Similarly, Fifth Third's Code of Business Conduct and Ethics, which was publicly filed, repeatedly claimed that "Unethical business practices are strictly prohibited," including, "Incentive gaming," "Falsifying documents or inflating performance results," and "Opening bogus or fake accounts," and "There is zero tolerance for internal fraud within Fifth Third's organization."

24. And in its risk disclosures, even as the CFPB investigation and the use of unauthorized accounts was already known to them, Fifth Third purported to warn investors about the *potential* risk that "a violation of law or regulation by another financial institution *may give rise* to an inquiry or investigation by regulators or other authorities of the same or similar practices by Fifth

- 7 -

Third," "Fifth Third is also subject to risk from ***potential employee misconduct***, including non-compliance with policies and improper use . . . of confidential information" and "Fifth Third's framework for managing risks ***may not*** be effective in mitigating its risk and loss."

> **D.      Investors Are Assured About Defendants' Knowledge of Known Risks and the Importance of Fifth Third's Consumer Banking Segment**

25.      While failing to disclose the CFPB investigation or the unauthorized account issue at Fifth Third, Defendants assured investors that the Company's "robust and active risk management practices" ensured they would have known about such issues and that the issues would have been escalated to senior management and the Board of Directors.  For example, every year in Fifth Third's SEC Forms 10-K and Forms 10-Q, Defendants touted their "risk management framework, which ensures consistent processes for identifying, assessing, managing, monitoring, and reporting risks" and their "focus[] on the reporting and escalating of compliance issues to senior management and the Board."  And in the Company's Code of Business Conduct and Ethics, which was publicly disseminated on March 16, 2016, September 25, 2017, September 24, 2018 and September 20, 2019, Fifth Third told investors that "[e]very Fifth Third employee has a responsibility to communicate situations that could cause risk or harm to Bancorp or our customers," including "[o]pening accounts . . . without customer authorization," that Fifth Third "investigates every concern that employees report through any channel," and that "[e]very report of a violation is taken seriously."

26.      While Defendants were assuring investors about their "robust" risk management practices, they were also extolling the importance of Fifth Third's consumer banking segment.  For example, at Fifth Third's December 7, 2017 Investor Day conference, the Company's Executive Vice President and Head of Regional Banking, Phil McHugh, emphasized how crucial consumer banking was to the Company: "Today, we comprise roughly 38% of our loan portfolio and we account for 60% of the total deposits.  We generate nearly 50% of the total revenue for the

- 8 -

company."  Similarly, at a December 7, 2016 Goldman Sachs US Financial Services Conference, defendant Carmichael stated the Bank was "looking for a more balanced growth between our consumer and our commercial businesses.  To that end, we are focused on growing our credit card and unsecured personal lending businesses."  Likewise, defendant Tuzun told investors at the March 7, 2018 RBC Capital Markets Conference that the Company's "fundamental metric is household growth," stating that "[a]s long as we can grow households, then we are achieving what we need to achieve."

   E.   **Defendants Take Advantage of the Market Not Knowing About the CFPB Investigation or Fifth Third's Unethical Practices**

27.   By failing to disclose the truth to investors about the CFPB investigation or the unauthorized account issue at Fifth Third, Defendants kept the Company's stock price trading at an artificially inflated level throughout the Class Period.  In turn, Defendants were able to take advantage of their fraudulent conduct.  Between 2017 and 2019, defendants Carmichael and Tuzun pocketed more than $24.3 million and $6.2 million in incentive compensation, respectively.  In addition to his incentive compensation, Carmichael also profited from insider trading, selling 197,374 shares of his Fifth Third stock for over $5.8 million in proceeds – all while he knew, but failed to disclose, that Fifth Third had the same unauthorized account and credit card issues that had been uncovered at Wells Fargo and that the CFPB was actively investigating those unethical practices.

28.   Defendants also took advantage of Fifth Third's inflated stock price to facilitate a massive stock offering and complete one of the largest banking acquisitions in Chicago's history. Specifically, in September 2019, Fifth Third sold 10 million preferred shares, raising more than $242 million.  And in May 2019, Fifth Third issued approximately 131 million shares of common stock,

which was then trading at an inflated price of $24.62 per share, to complete a $4.7 billion acquisition of MB Financial.

## F. The Retirement of Fifth Third's Chief Risk Officer Is Announced in January 2020

29.     On January 30, 2020, Fifth Third announced that its Chief Risk Officer, Frank Forrest, was leaving his position "effective immediately" and would officially retire from the Company by the end of the year.  Forrest had served as Chief Risk Officer since 2014, and no explanation was provided about why he was leaving Fifth Third.  But in the three years since Fifth Third received the CFPB's Civil Investigative Demand notice, and while Defendants failed to disclose the CFPB investigation or the unauthorized account issue underlying that investigation, Forrest sold over $3.0 million worth of his Fifth Third stock.

## G. The Truth About the CSFB Investigation and Fifth Third's Unauthorized Account Scandal Is Revealed in March 2020

30.     On March 2, 2020, less than five weeks after Fifth Third reported that its Chief Risk Officer was retiring, the Company filed its Annual Report on Form 10-K for FY 2019 with the SEC. At page 161 of the Form 10-K, Fifth Third disclosed for the first time that "the CFPB staff has notified Fifth Third that it intends to file an enforcement action in relation to alleged unauthorized account openings. . . .  The impact of this potential enforcement action has been reflected in our reasonably possible losses."  After the close of the market on March 2, 2020, Barclays Capital issued a report on Fifth Third titled "2019 10-K Review:  CFPB Action for Unauthorized Account Openings."  Based on the Form 10-K, the report included that "CFPB staff notified FITB [Fifth Third] that it intends to file an enforcement action in relation to alleged unauthorized account openings."  The report also identified that in conjunction with the disclosure of the CFPB action, Fifth Third had more than doubled its reserve for "reasonably possible . . . losses related to legal and regulatory proceedings," from $27 million in 3Q 2019 to $56 million.

- 10 -

31.     Despite Fifth Third's burying of the information about the CFPB action in the Form 10-K, members of the media also uncovered and reported the negative news.  For example, on March 4, 2020, the online publisher housingwire.com published an article titled "Fifth Third facing its own fake account fiasco: Bank discloses that CFPB plans enforcement action."  The same day, *American Banker* issued an article titled "Fifth Third latest bank in CFPB crosshairs over phony accounts."  And on March 6, 2020, *Axios* issued a story reporting that "[t]he banking industry's fake account scheme may have been widespread" and that "the CFPB is targeting [Fifth Third] for 'alleged unauthorized account openings.'"

32.     As a result of the disclosure about the CFPB fake account action, Fifth Third's stock price dropped from a close of $25.72 on March 2, 2020 to a close of $24.44 on March 3, 2020, a $1.28 per share decline on unusually high volume.  Fifth Third's share price continued to drop in the days following the disclosure of the CFPB action, falling to $22.20 by March 6, 2020, a loss of $3.52 per share or 14% in four days.

33.     During the day on Monday, March 9, 2020, the CFPB issued a press release titled "Consumer Financial Protection Bureau Files Suit Against Fifth Third Bank, National Association for Allegedly Opening Unauthorized Accounts and Enrolling Consumers in Unauthorized Products and Services" and filed its complaint alleging Fifth Third had violated the Consumer Financial Protection Act's prohibition against unfair and abusive acts, the Truth in Lending Act, and the Truth in Savings Act.

34.     The CFPB press release reported that "for several years Fifth Third, without consumers' knowledge or consent: opened deposit and credit-card accounts in consumers' names; transferred funds from consumers' existing accounts to new, improperly opened accounts; enrolled consumers in unauthorized online-banking services; and activated unauthorized lines of credit on consumers' accounts."  It further reported that "for years and continuing through at least 2016, Fifth

- 11 -

Third used a 'cross-sell' strategy to increase the number of products and services it provided to existing customers; used an incentive-compensation program to reward selling new products; conditioned employee-performance ratings and, in some instances, continued employment on meeting ambitious sales goals"; and that, "despite knowing since at least 2008 that employees were opening unauthorized consumer-financial accounts, Fifth Third took insufficient steps to detect and stop the conduct and to identify and remediate harmed consumers." Linked to the press release was the filed version of the CFPB's complaint.

35.     The CFPB's complaint, filed in the United States District Court for the Northern District of Illinois, alleged eight counts against Fifth Third for violations of the Consumer Financial Protection Act's prohibition against unfair and abusive acts or practices as well as the Truth in Lending Act and the Truth in Savings Act and their implementing regulations. According to the complaint, "Fifth Third used a 'cross-sell' strategy to increase the total number of products and services it provided to existing customers" and "also used an incentive-compensation program that rewarded managers and their subordinate employees for selling new products and services to existing customers." The CFPB identified, "By 2010, at the latest, Fifth Third was aware that employees were opening products and services in consumers' names without those consumers' knowledge or consent in order to achieve sales goals or obtain incentive rewards." According to a March 9, 2020 report in *The New York Times*, "A person familiar with the bank's operations said it had begun investigating potential unauthorized transactions in 2010, after its internal compliance systems raised alarms."

36.     The CFPB alleged that Fifth Third opened both deposit accounts and credit card accounts without customers' knowledge or consent. For example, the CFPB complaint alleged that "Fifth Third imposed aggressive sales goals for its employees to sell credit cards to consumers, and its incentive-compensation program rewarded employees for selling new credit cards." As a result,

- 12 -

"By 2009, at the latest, Fifth Third noticed a spike in unauthorized credit cards being issued to consumers." Nevertheless, "Fifth Third continued to emphasize sales and to maintain credit-card sales goals and incentive compensation."

37.     Fifth Third also "imposed aggressive sales goals for its employees to enroll consumers in its online-banking services." In order to hit these goals, the complaint stated, "From at least 2010 through at least 2016, Fifth Third enrolled consumers in online-banking services without their knowledge or consent." Similarly, for Fifth Third's "Early Access" program – a fee-based line of credit that allows funds to be withdrawn before they have been deposited in an account – the Company "imposed aggressive sales goals for its employees . . . and its incentive-compensation program rewarded employees for enrolling consumers in 'fee-based products,' including Early Access." According to the CFPB:

> Fifth Third also opened Early Access lines of credit on consumers' deposit accounts without customers' knowledge or consent. Fifth Third was aware of this practice by June 2010, when senior management was notified of an increase in the number of calls by employees to the internal whistleblower hotline regarding the unauthorized opening of Early Access lines of credit.

38.     As the CFPB complaint emphasized, "Even after learning of unauthorized Fifth Third consumer-financial products and services by 2008, Fifth Third failed to change its sales practices to avoid consumer harm. Instead, Fifth Third continued to foster sales practices that were likely to cause unauthorized products and services." According to the CFPB, Fifth Third "failed to take steps to determine and address a root cause of unauthorized accounts, which was consistently said by employees to be intense sales pressure," and "failed to close known loopholes in its collection of proof of consumer authorization, thereby making it easy for employees to open accounts without valid signature cards for deposit accounts or applications for credit products." "In short," as the CFPB alleged, "Fifth Third focused on its own financial interests to the detriment of consumers."

