## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

HEAVY & GENERAL LABORERS' )
LOCAL 472 & 172 PENSION AND )
ANNUITY FUNDS et al., individually )
and on behalf of all others similarly situated, )
                                      )
        Plaintiff, )
                                        )     No. 20 C 2176
        v. )
                                        )     Judge Sara L. Ellis
FIFTH THIRD BANCORP, GREG D. )
CARMICHAEL, and TAYFUN TUZUN, )
                                        )
        Defendants. )

## <u>OPINION AND ORDER</u>

An individual shareholder brought this putative securities class action lawsuit on behalf of herself and all others who purchased common stock in Fifth Third Bancorp ("Fifth Third") from November 9, 2016 through March 6, 2020 (the "Class Period"), alleging that Defendants Fifth Third and its officers Greg D. Carmichael and Tayfun Tuzun engaged in federal securities fraud. After the Court appointed putative class member Heavy & General Laborers' Local 472 & 172 Pension and Annuity Funds as Lead Plaintiff, it filed a consolidated complaint, in which it alleges that Defendants Fifth Third, Carmichael, and Tuzun violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), codified at 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. Defendants now move to dismiss the consolidated complaint. Because Lead Plaintiff has failed to allege facts that give rise to a strong inference of scienter on the part of any Defendant, the Court grants Defendants' motion to dismiss without prejudice.

## BACKGROUND[1]

### I.     The Parties

Heavy & General Laborers' Local 472 & 172 Pension and Annuity Funds is based in Newark, New Jersey, and the Court appointed it Lead Plaintiff on June 29, 2020.  Lead Plaintiff purchased shares of Fifth Third common stock during the Class Period.

Fifth Third, headquartered in Cincinnati, provides financial services to corporations, individuals, and non-profits, including an assortment of checking, savings, and money market accounts, wealth management solutions, payments and commerce solutions, insurance services, and credit products such as commercial loans and leases, mortgage loans, credit cards, installment loans, and auto loans.  Fifth Third also operates full-service banking centers across Ohio, Kentucky, Indiana, Michigan, Illinois, Florida, Tennessee, West Virginia, Georgia, and North Carolina.

During the Class Period, Carmichael served as Fifth Third's President and Chief Executive Officer.  He also took over as the Chairman of the Board of Directors in January 2018.  Likewise, Tuzun served as Fifth Third's Executive Vice President and Chief Financial Officer during the Class Period.

### II.    The Consumer Financial Protection Bureau (the "CFPB) Investigation into Fifth Third's Sales Practices

On November 3, 2016, the CFPB notified Fifth Third of an investigation into Fifth Third's sales practices, providing Fifth Third with a Civil Investigation Demand ("CID") addressed to Carmichael.  The CID indicated that the CFPB had concerns with Fifth Third's practices in, among other things, "opening an account for any product or service offered by the

---

[1] The Court takes the facts in the background section from Lead Plaintiff's consolidated complaint and presumes them to be true for the purpose of resolving Defendants' motion to dismiss.  *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).

Company without the knowledge and consent of a consumer," "changing, without the consumer's knowledge and consent, the type of account or service in which the consumer is enrolled," and "engaging in unauthorized transactions on behalf of a consumer." Doc. 53 ¶ 21. The CFPB further issued five additional CIDs to Fifth Third concerning the use of unauthorized accounts and predatory consumer practices between 2017 and 2019, all addressed to Carmichael.

### III.    The CFPB Complaint Filed Against Fifth Third

On March 9, 2020, the CFPB filed a complaint against Fifth Third in the United States District Court for the Northern District of Illinois, *Bureau of Consumer Financial Protection v. Fifth Third Bank, N.A.*, No. 20 C 1683, alleging that Fifth Third violated the Consumer Financial Protection Act's prohibition against unfair and abusive acts or practices, the Truth in Lending Act, and the Truth in Savings Act. In the complaint, the CFPB alleged that "Fifth Third used a 'cross-sell' strategy to increase the total number of products and services to existing customers" and "used an incentive-compensation program that rewarded managers and their subordinate employees for selling new products and services to existing customers." Doc. 53 ¶ 35. The CFPB also claimed that Fifth Third opened deposit and credit card accounts without customers' knowledge or consent and imposed "aggressive" sales goals for its employees to enroll consumers in its online banking services. *Id.* ¶ 37.

The CFPB asserted that by 2009, Fifth Third noticed an increase in unauthorized credit cards issued to consumers. It also stated that Fifth Third knew of the practice of opening lines of credit on consumers' deposit accounts without knowledge or consent by June 2010, "when senior management was notified of an increase in the number of calls by employees to the internal whistleblower hotline regarding the unauthorized opening of . . . lines of credit." *Id.* The complaint emphasized that, even after learning of the unauthorized consumer-financial products

and services, Fifth Third continued to push sales practices that likely would cause the opening of unauthorized services or products. According to the CFPB, Fifth Third "failed to take steps to determine and address a root cause of unauthorized accounts, which was consistently said by employees to be intense sales pressure," and "failed to close known loopholes in its collection of proof of consumer authorization, thereby making it easy for employees to open accounts without valid signature cards for deposit accounts or applications for credit products." *Id.* ¶ 38.

## IV. Revelations Concerning Fifth Third's Sales Practices as a Result of the CFPB Investigation

As a result of the November 3, 2016 CID, Fifth Third produced more than 50,000 pages of documents, emails, and data regarding consumer accounts and products to the CFPB. The parties filed a number of these documents in redacted form in conjunction with a venue dispute in the CFPB lawsuit. According to the CFPB, these documents revealed that Fifth Third knew of its problematic sales practices as early as 2008.

For example, the CFPB highlighted a June 2010 internal email from an individual the CFPB identified as Fifth Third's "head of retail banking" that the Chicago "leadership team have a reputation of less than desirable sales management practices" and that "[b]ullying and threats are often used to achieve results." *Id.* ¶ 44. The email further stated that "there have been consistent problems around unauthorized credit card sales in Chicago." *Id.* An additional email from a former regional manager of Fifth Third stated that "[Fifth Third] had a fraud issue within the Center and upon investigation discovered that [redacted name] had knowledge and allowed other employees to use each other's terminals and IDs to conduct transactions (in some cases for themselves)." *Id.* ¶ 45. In a resignation letter that the CFPB identified as sent to "bank management," a Fifth Third employee discussed "witnessing unethical and predatory banking practices." *Id.* ¶ 46. The banker specifically told Fifth Third's management, "I would consider

4

many of the sales practices and tactics used [at Fifth Third] to be predatory. Many of these sales practices were brought to us by the regional and market management. They are openly discussed on our conference calls." *Id.* The letter also identified "[p]olicies such as 'everyone should have 2-3 checking accounts', or people 'upgrading' (switching existing MasterCard customers to Visa rewards) credit cards for customer[s] without telling them they are applying for new credit" and noted that Fifth Third was "becoming a 'predatory' institution." *Id.*

Further, the CFPB summarized deposition testimony as showing that Fifth Third internally investigated cases of what it called "gaming," which includes "opening unauthorized accounts but is broadly defined as the 'manipulation or concealment of accounts or activities with intent to deceive either customer or bank for personal gain,' including 'goal attainment, financial gain, retention of position, etc.'" *Id.* ¶ 47. The CFPB also identified that "Fifth Third admits that from 2010 to 2016 it opened more than 1,000 accounts without . . . authorization," further commenting that "[t]here is substantial evidence that Fifth Third's admission understates its problem, and Fifth Third continued to drive sales without implementing a systematic way to detect unauthorized accounts." *Id.* As with the documents filed in conjunction with the venue dispute, the parties also withheld deponents' names.