- 13 -

39.     The CFPB press release and complaint immediately generated national news.  For example, prior to the close of the market on March 9, 2020, *Reuters* published an article titled "U.S. consumer watchdog charges Fifth Third Bank on opening phony accounts" that reported, "The U.S. Consumer Financial Protection Bureau (CFPB) said on Monday it charged Fifth Third Bank, National Association, with creating fake client deposit and credit-card accounts and transferring clients' funds to those accounts without consent, citing an abuse of fair lending and savings laws." Similarly, *The New York Times* published an article on March 9, 2020 about the CFPB action headlined "Fifth Third Bank Opened Fraudulent Accounts, Consumer Bureau Says:  For more than eight years the bank ignored signs that employees were opening unauthorized accounts to meet aggressive sales goals, a federal regulator said in a lawsuit."  The same day, *The Wall Street Journal* published an article titled "CFPB Says Fifth Third Employees Opened Accounts Without Customer Consent: Lawsuit alleges bank didn't do enough to monitor or adjust sales goals."   And the following day, *DealBreaker* published an article about the Fifth Third unauthorized account scandal titled "Fake Accounts Were Such a Good Idea, They Thought Of It Twice."

40.     The day after Fifth Third's disclosure of the CFPB complaint, during a Senate Committee on Banking, Housing, and Urban Affairs hearing, Ohio Senator Sherrod Brown remarked, "'FDIC Chair Jelena McWilliams would have known about the fake accounts.  She was legal officer at Fifth Third for a couple-year period.  Leonard Chanin was also her deputy at Fifth Third before he became a deputy at FDIC.  He would have known about the bureau's fake-account investigation of Fifth Third.'"[1]

41.     In substantial part as a result of the disclosures about Fifth Third's unauthorized account scandal, the Company's stock price dropped from a close of $22.20 on Friday, March 6,

---

[1]     Jelena McWilliams was Fifth Third's Chief Legal Officer and Corporate Secretary from January 2017 to May 2018.

- 14 -

2020 to a close of $18.30 on Monday, March 9, 2020, a $3.90 per share decline. While the entire

market was declining on March 9, 2020, Fifth Third's stock price fell substantially more than the

market as a whole (as reflected by the S&P 500) and the stock price of peer banks. Fifth Third's

share price continued to drop in the days following the filing of the CFPB action, falling to $15.90

by March 12, 2020, a loss of $6.30 per share or 28% in four days. Indeed, prior to the market

opening on March 10, 2020, a CNBC article identified Fifth Third as one of the "biggest movers in

the premarket" and reported, "The bank was charged by the Consumer Financial Protection Bureau

with opening new accounts without customer consent, in order to meet sales goals." An article

published on *The Motley Fool* website titled "Why Fifth Third's Stock Plunged Over 20% in the

Last Week," reported:

> On top of those two strong headwinds [the Covid-19 pandemic and the
> Federal Reserve lowering interest rates], Fifth Third got hit with a lawsuit from the
> Consumer Financial Protection Bureau (CFPB) on March 9 for alleged illegal
> practices. . . . All this adds up to tough times for Fifth Third as the stock is down
> about 27% in the past five trading days during trading on Tuesday, and 54% year-to-
> date.

42.     An April 5, 2020 article, also published on *The Motley Fool* website, similarly

reported, "Fifth Third's stock probably wouldn't have fallen nearly as much in March, but it had the

added headwind of being sued by the Consumer Financial Protection Bureau (CFPB) on March 9,

which accused Fifth Third of opening fake accounts, not unlike the scandal that enveloped Wells

Fargo (NYSE:WFC) in 2016."

**H.      Documents from the CFPB Action and Confidential Witness
         Allegations Corroborate the Scope of Fifth Third's Unethical and
         Illegal Practices**

43.     In conjunction with the CFPB's November 3, 2016 Investigative Demand Notice,

Fifth Third produced more than 50,000 pages of documents and emails to the CFPB, as well data

regarding consumer accounts and products. While those documents have been shielded from the

- 15 -

public, a small number of e-mails were filed in June 2020, in redacted form, in connection with a venue dispute in the CFPB action. Those e-mails evidence both the severity and knowledge of the use of unauthorized accounts at Fifth Third.

44.     In June 2010, an individual the CFPB identified as the Bank's "head of retail banking" (names and e-mails addresses were redacted from the court filings) wrote in an internal Fifth Third email that the Chicago "leadership team have a reputation of less than desirable sales management practices"; that "Bullying and threats are often used to achieve results"; and, "As you probably know, there have been consistent problems around unauthorized credit card sales in Chicago."

45.     Another email identifies a former regional manager of Fifth Third who was promoted after "reports that she did not engage in ethical sales practices with customers" and states, "We had a fraud issue within the Center and upon investigation discovered that [redacted name] had knowledge and allowed other employees to use each other's terminals and IDs to conduct transactions (in some cases for themselves)."

46.     In a four-page resignation letter that the CFPB identified as sent to "bank management," a Fifth Third employee discussed "witnessing unethical and predatory banking practices." This banker had "tried to raise concerns through the ethics hotline, however it doesn't appear that anything has come of it." Specifically, the banker told Fifth Third's management, "I would consider many of the sales practices and tactics used [at Fifth Third] to be predatory. Many of these sales practices were brought to us by the regional and market management. They are openly discussed on our conference calls." The letter identifies "[p]olicies such as 'everyone should have 2-3 checking accounts', or people 'upgrading' (switching existing MasterCard customers to Visa rewards) credit cards for customer[s] without telling them they are applying for new credit" and concludes, "We are becoming a 'predatory' institution." The letter to Fifth Third's management

- 16 -

further stated, "The most common thing I see is customers that have 2 or 3 other checking accounts that they didn't even know they had. . . . One of the 'plays' (sales tactics) in our region is to get everyone to have a second or third checking account. . . . Uneducated customers of ours are being target[ed] to get sales; this is subsequently causing more unnecessary overdrafts by spreading out a customer's funds and also service fees for many customers." "The motivation for these practices is simple," wrote the Fifth Third banker, "if you don't meet your goal you get fired. That's what I've been told, and that's what other employees have been told, they are pushing the ethical envelope in order to save their jobs."

47. Citing to deposition testimony, the CFPB briefing ("Opposition to Motion to Transfer Venue") also states that "Fifth Third . . . internally investigated cases of what it called 'gaming.' Gaming, according to Fifth Third, includes opening unauthorized accounts but is broadly defined as the 'manipulation or concealment of accounts or activities with intent to deceive either customer or bank for personal gain,' including 'goal attainment, financial gain, retention of position, etc.'" The CFPB briefing also identifies that "Fifth Third admits that from 2010 to 2016 it opened more than 1,000 accounts without . . . authorization," and notes, "There is substantial evidence that Fifth Third's admission understates its problem, and Fifth Third continued to drive sales without implementing a systematic way to detect unauthorized accounts." In fact, the first demand for relief alleged in the CFPB complaint is to "permanently enjoin Fifth Third from, without the consumer's consent: (1) opening any deposit account; (2) issuing any credit card; (3) enrolling the consumer in online banking services; and (4) opening an line of credit."

48. Former employees of Fifth Third have provided additional detail of the unauthorized account scandal. According to a former Fifth Third employee who worked at the Bank from July 2001 to July 2020 at branches in Illinois, Fifth Third's regional bank managers were using financial incentives to entice branch managers to meet certain sales goals for credit card applications at the

- 17 -

branch level as late as 2020. According to this employee, during the years he/she worked at the Bank and up to 2020, employees were incentivized to open new accounts, which encouraged a practice called gaming, the opening of bogus accounts to meet sales goals. Both new loan and credit card applications were key metrics by which employee performance was measured. Two former financial center managers who worked at the Company prior to and during the Class Period reported that the pressure imposed on personnel to cross-sell and achieve sales results was intense.

49. While gaming practices had already existed at Fifth Third, they increased when former Wells Fargo personnel were hired by Fifth Third in 2010. For example, another former employee, who was a Fifth Third Financial Center Manager and held other positions from 2004 to 2015, reported that when former Wells Fargo executives joined Fifth Third, bank manager incentive compensation for opening new accounts dramatically increased, including bonuses of $10,000 per quarter for hitting set account goals. Employees who did not reach their goals were under threat of losing their jobs. According to this former employee, it was internally known that the only way to meet new account goals was to open bogus accounts. This former employee also reported on unethical practices with regard to opening credit cards. For example, if a customer reported a lost or stolen credit card, unbeknownst to the customer the account would not be closed but rather rendered inactive and then a new account would be opened, resulting in the customer having two accounts. Another unethical practice employees used to boost their numbers occurred when a customer applied for and received a home equity loan; the bank, without the customer's knowledge, applied for a credit card for the customer, or two credit cards if there were joint owners of the home. Similarly, this practice was also used with regular bank accounts. If a customer opened a checking account they would automatically be given a savings account without their authorization. These practices were known and used by employees to meet otherwise unobtainable production goals set by management.

- 18 -

50.     Former Company employees described other unethical practices engaged in by Fifth Third employees due to pressures imposed by the Bank to obtain sales goals, including selling products to customers (such as additional checking and savings accounts) that the customers did not actually need.  A former branch manager who had been with Fifth Third since 2002 reported that this type of unethical account practice was ongoing and that employees were trained for it.  For example, branch employees were instructed to pressure customers to open several separate accounts as either a budgeting tool or to pay different loans, which was not necessary.  This employee also reported the routine practice of using customers' credit scores, without their knowledge, to increase credit card account openings.  For instance, when a customer came into the branch for routine business, branch employees were instructed to check their credit scores, and if the score was good, the customer would be advised that their current Fifth Third credit card was compromised and the bank would send the customer a new card with a new account number.  This witness confirmed that branch employees engaged in these tactics to maintain their sales quotas.

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS MADE DURING THE CLASS PERIOD

51.     During the Class Period, Defendants made false and misleading statements and material omissions concerning Fifth Third's: (1) purported risk disclosures; (2) risk management practices; (3) Code of Business Conduct and Ethics; (4) product cross-selling and consumer business; and (5) employee incentive compensation.

### A.    Defendants' Misleading Statements and Material Omissions Regarding Risks Facing Fifth Third

52.     The Class Period begins on November 9, 2016, when Fifth Third filed its Form 10-Q quarterly report with the SEC, signed by defendants Carmichael and Tuzun, reporting the Company's 3Q 2016 results.  The 3Q 2016 Form 10-Q stated, "There have been no material changes made during the third quarter of 2016 to any of the risk factors as previously disclosed in the

- 19 -

Bancorp's most recent annual report and subsequent periodic reports as filed with the SEC." Prior to the filing of the 3Q 2016 Form 10-Q, Fifth Third's most recent SEC reports to contain the Company's risk factors were Fifth Third's FY 2015 Form 10-K (filed February 25, 2016) and 2Q 2016 Form 10-Q (filed August 5, 2016). The following purported risk factors in Fifth Third's 2015 Form 10-K and 2Q 2016 Form 10-Q, incorporated by reference in the Company's 3Q 2016 Form 10-Q, were materially misleading, in pertinent part:

    a.    "Fifth Third's actual or alleged conduct in activities, such as lending practices, data security, corporate governance and acquisitions, may result in negative public opinion and may damage Fifth Third's reputation. Actions taken by government regulators and community organizations may also damage Fifth Third's reputation."

    b.    "Fifth Third and/or its affiliates are or may become involved from time to time in information-gathering requests, reviews, investigations and proceedings (both formal and informal) by governmental regulatory agencies and law enforcement authorities, as well as self-regulatory agencies, regarding their respective businesses."

    c.    "Compliance with the rules and policies adopted by the CFPB may limit the products Fifth Third may permissibly offer to customers, or limit the terms on which those products may be issued, or may adversely affect Fifth Third's ability to conduct its business as previously conducted."

    d.    "Like other large financial institutions and companies, Fifth Third is also subject to risk from potential employee misconduct, including noncompliance with policies and improper use or disclosure of confidential information."

    e.    "[T]he CFPB . . . [has] the authority to compel or restrict certain actions by Fifth Third and its banking subsidiary, Fifth Third Bank. . . ." "In the wake of the most recent global financial crisis, Fifth Third and other financial institutions more generally have been subjected to increased scrutiny from government authorities, including bank regulatory authorities, stemming from broader systemic regulatory concerns, including with respect to . . . consumer compliance and other prudential matters and efforts to ensure that financial institutions take steps to improve their risk management and prevent future crises."

    f.    "[G]overnment authorities, including the bank regulatory agencies, are also pursuing aggressive enforcement actions with respect to compliance and other legal matters involving financial activities, which heightens the risks associated with actual and perceived compliance failures."