Former Fifth Third employees also described unethical practices employees engaged in due to pressures imposed by Fifth Third to attain sales goals. According to a former Fifth Third employee who worked from July 2001 to July 2020 at branches in Illinois, Fifth Third's regional bank managers used financial incentives to entice branch managers to meet sales goals for credit card applications as late as 2020. Another unidentified former employee also asserted that employees who did not reach their goals were under threat of losing their jobs and that employees knew that the only way to meet new account goals was to open fake accounts. This

former employee also reported on unethical practices linked to opening unauthorized credit cards without permission or approval of the customer.

## V.     Fifth Third's Stock Sales and Acquisition of MB Financial

In March 2019, Fifth Third completed a $4.7 billion acquisition of MB Financial, a Chicago-based company.  MB Financial shareholders approved the acquisition in part based on Fifth Third's Registration Statement, which highlighted the historical performance of its common stock.  Fifth Third had to use that common stock to fund 90% of the $4.7 billion acquisition price because Fifth Third did not have sufficient capital to complete the acquisition with cash.  As such, Fifth Third issued approximately 131 million new shares of common stock that, as of March 22, 2019, traded at the price of $24.62 per share.

In that same year, on September 17, 2019, Fifth Third sold 10 million preferred shares at $25.00 per share.  The prospectus for the offering incorporated risk factors from Fifth Third's FY 2018 Form 10-K and noted that Fifth Third would use the proceeds from the offering for general corporate purposes, including repurchases of shares of its common stock.  As a result of this offering, Fifth Third raised $242 million.

But, after Fifth Third disclosed the CFPB investigation and anticipated lawsuit in its FY 2019 Form 10-K on March 2, 2020, Fifth Third's stock price dropped from $22.20 on March 6 to $18.30 on March 9, a $3.90 per share decline.  Although the market was declining on March 9, Fifth Third's stock price fell more than the market as a whole and the stock price of peer banks. Fifth Third's stock continued to decline, losing 28% per share between March 9 and March 12.

## VI.     Carmichael and Tuzun's Incentive Compensation and Stock Sales

According to the 2017 Definitive Proxy Statement, Fifth Third's executive compensation structure used pay for performance incentive compensation, with stock price growth,

performance relatives to peers, and a risk performance assessment the key components in determining executives' incentive compensation.

The incentive compensation Carmichael received for 2016, 2017, and 2018 exceeded his annual salary. In total, during the Class Period, Carmichael collected over $23.4 million in incentive-based compensation, representing more than 88% of his total compensation. As of March 2020, Fifth Third cut Carmichael's incentive compensation by $2.4 million when compared to the $9,849,976 he received in incentive compensation and stock awards in 2019. The incentive compensation Tuzun received for 2016, 2017, and 2018 also exceeded his annual salary. During the Class Period, Tuzun collected a total of $6.2 million in incentive-based compensation, representing more than 79% of his total compensation.

During the Class Period, Carmichael sold more than $5.8 million of his Fifth Third stock, 26% in total. As reflected in the chart below, Carmichael sold his Fifth Third stock at prices that were 22% to 104% higher than where the stock price traded following the March 2020 disclosure of the CFPB investigation and lawsuit.

| Date | Number of Shares | Share Price | Total Proceeds |
|---|---|---|---|
| Nov. 10, 2016 | 17,689 | $23.45 | $414,807 |
| Nov. 16, 2016 | 36,821 | $25.11 | $924,575 |
| Feb. 13, 2018 | 87,613 | $32.37 | $2,836,033 |
| Oct. 29, 2019 | 55,251 | $29.59 | $1,634,877 |
| **Total** | **197,374** | | **$5,810,292** |

*Id*. ¶ 120. Over the eighteen months before the start of the Class Period and in the six months following the end of the Class Period, however, Carmichael did not sell any of his Fifth Third stock.

7

## VII.  Defendants' Allegedly False and Misleading Statements

During the Class Period, which began on November 9, 2016, when Fifth Third filed its Form 10-Q quarterly report with the SEC, Lead Plaintiff alleges that Defendants made false and misleading statements and material omissions concerning Fifth Third's (1) purported risk disclosures, (2) risk management practices, (3) Code of Business Conduct and Ethics, (4) product cross-selling and consumer business, and (5) employee incentive compensation.

### A.  Fifth Third's Risk Disclosures

Lead Plaintiff first asserts that Defendants made misleading statements and material omissions regarding the risks Fifth Third faced in both the Form 10-Qs and Form 10-Ks it filed with the SEC.  Fifth Third filed its 3Q 2016 Form 10-Q, which Carmichael and Tuzun signed, shortly after it received the CFPB's CID.  The 3Q 2016 Form 10-Q stated that there "have been no material changes made during the third quarter of 2016 to any of the risk factors as previously disclosed in the Bancorp's most recent annual report and subsequent periodic reports as filed with the SEC." *Id.* ¶ 52.  Fifth Third had most recently listed its risk factors in its FY 2015 Form 10-K (filed February 25, 2016) and 2Q 2016 Form 10-Q (filed August 5, 2016).  The risk factors included:

- Fifth Third's actual or alleged conduct in activities, such as lending practices, data security, corporate governance and acquisitions, may result in negative public opinion and may damage Fifth Third's reputation.  Actions taken by government regulators and community organizations may also damage Fifth Third's reputation.

- Fifth Third and/or its affiliates are or may become involved from time to time in information-gathering requests, reviews, investigations and proceedings (both formal and informal) by governmental regulatory agencies and law enforcement authorities, as well as self-regulatory agencies, regarding their respective businesses.

- Compliance with the rules and policies adopted by the CFPB may limit the products Fifth Third may permissibly offer to customers, or limit the terms on which those products may be issued, or may adversely affect Fifth Third's ability to conduct its business as previously conducted.

- Like other large financial institutions and companies, Fifth Third is also subject to risk from potential employee misconduct, including noncompliance with policies and improper use or disclosure of confidential information.

- [T]he CFPB . . . [has] the authority to compel or restrict certain actions by Fifth Third and its banking subsidiary, Fifth Third Bank. . . . In the wake of the most recent global financial crisis, Fifth Third and other financial institutions more generally have been subjected to increased scrutiny from government authorities, including bank regulatory authorities, stemming from broader systemic regulatory concerns, including with respect to . . . consumer compliance and other prudential matters and efforts to ensure that financial institutions take steps to improve their risk management and prevent future crises.

- [G]overnment authorities, including the bank regulatory agencies, are also pursuing aggressive enforcement actions with respect to compliance and other legal matters involving financial activities, which heightens the risks associated with actual and perceived compliance failures.