    53.    On February 24, 2017, Fifth Third filed its 2016 Form 10-K with the SEC, signed by defendants Carmichael and Tuzun. The Company's 2016 Form 10-K identified the following risk

- 20 -

factors, in pertinent part, that "***could***" have an impact on Fifth Third's operations and business and

were materially misleading:

a.   "Fifth Third's actual or alleged conduct in activities, such as lending practices, data security, corporate governance and acquisitions, may result in negative public opinion and may damage Fifth Third's reputation.  Actions taken by government regulators and community organizations may also damage Fifth Third's reputation."

b.   "Fifth Third and/or its affiliates are or may become involved from time to time in information-gathering requests, reviews, investigations and proceedings (both formal and informal) by governmental regulatory agencies and law enforcement authorities, as well as self-regulatory agencies, regarding their respective customers and businesses."

c.   "Compliance with the rules and policies adopted by the CFPB may limit the products Fifth Third may permissibly offer to customers, or limit the terms on which those products may be issued, or may adversely affect Fifth Third's ability to conduct its business as previously conducted."

d.   "Like other large financial institutions and companies, Fifth Third is also subject to risk from potential employee misconduct, including non-compliance with policies and improper use or disclosure of confidential information."

e.   "[T]he CFPB . . . [has] the authority to compel or restrict certain actions by Fifth Third and its banking subsidiary, Fifth Third Bank. . . ."  "In the wake of the most recent global financial crisis, Fifth Third and other financial institutions more generally have been subjected to increased scrutiny from government authorities, including bank regulatory authorities, stemming from broader systemic regulatory concerns, including with respect to . . . consumer compliance and other prudential matters and efforts to ensure that financial institutions take steps to improve their risk management and prevent future crises."

f.   "[G]overnment authorities, including the bank regulatory agencies, are also pursuing aggressive enforcement actions with respect to compliance and other legal matters involving financial activities, which heightens the risks associated with actual and perceived compliance failures and may also adversely affect Fifth Third's ability to enter into certain transactions or engage in certain activities, or obtain necessary regulatory approvals in connection therewith."

g.   "Fifth Third's framework for managing risks may not be effective in mitigating its risk and loss. . . ."  "A failure in Fifth Third's internal controls could have a significant negative impact . . . on the perception that customers, regulators and investors may have of Fifth Third. . . ."  "If Fifth Third's risk management framework proves ineffective, Fifth Third could incur litigation, negative regulatory consequences [and] reputational damages . . . ."

54.     On February 28, 2018, Fifth Third filed its 2017 Form 10-K with the SEC, signed by defendants Carmichael and Tuzun.  The Company's 2017 Form 10-K identified the following risk factors, in pertinent part, that "*could*" have an impact on Fifth Third's operations and business and were materially misleading:

a.      "Fifth Third's actual or alleged conduct in activities, such as certain sales and lending practices, data security, corporate governance and acquisitions, behavior of employees, association with particular customers, business partners, investment or vendors, as well as developments from any of the other risks described above, may result in negative public opinion and may damage Fifth Third's reputation.  Actions taken by government regulators, shareholder activists and community organizations may also damage Fifth Third's reputation."

b.      "Fifth Third and/or its affiliates are or may become involved from time to time in information-gathering requests, reviews, investigations and proceedings (both formal and informal) by governmental regulatory agencies and law enforcement authorities, as well as self-regulatory agencies, regarding their respective customers and businesses, as well as their sales practices, data security, product offerings, compensation practices, and other compliance issues.  Also, a violation of law or regulation by another financial institution may give rise to an inquiry or investigation by regulators or other authorities of the same or similar practices by Fifth Third. . . ." "Like other large financial institutions and companies, Fifth Third is also subject to risk from potential employee misconduct, including non-compliance with policies and improper use or disclosure of confidential information."

c.      "[T]he CFPB . . . [has] the authority to compel or restrict certain actions by Fifth Third and its banking subsidiary, Fifth Third Bank. . . ."  "Fifth Third and other financial institutions are subject to scrutiny from government authorities, including bank regulatory authorities, stemming from broader systemic regulatory concerns, including with respect to . . . consumer compliance and other prudential matters and efforts to ensure that financial institutions take steps to improve their risk management and prevent future crises."

d.      "[G]overnment authorities, including the bank regulatory agencies and law enforcement, are also pursuing aggressive enforcement actions with respect to compliance and other legal matters involving financial activities, which heightens the risks associated with actual and perceived compliance failures."

e.      "Fifth Third's framework for managing risks may not be effective in mitigating its risk and loss. . . ."  "A failure in Fifth Third's internal controls could have a significant negative impact . . . on the perception that customers, regulators and investors may have of Fifth Third. . . ."  "If Fifth Third's risk management framework proves ineffective, Fifth Third could incur litigation, negative regulatory consequences [and] reputational damages . . . ."

- 22 -

55.     On March 1, 2019, Fifth Third filed its 2018 Form 10-K with the SEC, signed by defendants Carmichael and Tuzun.  The Company's 2018 Form 10-K identified the following risk factors, in pertinent part, that "*could*" have an impact on Fifth Third's operations and business and were materially misleading:

a.  "Fifth Third's actual or alleged conduct in activities, such as certain sales and lending practices, data security, corporate governance and acquisitions, behavior of employees, association with particular customers, business partners, investment or vendors, as well as developments from any of the other risks described above, may result in negative public opinion and may damage Fifth Third's reputation.  Actions taken by government regulators, shareholder activists and community organizations may also damage Fifth Third's reputation."

b.  "Fifth Third and/or its affiliates are or may become involved from time to time in information-gathering requests, reviews, investigations and proceedings (both formal and informal) by governmental regulatory agencies and law enforcement authorities, as well as self-regulatory agencies, regarding their respective customers and businesses, as well as their sales practices, data security, product offerings, compensation practices and other compliance issues.  Also, a violation of law or regulation by another financial institution may give rise to an inquiry or investigation by regulators or other authorities of the same or similar practices by Fifth Third. . . ."  "Like other large financial institutions and companies, Fifth Third is also subject to risk from potential employee misconduct, including non-compliance with policies and improper use or disclosure of confidential information."

c.  "[T]he CFPB . . . [has] the authority to compel or restrict certain actions by the Bancorp and Fifth Third Bank."  "The Bancorp and Fifth Third Bank. . . . Fifth Third and other financial institutions are subject to scrutiny from government authorities, including bank regulatory authorities, stemming from broader systemic regulatory concerns, including with respect to . . . consumer compliance and other prudential matters and efforts to ensure that financial institutions take steps to improve their risk management and prevent future crises."

d.  "Fifth Third's framework for managing risks may not be effective in mitigating its risk and loss. . . .  A failure in Fifth Third's internal controls could have a significant negative impact . . . on the perception that customers, regulators and investors may have of Fifth Third. . . ."  "If Fifth Third's risk management framework proves ineffective, Fifth Third could incur litigation, negative regulatory consequences [and] reputational damages . . . ."

56.     Defendants' statements identified in ¶¶52-55, were false and misleading and omitted material facts because at the time they were made such risks were then existing due to the CFPB

- 23 -

investigation into unauthorized account practices and Defendants' knowledge that the practices had

been ongoing at Fifth Third since at least 2008.

**B.** **Defendants' Misleading Statements and Material Omissions**
    **Regarding Fifth Third's Risk Management Practices**

57.     On November 9, 2016, Fifth Third filed its 3Q 2016 Form 10-Q, signed by

defendants Carmichael and Tuzun.  The 3Q 2016 Form 10-Q addressed Fifth Third's purported risk

practices for managing regulatory compliance risk.  According to the Form 10-Q:

> Regulatory compliance risk is defined as the risk of legal or regulatory
> sanctions, financial loss, or damage to reputation as a result of noncompliance with
> (i) applicable laws, regulations, rules and other regulatory requirements (including
> but not limited to the risk of consumers experiencing economic loss or other legal
> harm as a result of noncompliance with consumer protection laws, regulations and
> requirements); (ii) . . . codes of conduct; and (iii) principles of integrity and fair
> dealing applicable to Fifth Third's activities and functions.

58.     Defendants' misleading statements in the 3Q 2016 Form 10-Q pertaining to Fifth

Third's regulatory compliance risk management practices were, in pertinent part, as follows:

a.      "Fifth Third focuses on managing regulatory compliance risk in accordance with the
        Bancorp's integrated risk management framework, which ensures consistent
        processes for identifying, assessing, managing, monitoring, and reporting risks."

b.      "The current regulatory environment, including heightened regulatory expectations
        and material changes in laws and regulations, increases compliance risk.  To mitigate
        compliance risk, Compliance Risk Management provides independent oversight to
        ensure consistency and sufficiency in the execution of the program, and ensures that
        lines of business, regions and support functions are adequately identifying, assessing
        and monitoring compliance risks and adopting proper mitigation strategies. . . .
        Additionally, Compliance Risk Management implements key compliance programs
        and processes including but not limited to, risk assessments, key risk indicators,
        issues tracking, regulatory compliance testing and monitoring, . . ."

c.      "Compliance Risk Management provides independent oversight to ensure that an
        enterprise-wide framework, including processes and procedures, are in place to
        comply with applicable laws, regulations, rules and other regulatory requirements;
        internal policies and procedures; and principles of integrity and fair dealing
        applicable to the Bancorp's activities and functions.  The Bancorp focuses on
        managing regulatory compliance risk in accordance with the Bancorp's integrated
        risk management framework, which ensures consistent processes for identifying,
        assessing, managing, monitoring and reporting risks."

- 24 -

59.     On February 24, 2017, Fifth Third filed its Form 10-K annual report with the SEC, signed by defendants Carmichael and Tuzun, reporting the Company's fourth quarter and 2016 results.  The 2016 Form 10-K contained the following misleading statements about Fifth Third's purported regulatory compliance risk management practices, in pertinent part:

a.      "Fifth Third focuses on managing regulatory compliance risk in accordance with the Bancorp's integrated risk management framework, which ensures consistent processes for identifying, assessing, managing, monitoring, and reporting risks."

b.      "The current regulatory environment, including heightened regulatory expectations and material changes in laws and regulations, increases compliance risk.  To mitigate compliance risk, Compliance Risk Management provides independent oversight to ensure consistency and sufficiency in the execution of the program, and ensures that lines of business, regions and support functions are adequately identifying, assessing and monitoring compliance risks and adopting proper mitigation strategies. . . . Additionally, Compliance Risk Management implements key compliance programs and processes including but not limited to, risk assessments, key risk indicators, issues tracking, regulatory compliance testing and monitoring, . . ."

c.      "Compliance Risk Management provides independent oversight to ensure that an enterprise-wide framework, including processes and procedures, are in place to comply with applicable laws, regulations, rules and other regulatory requirements; internal policies and procedures; and principles of integrity and fair dealing applicable to the Bancorp's activities and functions.  The Bancorp focuses on managing regulatory compliance risk in accordance with the Bancorp's integrated risk management framework, which ensures consistent processes for identifying, assessing, managing, monitoring and reporting risks."