*Id*. ¶ 52. Fifth Third included these same risk factors in its FY 2016 Form 10-K, filed on February 24, 2017, which Carmichael and Tuzun signed. The FY 2016 Form 10-K also included the following statement:

- Fifth Third's framework for managing risks may not be effective in mitigating its risk and loss. . . . A failure in Fifth Third's internal controls could have a significant negative impact . . . on the perception that customers, regulators and investors may have of Fifth Third. . . . If Fifth Third's risk management framework proves ineffective, Fifth Third could incur litigation, negative regulatory consequences [and] reputational damages . . . .

*Id*. ¶ 53.

In 2018 and 2019, Fifth Third's FY 2017 and 2018 Form 10-Ks, signed again by Carmichael and Tuzun, identified the following risk factors, in pertinent part, that "could" have an impact on Fifth Third's operations and business:

- Fifth Third's actual or alleged conduct in activities, such as certain sales and lending practices, data security, corporate governance and acquisitions, behavior of employees, association with particular customers, business partners, investment or vendors, as well as developments from any of the other risks described above, may result in negative public opinion and may damage Fifth Third's reputation. Actions taken by government regulators, shareholder activists and community organizations may also damage Fifth Third's reputation.

- Fifth Third and/or its affiliates are or may become involved from time to time in information-gathering requests, reviews, investigations and proceedings (both formal and informal) by governmental regulatory agencies and law enforcement authorities, as well as self-regulatory agencies, regarding their respective customers and businesses, as well as their sales practices, data security, product offerings, compensation practices, and other compliance issues. Also, a violation of law or regulation by another financial institution may give rise to an inquiry or investigation by regulators or other authorities of the same or similar practices by Fifth Third. . . . Like other large financial institutions and companies, Fifth Third is also subject to risk from potential employee misconduct, including non-compliance with policies and improper use or disclosure of confidential information.

- [T]he CFPB . . . [has] the authority to compel or restrict certain actions by Fifth Third and its banking subsidiary, Fifth Third Bank. . . . Fifth Third and other financial institutions are subject to scrutiny from government authorities, including bank regulatory authorities, stemming from broader systemic regulatory concerns, including with respect to . . . consumer compliance and other prudential matters and efforts to ensure that financial institutions take steps to improve their risk management and prevent future crises.

- [G]overnment authorities, including the bank regulatory agencies and law enforcement, are also pursuing aggressive enforcement actions with respect to compliance and other legal matters

10

involving financial activities, which heightens the risks associated
with actual and perceived compliance failures.

- Fifth Third's framework for managing risks may not be effective in
  mitigating its risk and loss. . . .  A failure in Fifth Third's internal
  controls could have a significant negative impact . . . on the
  perception that customers, regulators and investors may have of
  Fifth Third. . . .  If Fifth Third's risk management framework
  proves ineffective, Fifth Third could incur litigation, negative
  regulatory consequences [and] reputational damages . . . .

*Id.* ¶¶ 54, 55.

**B.    Fifth Third's Risk Management Practices**

Lead Plaintiff further contends that Defendants made misleading statements and material

omissions in Fifth Third's Form 10-Qs and Form 10-Ks concerning its purported risk practices

for managing regulatory compliance risk.  In its 3Q 2016 Form 10-Q, Fifth Third stated:

> Regulatory compliance risk is defined as the risk of legal or
> regulatory sanctions, financial loss, or damage to reputation as a
> result of noncompliance with (i) applicable laws, regulations, rules
> and other regulatory requirements (including but not limited to the
> risk of consumers experiencing economic loss or other legal harm
> as a result of noncompliance with consumer protection laws,
> regulations and requirements); (ii) . . . codes of conduct; and
> (iii) principles of integrity and fair dealing applicable to Fifth
> Third's activities and functions.

*Id.* ¶ 57.  In that same form, Fifth Third listed its risk management practices as

follows:

- Fifth Third focuses on managing regulatory compliance risk in
  accordance with the Bancorp's integrated risk management
  framework, which ensures consistent processes for identifying,
  assessing, managing, monitoring, and reporting risks.

- The current regulatory environment, including heightened
  regulatory expectations and material changes in laws and
  regulations, increases compliance risk.

- To mitigate compliance risk, Compliance Risk Management
  provides independent oversight to ensure consistency and

sufficiency in the execution of the program, and ensures that lines of business, regions and support functions are adequately identifying, assessing and monitoring compliance risks and adopting proper mitigation strategies. . . .  Additionally, Compliance Risk Management implements key compliance programs and processes including but not limited to, risk assessments, key risk indicators, issues tracking, regulatory compliance testing and monitoring . . .

- Compliance Risk Management provides independent oversight to ensure that an enterprise-wide framework, including processes and procedures, are in place to comply with applicable laws, regulations, rules and other regulatory requirements; internal policies and procedures; and principles of integrity and fair dealing applicable to the Bancorp's activities and functions.  The Bancorp focuses on managing regulatory compliance risk in accordance with the Bancorp's integrated risk management framework, which ensures consistent processes for identifying, assessing, managing, monitoring and reporting risks.

*Id.* ¶ 58.

On February 24, 2017, Fifth Third filed its FY 2016 Form 10-K, signed by Carmichael and Tuzun.  The form contained the same statements about the bank's regulatory compliance risk management practices as in the 3Q 2016 Form 10-Q.  The Company's FY 2017 and 2018 Form 10-Ks also contained nearly identical statements about Fifth Third's purported regulatory compliance risk management practices as the 3Q 2016 Form 10-Q.

Fifth Third's FY 2017 Form 10-K further identified the "core principles of risk management that are used to ensure [Fifth Third] is operating in a safe and sound manner."  The form identified these "core principles" of risk management as:

- Ensur[ing] Fifth Third's products and services are designed, delivered and maintained to provide value and benefit to its customers and to Fifth Third, and that potential opportunities remain aligned to the core customer base.  The Bancorp does not offer products or services that are not appropriate for its customers

- Act[ing] with integrity in all activities.

12

- Focus[ing] on providing operational excellence by providing reliable, accurate and efficient services to meet customer's needs.

- Conduct[ing] business in compliance with all applicable laws, rules and regulations and in alignment with internal policies and procedures.

*Id.* ¶ 60.

## C. Fifth Third's Code of Business Conduct and Ethics

As of 2016, Fifth Third maintained a Code of Business Conduct and Ethics, which it amended several times during the Class Period and which it filed with the SEC on Current Report Form 8-Ks so that investors could learn of its practices. The Code applied to all officers, directors and employees of Fifth Third, including but not limited to Fifth Third's principal executive officer (Carmichael), principal financial officer (Tuzun), principal accounting officer, and controller.

The purported misleading statements in the 2016 Code, filed with the SEC on Current Report Form 8-K on March 16, 2016, were, in pertinent part:

- We must all deal honestly, ethically, fairly and in good faith with Fifth Third's customers, shareholders, employees, suppliers, regulators, business partners, competitors and others. We may not take unfair advantage of anyone through manipulation, concealment, abuse of privileged or confidential information, misrepresentation, fraudulent behavior or any other unfair dealing practice.