60.     On February 28, 2018, Fifth Third filed its Form 10-K annual report with the SEC, signed by defendants Carmichael and Tuzun, reporting the Company's 4Q and 2017 results.  The 2017 Form 10-K identified Fifth Third's "core principles of risk management that are used to ensure the [Company] is operating in a safe and sound manner."  Defendants' misleading statements in the "core principles" of risk management were, in pertinent part, as follows:

•      Ensure Fifth Third's products and services are designed, delivered and maintained to provide value and benefit to its customers and to Fifth Third, and that potential opportunities remain aligned to the core customer base.  The Bancorp does not offer products or services that are not appropriate for its customers.

*       *       *

- 25 -

- Act with integrity in all activities.

- Focus on providing operational excellence by providing reliable, accurate and efficient services to meet customer's needs.

\* \* \*

- Conduct business in compliance with all applicable laws, rules and regulations and in alignment with internal policies and procedures.

61. The Company's 2017 Form 10-K also contained the following misleading statements about Fifth Third's purported regulatory compliance risk management practices, in pertinent part:

a. "Fifth Third focuses on managing regulatory compliance risk in accordance with the Bancorp's integrated risk management framework, which ensures consistent processes for identifying, assessing, managing, monitoring, and reporting risks."

b. "The current regulatory environment, including heightened regulatory expectations and material changes in laws and regulations, increases compliance risk. To mitigate compliance risk, Compliance Risk Management provides independent oversight to ensure consistency and sufficiency in the execution of the program, and ensures that lines of business, regions and support functions are adequately identifying, assessing and monitoring compliance risks and adopting proper mitigation strategies. . . . Additionally, the Chief Compliance Officer is responsible for establishing and overseeing the Compliance Risk Management program which implements key compliance processes including but not limited to, risk assessments, key risk indicators, issues tracking, regulatory compliance testing and monitoring, . . . ."

62. On March 1, 2019, Fifth Third filed its Form 10-K annual report with the SEC, signed by defendants Carmichael and Tuzun, reporting the Company's 4Q and 2018 results. The 2018 Form 10-K contained the following misleading statements about Fifth Third's purported regulatory compliance risk management practices, in pertinent part:

a. "Fifth Third focuses on managing regulatory compliance risk in accordance with the Bancorp's integrated risk management framework, which ensures consistent processes for identifying, assessing, managing, monitoring, and reporting risks."

b. The current regulatory environment, including heightened regulatory expectations and material changes in laws and regulations, increases compliance risk. "To mitigate compliance risk, Compliance Risk Management provides independent oversight to ensure consistency and sufficiency in the execution of the program, and ensures that lines of business, regions and support functions are adequately identifying, assessing and monitoring compliance risks and adopting proper mitigation strategies. . . . Additionally, the Chief Compliance Officer is responsible

- 26 -

for establishing and overseeing the Compliance Risk Management program which implements key compliance processes, including but not limited to, . . . risk assessments, key risk indicators, issues tracking, regulatory compliance testing and monitoring, . . ."

63.    The statements identified in ¶¶58-62, were materially false and misleading and omitted material facts because Defendants failed to disclose that Fifth Third was already in receipt of an Investigative Demand from the CFPB, which informed Defendants that CFPB was investigating Fifth Third for its unauthorized account practices, and failed to disclose that unauthorized account practices had been ongoing at Fifth Third since at least 2008.

C.    **Defendants' Misleading Statements and Material Omissions Regarding Fifth Third's Code of Business Conduct and Ethics**

64.    At the start of the Class Period, Fifth Third maintained a Code of Business Conduct and Ethics, which was amended several times during the Class Period. Fifth Third filed the Code and the amendments with the SEC on Current Report Form 8-Ks so investors were informed of the Company's purported practices. The Code was applicable to all officers, directors and employees of Fifth Third, including but not limited to Fifth Third's principal executive officer (defendant Carmichael), principal financial officer (defendant Tuzun), principal accounting officer and controller.

65.    The Code of Business Conduct and Ethics in effect at the start of the Class Period through September 18, 2017 was filed with the SEC on Current Report on Form 8-K on March 16, 2016 ("2016 Code"). The misleading statements in the 2016 Code were, in pertinent part:

a.    "We must all deal honestly, ethically, fairly and in good faith with Fifth Third's customers, shareholders, employees, suppliers, regulators, business partners, competitors and others. We may not take unfair advantage of anyone through manipulation, concealment, abuse of privileged or confidential information, misrepresentation, fraudulent behavior or any other unfair dealing practice."

b.    "Employees, customers, shareholders and communities must know that Fifth Third conducts all activities with the highest standards and unquestioned integrity. They

have to know by our actions that they can trust us, and we have to show by our actions that we provide something different; something of value."

    c.    "Our Purpose is to listen to customers and inspire them with smart financial solutions that continually improve their lives and the well-being of our communities. Relationships are at the heart of our Purpose, and what could be more personal than that? This is not a mere collection of words, but rather a blueprint for how we are to conduct ourselves. We ask questions. We listen. We inspire. We focus on continual improvement – for customers, for communities and for ourselves."

    d.    "Employees are expected and required to take appropriate steps to address issues that subject the bank to risk of potential regulatory, reputational or legal harm."

66. On September 25, 2017, Fifth Third filed a Current Report on Form 8-K with the SEC to which the Company appended as an exhibit an amended and restated Code, adopted and approved by the Company's Board of Directors, including defendant Carmichael, on September 19, 2017 ("2017 Code"). The 2017 Code included a message from Carmichael stating, "Doing the right thing is central to our ability to achieve our Vision to be the One Bank people most value and trust. It's a commitment that inspires us to create a great customer experience . . . . It is a commitment that forms the bedrock of Fifth Third's reputation as a respected corporate citizen. And it is a commitment that begins with each Fifth Third employee." The misleading statements in the 2017 Code were, in pertinent part:

    a.    "Fifth Third believes that fair and honest business practices are essential to keeping our customer at the center of everything we do. We should always act in the best interest of our customers. Unethical business practices, such as incentive gaming, falsifying documents or inflating performance results, are strictly prohibited. You are prohibited from manipulating records, opening accounts without customer authorization, offering customers unnecessary products and falsifying records or applications in order to benefit yourself or other employees of Fifth Third."

    b.    "Fifth Third is committed to providing customers with financial products and services in ways that avoid the use of any practices that could be deemed predatory, unfair, deceptive or abusive."

    c.    "Fifth Third Bancorp is committed to minimizing the impact of internal and external fraud to both Fifth Third and our customers. Every employee at every level of the Bancorp is accountable and expected to do their part to protect Fifth Third and our customers from fraudulent activity. There is zero tolerance for internal fraud within Fifth Third's organization and internal fraudulent activity must be referred to Bank

- 28 -

Protection when suspected. Failure to report fraudulent activity exposes Fifth Third to regulatory and compliance violations and could lead to significant financial penalties and additional fraud losses."

d.     "Employees must not engage in deceptive or dishonest business practices, such as misrepresenting products or offering customers inaccurate or insufficient information about products in order to benefit personally."

e.     "A fundamental part of our commitment to integrity is adhering to the letter and the spirit of applicable laws, regulations and Bancorp policies. All employees are required to fully comply with all applicable laws, rules and regulations, as well as with all Fifth Third policies and procedures."

67.     On September 24, 2018, Fifth Third filed a Current Report on Form 8-K with the SEC to which Defendants appended as an exhibit an amended and restated Code, adopted and approved by the Company's Board of Directors, including defendant Carmichael, on September 19, 2018 ("2018 Code"). The 2018 Code included the same message from Carmichael as alleged in ¶66. The misleading statements in the 2018 Code were, in pertinent part:

a.     "Fifth Third believes that fair and honest business practices are essential to keeping our customer at the center of everything we do. We should always act in the best interest of our customers." "Unethical business practices are strictly prohibited. Examples of such activities include, but are not limited to":

    • Incentive gaming

    • Falsifying documents or inflating performance results

    • Manipulating records

    • Opening bogus or fake accounts

    • Opening accounts or selling products without customer authorization

    • Offering customers unnecessary products

    • Falsifying records or applications in order to benefit yourself or other employees of Fifth Third

b.     "Fifth Third is committed to providing customers with financial products and services in ways that avoid the use of any practices that could be deemed predatory, unfair, deceptive or abusive."

- 29 -

c.    "Fifth Third Bancorp is committed to minimizing the impact of internal and external fraud to both Fifth Third and our customers.  Every employee at every level of the Bancorp is accountable and expected to do [their] part to protect Fifth Third and our customers from fraudulent activity.  There is zero tolerance for internal fraud within Fifth Third's organization and internal fraud activity must be referred to Bank Protection when suspected.  Failure to report fraudulent activity exposes Fifth Third to regulatory and compliance violations and could lead to significant financial penalties and additional fraud losses."

68.    On September 20, 2019, Fifth Third filed a Current Report on Form 8-K with the SEC to which Defendants appended as an exhibit an amended and restated Code, adopted and approved by the Company's Board of Directors, including defendant Carmichael, on September 16, 2019 ("2019 Code").  The 2019 Code included the same message from Carmichael as alleged in ¶66.  The misleading statements in the 2019 Code were, in pertinent part:

a.    "Fifth Third believes that fair and honest business practices are essential to keeping our customer at the center of everything we do.  We should always act in the best interest of our customers."  "Unethical business practice are strictly prohibited.  Examples of such activities include, but are not limited to":

- Incentive gaming

- Falsifying documents or inflating performance results

- Manipulating records

- Opening bogus or fake accounts

- Opening accounts or selling products without customer authorization

- Offering customers unnecessary products

- Falsifying records or applications in order to benefit yourself or other employees of Fifth Third

b.    "Fifth Third is committed to providing customers with financial products and services in ways that avoid any practices that could be deemed predatory, unfair, deceptive or abusive."

c.    "Fifth Third Bancorp is committed to minimizing the impact of internal and external fraud to both Fifth Third and our customers.  Every employee at every level of the Bancorp is accountable and expected to do [their] part to protect Fifth Third and our customers from fraudulent activity.  There is zero tolerance for internal fraud within Fifth Third's organization and internal fraudulent activity must be referred to Bank

Protection when suspected. Failure to report fraudulent activity exposes Fifth Third to regulatory and compliance violations and could lead to significant financial penalties and additional fraud losses."

69.     The statements in ¶¶65-68, were false and misleading and omitted material facts because the unethical practices Defendants asserted were prohibited by Fifth Third's Code of Business Conduct and Ethics were already taking place at Fifth Third and the Company was under investigation by the CFPB for the very practices that the Code identified as unethical.

**D.      Defendants' False and Misleading Statements and Omissions Regarding Fifth Third's Product Cross Selling, Consumer Business and Customer Relations**

70.     On February 24, 2017, Fifth Third filed its 2016 Form 10-K, signed by defendants Carmichael and Tuzun, which stated that Fifth Third was "taking advantage of cross-sell opportunities" generated by synergies formed by the Company's business segments.

71.     On February 28, 2018, Fifth Third filed its 2017 Form 10-K, signed by defendants Carmichael and Tuzun, which contained substantively the same misleading statement as set forth in ¶70, stating that Fifth Third was "taking advantage of cross-sell opportunities" generated by synergies formed by the Company's business segments.

72.     On March 1, 2019, Fifth Third filed its 2018 Form 10-K, signed by defendants Carmichael and Tuzun, which contained substantively the same misleading statement as set forth in ¶70, stating that Fifth Third was "taking advantage of cross-sell opportunities" generated by synergies formed by the Company's business segments.