- Employees, customers, shareholders and communities must know that Fifth Third conducts all activities with the highest standards and unquestioned integrity. They have to know by our actions that they can trust us, and we have to show by our actions that we provide something different; something of value.

- Our Purpose is to listen to customers and inspire them with smart financial solutions that continually improve their lives and the well-being of our communities. Relationships are at the heart of our Purpose, and what could be more personal than that? This is not a mere collection of words, but rather a blueprint for how we

13

are to conduct ourselves.  We ask questions.  We listen.  We inspire.  We focus on continual improvement – for customers, for communities and for ourselves.

- Employees are expected and required to take appropriate steps to address issues that subject the bank to risk of potential regulatory, reputational or legal harm.

*Id.* ¶ 65.

Fifth Third adopted an amended and restated Code on September 19, 2017, which it filed as an exhibit to the 2017 Form 8-K filed with the SEC.  The 2017 Code included a statement from Carmichael, noting, "Doing the right thing is central to our ability to achieve our Vision to be the One Bank people most value and trust.  It's a commitment that inspires us to create a great customer experience . . . .  It is a commitment that forms the bedrock of Fifth Third's reputation as a respected corporate citizen.  And it is a commitment that begins with each Fifth Third employee."  *Id.* ¶ 66.  The alleged misleading statements in the 2017 Code were:

- Fifth Third believes that fair and honest business practices are essential to keeping our customer at the center of everything we do.  We should always act in the best interest of our customers.  Unethical business practices, such as incentive gaming, falsifying documents or inflating performance results, are strictly prohibited.  You are prohibited from manipulating records, opening accounts without customer authorization, offering customers unnecessary products and falsifying records or applications in order to benefit yourself or other employees of Fifth Third.

- Fifth Third is committed to providing customers with financial products and services in ways that avoid the use of any practices that could be deemed predatory, unfair, deceptive or abusive.

- Fifth Third Bancorp is committed to minimizing the impact of internal and external fraud to both Fifth Third and our customers.  Every employee at every level of the Bancorp is accountable and expected to do their part to protect Fifth Third and our customers from fraudulent activity.  There is zero tolerance for internal fraud within Fifth Third's organization and internal fraudulent activity must be referred to Bank Protection when suspected.  Failure to report fraudulent activity exposes Fifth Third to regulatory and

14

compliance violations and could lead to significant financial penalties and additional fraud losses.

- Employees must not engage in deceptive or dishonest business practices, such as misrepresenting products or offering customers inaccurate or insufficient information about products in order to benefit personally.

- A fundamental part of our commitment to integrity is adhering to the letter and the spirit of applicable laws, regulations and Bancorp policies. All employees are required to fully comply with all applicable laws, rules and regulations, as well as with all Fifth Third policies and procedures.

*Id*. ¶ 66. In September 2018, Fifth Third amended the Code again, which it filed with its 2018 and 2019 Current Report Form 8-Ks. The 2018 Code included the same message from Carmichael as found in the 2017 Code and further stated:

- Fifth Third believes that fair and honest business practices are essential to keeping our customer at the center of everything we do. We should always act in the best interest of our customers.

- Unethical business practices are strictly prohibited. Examples of such activities include, but are not limited to:

    - Incentive gaming
    - Falsifying documents or inflating performance results
    - Manipulating records
    - Opening bogus or fake accounts
    - Opening accounts or selling products without customer authorization
    - Offering customers unnecessary products
    - Falsifying records or applications in order to benefit yourself or other employees of Fifth Third

- Fifth Third is committed to providing customers with financial products and services in ways that avoid the use of any practices that could be deemed predatory, unfair, deceptive or abusive.

- Fifth Third Bancorp is committed to minimizing the impact of internal and external fraud to both Fifth Third and our customers. Every employee at every level of the Bancorp is accountable and expected to do [their] part to protect Fifth Third and our customers from fraudulent activity. There is zero tolerance for internal fraud

15

> within Fifth Third's organization and internal fraud activity must
> be referred to Bank Protection when suspected. Failure to report
> fraudulent activity exposes Fifth Third to regulatory and
> compliance violations and could lead to significant financial
> penalties and additional fraud losses.

*Id.* ¶¶ 67, 68.

### D. Product Cross Selling, Consumer Business, and Customer Relations

Lead Plaintiff also asserts that Defendants made false and misleading statements concerning Fifth Third's product cross selling, consumer business, and customer relations. Fifth Third's FY 2016, 2017, and 2018 Form 10-Ks, all signed by Carmichael and Tuzun, stated that Fifth Third was "taking advantage of cross-sell opportunities" generated by synergies formed by its business segments. *Id.* ¶¶ 70–72.

On December 7, 2016, Carmichael and Tuzun presented at the Goldman Sachs US Financial Services Conference. Carmichael spoke to investors regarding Fifth Third's consumer growth strategy, stating that Fifth Third was "looking for a more balanced growth between our consumer and our commercial businesses" and "[t]o that end, we are focused on growing our credit card and unsecured personal lending businesses. Both of these businesses have attractive return profiles and growth potential." *Id.* ¶ 73.

On January 24, 2017, Fifth Third hosted an earnings conference call to discuss the Company's 4Q 2017 financial results, in which Carmichael talked about how Fifth Third's consumer growth strategy of growing credit cards and consumer loans would "allow us to achieve a better balance between commercial and consumer loan growth." *Id.* ¶ 74. During the call, Carmichael commented:

> [W]e have a great business model. We have the right businesses
> that we are in, right, and we do a fantastic job of going to the
> market and our people do a fantastic job of going to the market
> really as one bank – Fifth Third.

> And it is really about harvesting the full relationships of the customer relationships on the consumer side, on the commercial side. It is about providing the right products and services to our customers and really being the one bank our customers most value and trust. We have worked hard to put that model in place across our franchise. So we feel very good about that.
>
> And really our strong brand and our footprint is extremely important to us and we are going to continue to focus on our brand equity in the marketplace. But when you look at it across the board we have strong earnings capacity, we have a great team in place, we have invested heavily in the right products. We made some strategic moves recently that position us well for the future. And I think we will have the products, the services and the team to deliver on that in the market.

*Id.* ¶ 74.

On March 7, 2017, Carmichael and Tuzun presented at the RBC Capital Markets Financial Institutions Conference, where Carmichael again discussed with analysts and investors Fifth Third's consumer growth strategy, stating, "[g]rowth in credit cards and other consumer loans should allow us to achieve a better balance between commercial and consumer loan growth." *Id.* ¶ 75. He also stated that Fifth Third "takes pride in" its ranking "as the second most trusted company for retail banking," noting that Fifth Third "believe[s] in putting the customer at the center of everything we do" and that "[i]n addition to being a trusted partner, we have received high customer satisfaction scores and our mobile offerings have received a number of accolades." *Id.*

On December 7, 2017, Fifth Third hosted an Investor Day for analysts and investors. During the conference, Carmichael discussed the customer experience, stating that "[i]t starts with the financial needs analysis, and we dive deep into understanding the needs of that customer. . . . Once again, we can't be a great bank if we don't focus on taking care of the customer, and we measure this very carefully. We got to make sure that we have products that

17

are seamless, convenient, fast, that they're tailored to meet the customer needs*." Id.* ¶ 76.