73.     On December 7, 2016, defendants Carmichael and Tuzun presented at the Goldman Sachs US Financial Services Conference. During the conference Carmichael spoke to investors about Fifth Third's consumer growth strategy, stating that the Company was "looking for a more balanced growth between our consumer and our commercial businesses" and "[t]o that end, we are

- 31 -

focused on growing our credit card and unsecured personal lending businesses. Both of these businesses have attractive return profiles and growth potential."

74.     On January 24, 2017, Fifth Third hosted an earnings conference call, attended by Carmichael and Tuzun, to discuss the Company's 4Q 2017 financial results. Carmichael talked again about Fifth Third's consumer growth strategy, which was to grow credit cards and consumer loans to "allow us to achieve a better balance between commercial and consumer loan growth." During the conference call analysts asked Carmichael about Fifth Third's strategy and "what is going to make you different than just being a good bank?" Carmichael responded:

> . . . we have a great business model. We have the right businesses that we are in, right, and we do a fantastic job of going to the market and our people do a fantastic job of going to the market really as one bank – Fifth Third.
>
> And it is really about harvesting the full relationships of the customer relationships on the consumer side, on the commercial side. It is about providing the right products and services to our customers and really being the one bank our customers most value and trust. We have worked hard to put that model in place across our franchise. So we feel very good about that.
>
> And really our strong brand and our footprint is extremely important to us and we are going to continue to focus on our brand equity in the marketplace. But when you look at it across the board we have strong earnings capacity, we have a great team in place, we have invested heavily in the right products. We made some strategic moves recently that position us well for the future. And I think we will have the products, the services and the team to deliver on that in the market.

75.     On March 7, 2017, defendants Carmichael and Tuzun presented at RBC Capital Markets Financial Institutions Conference. Carmichael again discussed with analysts and investors Fifth Third's consumer growth strategy, stating, "Growth in credit cards and other consumer loans should allow us to achieve a better balance between commercial and consumer loan growth." During the call, Carmichael boasted about Fifth Third's ranking as "the second most trusted company for retail banking" and told investors that the Company takes "pride in this because we believe in putting the customer at the center of everything we do. In addition to being a trusted

- 32 -

partner, we have received high customer satisfaction scores and our mobile offerings have received a number of accolades."

76.     On December 7, 2017, Fifth Third hosted an Investor Day for analysts and investors, which was attended by Carmichael and Tuzun. During the conference Carmichael talked about the customer experience and providing customers with the products they need. Carmichael stated: "It starts with the financial needs analysis, and we dive deep into understanding the needs of that customer. . . . Once again, we can't be a great bank if we don't focus on taking care of the customer, and we measure this very carefully. We got to make sure that we have products that are seamless, convenient, fast, that they're tailored to meet the customer needs." During the same call Carmichael also emphasized that "Value and trust is extremely important."

77.     During the same call Philip McHugh, a Fifth Third executive vice president, also talked about the customer experience, stating:

> First, we focus on the customer, right? We want to understand their state of mind, their situation, their needs, emotionally how can we connect with them? Then, we utilize fundamental selling skills. We ask thought-provoking questions to clarify their needs. We teach our teams to listen, stop talking, listen. Let the customer tell us what they want, then we earn the right to advance with those customers by explaining what we heard, confirming but also displaying significant product knowledge and how we can help them and then we provide solutions based on those needs.

78.     During the investor call, Frank R. Forrest, Fifth Third's Chief Risk Officer, discussed at length the Company's risk management practices, stating:

- "We have enhanced risk management programs and processes across the firm. And through all these actions, we are now achieving strong and consistent results, and we are exceptionally well positioned to perform through the next cycle."

- "[W]e are managing the risk across the company today exceptionally well."

- "We've improved expertise in the most significant areas of risk that face our industry and our company. That includes . . . customer practices. . . ."

- "I'm now going to talk a little bit about culture and how we manage conduct risk. We all know that conduct risk, ethics, how we handle our customer relationships, how we treat our employees, it's all been headline risk. We've read a lot about it. Conduct risk at Fifth Third Bank is well managed, and it's in alignment with our core values. It is foundational in everything we do to have a strong risk culture and a One Bank strategy that Greg just covered. We have a corporate responsibility and reputation office that provides oversight in governance of key areas that drive our culture, and that includes ethics and diversity and community commitment and safeguarding the reputation of the company, which is one of my primary responsibilities. All of these areas are critical elements of our company's culture, and we closely monitor these activities and report them to the Board and to management and to our regulators."

- "The last consumer portfolio I want to talk briefly about is card. It's $2.2 billion today. It's 6% of our overall consumer portfolio. But we have a strategy that you'll hear about to grow this portfolio within our appetite with a measured and a managed approach. We've been actually recruiting industry experts recently to help us grow the business within our defined risk profile, and we see some opportunity here, and we are advancing the use of analytics to improve our credit decisioning on the card business."

79. On October 23, 2018, Fifth Third hosted an earning conference call with investors, which was attended by Carmichael and Tuzun, to discuss the Company's 3Q 2018 financial results. During the call Carmichael told investors that organic growth was a top priority for the Company, stating, "Our third priority is to pursue profitable organic growth opportunities in our key businesses. In addition to our branch network optimization initiative to drive improved household, deposit, and revenue growth across our retail footprint, we're also prioritizing organic growth opportunities across all areas of the franchise."

80. On January 22, 2019, Fifth Third hosted an earnings conference call with investors, which was attended by Carmichael and Tuzun, to discuss the Company's 4Q and 2018 financial results. During the call Carmichael stated that "we continue to invest in organic growth opportunities, including the previously communicated branch network optimization."

81. The statements identified in ¶¶70-80, were materially false and misleading and omitted material facts because Defendants failed to disclose that since at least 2008 Fifth Third had

been using unethical account practices to increase the number of products and services it provided to its customers. Without customers' knowledge or consent, Fifth Third's employees were incentivized to open accounts, transfer funds from customer accounts to improperly opened accounts, enroll customers in online banking, and activate unauthorized lines of credit. In doing so Fifth Third endangered its customers' data and created the illusion of stable growth in its consumer business. Fifth Third also failed to disclose that it had received an Investigative Demand from the CFPB on November 3, 2016, which informed Defendants that CFPB was investigating Fifth Third for its unethical and illegal banking practices.

### E.    Defendants' False and Misleading Statements Concerning Fifth Third's Incentive Compensation

82.    On March 9, 2017, Fifth Third filed a Proxy Statement with the SEC, which was reviewed by defendants Carmichael and Tuzun. The Proxy Statement discussed the Company's compensation plan, stating in pertinent part:

a.    "The Company endeavors to attract and retain the best people in the financial services industry and motivate them to fulfill the Company's Vision of becoming the One Bank that people most value and trust. We intend to accomplish this in the way that we consider our shareholders' long-term interests, by establishing compensation programs that reward our people for delivering products our customers highly value, and avoiding excessive risk. Our compensation philosophy comprises the following guiding principles":

- Manage risk effectively within incentive programs designed to pay for performance.

- Align compensation with long-term shareholder interests.

- Provide strong oversight of executive pay.

- Conduct recurring processes that ensure strategic and fiscal soundness along with balanced risk taking.

b.    "We incorporate formulaic and discretionary risk-balancing mechanisms, which outline specific metrics for modifying payouts to discourage unnecessary or imprudent risk-taking actions."

- 35 -

c.   "In December 2015, the Committee, in conjunction with the Risk and Compliance Committee, reviewed our executive and other incentive programs. Based on the provisions and actions above, the Committee concluded that their design and/or metrics do not encourage unnecessary and/or inappropriate risk taking."

83.   On March 6, 2018, Fifth Third filed a Proxy Statement with the SEC, which was reviewed by defendants Carmichael and Tuzun. The Proxy Statement discussed the Company's compensation plan, stating in pertinent part:

a.   "At Fifth Third, we endeavor to attract and retain the best people and motivate them to fulfill the Company's Vision of becoming the One Bank that people most value and trust. We intend to accomplish this in the way that we consider our shareholders' long-term interests, by establishing compensation programs that reward our people for delivering products and services our customers highly value, and for avoiding excessive risk."

b.   "We believe it is critical to bring a multi-faceted strategy toward mitigating risk in incentive plans. We incorporate formulaic and discretionary risk-balancing mechanisms, which include specific metrics for modifying payouts to discourage taking unnecessary or imprudent risks."

c.   "In February 2017, the Committee, in conjunction with the Risk and Compliance Committee, reviewed our executive and other incentive programs. Based on the provisions and actions above, the Committee concluded that their design and/or metrics do not encourage taking unnecessary or inappropriate risk."

84.   On March 6, 2019, Fifth Third filed a Proxy Statement with the SEC, which was reviewed by defendants Carmichael and Tuzun. The Proxy Statement discussed the Company's compensation plan, stating in pertinent part:

a.   "Our compensation methodology and structure centers on our compensation philosophy, which comprises the following guiding principles":

   • Manage risk effectively within incentive programs designed to pay for performance.

   • Align compensation with long-term shareholder interests.

   • Provide strong oversight of executive compensation.

   • Conduct recurring processes that ensure strategic and fiscal soundness along with balanced risk taking.

- 36 -

b.  "We believe it is critical to bring a multi-faceted strategy toward mitigating risk in our compensation programs and incentive plans. We incorporate formulaic and discretionary risk-balancing mechanisms, which include specific metrics for modifying payouts to discourage taking unnecessary or imprudent risks."

c.  "In December 2018, the Committee met jointly with the Risk and Compliance Committee to review our executive and other incentive programs. Based in part on the provisions and actions above, the Committee concluded that the design and/or metrics of such programs do not encourage taking unnecessary or inappropriate risk."

85.     The statements identified in ¶¶82-84, were materially false and misleading and omitted material facts because Defendants failed to disclose that Fifth Third used incentive compensation programs that rewarded managers and their subordinate employees for selling new products and services to existing customers. Fifth Third also failed to disclose that these incentive compensation plans were not properly implemented and monitored and were therefore creating incentives for Fifth Third employees to engage in misconduct in order to meet goals and earn additional compensation.

## VI.     THE TRUTH IS REVEALED

86.     On March 2, 2020, less than five weeks after it was reported that Fifth Third's Chief Risk Officer Frank Forrest was retiring, and after Forrest had completed over $3.0 million in Class Period insider stock sales, the Company filed its Annual Report on Form 10-K for FY 2019 with the SEC. At page 161 of the Form 10-K, Fifth Third disclosed for the first time that "the CFPB staff has notified Fifth Third that it intends to file an enforcement action in relation to alleged unauthorized account openings. . . . The impact of this potential enforcement action has been reflected in our reasonably possible losses." After the close of the market on March 2, 2020, Barclays Capital issued a report on Fifth Third titled "2019 10-K Review: CFPB Action for Unauthorized Account Openings." Based on the Form 10-K, the report included that "CFPB staff notified FITB [Fifth Third] that it intends to file an enforcement action in relation to alleged unauthorized account openings." The report also identified that in conjunction with the disclosure of the CFPB action,

- 37 -

Fifth Third had more than doubled its reserve for "reasonably possible . . . losses related to regulatory proceedings," from $27 million in 3Q 2019 to $56 million.