Carmichael also emphasized that "[v]alue and trust is extremely important." *Id.* During that

same call, Frank R. Forrest, Fifth Third's Chief Risk Officer, discussed at length the Company's

risk management practices. He stated:

- We have enhanced risk management programs and processes across the firm. And through all these actions, we are now achieving strong and consistent results, and we are exceptionally well positioned to perform through the next cycle.

- [W]e are managing the risk across the company today exceptionally well.

- We've improved expertise in the most significant areas of risk that face our industry and our company. That includes . . . customer practices. . . .

- I'm now going to talk a little bit about culture and how we manage conduct risk. We all know that conduct risk, ethics, how we handle our customer relationships, how we treat our employees, it's all been headline risk. We've read a lot about it. Conduct risk at Fifth Third Bank is well managed, and it's in alignment with our core values. It is foundational in everything we do to have a strong risk culture and a One Bank strategy that Greg just covered. We have a corporate responsibility and reputation office that provides oversight in governance of key areas that drive our culture, and that includes ethics and diversity and community commitment and safeguarding the reputation of the company, which is one of my primary responsibilities. All of these areas are critical elements of our company's culture, and we closely monitor these activities and report them to the Board and to management and to our regulators.

- The last consumer portfolio I want to talk briefly about is card. It's $2.2 billion today. It's 6% of our overall consumer portfolio. But we have a strategy that you'll hear about to grow this portfolio within our appetite with a measured and a managed approach. We've been actually recruiting industry experts recently to help us grow the business within our defined risk profile, and we see some opportunity here, and we are advancing the use of analytics to improve our credit decisioning on the card business.

*Id.* at ¶ 78.

Fifth Third hosted an earnings conference call with investors on October 23, 2018, which Carmichael and Tuzun attended, to discuss its 3Q 2018 financial results. During the call, Carmichael told investors that "[o]ur third priority is to pursue profitable organic growth opportunities in our key businesses. In addition to our branch network optimization initiative to drive improved household, deposit, and revenue growth across our retail footprint, we're also prioritizing organic growth opportunities across all areas of the franchise*." Id*. ¶ 79. On January 22, 2019, Fifth Third again hosted an earnings conference call with investors to discuss its 4Q and 2018 financial results, with Carmichael stating that "we continue to invest in organic growth opportunities, including the previously communicated branch network optimization." *Id.* ¶ 80.

### E. Incentive Compensation

Lead Plaintiff also asserts that Defendants made false and misleading statements concerning Fifth Third's incentive compensation. On March 9, 2017, Fifth Third filed a Proxy Statement with the SEC, reviewed by Carmichael and Tuzun, that stated:

- The Company endeavors to attract and retain the best people in the financial services industry and motivate them to fulfill the Company's Vision of becoming the One Bank that people most value and trust. We intend to accomplish this in the way that we consider our shareholders' long-term interests, by establishing compensation programs that reward our people for delivering products our customers highly value, and avoiding excessive risk. Our compensation philosophy comprises the following guiding principles:

  - Manage risk effectively within incentive programs designed to pay for performance.
  - Align compensation with long-term shareholder interests.
  - Provide strong oversight of executive pay.
  - Conduct recurring processes that ensure strategic and fiscal soundness along with balanced risk taking.

- We incorporate formulaic and discretionary risk-balancing mechanisms, which outline specific metrics for modifying payouts to discourage unnecessary or imprudent risk-taking actions.

- In December 2015, the Committee, in conjunction with the Risk and Compliance Committee, reviewed our executive and other incentive programs. Based on the provisions and actions above, the Committee concluded that their design and/or metrics do not encourage unnecessary and/or inappropriate risk taking.

*Id*. ¶ 82.

Similarly, the 2018 Proxy Statement, which Carmichael and Tuzun again reviewed, also discussed the bank's compensation plan, stating in part:

- At Fifth Third, we endeavor to attract and retain the best people and motivate them to fulfill the Company's Vision of becoming the One Bank that people most value and trust. We intend to accomplish this in the way that we consider our shareholders' long-term interests, by establishing compensation programs that reward our people for delivering products and services our customers highly value, and for avoiding excessive risk.

- We believe it is critical to bring a multi-faceted strategy toward mitigating risk in incentive plans. We incorporate formulaic and discretionary risk-balancing mechanisms, which include specific metrics for modifying payouts to discourage taking unnecessary or imprudent risks.

- In February 2017, the Committee, in conjunction with the Risk and Compliance Committee, reviewed our executive and other incentive programs. Based on the provisions and actions above, the Committee concluded that their design and/or metrics do not encourage taking unnecessary or inappropriate risk.

*Id*. ¶ 83.

The 2019 Proxy Statement, reviewed by Carmichael and Tuzun, also contained information on Fifth Third's compensation plan, which stated:

- Our compensation methodology and structure centers on our compensation philosophy, which comprises the following guiding principles:

- ▪ Manage risk effectively within incentive programs designed to pay for performance.
- ▪ Align compensation with long-term shareholder interests.
- ▪ Provide strong oversight of executive compensation.
- ▪ Conduct recurring processes that ensure strategic and fiscal soundness along with balanced risk taking.

- We believe it is critical to bring a multi-faceted strategy toward mitigating risk in our compensation programs and incentive plans. We incorporate formulaic and discretionary risk-balancing mechanisms, which include specific metrics for modifying payouts to discourage taking unnecessary or imprudent risks.

- In December 2018, the Committee met jointly with the Risk and Compliance Committee to review our executive and other incentive programs. Based in part on the provisions and actions above, the Committee concluded that the design and/or metrics of such programs do not encourage taking unnecessary or inappropriate risk.

*Id*. ¶ 84.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not

its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.

1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in

the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's

favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule

12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to

the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th

Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Securities fraud claims must also satisfy Rule 9(b)'s particularity requirement, which requires a party to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019); *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614–15 (7th Cir. 2011). "This ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank*, 649 F.3d at 615 (citation omitted).

Congress further heightened the pleading standards for securities fraud claims when it enacted the Private Securities Litigation Reform Act ("PSLRA") "[a]s a check against abusive litigation by private parties" in securities fraud suits. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* ("*Tellabs II*"), 551 U.S. 308, 313 (2007). The PSLRA requires "complaints alleging securities fraud [to] 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Cornielsen*, 916 F.3d at 598–99 (quoting 15 U.S.C. § 78u-4(b)(2)(A). The PSLRA also requires "[a]ny complaint alleging a material misstatement or omission [to] 'specify each statement alleged to have been misleading' and the 'reason or reasons why the statement is misleading.'" *Id.* at 599 (quoting 15 U.S.C. § 78u-4(b)(1)). On motion by a defendant, the Court must dismiss a complaint that does not meet these requirements. 15 U.S.C. § 78u-4(b)(3)(A).

## ANALYSIS

Lead Plaintiff's consolidated complaint sets forth two claims: first, Lead Plaintiff alleges that all Defendants have violated § 10(b) of the Exchange Act and SEC Rule 10b-5 and second,

Lead Plaintiff seeks to hold Carmichael and Tuzun individually liable under § 20(a) of the Exchange Act as "controlling persons" of Fifth Third. Defendants move to dismiss both claims.