87.     Despite burying the information about the CFPB action in the Form 10-K, members of the media also uncovered and reported the negative news.  For example, on March 4, 2020, the online publisher housingwire.com published an article titled "Fifth Third facing its own fake account fiasco: Bank discloses that CFPB plans enforcement action."  The same day, *American Banker* issued an article titled "Fifth Third latest bank in CFPB crosshairs over phony accounts."  And on March 6, 2020, *Axios* issued a story reporting that "[t]he banking industry's fake account scheme may have been widespread" and that "the CFPB is targeting [Fifth Third] for 'alleged unauthorized account openings.'"

88.     As a result of the disclosure about the CFPB fake account action, Fifth Third's stock price dropped from a close of $25.72 on March 2, 2020 to a close of $24.44 on March 3, 2020, a $1.28 per share decline on unusually high volume.  Fifth Third's share price continued to drop in the days following the disclosure of the CFPB action, falling to $22.20 by March 6, 2020, a loss of $3.52 per share or 14% in four days.

89.     During the day on Monday, March 9, 2020, the CFPB issued a press release titled "Consumer Financial Protection Bureau Files Suit Against Fifth Third Bank, National Association for Allegedly Opening Unauthorized Accounts and Enrolling Consumers in Unauthorized Products and Services" and filed its complaint alleging Fifth Third had violated the Consumer Financial Protection Act's prohibition against unfair and abusive acts, as well as the Truth in Lending Act and the Truth in Savings Act.

90.     The CFPB press release reported that "for several years Fifth Third, without consumers' knowledge or consent: opened deposit and credit-card accounts in consumers' names; transferred funds from consumers' existing accounts to new, improperly opened accounts; enrolled

- 38 -

consumers in unauthorized online-banking services; and activated unauthorized lines of credit on consumers' accounts." It further reported that "for years and continuing through at least 2016, Fifth Third used a 'cross-sell' strategy to increase the number of products and services it provided to existing customers; used an incentive-compensation program to reward selling new products; and conditioned employee-performance ratings and, in some instances, continued employment on meeting ambitious sales goals"; and "despite knowing since at least 2008 that employees were opening unauthorized consumer-financial accounts, Fifth Third took insufficient steps to detect and stop the conduct and to identify and remediate harmed consumers." Linked to the press release was the filed version of the CFPB's complaint.

91.     The CFPB's complaint, filed in the United States District Court for the Northern District of Illinois, alleged eight counts against Fifth Third for violations of the Consumer Financial Protection Act's prohibition against unfair and abusive acts or practices as well as the Truth in Lending Act and the Truth in Savings Act and their implementing regulations. According to the complaint, "Fifth Third used a 'cross-sell' strategy to increase the total number of products and services it provided to existing customers" and "also used an incentive-compensation program that rewarded managers and their subordinate employees for selling new products and services to existing customers." The CFPB identified, "By 2010, at the latest, Fifth Third was aware that employees were opening products and services in consumers' names without those consumers' knowledge or consent in order to achieve sales goals or obtain incentive rewards." According to a March 9, 2020 report in *The New York Times*, "A person familiar with the bank's operations said it had begun investigating potential unauthorized transactions in 2010, after its internal compliance systems raised alarms."

92.     The CFPB alleged that both deposit accounts and credit card accounts were opened without customers' knowledge or consent. For example, "Fifth Third imposed aggressive sales goals

for its employees to sell credit cards to consumers, and its incentive-compensation program rewarded employees for selling new credit cards." As a result, the complaint alleged, "By 2009, at the latest, Fifth Third noticed a spike in unauthorized credit cards being issued to consumers." Nevertheless, "Fifth Third continued to emphasize sales and to maintain credit-card sales goals and incentive compensation."

93.     Fifth Third also "imposed aggressive sales goals for its employees to enroll consumers in its online-banking services," and in order to hit these goals "[f]rom at least 2010 through at least 2016, Fifth Third enrolled consumers in online-banking services without their knowledge or consent." Similarly, for Fifth Third's "Early Access" program – a fee-based line of credit that allows funds to be withdrawn before they have been deposited in an account – the Company "imposed aggressive sales goals for its employees… and its incentive-compensation program rewarded employees for enrolling consumers in 'fee-based products,' including Early Access." According to the CFPB:

> Fifth Third opened Early Access lines of credit on consumers' deposit accounts without their knowledge or consent. Fifth Third was aware of this by June 2010, when senior management was notified of an increase in the number of calls by employees to the internal whistleblower hotline regarding the unauthorized opening of Early Access lines of credit.

94.     As the CFPB complaint emphasized, "Even after learning of unauthorized Fifth Third consumer-financial products and services by 2008, Fifth Third failed to change its sales practices to avoid consumer harm. Instead, Fifth Third continued to foster sales practices that were likely to cause unauthorized products and services." According to the CFPB, Fifth Third "failed to take steps to determine and address a root cause of unauthorized accounts, which was consistently said by employees to be intense sales pressure" and "failed to close known loopholes in its collection of proof of consumer authorization, thereby making it easy for employees to open accounts without

- 40 -

valid signature cards for deposit accounts or applications for credit products."  "In short," as the CFPB alleged, "Fifth Third focused on its own financial interests to the detriment of consumers."

95.    The CFPB press release and complaint immediately generated national news.  For example, prior to the close of the market on March 9, 2020, *Reuters* published an article titled "U.S. consumer watchdog charges Fifth Third Bank on opening phony accounts" that reported, "The U.S. Consumer Financial Protection Bureau (CFPB) said on Monday it charged Fifth Third Bank, National Association, with creating fake client deposit and credit-card accounts and transferring clients' funds to those accounts without consent, citing an abuse of fair lending and savings laws." Similarly, *The New York Times* published an article on March 9, 2020 about the CFPB action headlined "Fifth Third Bank Opened Fraudulent Accounts, Consumer Bureau Says:  For more than eight years the bank ignored signs that employees were opening unauthorized accounts to meet aggressive sales goals, a federal regulator said in a lawsuit."  The same day *The Wall Street Journal* published an article titled "CFPB Says Fifth Third Employees Opened Accounts Without Customer Consent: Lawsuit alleges bank didn't do enough to monitor or adjust sales goals."  And the following day, *DealBreaker* published an article about the Fifth Third unauthorized account scandal titled "Fake Accounts Were Such a Good Idea, They Thought Of It Twice."

96.    In a substantial part as a result of the disclosures about Fifth Third's unauthorized account scandal, the Company's stock price dropped from a close of $22.20 on March 6, 2020 to a close of $18.30 on March 9, 2020, a $3.90 per share decline.  While the entire market was declining on March 9, 2020, Fifth Third's stock price fell substantially more than the market as a whole (as reflected by the S&P 500) and the stock price of peer banks.  Fifth Third's share price continued to drop in the days following the filing of the CFPB action, falling to $15.90 by March 12, 2020, a loss of $6.30 per share or 28% in four days.  Indeed, prior to the market opening on March 10, 2020, a CNBC article identified Fifth Third as one of the "biggest movers in the premarket" and reported,

- 41 -

"The bank was charged by the Consumer Financial Protection Bureau with opening new accounts without customer consent, in order to meet sales goals."  An article published on *The Motley Fool* website titled "Why Fifth Third's Stock Plunged Over 20% in the Last Week" reported:

> On top of those two strong headwinds [the Covid-19 pandemic and the Federal Reserve lowering interest rates], Fifth Third got hit with a lawsuit from the Consumer Financial Protection Bureau (CFPB) on March 9 for alleged illegal practices. . . .  All this adds up to tough times for Fifth Third as the stock is down about 27% in the past five trading days during trading on Tuesday, and 54% year-to-date.

97.     An April 5, 2020 article, also published on *The Motley Fool* website, similarly reported, "Fifth Third's stock probably wouldn't have fallen nearly as much in March, but it had the added headwind of being sued by the Consumer Financial Protection Bureau (CFPB) on March 9, which accused Fifth Third of opening fake accounts, not unlike the scandal that enveloped Wells Fargo (NYSE:WFC) in 2016."

## VII.     ADDITIONAL SCIENTER ALLEGATIONS

98.     By virtue of the facts set forth herein, it may be strongly inferred that Defendants knew or recklessly disregarded that the statements in §V, *supra*, were misleading to investors and omitted material information.

### A.     Defendants' Admitted Knowledge of Known Risks

99.     In addition to defendant Carmichael's receipt of the CFPB Investigative Demand Notice on November 3, 2016, Defendants' public statements throughout the Class Period evidence that they would have known, or at a minimum recklessly disregarded, both the CFPB investigation and the unauthorized account issue at Fifth Third.

100.     Defendants assured investors during Fifth Third's earnings calls and in its SEC Filings that the Company's "robust and active risk management practices" ensured that Defendants'

knew about the kind of predatory banking practices at issue here and that such issues were escalated to senior management and the Board of Directors as a matter of course.

101.    For example, Fifth Third's 3Q 2016 Form 10-Q, filed November 9, 2016, stated that Fifth Third "focuses on managing regulatory compliance risk in accordance with the Bancorp's integrated risk management framework, which ensures consistent processes for identifying, assessing, managing, monitoring, and reporting risks." Fifth Third further assured investors that it reported and escalated all compliance issues to senior management and the Board of Directors systematically:

> Fifth Third also focuses on the reporting and escalation of compliance issues to senior management and the Board. The Management Compliance Committee is the key committee that oversees and supports Fifth Third in the management of compliance risk across the enterprise. The Management Compliance Committee oversees Fifth Third-wide compliance issues, industry best practices, legislative developments (in coordination with the Regulatory Change Management Committee), regulatory concerns, and other leading indicators of compliance risk. The Management Compliance Committee reports to the Enterprise Risk Management Committee,[2] which reports to the Risk and Compliance Committee of the Board of Directors.

102.    Defendants repeated substantively identical statements concerning Fifth Third's processes for reporting and escalating compliance and other risk issues in the Bank's FY 2016 Form 10-K, filed February 24, 2017 (¶101).

103.    Defendants Carmichael and Tuzun both signed the Company's Forms 10-K and Forms 10-Q filed during the Class Period and certified them pursuant to the Sarbanes-Oxley Act ("SOX"). These SOX certifications also evidence that Defendants would have known, or had to recklessly disregard, the predatory banking practices, stating that Carmichael and Tuzun are "responsible for establishing and maintaining disclosure controls and procedures," that they

---

[2]      At all times during the Class Period, Carmichael was a member of the Enterprise Risk Management Committee ("ERMC").

- 43 -

"designed" and "[e]valuated the effectiveness of" Fifth Third's "disclosure controls and procedures,"

and that they have "disclosed" "[a]ll significant deficiencies and material weaknesses" and "[a]ny

fraud, whether or not material, that involves management or other employees who have a significant

role in the Registrant's internal control over financial reporting."

104.    In Fifth Third's 1Q 2017 Form 10-Q, filed May 5, 2017, Defendants repeated

statements substantively identical to those in its prior SEC reports concerning the Bank's processes

for reporting and escalating compliance and other risk issues (¶¶101-102).  It also elaborated on the

Company's Risk Management Process, assuring investors that this process "provides a consistent

and integrated approach for managing risks and ensuring appropriate risk mitigants and controls are

in place, and  risks and issues are appropriately escalated."  And it explained precisely how the

Company escalated compliance issues to the Bank's senior management and the Board in new detail:

> The Bancorp's risk governance structure includes management committees
> operating under delegation from, and providing information directly or indirectly to,
> the Board.  The Bancorp Board delegates certain responsibilities to Board sub-
> committees, including the RCC as outlined in each respective Committee Charter,
> which may be found on https://www.53.com.  The ERMC, which reports to the RCC,
> comprises senior management from across the Bancorp and reviews and approves
> risk management frameworks and policies, oversees the management of all risk types
> to ensure that aggregated risks remain within the Bancorp's risk appetite, and fosters
> a risk culture to ensure appropriate escalation and transparency of risks.