## I.  "Puzzle" Pleading

Defendants first argue that Lead Plaintiff's consolidated complaint improperly relies on so-called "puzzle" pleading. Defendants claim this form of pleading is impermissible in a complex securities action such as this one because it fails to provide individualized explanations of falsity for each of the allegedly false and misleading statements outlined in the consolidated complaint and instead merely pastes repetitive and lengthy quotes from Fifth Third's regulatory filings and earnings followed by boilerplate allegations.

The PSLRA requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and, if based on information and belief, all facts that form the plaintiff's basis for believing that the statement is misleading. 15 U.S.C. § 78u-4(b)(1). "Puzzle pleading refers to a pleading style that forces the Court and the defendant to piece together exactly which statements [Lead Plaintiff is] challenging and what allegations contradict those statements." *U.S. Sec. & Exch. Comm'n v. Winemaster*, No. 19-CV-04843, 2021 WL 1172773, at *14 (N.D. Ill. Mar. 29, 2021) (citations omitted) (internal quotation marks omitted). A pleading like that can "improperly place[] the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts." *Conlee v. WMS Indus., Inc.*, No. 11 C 3503, 2012 WL 3042498, at *4 (N.D. Ill. July 25, 2012) (citation omitted) (internal quotation marks omitted). The end result of puzzle pleading may "leave the reader—whether Defendants or the court—jumping from page to page in an attempt to link the alleged statements to the background that supposedly makes them false or misleading." *Id.*

Defendants argue that the consolidated complaint does not satisfy the PSLRA's pleading standards because it quotes Fifth Third's statements at length and then uses a stock assertion that the statement is false or misleading.  *See id.* (dismissing complaint wherein "the heart of the complaint, the section titled 'Defendants' False and Misleading Statements Made During the Class Period,' is a sixteen page mash-up of block quotes, snippets, parentheticals, and Lead Plaintiff's characterizations of alleged statements made by one or more Defendants"); *see also Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012) (complaint failed to satisfy the PSLRA because it "consist[ed] in large part of large block quotations with italicized text, followed by a passage that reads '[t]he statements referenced in [the preceding paragraphs] were each materially false and misleading when made for the reasons set forth in ¶ 256 and the factual data contained throughout this Complaint" (second and third alterations in original)).

Here, however, the Court does not find Lead Plaintiff's consolidated complaint impermissibly employs puzzle pleading because the Court can identify the alleged false statements giving rise to the claims at issue and the factual allegations Lead Plaintiff claims demonstrates their falsity.  And Defendants' extensive motion to dismiss suggests that they too can adequately follow and understand Lead Plaintiff's allegations.  In fact, Lead Plaintiff identifies the statements it challenges and when Defendants made those statements, organizes the statements underneath discrete section headings, puts forth some reasoning, albeit barely, as to why the alleged statements are misleading, and does not use stock assertions nor refer back to any preceding paragraphs in doing so.  *See Boca Raton Firefighters' & Police Pension Fund v. DeVry, Inc.*, No. 10 C 7031, 2012 WL 1030474, at *1 n.4 (N.D. Ill. Mar. 27, 2012) (declining to dismiss a complaint for puzzle pleading even where the complaint's format created repetition

because it did not make the complaint too difficult to understand). This suffices to allow the Court to reach the merits of Defendants' arguments for dismissal.

In connection with their puzzle pleading assertion, Defendants also argue that the facts on which Lead Plaintiff relies are not based on its personal knowledge, but rather on unproven and heavily disputed allegations drawn from the CFPB investigation and allegations concerning conduct that occurred at Wells Fargo, a peer bank, that the Court should disregard. But the Court finds nothing improper in Lead Plaintiff's use of information lifted from the CFPB action, as "[i]t makes little sense to say that information from . . . a study [or investigation]—which the [complaint] could unquestionably rely on if it were mentioned in a news clipping or public testimony—is immaterial simply because it is conveyed in an unadjudicated complaint." *In re Herbal Supplements Mktg. & Sales Pracs. Litig.*, No. 15-CV-5070, 2017 WL 2215025, at *6 (N.D. Ill. May 19, 2017) (citing *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 767–68 n.24 (S.D.N.Y. 2012)).

Moreover, the Court does not find it appropriate to strike the allegations related to the Wells Fargo investigation, as the Court does not find them lengthy, complex, or unduly prejudicial. *See Cumis Ins. Soc'y, Inc. v. Peters*, 983 F. Supp. 787, 798 (N.D. Ill. 1997) (courts may strike allegations where "the allegations being challenged are so unrelated to plaintiff's claim as to be void of merit and unworthy of any consideration" and they are unduly prejudicial); *Trustmark Life Ins. Co. v. Univ. of Chicago Hosps.*, No. 94 C 4692, 1996 WL 68009, at *1 (N.D. Ill. Feb.14, 1996). Instead, the Wells Fargo allegations merely provide background to the CFPB's subsequent investigation into Fifth Third's allegedly similar practices and some of Defendants' statements. Having resolved Defendants' preliminary pleading challenges to the

25

consolidated complaint, the Court proceeds to address Defendants' substantive arguments for dismissal.

## II.     Section 10(b) Claim (Count I)

Defendants next argue that Lead Plaintiff falls short in satisfying the pleading requirements to assert its claim for securities fraud under § 10(b) of the Exchange Act.  Section 10(b) and SEC Rule 10b-5 "prohibit fraudulent or misleading statements of material fact in connection with the purchase or sale of a security." *Walleye Trading LLC v. AbbVie Inc.*, 962 F.3d 975, 977 (7th Cir. 2020).  Section 10(b) prohibits the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of" the SEC's rules and regulations.  15 U.S.C. § 78j(b).  Relevant here, Rule 10b-5 implements § 10(b) by making it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(b).

To state a claim under § 10(b) and Rule 10b-5(b), a plaintiff must allege that "(1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages." *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 896 (N.D. Ill. 2020) (citations omitted).  Defendants' motion addresses the first element (falsity) with respect to the statements challenged by Lead Plaintiff, the third element (scienter) with respect to all the challenged statements, and the sixth element (damages).  Because Defendants' scienter argument is dispositive, the Court will only address that argument.

To meet the scienter requirement, Lead Plaintiff must allege with particularity facts giving rise to a strong inference that each defendant acted with the required state of mind. *Cornielsen*, 916 F.3d at 601–02. For the § 10(b) claim, "that state of mind is 'an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false.'" *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018) (quoting *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007)). Courts define "recklessness" in this context as "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 756 (7th Cir. 2013) (citations omitted). "Alleging that a defendant should have known about fraud is not enough to show that the defendant was reckless." *In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.* ("*CBOE*"), 435 F. Supp. 3d 845, 861 (N.D. Ill. 2020).