105.    Defendants repeated substantively identical statements concerning Fifth Third's

robust risk identification and escalation process  in the 2Q and 3Q 2017 Form 10-Qs, filed August 8,

2017, and November 6, 2017, respectively (¶¶101-102, 104).

106.    Defendants also filed and published Fifth Third's Code of Business Conduct and

Ethics with the SEC on September 25, 2017.  The 2017 Code evidences that Defendants would have

known about, or recklessly disregarded, the unauthorized account issues and the CFPB  investigation

that they omitted from their public statements to investors.  The 2017 Code mandated reporting of

any suspected fraud and compliance violations across the entire Company.  Indeed, in prohibiting

- 44 -

"unethical business practices" and telling investors that "Fifth Third is fully committed to maintaining non-abusive and anti-predatory lending practices," the 2017 Code enumerated the exact unauthorized account practices at issue here:

> Unethical business practices, such as **_incentive gaming_**, falsifying documents or inflating performance results, are strictly prohibited. You are prohibited from manipulating records, **_opening accounts without customer authorization, offering customers unnecessary products_** and falsifying records or applications in order to benefit yourself or other employees of Fifth Third.

107.    The 2017 Code further held each employee "accountable for . . . [r]eporting any potential violations or ethical concerns promptly and in an appropriate manner." Fifth Third managers were warned that they "must respond to misconduct and report violations as soon as you witness them or are made aware." And the Company insisted that "[e]very Fifth Third employee has a responsibility to communicate situations that could cause risk or harm to the Bank or our customers" – "manager and non-manger alike" – even if the employee "may not have all the information." Citing its commitment to "adhering to the letter and the spirit of applicable laws, regulations and Bancorp policies," the 2017 Code further stated that "[a]ll employees are required to fully comply with all applicable laws, rules and regulations, as well as with all Fifth Third policies and procedures." To facilitate such reporting and escalating, the 2017 Code required Fifth Third employees and executives to "refer all cases of suspected fraud through the appropriate channels," which included a 24-hour a day ethics hotline, a Fraud Hotline, and a Fraud Referral Form. The 2017 Code also affirmed that any and all of this mandatory reporting was investigated and thus escalated: "The Bancorp investigates every concern that employees report through any channel" and that "[e]very report of a violation is taken seriously."

108.    The 2017 Code also assured investors that Fifth Third was committed to "the integrity and accuracy" of its "[b]usiness and financial records," which it described as "critical to Fifth Third Bancorp's operations," including "those filed and/or produced with the Securities Exchange

- 45 -

Commission." To ensure these records "are complete, fair, accurate, clear and transparent," Fifth Third emphasized its "Disclosure Council and Disclosure Council Guidelines that govern filing and disclosures."

109. Fifth Third also held an Investor Day conference on December 7, 2017, during which its Chief Risk Officer Frank Forrest further extolled the Company's "strong proactive risk management" and stated, "Risk management at Fifth Third is embedded in our culture, in everything we do." In the context of "headline risk" in the banking sector shortly after Wells Fargo's unauthorized account scandal was disclosed, Forrest assured investors that "we closely monitor these activities and report them to the Board and to management and to our regulators."

110. Defendants filed Fifth Third's FY 2017 Form 10-K on February 28, 2018. In it, Defendants repeated the statements from the Bank's earlier SEC filings concerning its "effective" risk management reporting and escalating processes (¶¶101-102, 104-105). After reaffirming that Fifth Third's Risk Management Process "ensures consistent processes for identifying, assessing, managing, monitoring, and reporting risks" and "fosters a risk culture to ensure appropriate escalation," Defendants added that "escalat[ing] risks and issues" was a "core principle[ ]" that "ensure[d] the Bancorp is operating in a safe and sound manner."

111. In Fifth Third's subsequent quarterly and annual reports during the Class Period – filed May 4, 2018, August 8, 2018, November 6, 2018, March 1, 2019, May 10, 2019, August 8, 2019, November 8, 2019, and March 2, 2020 – Defendants repeated the statements from the Bank's 2017 Form 10-K concerning the robust risk identification and escalation process nearly verbatim. And beginning with the 2Q 2019 Form 10-Q, filed August 8, 2019, Defendants added to Fifth Third's filings the unequivocal statement that the Bank's risk management processes "ensure" that "risks and issues are appropriately escalated . . . to the Bancorp's management and Board."

112.    Fifth Third updated its Code of Business Conduct & Ethics in 2018 and 2019, filing these updates with the SEC and publishing them on September 24, 2018, and September 18, 2019, respectively.  The 2018 and 2019 Codes were identical to each other and nearly identical to the 2017 Code (including the mandatory requirements for reporting and escalating risks and issues) with one addition, a purported prohibition on "***[o]pening bogus or fake accounts***."  The 2018 and 2019 Codes also stated that "Fifth Third is committed to providing customers with financial products and services in ways that avoid any practices that could be deemed predatory, unfair, deceptive or abusive."

113.    Defendants filed Fifth Third's 2020 Proxy Statement with the SEC on March 4, 2020. The 2020 Proxy Statement assured investors that "[t]he Bancorp's risk governance structure ensures proper oversight of risk across the firm and provides a path for escalation of risks and issues to management and board-level committees to drive effective risk decisioning."  The 2020 Proxy Statement further emphasized defendant Carmichael's role in reporting and escalating risks and issues, stating that "he drove accountability for a culture of strong risk management and regulatory results" and "was also responsible for customer experience results."

## B.    Defendants Collect Over $35.4 Million in Incentive Compensation and Insider Trading

114.    The Individual Defendants were incentivized to conceal the unauthorized account practices at Fifth Third and the CFPB investigation of those practices because a significant portion of their compensation was performance-based.  According to Fifth Third's Definitive Proxy Statement dated March 9, 2017, the executive compensation structure largely comprised "pay for performance" incentive compensation, with "stock price growth," "performance relative to [banking] peers," and a "risk performance assessment" the key factors in determining the executive's incentive compensation.

- 47 -

115.    By failing to disclose the use of fake accounts at Fifth Third and the CFPB's investigation of the Company's practices, defendants Carmichael and Tuzun artificially inflated Fifth Third's stock price and obfuscated known risks facing the bank.  As a result, they were able to collect significant incentive compensation during the Class Period.

116.    As set forth in the chart below, Carmichael's incentive compensation for each of 2016, 2017 and 2018 (paid in 2017, 2018 and 2019, respectively) was both significant and far exceeded his annual salary:

| Year | Salary | Incentive Compensation and Stock Awards | Incentive Compensation as a % of Salary |
|------|--------|------------------------------------------|------------------------------------------|
| 2016 | $994,287 | $6,250,004 | 629% |
| 2017 | $1,000,064 | $7,324,998 | 732% |
| 2018 | $1,088,531 | $9,849,976 | 905% |

117.    In total, during the Class Period and while the truth about Fifth Third's predatory banking practices and the CFPB investigation were kept hidden from investors, Carmichael collected over $23.4 million in incentive-based compensation, which represented more than 88% of his total compensation.  As of March 2020, when the truth about the unauthorized accounts and CFPB investigation began to be revealed, Carmichael's incentive compensation was cut by $2.4 million relative to what he collected in 2019.

118.    As set forth in the chart below, Tuzun's incentive compensation for each of 2016, 2017 and 2018 (paid in 2017, 2018 and 2019, respectively) was also both significant and far exceeded his annual salary:

| Year | Salary | Incentive Compensation and Stock Awards | Incentive Compensation as a % of Salary |
|------|--------|------------------------------------------|------------------------------------------|
| 2016 | $519,342 | $1,900,000 | 366% |

- 48 -

| Year | Salary | Incentive Compensation and Stock Awards | Incentive Compensation as a % of Salary |
|------|--------|------------------------------------------|------------------------------------------|
| 2017 | $553,426 | $2,030,003 | 367% |
| 2018 | $586,015 | $2,350,011 | 401% |

119. In total, during the Class Period and while the truth about Fifth Third's unauthorized account practices and the CFPB investigation were kept hidden from investors, Tuzun collected over $6.2 million in incentive-based compensation, which represented more than 79% of his total compensation. As of March 2020, as the truth about the unauthorized accounts and CFPB investigation began to be revealed, Carmichael's incentive compensation was cut by over 12% ($285,000) relative to what he collected in 2019.

120. In addition to his $23.4 million in incentive compensation, during the Class Period Carmichael sold more than $5.8 million of his Fifth Third stock while in possession of material information about the CFPB investigation and unauthorized account practices. As reflected in the chart below, Carmichael sold his Fifth Third stock at prices that were $3.57 to $16.47 per share (22% to 104%) higher than where the stock price traded following the March 2020 disclosures of the truth.

| Date | Number of Shares | Share Price | Total Proceeds |
|------|------------------|-------------|----------------|
| Nov. 10, 2016 | 17,689 | $23.45 | $414,807 |
| Nov. 16, 2016 | 36,821 | $25.11 | $924,575 |
| Feb. 13, 2018 | 87,613 | $32.37 | $2,836,033 |
| Oct. 29, 2019 | 55,251 | $29.59 | $1,634,877 |
| **Total** | **197,374** | | **$5,810,292** |

121. Based on the Form 4 that was filed in conjunction with Carmichael's October 29, 2019 stock sale, he continued to hold 567,440 shares of Fifth Third stock. Accordingly, during the Class Period, Carmichael sold 26% of his Fifth Third stock. Carmichael's stock sales during the Class Period were also inconsistent with his transactions before and after the Class Period. In the 18

- 49 -

months before the start of the Class Period and in the six months following the end of the Class Period, Carmichael did not sell any of his Fifth Third stock.

**C.     Defendants Complete $242 Million Offering of Fifth Third Securities**

122.    On September 17, 2019, while Fifth Third's common stock price continued to trade at artificially inflated levels and investors were unaware of the CFPB investigation or unauthorized account scandal, Defendants sold 10,000,000 preferred shares at $25.00 per share.  The prospectus for the offering incorporated the misleading risk factors from Fifth Third's March 1, 2019 Form 10-K (¶55, *supra*) and stated that the proceeds from the offering would be used "for general corporate purposes, which may include repurchases of shares of our common stock."  The success of the offering depended on both keeping Fifth Third's common stock price artificially inflated and in keeping the CFPB investigation and predatory banking practices concealed from investors.  As a result of the September 2019 offering, Defendants were able to raise $242 million.

**D.     Defendants Issued 131 Million Shares of Fifth Third Common Stock to Complete $4.3 Billion Acquisition of MB Financial**

123.    On March 22, 2019, in its largest deal in 20 years, Fifth Third completed the $4.7 billion acquisition of Chicago-based MB Financial.  To complete the acquisition, Defendants needed to convince MB Financial shareholders to vote for the acquisition.  The Registration Statement used to solicit the vote of MB Financial shareholders touted "the historical performance of Fifth Third common stock," but it failed to disclose the unauthorized account issues at Fifth Third or the CFPB's investigation.    The Registration Statement also incorporated the false and misleading risk disclosures, identified above, in Fifth Third's FY 2017 Form 10-K (¶54, *supra*).  Unaware of the material facts about the unauthorized account practices and CFPB investigation, MB Financial shareholders approved the acquisition.

- 50 -

124.    Defendants also needed to fund the $4.7 billion acquisition of MB Financial. Because Fifth Third did not have sufficient capital to complete the acquisition with cash, Defendants had to use the Company's common stock to fund 90% of the acquisition price. Accordingly, Defendants issued approximately 131 million new shares of Fifth Third common stock that, as of March 22, 2019, was trading at the artificially inflated price of $24.62 per share.