The PSLRA requires a plaintiff to "satisfy a heightened standard of plausibility" in pleading scienter. *Kohl's*, 895 F.3d at 936. The plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" for "*each* act or omission alleged to violate this chapter." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). To meet this "strong inference" standard, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs II*, 551 U.S. at 314. In determining whether a complaint has met this standard, the Court must account for "plausible, nonculpable explanations for the defendant's conduct" and weigh them against the strength of the inferences in favor of scienter. *Id.* at 323–24; *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008). In the end, the

27

Court must determine whether all the facts set forth in the consolidated complaint, accepted as true and taken collectively, "give rise to a strong inference of scienter." *Tellabs II*, 551 U.S. at 322–23, 326.

Lead Plaintiff argues that Defendants made false and misleading statements and material omissions concerning Fifth Third's (1) risk disclosures, (2) risk management practices, (3) Code of Conduct and Ethics, (4) product cross-selling and consumer business, and (5) employee incentive compensation. It must allege facts showing that Defendants "had the requisite scienter at the time that they made each allegedly fraudulent statement." *In re NeoPharm, Inc. Sec. Litig.*, No. 02 C 2976, 2007 WL 625533, at *6 (N.D. Ill. Feb. 23, 2007); *Smyth v. China Agritech, Inc.*, No. CV 13-03008-RGK (PJWx), 2013 WL 12145047, at *3 (C.D. Cal. Sept. 26, 2013) ("The scienter analysis focuses on the state of mind of defendants at the time the false statements were made."). Moreover, because Lead Plaintiff contends that Fifth Third, Carmichael, and Tuzun all violated § 10(b), it must plead a strong inference of scienter with respect to *each* Defendant. *See Cornielsen*, 916 F.3d at 601–02; *Pugh*, 521 F.3d at 692–95, 697–98 (where the plaintiffs alleged that both a corporate defendant and its executive officers violated § 10(b), addressing separately whether the plaintiffs had adequately pleaded scienter for the individual officers and the corporate defendant).

"Corporations, of course, have no state of mind on their own. Instead, the scienter of their agents must be imputed to them." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1254 (11th Cir. 2008). "Accordingly, the corporate scienter inquiry must focus on 'the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and

employees acquired in the course of their employment.'" *Pugh*, 521 F.3d at 697 (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.* ("*Tellabs III*"), 513 F.3d 702, 708 (7th Cir. 2008)). Because the only relevant actors here are Carmichael and Tuzun[2], the Court does not separately address Fifth Third's scienter. Rather, to the extent that the Court concludes that Lead Plaintiff has sufficiently pleaded the required scienter for either Carmichael or Tuzun, the Court finds that that it can also infer Fifth Third's scienter from the same allegations. The Court, therefore, proceeds to consider Lead Plaintiff's asserted bases for scienter.

### A.      Knowledge of False Statements and Omitted Facts

First, Lead Plaintiff argues that Defendants knew the omitted facts undermining their alleged misstatements, which suffices to plead scienter. Specifically, Lead Plaintiff points out that Carmichael received the CFPB CID before the Class Period began, along with five additional demands during the Class Period. According to Lead Plaintiff, these demands apprised Carmichael of the CFPB's investigation into specific allegedly problematic sales practices at Fifth Third, namely that employees were opening unauthorized accounts. And Carmichael signed all statements filed with the SEC after receiving the CIDs starting in 2016, in addition to speaking at investor calls and conferences discussing Fifth Third's sales practices and its compliance structure. Instead of alleging knowledge of the omitted facts, however, all that the allegations concerning the CIDs demonstrate at this stage is that Carmichael knew of the investigation, not necessarily of the problem itself. *See Higginbotham*, 495 F.3d at 758 ("[T]here

---

[2] The consolidated complaint also includes statements Forrest and Fifth Third executive vice president Philip McHugh made. Because Lead Plaintiff did not discuss scienter with respect to either officer in its opposition to Defendants' motion to dismiss, the Court only considers the arguments and corresponding allegations identified by Lead Plaintiff and does not consider any other allegations that Lead Plaintiff fails to discuss in its opposition. *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 825 (7th Cir. 2015) ("[A] party generally forfeits an argument or issue not raised in response to a motion to dismiss.").

is a big difference between knowing about the reports . . . and knowing that the reports are false.").

The consolidated complaint also suggests that Tuzun was or should have been aware of fraud occurring at Fifth Third because he attended investor meetings and signed all statements filed with SEC during the Class Period. But the consolidated complaint does not include any allegations that, in attending the investor meetings or signing the statements, Tuzun was told of the falsity of any of the representations or otherwise knew of the alleged problems. The Court also cannot infer scienter based on Carmichael or Tuzun's executive positions because "a pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." *Arbitrage Event-Driven Fund v. Tribune Media Co.*, No. 18 C 6175, 2020 WL 60186, at *10 (N.D. Ill. Jan. 6, 2020) (citation omitted); *accord Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 673 F. Supp. 2d 718, 747 (S.D. Ind. 2009) ("[R]espective positions within the company prove nothing about fraud or knowledge thereof but rather are exactly the type of generalized allegations the court must disregard under the PSLRA." (citation omitted)), *aff'd*, 679 F.3d 952 (7th Cir. 2012).

In addition, while the consolidated complaint does allege that Fifth Third knew of pervasive employee misconduct, it fails to identify which corporate agents or officers knew of said misconduct. None of these allegations allow for the inference that Carmichael and Tuzun had such knowledge. At most, they allow an inference that Carmichael and Tuzun should have known about the fraud, but what they should have known does not suffice to show that they acted recklessly. *CBOE*, 435 F. Supp. 3d at 861.

### B.     Assurances about Compliance with Risk Management Practices

Second, Lead Plaintiff argues that Carmichael and Tuzun acted with scienter because they made statements concerning Fifth Third's robust risk management and compliance practices and that, pursuant to these practices, any improper sales practices would have made their way to them.  According to Lead Plaintiff, Carmichael's and Tuzun's assurances about the robustness of the risk practices served to conceal Fifth Third's faulty reporting structure and their knowledge of its problems.  *See S.E.C. v. Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008) (scienter inferred when defendants "knew that the representations they made to investors were false").  But here, Lead Plaintiff does not allege any specific facts that demonstrate that Carmichael or Tuzun knew about the deficiencies in the Fifth Third's reporting structure or the obviousness of those deficiencies.  "By definition, all frauds demonstrate the 'inadequacy' of existing controls, just as all bank robberies demonstrate the failure of bank security and all burglaries demonstrate the failure of locks and alarm systems."  *Higginbotham*, 495 F.3d at 759–60.  As such, the existence of inadequate compliance practices alone does not demonstrate that Carmichael and Tuzun made "statements regarding those controls necessarily acted with the intent to deceive."  *Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791, 801–02 (N.D. Ill. 2007).