125.    Had the truth been known about the unauthorized account scandal and CFPB investigation, Defendants would not have been able to complete the acquisition of MB Financial or, if it had been approved, would have had to issue substantially more stock to fund the acquisition. Indeed, based on Fifth Third's stock price on March 12, 2020, following the disclosures of Defendants' fraudulent conduct, Defendants would have had to issue 71.8 million more shares of stocks – 54% – than they did by completing the MB Financial acquisition while the Company's stock price was artificially inflated.

## VIII.  LOSS CAUSATION AND ECONOMIC LOSS

126.    During the Class Period, as detailed herein, Defendants made misleading statements and material omissions and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Fifth Third common stock and operated as a fraud or deceit on Class Period purchasers of Fifth Third common stock by failing to disclose that the Company's incentive structure had led to fraudulent customer accounts and credit cards opened in violation of consumer protection laws and regulations and that Fifth Third had been subject to a CFPB investigation of these activities since November 2016.

127.    Defendants' false and misleading statements had their intended effect and directly and proximately caused Fifth Third common stock to trade at artificially inflated levels, reaching a Class Period high of $34.26 per share.

128. As a result of Defendants' fraudulent conduct as alleged herein, the price at which Fifth Third common stock traded was artificially inflated throughout the Class Period. When Plaintiff and other members of the Class purchased their Fifth Third common stock, the true value of such common stock was substantially lower than the prices actually paid. As a result of purchasing Fifth Third common stock during the Class Period at artificially inflated prices, Plaintiff and other members of the Class suffered economic loss, *i.e.,* damages, under federal securities laws, when such artificial inflation dissipated.

129. As a result of Defendants' misleading statements and material omissions, Plaintiff, and other members of the Class relied, to their detriment, on such statements and documents, and/or the integrity of the market, in purchasing their Fifth Third common stock at artificially inflated prices during the Class Period. Had Plaintiff and other members of the Class known the truth, they would not have taken such actions.

130. When the misrepresentations and omissions that Defendants had concealed from the market were disclosed beginning on March 2, 2020, the price of Fifth Third common stock fell, causing substantial losses to investors.

131. On March 2, 2020, Fifth Third filed its Annual Report on Form 10-K for FY 2019 with the SEC. At page 161 of the Form 10-K, Fifth Third disclosed for the first time that "the CFPB staff has notified Fifth Third that it intends to file an enforcement action in relation to alleged unauthorized account openings. . . . The impact of this potential enforcement action has been reflected in our reasonably possible losses." As set forth above in ¶¶30-31, 86-87, analysts and reporters promptly reported on the disclosure.

132. As a result of the disclosure about the CFPB fake account action, Fifth Third's stock price dropped from a close of $25.72 on March 2, 2020 to a close of $24.44 on March 3, 2020, a $1.28 per share decline. Fifth Third's share price continued to drop in the days following the

disclosure of the CFPB action, falling to $22.20 by March 6, 2020, a loss of $3.52 per share or 14% in four days.

133.     During the day on March 9, 2020, the CFPB issued a press release titled "Consumer Financial Protection Bureau Files Suit Against Fifth Third Bank, National Association for Allegedly Opening Unauthorized Accounts and Enrolling Consumers in Unauthorized Products and Services" and filed its complaint alleging Fifth Third had violated the Consumer Financial Protection Act's prohibition against unfair and abusive acts, as well as the Truth in Lending Act and the Truth in Savings Act.  As set forth above in ¶¶39, 41-42, 95-97, the CFPB press release and complaint generated national news.

134.     In substantial part as a result of the disclosures about Fifth Third's fake account scandal, the Company's stock price dropped from a close of $22.20 on March 6, 2020 to a close of $18.30 on March 9, 2020, a $3.90 per share decline.  While the entire market was declining on March 9, 2020, Fifth Third's stock price fell substantially more than the market as a whole (as reflected by the S&P 500) and the stock price of peer banks.  Fifth Third's share price continued to drop in the days following the filing of the CFPB action, falling to $15.90 by March 12, 2020, a loss of $6.30 per share or 28% in four days.

135.     The timing and magnitude of the decline in the price of Fifth Third common stock negates any inference that losses suffered by Plaintiff and other Class members were fully caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  As discussed above, from the initial disclosure about the CFPB action disclosure on March 2, 2020 to March 6, 2020, Fifth Third's stock price fell 14%.  In comparison, the closing price of the S&P 500 only dropped 3.8% over the same period.  Similarly, from the March 9, 2020 disclosure of the CFPB complaint through March 12, 2020, Fifth Third's

- 53 -

stock price fell 28%. Over those same days, which included a sharp negative reaction to emerging news about the Covid-19 pandemic, the S&P 500 fell 16%.

136. As a result of their purchases of Fifth Third common stock during the Class Period and the subsequent decline in the value of those shares when the truth was revealed to the market, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## IX.   PRESUMPTION OF RELIANCE

137. At all relevant times, the market for Fifth Third common stock was an efficient market for the following reasons, among others:

(a)   Fifth Third common stock met the requirements for listing and was listed and actively traded on the Nasdaq Global Select Market, a highly efficient and automated market;

(b)   according to the Company's 2019 Form 10-K, the Company had more than 709 million shares of common stock outstanding as of January 31, 2020, demonstrating a very active and broad market for Fifth Third common stock;

(c)   as a regulated issuer, Fifth Third filed periodic public reports with the SEC;

(d)   Fifth Third regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)   Fifth Third was followed by numerous securities analysts employed by major brokerage firms, who wrote reports that were distributed to the brokerage firms' sales forces and the public.

138. As a result of the foregoing, the market for Fifth Third common stock promptly digested current information regarding Fifth Third from publicly available sources and reflected such

information in Fifth Third's common stock price. Under these circumstances, a presumption of reliance applies to Plaintiff's and Class Members' purchases of Fifth Third common stock.

139. A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's claims are based on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Fifth Third's predatory banking practices and the CFPB investigation of those practices, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material omissions set forth above, that requirement is satisfied here.

## X.    NO SAFE HARBOR

140. The false and misleading statements alleged herein were not forward-looking. To the extent any of the alleged false and misleading statements were forward-looking, the federal statutory safe harbor for forward-looking statements under certain circumstances does not apply. Many of the specific statements alleged were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements accompanying them. To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Such cautions were absent from Fifth Third's Class Period filings and oral disclaimers.

141. Alternatively, to the extent that the statutory safe harbor could apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because, at the time each of those forward-looking statements were made, the speaker knew that the particular forward-looking statement was false or misleading and the forward-

looking statement was authorized and approved by an executive officer of Fifth Third who knew that those statements were false or misleading when made.

142.     Moreover, to the extent that Defendants issued any disclosures designed to warn or caution investors of certain risks, those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned of and/or had actual knowledge of material adverse facts undermining such disclosures.

## XI.     CLASS ACTION ALLEGATIONS

143.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all purchasers of Fifth Third common stock during the Class Period.  Excluded from the Class are: Defendants, the current and Class Period officers and directors of the Company, the members of the immediate families and the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, and any entity in which such excluded persons have or had a controlling interest.

144.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Fifth Third common stock was actively traded on the Nasdaq Global Select Market.  According to the Company's 2019 Form 10-K, the Company had more than 709 million shares of common stock outstanding as of January 31, 2020  While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number at least in the hundreds, if not thousands, and that they are geographically dispersed.

145.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's and all the Class members' damages arise from and were caused by the same representations and omissions made by or chargeable to Defendants.  Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

- 56 -

146.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

147.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether statements made by or chargeable to Defendants during the Class Period misrepresented or omitted material facts;

(c)    Whether the price of Fifth Third common stock was artificially inflated during the Class Period; and

(d)    To what extent the members of the Class have sustained damages and the proper measure of damages.

148.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for members of the Class to individually redress the wrongs done to them.  Plaintiff is not aware of any difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5
### Against Fifth Third and the Individual Defendants

149.    Plaintiff incorporates the foregoing paragraphs by reference.

- 57 -

150.     During the Class Period, Fifth Third and the Individual Defendants disseminated or approved the misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

151.     These Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they:

          (a)     Employed devices, schemes, and artifices to defraud;

          (b)     Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

          (c)     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and other members of the Class in connection with their purchases of Fifth Third common stock.

152.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases of Fifth Third common stock during the Class Period, because, in reliance on the integrity of the market, Plaintiff and other members of the Class paid artificially inflated prices for Fifth Third common stock and experienced losses when the artificial inflation was released from Fifth Third common stock as a result of the leakage and disclosure of information and price declines detailed herein.  Plaintiff and other members of the Class would not have purchased Fifth Third common stock at the prices paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements and material omissions.

4833-1164-7178.v1

153. By virtue of the foregoing, Fifth Third and the Individual Defendants have each violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violation of §20(a) of the Exchange Act**
**Against Defendants Carmichael and Tuzun**

154. Plaintiff incorporates the foregoing paragraphs by reference.

155. Defendants Carmichael and Tuzun acted as controlling persons of Fifth Third within the meaning of §20(a) of the Exchange Act.

156. By virtue of their high-level positions, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's disclosures, Carmichael and Tuzun had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. Carmichael and Tuzun were provided with, or had unlimited access to copies of, the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

157. As set forth above, Fifth Third violated §10(b) and Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, defendants Carmichael and Tuzun are liable pursuant to §20(a) of the Exchange Act for the §10(b) violations. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class

Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from the Company's stock.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.       Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and b(3) of the Federal Rules of Civil Procedure and certifying Plaintiff as Class Representative and Robbins Geller Rudman & Dowd LLP as Class Counsel;

B.       Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.       Awarding Plaintiff reasonable costs and expenses incurred in this action, including attorneys' fees, experts' fees, and other costs and disbursements; and

D.       Awarding such further relief, including any equitable/injunctive relief, as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

DATED:  September 14, 2020              ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                       TOR GRONBORG
                                       LAURIE L. LARGENT
                                       CHRISTOPHER R. KINNON


                                       s/ TOR GRONBORG
                                       TOR GRONBORG

- 60 -

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
torg@rgrdlaw.com
llargent@rgrdlaw.com
ckinnon@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN (IL Bar # 6329016)
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)
bcochran@rgrdlaw.com

Lead Counsel for Lead Plaintiff

4833-1164-7178.v1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on September 14, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ TOR GRONBORG
TOR GRONBORG

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: torg@rgrdlaw.com

# Mailing Information for a Case 1:20-cv-02176 Heavy & General Laborers' Local 472 & 172 Pension and Annuity Funds et al v. Fifth Third Bancorp et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Brian E. Cochran**
  BCochran@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Anthony Fata**
  afata@caffertyclobes.com

- **Carol V Gilden**
  cgilden@cohenmilstein.com,lhoeksema@cohenmilstein.com,efilings@cohenmilstein.com

- **Tor Gronborg**
  torg@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com

- **Christopher R. Kinnon**
  Ckinnon@rgrdlaw.com

- **Marcella Louise Lape**
  marcella.lape@skadden.com,chdocket@skadden.com

- **Laurie Largent**
  LLargent@rgrdlaw.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,tcrockett@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Katherine Fletcher Morgan**
  katherine.morgan@skadden.com,chdocket@skadden.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Daniel James Scime**
  daniel.scime@skadden.com,chdocket@skadden.com

- **Charles F. Smith , Jr**
  cfsmith@skadden.com,chdocket@skadden.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)