### C.     CFPB Litigation

Lead Plaintiff next argues that the CFPB's ongoing litigation against Fifth Third supports an inference of scienter.  Government investigations can help to reinforce allegations of scienter.  *See In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) ("That the SEC and DOJ initiated investigations provides additional support for finding that scienter has been adequately pleaded.").  But making such an inference on its own strikes the Court as improperly inferring fraud by hindsight.  *See Société Générale Sec. Servs., GbmH v. Caterpillar, Inc.*, No. 17

CV 1713, 2018 WL 4616356, at *3 (N.D. Ill. Sept. 26, 2018) (the PSLRA's heightened pleading requirements are intended "to discourage claims of so-called fraud by hindsight" (citations omitted) (internal quotation marks omitted)); *see also W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, No. 19-CV-01323, 2020 WL 6118605, at *25 (N.D. Ill. Oct. 15, 2020) ("The Seventh Circuit has emphasized that 'hindsight' cannot be the 'only basis' of a proposed scienter inference, since there is no 'fraud by hindsight.'" (citing *Higginbotham*, 495 F.3d at 759)). "Courts in this district have declined to allow plaintiffs to use a must have known theory as an end-run around the requirement that plaintiffs set forth particularized facts to suggest that defendants acted knowingly or recklessly." *Conagra Brands, Inc.*, 2020 WL 6118605, at *25 (citations omitted). Further, Lead Plaintiff points to nothing in the CFPB litigation that suggests that Carmichael or Tuzun had personal knowledge of any problematic practices at the time when they made the statements at issue. As such, the Court does not find it appropriate to infer scienter from conclusory statements made in another litigation. *See In re Bally Total Fitness Sec. Litig.*, No. 04 C 3530, 2006 WL 3714708, at *1–2, 6–7 (N.D. Ill. July 12, 2006) (February 2005 press release did not support an inference of scienter because its findings were "simply hindsight conclusions" that did "not assist in determining the state of mind behind the misstatements at the time they were made" between August 1999 and April 2004).

### D. Motive

Lead Plaintiff further argues that it has adequately pleaded motive to support an inference of scienter. A plaintiff may use "motive and opportunity or circumstantial evidence to establish scienter under the PSLRA, as long as those facts support a strong inference that the defendant acted recklessly or knowingly." *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815, 823 (N.D. Ill. 2000) (citations omitted). Lead Plaintiff first focuses on Carmichael and Tuzun's incentive

32

compensation, arguing that they stood to profit from concealing ongoing problems with unauthorized accounts and the resulting CFPB investigation. The consolidated complaint shows that, in addition to their regular compensation, Carmichael collected nearly $23.4 million in incentive-based compensation during the Class Period, whereas Tuzun made $6.2 million. When Fifth Third disclosed the account problems and the resulting CFPB investigation in March 2020, Carmichael's incentive compensation for 2019 dropped by $2.4 million and Tuzun's by 12%.

But these allegations do not contribute to a strong inference of scienter. Allegations regarding a corporate officer's motivation to earn bonuses, stock, or other compensation "are too common among corporations and their officers to be considered evidence of scienter." *Bally Total Fitness*, 2006 WL 3714708, at *9; *see Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012) (an alleged incentive to improve bonuses and increase the value of stock options was "too generic to satisfy" *Tellabs II*). Rather, if courts accepted the motive to reap higher compensation "as sufficient to establish scienter, most corporate executives would be subject to such allegations, and the heightened pleading requirements for these claims would be meaningless." *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 714 (N.D. Ill. 2005); *see also Kohl's*, 895 F.3d at 939–40 ("[A] generalized motive common to all corporate executives is not enough to establish scienter. Otherwise, 'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'" (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009))). Indeed, "[t]he desire to increase the value of a company and attain the benefits that result, such as meeting analyst expectations and reaping higher compensation, are basic motivations not only of fraud, but of running a successful corporation." *Davis*, 385 F. Supp. 2d at 714. Therefore, because Lead Plaintiff does not tie Carmichael and

Tuzun's incentive compensation specifically to the challenged practices, with it instead just generally tied to the overall value of the company, the Court cannot infer scienter from Fifth Third's incentive compensation plan.

Lead Plaintiff also argues that Carmichael and Tuzun had a motive to conceal the CFPB investigation and improper account practices in order to complete the MB Financial acquisition, for which Fifth Third needed to issue stock while the price was artificially high. But the general desire to keep stock prices high to make the company appear profitable or to close a deal, on its own, does not suffice to allow a strong inference of scienter and, as with the incentive compensation argument, could just as well demonstrate Carmichael and Tuzun's motivation "of running a successful corporation." *Davis*, 385 F. Supp. 2d at 714.

Finally, Lead Plaintiff advances the theory that Carmichael's stock trades during the Class Period further evidence his motive to commit fraud, claiming they were "dramatically out of line with prior trading practices at times [and] calculated to maximize the personal benefit from undisclosed inside information." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 604 (7th Cir. 2006). "Insider trading alone does not raise an inference of scienter," however. *Davis*, 385 F. Supp. 2d at 714; *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 WL 4360648, at *13 (N.D. Ill. Sept. 23, 2008). Instead, "[t]he sale must be suspicious in scope or timing" to support such an inference. *Davis*, 385 F.Supp.2d at 715. Carmichael's sales within the Class Period do not meet this criteria. Although Lead Plaintiff points out that Carmichael sold 26% of his shares during the Class Period but did not trade eighteen months before or six months afterwards, the sales during the Class Period show similar gaps of time in between trades. And Lead Plaintiff has failed to tie the timing of the sales to any specific misleading or false statements made by Carmichael or Tuzun. Without additional context to suggest that

Carmichael's stock sales were suspicious or unusual, the Court does not find they support a strong inference of scienter.  *See Higginbotham*, 495 F.3d at 759 ("[A]bsence of sales by other managers . . . implied that nothing was thought to be out of the ordinary."); *Davis*, 385 F. Supp. 2d at 714–15 ("The strength of an inference depends on how closely it follows from a fact. Without more, an executive's sale of stock does not lead to the conclusion that he engaged in fraud.").

Having examined Lead Plaintiff's arguments concerning scienter individually and collectively, the Court cannot find sufficient allegations giving rise to a strong inference of scienter on either Carmichael's or Tuzun's part.  As a result, the Court also cannot impute scienter on Fifth Third.  Accordingly, the Court dismisses Lead Plaintiff's § 10(b) claims without prejudice.

## III.    Section 20(a) Claim (Count II)

Lead Plaintiff also alleges that Carmichael and Tuzun violated § 20(a) of the Exchange Act as "controlling persons" of Fifth Third.  "Section 20(a) provides a basis for holding individuals liable for acts of securities fraud if they control other individuals or businesses that violate the securities laws."  *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 886 (N.D. Ill. 2011) (citing 15 U.S.C. § 78t).  However, "to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws—here, a violation of § 10(b) and Rule 10b-5."  *Pugh*, 521 F.3d at 693.  Because Lead Plaintiff has failed to adequately plead its § 10(b) claim, its claim for control person liability under § 20(a) also fails at this stage.  *Id.* at 698 ("[B]ecause the plaintiffs have not adequately alleged the direct liability of any defendant [under § 10(b) and Rule 10b-5], their § 20(a) claim was also correctly dismissed."); *Fryman*, 462 F. Supp. 3d at 891,

35

905 (dismissing § 20(a) claims against the corporate defendant's CEO and CFO where the plaintiffs failed to adequately plead § 10(b) claims).

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss [58]. The Court dismisses the consolidated complaint without prejudice. The Court gives Lead Plaintiff until June 11, 2021 to file an amended complaint if it can do so consistent with Federal Rule of Civil Procedure 11 and this Opinion.

Dated: April 26, 2021

_____
SARA L. ELLIS
United States District Judge