UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| HEAVY & GENERAL LABORERS' LOCAL 472 & 172 PENSION AND ANNUITY FUNDS, Individually and on Behalf of All Others Similarly Situated, ) ) ) ) ) | Case No. 1:20-cv-02176 CLASS ACTION Judge Sara L. Ellis |
| Plaintiff, ) ) | |
| vs. ) ) | |
| FIFTH THIRD BANCORP, et al., ) ) | |
| Defendants. ) ) ) | DEMAND FOR JURY TRIAL |

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

4825-7546-1374.v1

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................................1

II.    JURISDICTION AND VENUE ...............................................................................13

III.   PARTIES ...................................................................................................................13

IV.   FACTUAL BACKGROUND....................................................................................15

      A.     Fifth Third's Integrity, Reputational Assets, and Ability to Maintain Client Trust Are of Paramount Importance to The Bank's Business and Investors .........15

      B.     For More than a Decade, Fifth Third Incentivized a Host of Illicit Business Practices by Bank Employees to Artificially Inflate Results.................................16

            1.     Fifth Third Incentivized Non-Compliance...................................................16

            2.     Unauthorized Accounts.................................................................................18

            3.     Unauthorized Credit Cards ...........................................................................22

            4.     Online Banking .............................................................................................24

            5.     Early Access Lines of Credit ........................................................................24

            6.     Other Products ..............................................................................................25

      C.     Fifth Third Is Targeted by the CFPB for Its Illicit Business Practices .................25

      D.     The Wells Fargo Fake Account Scandal Places Fifth Third's Illicit Business Practices at the Forefront of Defendants' Minds....................................28

      E.     Defendants Fail to Disclose Fifth Third's Illicit Business Practices or the CFPB Investigation to Investors ..........................................................................31

      F.     Defendants Misrepresent Fifth Third's Business Practices and Risk Management Framework .......................................................................................32

      G.     Defendants Capitalize on Their Fraud ..................................................................34

      H.     The Retirement of Fifth Third's Chief Risk Officer Is Announced in January 2020 ..........................................................................................................34

      I.     The Truth About the CFPB Investigation and Fifth Third's Illicit Business Practices Is Revealed in March 2020........................................................35

**Page**

    J.       Documents and Allegations from the CFPB Action and Confidential Witness Allegations Corroborate the Scope of Fifth Third's Unethical and Illegal Practices and Establish the Knowledge and Involvement of the Individual Defendants ................................................................41

V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS MADE DURING THE CLASS PERIOD ............................45

    A.      Defendants' Misleading Statements and Material Omissions Regarding Fifth Third's Business Practices and Risk Management System..........................45

    B.      Defendants' Misleading Statements and Material Omissions Regarding Fifth Third's Code of Business Conduct and Ethics................................................49

    C.      Defendants' False and Misleading Statements and Omissions Regarding Fifth Third's Product Cross Selling, Consumer Business Practices and Customer Relations ................................................................................53

    D.      Defendants' False and Misleading Statements Concerning Fifth Third's Incentive Compensation................................................................58

    E.      Defendants' Misleading Statements and Material Omissions Regarding the Risk Environment Facing Fifth Third ................................................60

VI.    THE TRUTH BEGINS TO BE REVEALED ................................................63

VII.    ADDITIONAL SCIENTER ALLEGATIONS................................................69

    A.      The Individual Defendants Were in Charge of and Directly Involved with the Banking Operations at Issue ................................................69

    B.      The Individual Defendants' Role in Investigating the Misconduct Confirms Their Knowledge of the Undisclosed but Admitted Consumer Abuses ................................................................................71

    C.      Defendants' Additional Public Comments Contribute to a Compelling Inference of Scienter ................................................................75

    D.      The Individual Defendants Collect over $35.4 Million in Incentive Compensation and Insider Trading ................................................81

    E.      Defendants Complete a $242 Million Offering of Fifth Third Securities ............84

    F.      Defendants Issued 131 Million Shares of Fifth Third Common Stock to Complete the $4.3 Billion Acquisition of MB Financial ......................................85

4825-7546-1374.v1

**Page**

     G.     The Large Number of Executive Departures Bolsters an Already Compelling Inference of Scienter ........................................................86

VIII.     LOSS CAUSATION AND ECONOMIC LOSS ............................................86

IX.     PRESUMPTION OF RELIANCE ...................................................................90

X.     NO SAFE HARBOR ........................................................................................92

XI.     CLASS ACTION ALLEGATIONS .................................................................92

COUNT I ....................................................................................................................94

For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5 Against Fifth Third and the Individual Defendants ...........................................................................94

COUNT II ...................................................................................................................95

For Violation of §20(a) of the Exchange Act Against Defendants Carmichael and Tuzun ..........95

PRAYER FOR RELIEF ..............................................................................................96

DEMAND FOR TRIAL BY JURY .............................................................................97

Plaintiff Heavy & General Laborers' Local 472 & 172 Pension and Annuity Funds, individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys. This investigation included, among other things: review and analysis of U.S. Securities and Exchange Commission ("SEC") filings by Fifth Third Inc. ("Fifth Third," the "Bank" or the "Company"); Company press releases and earnings call transcripts; public information regarding Fifth Third including information posted on the Company website; analyst reports and media reports about the Company and the industry; litigation involving Fifth Third, including the pending Consumer Financial Protection Board ("CFPB" or the "Bureau") action against the Bank (*Bureau of Consumer Financial Protection v. Fifth Third Bank, Nat'l Ass'n.*, No. 1:21-cv-00262-DRC (S.D. Ohio); and consultation with former Fifth Third employees. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1.      This securities class action is brought on behalf of all purchasers of Fifth Third common stock between November 9, 2016 and March 6, 2020, inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder against Fifth Third and its most senior executives ("Defendants").

2.      Fifth Third is one of the largest regional consumer banks in the United States. The Bank, through its subsidiaries, provides a wide range of financial products and services, including checking, savings, and money market accounts, wealth management services, insurance services and credit products such as mortgage loans, credit cards and auto loans. As a consumer-facing lender, the Bank's integrity, reputational assets, and ability to maintain client trust are of paramount

- 1 -

importance and a centerpiece of the Bank's business, financial prospects and its value proposition for Fifth Third investors.

3.      Throughout the Class Period, Defendants reassured investors and the public that Fifth Third placed integrity, honesty and the wellbeing and interests of its clients at the heart of its business practices.  For example, Defendants represented to investors that Fifth Third's first "core" operating "principle" was its purported commitment to "*[a]ct with integrity in all activities*."[1]  Other purportedly "core principles" included Defendants' specific representations that Fifth Third was operated so as to, *inter alia*: (i) "[e]nsure Fifth Third's products and services are aligned to its core customer base and are designed, delivered and maintained to provide value and benefit to customers and to Fifth Third"; (ii) "not offer products or services that are not appropriate or suitable for customers"; (iii) "[p]rotect the [Bank's] reputation by thoroughly understanding the consequences of business strategies, products and processes"; and (iv) "[c]onduct business in compliance with all applicable laws, rules and regulations and in alignment with internal policies and procedures."  This sentiment was repeated throughout the organization in public statements to the Company's customers, with Fifth Third training its sales staff to reassure clients "*you can trust and have confidence that Fifth Third is acting in your best interests*."

4.      These and similar representations were diametrically opposed to reality.  For more than a decade, Fifth Third employees engaged in abusive and deceptive consumer practices designed to artificially inflate the Bank's financial and operational results.  These practices included, *inter alia*: (i) opening unauthorized accounts; (ii) transferring consumer funds without consent; (iii) misrepresenting terms and conditions to banking customers; (iv) falsifying records; and (v) assigning personal-identification numbers and passwords to consumer accounts without customers' knowledge

---

[1]      Emphasis added here and throughout unless otherwise noted.

or consent.  These illicit business practices were the predictable and known result of Fifth Third's employee compensation structure, which conditioned employee-performance ratings, and in some instances continued employment, on meeting sales goals and used an incentive-compensation program that rewarded managers and their subordinate employees for selling and cross-selling new products.  Fifth Third's misconduct violated a host of Banking laws and regulations, including the Consumer Financial Protection Act of 2010 ("CFPA"), the Truth in Lending Act ("TILA"), the Truth in Savings Act ("TISA"), and the Fair Credit Reporting Act ("FCRA"), presenting an acute risk that the Bank would be subjected to severe reputational, legal and financial harm if the truth regarding the Bank's activities were ever publicly disclosed.

5.      Fifth Third's Chief Executive Officer ("CEO") and Chairman Michael Carmichael ("Carmichael") and its Chief Financial Officer ("CFO") Tayfun Tuzun ("Tuzun") personally knew of and were ultimately responsible for Fifth Third's undisclosed transgressions.  To take one example of the Individual Defendants' personal involvement, by 2010 the practice of foisting upon unsuspecting consumers unauthorized consumer financial products and engaging in otherwise suspect sales practices at Fifth Third's Chicago offices had grown so egregious and widespread that it necessitated intervention by the Company's corporate headquarters.  As captured in an internal June 2010 email, Fifth Third's head of retail banking wrote that the Chicago "leadership team have a reputation of less than desirable sales management practices"; that "Bullying and threats are often used to achieve results"; and, "As you probably know, there have been consistent problems around unauthorized credit card sales in Chicago." Although Fifth Third has fought to keep the identity of the author of this email secrete, a Bank press release identifies Carmichael as "leading [Fifth Third's] Retail Bank" at the time as its Chief Operating Officer ("COO"), a position he held from 2006 to 2015.  Even if Carmichael was not the email's author, as the executive with primary responsibility and oversight of the Company's retail banking operations and regional financial

- 3 -

centers, he was intimately aware of the underlying misconduct described therein. Carmichael also oversaw the various actions by the Bank taken in response to these illicit sales practices, including an internal investigation and personnel changes. Similarly, Tuzun served as Fifth Third's assistant treasurer at the time and was involved in gathering, reviewing and reporting the Company's financial results from the Chicagoland area, and either knew or was reckless in not knowing of the undisclosed illicit sales scandal impacting one of the Bank's largest regional markets.

6.      However, despite Defendants' internal acknowledgement that the illicit sales practices impacting the Bank's Chicago operations were wrong and in need of correction, Defendants failed to stop ongoing misconduct by Bank employees or remediate the inappropriate incentive structure that drove this misconduct, and Fifth Third employees continued to engage in a host of illicit sales and marketing practices. Between 2010 and 2016 alone, Fifth Third received hundreds of customer complaints regarding illicit sales practices by its employees and internally identified more than 1,000 unauthorized accounts. However, these figures substantially understate the actual incidents of employee misconduct at the Company because Fifth Third executives took intentional actions to minimize, conceal and obfuscate the true scope of the problem, for example, by relying on consumers to self-identify as victims even though Fifth Third was aware that many consumers did not detect improper acts or practices and many others never lodged a complaint. Indeed, unauthorized credit card usage was so widespread at the Company, and the violations of law so internally obvious, that Fifth Third provided written communications to the CFPB during a 2015 Bureau examination disclosing the violations, and the Company has now stated that these communications provided the CFPB "***actual-not just constructive- notice of its claim for unauthorized credit card accounts***," such that they triggered the statute of limitations under the TILA, the FCRA and the CFPA.

- 4 -

7.     At the time that Fifth Third provided written communications disclosing violations of law to the CFPB, Tuzun had been Fifth Third's CFO for nearly two years (a position he assumed in 2013).  In addition, in 2015 Carmichael was promoted from his position as COO and President (positions in which he personally and directly oversaw the retail banking operations in which the misconduct occurred) to become Fifth Third's CEO and a member (and eventual Chairman) of the Fifth Third Board of Directors (the "Board").  In these new roles, Carmichael assumed responsibilities and oversight for the Bank's regulatory response and broader risk management activities.  As senior managers with direct oversight of the Bank's operations (including the specific retail segment at issue), reporting requirements and interactions with regulators, both Tuzun and Carmichael knew, or were reckless in not knowing, of the underlying misconduct by Fifth Third employees and the communication of these serious legal violations to the CFPB in 2015.

8.     The Individual Defendants received further confirmation about the scope and severity of the Bank's illicit sales practices through a CFPB investigation into misconduct by Fifth Third employees.  On November 3, 2016 – ***prior to the start of the Class Period*** – Fifth Third received a CFPB Civil Investigative Demand ("CID") personally addressed to Carmichael.  The CID expressly informed Carmichael of the "Specific Sales Practices" at the Bank that were the subject of the investigation, including "opening an account for any product or service offered by the Company without the knowledge and consent of a consumer," "changing, without the consumer's knowledge and consent, the type of account or service in which a consumer is enrolled," and "engaging in unauthorized transactions on behalf of a consumer."  Of course, Carmichael already knew of these issues from his roles as CEO and previously COO, as he had directly overseen the retail banking operations plagued by such issues and had responsibility for the Bank's response to the widespread abuse and deceptive tactics impacting the Bank's Chicago operations.

9.      Moreover, the wide-ranging CFPB investigation would require the direct and protracted participation of both Individual Defendants.  Between 2017 and 2019, the CFPB issued five additional CIDs to Fifth Third regarding the use of unauthorized accounts and predatory consumer practices at the Company.  In the course of this investigation, the Bank provided nearly a half-***billion*** data points, thousands of Company documents and extensive testimony to regulators – an immense effort that necessitated the active involvement of both Carmichael and Tuzun.  Then, in 2017, Fifth Third was forced to ***admit*** to the CFPB that it had opened consumer financial products without authorization ***every year from 2010 to 2017***.  This startling admission was made by Fifth Third with the knowledge and approval of the Individual Defendants as the Bank's most senior executives.

10.      Even in a vacuum, the Bank's admission of long-standing misconduct, the breadth of the CFPB investigation, the specific and extremely troubling sales practices internally identified by Fifth Third and later by the CFPB, and the Bureau's persistence in pursuing Fifth Third and seeking justice for the many victims of Fifth Third's predatory practices demonstrated beyond any reasonable doubt to the Individual Defendants that Fifth Third's long concealed misconduct had placed the Bank in extreme regulatory peril during the Class Period.  However, the likelihood of imminent adverse regulatory action and attendant reputational fallout was further magnified because the CFPB investigation was being conducted in the wake of an analogous unauthorized account scandal at Wells Fargo – one of Fifth Third's banking competitors.  Just two months before Fifth Third received the first CID, the Wells Fargo fake account scandal had burst into public view, ultimately leading to a collapse in that company's stock price, a host of litigation and regulatory actions, billions of dollars in fines, settlements and penalties and the ignominious exit of Wells Fargo's former Chairman and CEO.  Matt Levine, opinion columnist for *Bloomberg*, has described the Wells Fargo fake account scandal as "one of the highest profile cases of banking villainy since

- 6 -

the financial crisis." Thus, prior to the start of the Class Period, Defendants had been targeted by the CFPB for doing categorically the same thing, placing Fifth Third's years of abusive and deceptive practices and attendant legal peril at the forefront of Defendants' minds. By November 2016 at the latest, the Individual Defendants not only knew of the illicit sales practices by Fifth Third employees alleged herein, but they had been directly informed by the CFPB that the Bank was the next target in the regulatory crosshairs for long-fomenting an employee and sales culture akin to what had led to the demise of Wells Fargo's former CEO and Chairman.

11. Defendants disclosed none of these adverse facts to investors. To the contrary, Defendants repeatedly lied about the Bank's business practices, sales culture, compliance with applicable laws and regulations, and risk environment. For example, Defendants stated that Fifth Third strictly prohibited "[o]pening bogus or fake accounts," "[f]alsifying document or inflating performance results," and "[m]anipulating records." Defendants similarly claimed that the Bank "[a]cted with integrity in all activities," did "not offer products or services that are not appropriate for its customers," and conducted its business in "compliance with all applicable laws, rules and regulations and in alignment with internal policies and procedures." In 2017, *the same year that Fifth Third under Carmichael's leadership admitted to the CFPB that the Bank's employees had opened unauthorized consumer financial products every year for seven years straight*, Carmichael boasted on a conference call with investors that Fifth Third was "the second most trusted company for retail banking" because the Bank put "the customer at the center of everything we do."

12. These false and misleading statements created and maintained artificial inflation in the price of Fifth Third stock. During the Class Period, the price of Fifth Third common stock reached its highest prices in a decade, topping out at over $34 per share. Defendants capitalized on this inflated price, issuing 131 million shares of Fifth Third stock to complete a $4.7 billion acquisition of Chicago-based regional bank MB Financial in March 2019. Similarly, in September

- 7 -

2019, Defendants conducted a $250 million offering of Fifth Third preferred stock. The Individual Defendants also reaped tens of millions of dollars in excessive compensation and insider sale proceeds as a result of their fraud. For example, Carmichael collected over $23.4 million in incentive-based compensation from 2016 to 2018, representing more than 88% of his total compensation. Similarly, Tuzun received over $6.2 million in incentive-based compensation, which represented more than 79% of his total compensation, over that three-year period. For both Individual Defendants, their awards were expressly set by reference to operational targets such as their purported "promotion of the Bank's Core Values of Accountability, Integrity, Respect and Inclusion" – *i.e.*, ***the very issues implicated by Defendants' efforts to conceal the Bank's illicit sales practices***. Carmichael went one step further, selling nearly 200,000 Fifth Third shares at prices as high as $32 for over $5.8 million in gross insider trading proceeds. These sales were highly suspicious in both timing and amount and out of line with Carmichael's prior trading practices.

13.     Although Defendants were able to capitalize on their fraud, the Company's outside investors were not so fortunate. On March 2, 2020, Fifth Third disclosed for the first time that it was not only the subject of a CFPB investigation, but additionally that the Company was about to be sued into compliance "in relation to alleged unauthorized account openings" by the Bureau. Fifth Third also revealed it was doubling its reserve for "reasonably possible . . . losses related to regulatory proceedings," from $27 million in 3Q 2019 to $56 million. In substantial part as a result of these disclosures, the price of Fifth Third common stock dropped from a close of $25.72 on March 2, 2020 to a close of $22.20 by March 6, 2020, a loss of $3.52 per share, or 14%.

14.     Then, on Monday, March 9, 2020, the CFPB issued a press release announcing it had launched an enforcement action against Fifth Third. The press release detailed shocking misconduct by the Bank and its employees, stating in pertinent part as follow:

- 8 -

[F]or several years Fifth Third, without consumers' knowledge or consent: opened deposit and credit-card accounts in consumers' names; transferred funds from consumers' existing accounts to new, improperly opened accounts; enrolled consumers in unauthorized online-banking services; and activated unauthorized lines of credit on consumers' accounts….

. . . [F]or years and continuing through at least 2016, Fifth Third used a 'cross-sell' strategy to increase the number of products and services it provided to existing customers; used an incentive-compensation program to reward selling new products; and conditioned employee-performance ratings and, in some instances, continued employment on meeting ambitious sales goals. . . . [D]espite knowing since at least 2008 that employees were opening unauthorized consumer-financial accounts, Fifth Third took insufficient steps to detect and stop the conduct and to identify and remediate harmed consumers.

15.    That same day the CFPB filed a complaint in the United States District Court for the Northern District of Illinois against Fifth Third, alleging a host of legal and regulatory violations by the Bank.  According to the CFPB complaint, Fifth Third had known for a decade that its employees were opening unauthorized accounts in its customers' names, employing predatory cross-selling strategies and rewarding employees for achieving incentive-based targets even if that meant violating the law, while punishing those who failed to achieve these targets by any means necessary. As the CFPB complaint emphasized, "Even after learning of unauthorized Fifth Third consumer-financial products and services by 2008, Fifth Third failed to change its sales practices to avoid consumer harm.  Instead, Fifth Third continued to foster sales practices that were likely to cause unauthorized products and services."  According to the CFPB, Fifth Third "failed to take steps to determine and address a root cause of unauthorized accounts, which was consistently said by employees to be intense sales pressure" and "failed to close known loopholes in its collection of proof of consumer authorization, thereby making it easy for employees to open accounts without valid signature cards for deposit accounts or applications for credit products. … In short, Fifth Third focused on its own financial interests to the detriment of consumers."

16.     The extraordinary CFPB enforcement action – one of the only such actions to ever target a major bank for opening unauthorized accounts other than the Wells Fargo scandal – generated massive negative publicity for the Company.  Media agencies like *Reuters*, *The New York Times*, *The Wall Street Journal* and many others ran articles detailing the shocking allegations alleged in the CFPB complaint, with several making the obvious comparison to the Wells Fargo fake account scandal.  For example, *DealBreaker* published an article titled "Fake Accounts Were Such a Good Idea, They Thought Of It Twice," which stated that "the revelation" of the unauthorized account sales strategy at Wells Fargo "was not just unwelcome news to [Wells Fargo's senior leadership], but also to the people running Fifth Third Bank, which was also allegedly doing some unauthorized account opening."

17.     In a substantial part as a result of these disclosures, the price of Fifth Third common stock dropped from a close of $22.20 on March 6, 2020 to a close of $18.30 on March 9, 2020, a $3.90 per share decline.  The price of Fifth Third shares continued to drop in subsequent days, falling to $15.90 by March 12, 2020, a loss of $6.30 per share, or 28%, over four trading days.  In total, Fifth Third shares have fallen ***more than 50%*** from their Class Period high.

18.     Since the filing of the CFPB action, additional revelations have continued to come to light in that litigation further establishing the Individual Defendants' knowledge of Fifth Third's illicit business practices.  For example, the CFPB has detailed in an amended pleading the massive scope and duration of Fifth Third's misconduct and intentional failure to reform systemic issues at the Bank, all of which occurred on the watch and under the leadership of the Individual Defendants.  For example, the CFPB has alleged that "Fifth Third knows or consciously disregards that its admissions and claims understate the real number of unauthorized account openings and other improper sales conduct" and that there are in fact "***hundreds of thousands of Fifth Third accounts that bear indicia of non-authorization***," with misconduct by Bank employees and deficient Bank

- 10 -

practices stretching back to 2008 and continuing until at least 2020.  CFPB has also revealed that "**Fifth Third admitted in 2017** that it had opened consumer-financial products without consumer authorization during each year from 2010 to 2017" – *i.e.*, at the time that the Bank was being run by Carmichael and Tuzun as CEO and CFO, respectively.  In response, Fifth Third placed the timeline of the Bank's admissions to the Bureau even earlier, conceding that "Fifth Third disclosed unauthorized credit card accounts **during the Bureau's examination in 2015**," and that these "**written communications establish the Bureau's actual—not just constructive—notice of its claim for unauthorized credit card accounts**."  If these documents provided the Bureau's knowledge of legal violations in 2015 they must necessarily **also** establish the knowledge of Fifth Third and its senior management (*i.e.*, the Individual Defendants) who prepared and/or authorized such communications to one of the Bank's primary regulations.

19.     The CFPB amended complaint repeatedly and directly implicates the Individual Defendants in Fifth Third's misconduct, not just lower-level employees, further confirming their knowledge of the misconduct at issue.  For example, the CFPB amended complaint specifies that "Fifth Third was aware" of misconduct "by June 2010, when **senior management** was notified of an increase in the number of calls by employees to the internal whistleblower hotline regarding the unauthorized opening of Early Access lines of credit."  This would have included Carmichael, who led the Company's retail banking operations at the time, and likely also Tuzun, who was responsible for gathering and reporting on the Company's financial results impacted by the misconduct. Similarly, the CFPB amended complaint states that, "Fifth Third has, and **members of Fifth Third's senior management are and have been familiar with**, data and other information that would be useful in implementing available unauthorized-account-identification methods for at least years 2010 to 2021" – a time that the Individual Defendants were not just members of senior management, but in roles with specific responsibilities over the implicated aspects of Fifth Third's operations.  The

- 11 -

CFPB amended complaint further alleges that this illegal dereliction of duty was both knowing and intentional, stating that "Fifth Third, *through its senior management, chose* not to attempt to identify unauthorized consumer-financial products beyond those Fifth Third has admitted to opening because greater identification might cause Fifth Third reputational and financial harm."  The CFPB amended complaint even describes internal correspondence from executives in Carmichael's direct line of report contemporaneously detailing illicit sales practices at the Bank and stating that such practices were widely known within the organization.  For the avoidance of doubt, *the CFPB amended complaint expressly singles out Carmichael* (described as "Fifth Third's current Chairman and Chief Executive Officer – formerly Fifth Third's Chief Information Officer, Chief Operating Officer, and President") *as the person* "*responsible* for reviewing or overseeing Fifth Third's retail-banking business, its data maintenance and use, and its sales and investigative practices" at the time that the misconduct was occurring.

20.    In short, the Individual Defendants knew of and were intimately involved in perpetrating the misconduct alleged herein.  Indeed, the CFPB considers its allegations and the Bank's subsequent admissions so overwhelming in establishing that clear violations of law occurred at Fifth Third on Carmichael and Tuzun's watch that, on August 13, 2021, the Bureau moved for a partial *judgment on the pleadings*.

21.    This lawsuit seeks recompense for the losses suffered by Fifth Third investors as a result of the Company's illicit business practices and legal violations and Defendants' ultimately failed cover-up, which caused a substantial decline in the price of Fifth Third common stock upon public disclosure.

4825-7546-1374.v1

## II.     JURISDICTION AND VENUE

22.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

23.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

24.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b)-(c), and §27 of the Exchange Act, 15 U.S.C. §78aa. Fifth Third transacts business and has two corporate offices in this district, including the Fifth Third Center at 222 S. Riverside Plaza, Chicago, Illinois 60606, and a substantial portion of the acts alleged herein took place in this district.

25.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.     PARTIES

26.     Plaintiff Heavy & General Laborers' Local 472 & 172 Pension and Annuity Funds was appointed Lead Plaintiff on June 29, 2020. ECF No. 41. As set forth at ECF No. 20-3, Plaintiff purchased shares of Fifth Third common stock during the Class Period and has been damaged thereby.

27.     Defendant Fifth Third is incorporated in Ohio and has two corporate offices in this district, including the Fifth Third Center at 222 S. Riverside Plaza, Chicago, Illinois 60606. Fifth Third common stock trades in an efficient market on the Nasdaq Global Select Market under the ticker symbol "FITB."

28.     Defendant Carmichael has served as Fifth Third's President since 2012, its CEO and a director since November 2015, and as Chairman of the Board since January 2018. Prior to being

- 13 -

named CEO, Carmichael served as Fifth Third's COO, a position he assumed in 2006. Among his responsibilities as CEO, President and Chairman, Carmichael is responsible for the Bank's regulatory results, promoting a culture of strong risk management, customer and talent goals, and furthering the Bank's "core values." As COO, Carmichael led Fifth Third's Retail Bank, Investment Advisors, and Business Banking segments, and all affiliate banks and markets, as well as the Bank's growth, customer service levels, team work across divisional and functional areas, and promotion of the Bank's "core values" of accountability, integrity, respect and inclusion, and teamwork and collaboration.

29.     Carmichael made or had authority over the content and dissemination of the false and misleading statements and material omissions set forth herein at ¶¶107-111, 114-117, 119-130, 132-134, 136-137, and is liable for those false statements and omissions. Carmichael is also a control person of Fifth Third within the meaning of §20(a) of the Exchange Act.

30.     Defendant Tuzun served as Fifth Third's Executive Vice President and CFO from October 2013 until his resignation in November 2020. Among his responsibilities as CFO, Tuzun is responsible for the Bank's financial planning and reporting, operational excellence, managing the Bank's customer and talent goals, and furthering the Bank's "core values." Prior to serving as CFO, Tuzun was Fifth Third's Treasurer and Assistant Treasurer, positions in which he was responsible for the Bank's balance sheet, capital and liquidity management, risk management and compliance, operational excellence, maintaining a strong financial team, and promotion of the Bank's "core values" of accountability, integrity, respect and inclusion, and teamwork and collaboration.

31.     Tuzun made or had authority over the content and dissemination of the false and misleading statements and material omissions set forth herein at ¶¶107-111, 119-121, 126-128, 131-134, 136-137, and is liable for those false statements and omissions. Tuzun is also a control person of Fifth Third within the meaning of §20(a) of the Exchange Act.

- 14 -

32.     Defendants Carmichael and Tuzun are sometimes referred to herein collectively as the "Individual Defendants."  The Individual Defendants possessed the power and authority to control the contents of Fifth Third's SEC filings, press releases and other market communications. The Individual Defendants were provided with copies of Fifth Third's SEC filings and press releases alleged herein to be misleading prior to and shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Fifth Third, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that these representations were materially false and misleading when made.

## IV.     FACTUAL BACKGROUND

### A.     Fifth Third's Integrity, Reputational Assets, and Ability to Maintain Client Trust Are of Paramount Importance to The Bank's Business and Investors

33.     Fifth Third is one of the largest regional consumer banks in the United States.  As of December 31, 2020, Fifth Third had over $200 billion in assets and operated more than 1,100 full-service Banking Centers and 2,300 Fifth Third branded ATMs in Ohio, Kentucky, Indiana, Michigan, Illinois, Florida, Tennessee, West Virginia, Georgia, North Carolina and South Carolina. Fifth Third operates four main businesses: Commercial Banking, Branch Banking, Consumer Lending, and Wealth & Asset Management. The Bank provides a wide range of financial products and services, including checking, savings and money market accounts, wealth management services, insurance services and credit products such as mortgage loans, credit cards and auto loans.

34.     Critical to Fifth Third's success is the success of its consumer banking operations and its ability to garner the trust of consumers.  As the Company's Executive Vice President and Head of Regional Banking, Phil McHugh, emphasized at Fifth Third's December 7, 2017 Investor Day

- 15 -

4825-7546-1374.v1

conference, consumer banking "generate[s] nearly 50% of the total revenue for the company." Thus, the Bank's integrity, reputational assets, and ability to maintain consumer confidence are of paramount importance and a centerpiece of the Bank's business, financial prospects and its value proposition for Fifth Third investors. In fact, these attributes were so important to Fifth Third that its executives codified a set of "core values" centered on integrity and accountability which became an integral part of the Bank's public image and which were emphasized in marketing materials and in representations to investors. Senior executives – including the Individual Defendants – even had their compensation set in substantial part based on their ability to promote and adhere to these principles, and Fifth Third trained its sales staff to reassure clients "***you can trust and have confidence that Fifth Third is acting in your best interests***."

> **B.    For More than a Decade, Fifth Third Incentivized a Host of Illicit Business Practices by Bank Employees to Artificially Inflate Results**

35.    Despite its purported commitment to act with honesty, integrity and in its clients' best interests, behind the scenes Fifth Third fomented a sales culture which encouraged and rewarded a host of illicit business practices. These practices, detailed below, persisted not for more than a decade and were known to and remained intentionally uncorrected by the Individual Defendants, as well as other senior Fifth Third executives, for years, exposing the Bank to a severe risk of reputational, legal and financial harm if ever publicly disclosed.

> **1.    Fifth Third Incentivized Non-Compliance**

36.    The illicit business practices detailed herein were the known and predictable result of a perverse incentive structure implemented by Fifth Third management to reward increased sales and the hitting of other operational targets at all costs, even if it meant violating the law, and to punish those Bank employees who failed to perform. For example, Fifth Third tied its employees' performance ratings, and sometimes even their continued employment, to whether the Bank's

managers and their subordinates met aggressive sales goals. Fifth Third rewarded employees for selling new products and punished them for not selling enough new products. The Bank set sales goals higher than anticipated sales for thousands of employees and measured achievement of these goals using a point-based achievement system that was also a key component in employee performance ratings and promotions. Low performance ratings could result in discipline, including termination. To sell new products to consumers, Fifth Third trained its employees to tell (and otherwise convince) consumers that the products sold to them were in consumers' best interests.

37. From at least 2010 through at least 2019, Fifth Third also used a "cross-sell" strategy to increase the total number of products it provided to the Bank's customers. The Bank's cross-sell strategy involved selling multiple products to each customer, with Fifth Third setting a cross-sell goal of at least four products per customer from at least 2010 until at least 2017. Cross-selling improved customer retention by making it harder for a customer to detach from the Bank. Fifth Third's cross-sell goal of four products per customer was not based on an analysis of a customer's individual need, but rather it was based on Fifth Third's desire to improve customer retention and increase the Bank's revenues. Fifth Third also promoted an aggressive sales culture. For example, as described in an internal 2010 email, Fifth Third's head of retail banking (under the purview of Carmichael at the time) acknowledged that "[b]ullying and threats are often used to achieve results" in one of the Bank's largest markets, Chicago.

38. This incentive structure and aggressive sales culture resulted in a predictable epidemic of improper business practices at the Bank prior to and during the Class Period. As a result of Fifth Third's pressure on employees to sell more products than customers needed, Bank employees without consumers' knowledge and consent, *inter alia*: (i) opened deposit accounts in consumers' names; (ii) transferred funds from consumers' existing accounts to new, improperly-opened accounts; (iii) applied for and issued credit cards; (iv) enrolled consumers in online banking;

- 17 -

(v) opened lines of credit on consumers' accounts; and (vi) enrolled consumers in overdraft protection and other financial products without authorization.

### 2.     Unauthorized Accounts

39.     Since at least 2010, Defendants have known or were reckless in not knowing that Fifth Third employees were opening products in consumers' names without those customers' knowledge and consent to achieve sales goals or obtain incentive rewards.  Defendants also knew or were reckless in not knowing that one reason Bank employees were opening unauthorized consumer-financial products was because Fifth Third pressured its employees to sell beyond anticipated sales. For example, Fifth Third's head of retail banking wrote in 2010 that "there have been consistent problems around unauthorized credit card sales in Chicago," noting that the Chicago "leadership team [has] a reputation of less than desirable sales management practices" and that "[b]ullying and threats are often used to achieve results."

40.     Fifth Third has subsequently admitted to opening approximately 1,100 unauthorized consumer-financial products which it detected ***contemporaneously*** in the period of 2010 to 2016, as well as hundreds more following the launch of the CFPB investigation.  But these figures significantly understate the scope of the problem.  The CFPB investigation has revealed that Fifth Third "opened more than 1,100 unauthorized consumer-financial products" and that there are "***hundreds of thousands of Fifth Third accounts that bear indicia of non-authorization***."  Indeed, Fifth Third admitted to the CFPB in 2017 that its employees had opened unauthorized consumer-financial products ***every year from 2010 to 2017***.

41.     The CFPB also concluded that Fifth Third and its senior executives intentionally downplayed the issues and failed to take remedial actions.  Instead, Fifth Third obscured the scope of its unauthorized account problem by, for instance, relying on consumers to self-identify as victims or Fifth Third employees to allege improper activity.  And even when consumers or employees alleged

- 18 -

improper sales conduct, Fifth Third created obstacles to identifying additional unauthorized accounts by only recording the conduct as improper if the allegation was: (i) escalated above the bank branch; (ii) internally investigated; and (iii) determined to the satisfaction of a bank investigator to be "substantiated." Yet Fifth Third knew that many consumers did not detect Fifth Third's improper acts or practices and that many others did not lodge a complaint. For example, although Fifth Third knew by 2015 that many consumer complaints were not escalated even when consumers detected and reported questionable conduct, under the Bank's policies, a consumer complaint could only be escalated if the consumer complained in writing or "verbally expresses dissatisfaction AND requests to speak to someone else (*e.g.*, a supervisor)." The Bank also knew that many of Fifth Third's employees feared retribution for alleging improper conduct.

42.     The scope and nature of the problem further confirms Defendants' knowledge or reckless disregard for the truth. Some unauthorized deposit accounts were "funded" when a bank employee transferred funds to the unauthorized account from the same consumer's authorized account without the consumer's knowledge and consent. Once an unauthorized account was "funded" sufficient to qualify under the sales-goal tracking or incentive program, the Bank employee then transferred some or all of the funds back to the consumer's account, again without the consumer's knowledge or consent. In more than ***26,000 instances*** since 2010, a new Fifth Third deposit account was funded with $100 or less from an existing Fifth Third account and had no activity other than the subsequent transfer, within 90 days, of those funds back to the original account.

43.     Additionally, sometimes a Fifth Third employee would fund a consumer's account initially with the employee's own money and then take reimbursement funds without authorization from the consumer. Since 2010, more than ***124,000*** new Fifth Third deposit-accounts have been funded with $100 or less and defunded to a zero balance within 90 days.

- 19 -

44.     Sometimes, Fifth Third's employees closed an existing account and immediately opened a new one or reopened the just-closed account, getting sales credit for a new account.  In almost *7,000* instances since 2010, an existing customer's new deposit-account was funded with $100 or less by cash or internal transfer, had no activity other than the initial funding and defunding, and was associated with a Fifth Third email address even though the consumer was not a Fifth Third employee.

45.     Fifth Third also allowed its employees to earn sales credit for the "suppression" of paper account-statements, after which the consumer would not receive account statements by mail. After paper account-statements were suppressed, Fifth Third would only send account statements by email.  In thousands of instances, Fifth Third suppressed paper account-statements without a consumer email address to which it could send an electronic account-statement to a consumer.

46.     Fifth Third has acknowledged that each of these facts alone – minimum funding, fake email addresses, statement suppression and new-account funding from an existing account – could indicate a potentially unauthorized deposit account.

47.     Fifth Third charged unjustified fees to many consumers who had deposit accounts opened without their knowledge and consent.  Fifth Third employees also: (i) changed (without consumer consent) the types of accounts or services in which consumers were enrolled; (ii) made false representations about the terms and conditions of consumer-financial products or services to induce consumers to accept, change, or enroll in them; (iii) used or obtained consumers' credit reports without an authorized purpose; and (iv) without consumer authorization, assigned personal-identification numbers or falsified consumer-contact information, including by creating email addresses or using inaccurate email addresses, in order to facilitate unauthorized enrollment of consumers.  Fifth Third has admitted to almost 400 instances of the above acts or practices, but the CFPB's investigation revealed *more* than 400 instances.

- 20 -

48.     The Individual Defendants were well aware of the Bank's problem with opening unauthorized consumer financial products and Fifth Third's failure to remediate the misconduct and its efforts to conceal the problem's scope.  For example, the Bank admitted to disclosing unauthorized credit card accounts to the CFPB in written communications as part of the CFPB's 2015 examination of the Bank, and Fifth Third concedes knowing contemporaneously about the approximately 1,100 unauthorized accounts its employees opened from 2010 to 2016.  Later, in 2017, Fifth Third admitted to the Bureau that its employees had opened unauthorized financial products **every year from 2010 to 2017**. During this time, Carmichael, Fifth Third's current Chairman and CEO – and formerly its COO and President – was responsible for overseeing Fifth Third's retail-banking business, its data maintenance and use, and its sales and investigative practices.  Carmichael was also responsible for the retail banking unit at the time that Fifth Third was forced to intervene in its Chicago operations as a result of widespread issues and employee misconduct there, overseeing an investigation into the issues.  Tuzun became Fifth Third's CFO in 2013 so he too would have known about both the Bank's 2015 written disclosure of unauthorized credit card accounts to the CFPB, its contemporaneous detection of the approximately 1,100 unauthorized accounts its employees opened between 2010 and 2016, and its startling 2017 admission to the Bureau that the Bank had opened unauthorized consumer financial products every year from 2010 to 2017.

49.     In addition, the Individual Defendants were both responsible for regulatory compliance and risk management, adherence to and promotion of the Bank's "core values," and the particular aspects of the Bank's operations (including retail banking, financial planning and reporting, and regulatory compliance issues) directly implicated by the misconduct.  Fifth Third has further stated that, through its risk management practices and procedures, suspicious conduct and compliance issues were elevated to Fifth Third's senior executives, including the Individual

- 21 -

Defendants. Fifth Third engaged in monthly testing and review of each financial center's account opening documentation and employed a specialized investigations group to keep the Individual Defendants and other senior executives apprised of suspicious activities. Both Individual Defendants, as part of Fifth Third's senior management, chose not to reform the underlying incentive structure that caused the employee misconduct to proliferate or to reveal these issues to the Company's investors and instead lied about the Bank's culture and business practices in public statements during the Class Period.

### 3. Unauthorized Credit Cards

50. Under the Individual Defendants' leadership, Fifth Third also imposed aggressive sales goals for its employees to sell credit cards to consumers, and its incentive-compensation program rewarded employees for selling new credit cards. As a consequence, Fifth Third employees applied for and issued credit cards to customers without the customers' knowledge and consent. Fifth Third credit cards were especially susceptible to unauthorized applications and issuance because Fifth Third bank branches accepted telephone credit card applications until at least 2017.

51. Sometimes the Bank retained no other indication of consumer consent than branch employees' written notation of the phrase "phone application" on the signature line of the application along with the date and time. Moreover, Fifth Third had no capability to detect or report if an employee failed to forward the phone application to a central repository. Fifth Third considered disallowing bank-branch phone applications for credit cards in 2010, but it decided against this change even though Fifth Third's head of retail banking (again, Carmichael led Fifth Third's retail banking operations at the time as COO) knew that requiring a "wet signature" would "reduce the issue of customers receiving cards they did not anticipate." Fifth Third did not limit credit card sales to instances when "the customer is physically in the Financial Center" or eliminate phone applications "where we have no customer signature" until 2017—ten years later and after the

Individual Defendants knew Fifth Third was the target of a CFPB investigation and around the time the Bank admitted years of misconduct to the Bureau.

52.     Since 2010, more than *218,000* Fifth Third consumer credit cards have been issued but never activated or used for consumer-initiated transactions.  And since 2010, more than *4,000* Fifth Third consumer credit card accounts have been opened without any consumer-initiated purchases and with a Fifth Third email address when the consumer was not a Fifth Third employee. In fact, unauthorized credit card usage was so widespread at the Company and the violations of law so internally obvious, that Fifth Third provided written communications to the CFPB during a 2015 Bureau examination disclosing the violations, and the Company has now taken the position in litigation with the CFPB that these communications provided "*actual-not just constructive- notice of its claim for unauthorized credit card accounts*" at the time under several banking laws and regulations.

53.     Indeed, Carmichael and Tuzun were well aware of the Bank's unauthorized credit card problem long before this admission.  For example, the unauthorized credit card problem at Fifth Third's Chicago offices was so severe that it required the Company's corporate headquarters to intervene at a time that Carmichael was serving as COO and leading the Bank's retail operations.  In an internal June 2010 email, Fifth Third's head of retail banking wrote, "*As you probably know*, there have been consistent problems around unauthorized credit card sales in Chicago," which the Bank attributed internally to "less than desirable sales management practices," noting that "[b]ullying and threats are often used to achieve results."  As a result of the unauthorized credit card abuses in Chicago, the Bank, under Carmichael's leadership, conducted an investigation and carried out various corporate interventions, including personnel changes.

- 23 -

### 4. Online Banking

54.     Fifth Third also imposed aggressive sales goals for its employees to enroll consumers in its online-banking services, and its incentive-compensation program rewarded employees for enrolling consumers in those services.  As a consequence, Fifth Third employees enrolled consumers in online-banking services and even set up consumers' passwords without their knowledge and consent.

55.     Similarly, Fifth Third's sales programs credited employees for enrolling consumers if the consumer logged in three times. To obtain credit for unauthorized enrollments, Fifth Third employees would log in at least three times without the consumers' knowledge and consent.  To prevent consumers from detecting the unauthorized online-banking enrollment, Fifth Third employees sometimes enrolled the consumer using an email address unknown to the consumer, such as a Fifth Third email address.  Fifth Third employees also used other nonbank and non-consumer email addresses to avoid detection by the consumer.  Since 2010, Fifth Third has completed more than *48,000* consumer enrollments in online banking using a Fifth Third email address.  Of those, more than 12,000 had four or fewer login attempts.

### 5. Early Access Lines of Credit

56.     Fifth Third's Early Access product is a fee-based line of credit that allows Fifth Third's checking-account holders to withdraw Fifth Third-supplied funds from their checking account before the account holder's reimbursement funds have been deposited in the account.  Fifth Third imposed aggressive sales goals for its employees to sell Early Access to consumers, and its incentive-compensation program rewarded employees for enrolling consumers in "fee-based products," including Early Access.  As a consequence, Fifth Third opened unauthorized Early Access lines of credit from at least 2010 through 2014.  During this timeframe, more than *19,000*

- 24 -

Fifth Third Early Access accounts were opened and closed on the same day without being used.  At times, Fifth Third employees also forged consumer signatures on Early Access applications.

57.     Defendants knew, or were reckless in not knowing, that Fifth Third employees had opened Early Access lines of credit on consumers' checking accounts (without consumers' knowledge and consent) by at least June 2010, when senior management was notified of an increase in the number of calls by employees to the internal whistleblower hotline regarding the unauthorized opening of Early Access lines of credit.  But Fifth Third did not effectively curtail unauthorized Early Access lines of credit in 2010.  In 2013, Fifth Third found that Early Access was often "being activated without the customer present" and that there was "a 37% error rate in obtaining signatures" on Early Access applications.  Despite this, Fifth Third retained unauthorized Early Access lines of credit even after it stopped offering new Early Access lines of credit at the end of 2014.

### 6.     Other Products

58.     Fifth Third has also admitted to enrolling consumers in overdraft protection without their consent in 2015 and 2016 and to opening other unauthorized consumer-financial products and services, including Express Banking, Identity Alert, and Access 360 prepaid debit cards.

### C.     Fifth Third Is Targeted by the CFPB for Its Illicit Business Practices

59.     The CFPB is a federal agency charged with protecting consumers and serves as one of the Bank's primary regulators.  During a 2015 Bureau investigation, Fifth Third provided written communications to the CFPB disclosing that unauthorized credit card accounts had been opened by Bank employees in violation of the TILA, FCRA and the CFPA.  These violations were so clear and obvious that the Bank has subsequently taken the position in pending litigation with the CFPB that its 2015 "***written communications establish the Bureau's actual—not just constructive—notice of its claim for unauthorized credit card accounts***."

60.     Following this admission, in November 2016, the CFPB sent Fifth Third a CID addressed to the Bank's President and CEO, defendant Carmichael.  The CID sent to Carmichael expressly informed him of the "Specific Sales Practices" the CFPB was investigating at Fifth Third, including "opening an account for any product or service offered by the Company without the knowledge and consent of a consumer," "changing, without the consumer's knowledge and consent, the type of account or service in which a consumer is enrolled," and "engaging in unauthorized transactions on behalf of a consumer."

61.     Between 2017 and 2019, the CFPB issued five additional CIDs to Fifth Third regarding the use of unauthorized accounts and predatory consumer practices at the Company.  This wide-ranging, multi-year CFPB investigation required the direct and protracted participation of both Individual Defendants.  In responding to the investigation, the Bank provided the CFPB with nearly a half-***billion*** data points, thousands of Company documents, and extensive witness testimony– an immense effort that necessitated the active involvement of both Carmichael and Tuzun.  In 2017, Fifth Third was forced to admit to the CFPB that it had opened consumer financial products without authorization every year from 2010 to 2017.  It is implausible that the admission of such serious misconduct could have been made by Fifth Third without the knowledge and approval of Carmichael as the Bank's CEO and Board member and Tuzun as its CFO, especially in light of the analogous Wells Fargo fake account scandal which had forced the ignominious exit of that bank's CEO and Chairman in October 2016.

62.     As part of the investigation, Fifth Third also admitted to numerous practices that violated various banking laws and regulations.  For example, the Bank admitted to: (i) knowing that its employees had opened unauthorized accounts by at least 2010; (ii) contemporaneously detecting around 1,100 unauthorized accounts opened by Fifth Third employees from 2010 to 2016; and (iii) later, in the course of the CFPB investigating, identifying an additional 800 consumers who were

- 26 -

entitled to relief for unauthorized accounts but went unidentified and unremediated for more than three years. Fifth Third also admitted to almost 400 instances of abusive practices, including: (i) changing without consumer consent the types of accounts or services in which consumers were enrolled; (ii) making false representations about the terms and conditions of consumer-financial products or services to induce consumers to accept, change, or enroll in such products and services; (iii) using or obtaining consumers' credit reports without an authorized purpose; and (iv) without consumer authorization, assigning personal-identification numbers or falsified consumer-contact information, including by creating email addresses or using inaccurate email addresses, in order to facilitate unauthorized enrollment of consumers. Fifth Third has further admitted to opening other unauthorized consumer financial products and services, including Express Banking, Identity Alert, and Access 360 prepaid debit cards, and to enrolling consumers in overdraft protection without their consent in 2015 and 2016.

63.     But even in light of these admissions and the severity and scope of the CFPB investigation, the Individual Defendants failed to remediate and correct the deficiencies identified by the Bureau, requiring the CFPB to file an enforcement action in 2020 to enjoin the Bank's misconduct. The CFPB complaint sought to stop Fifth Third's ongoing violations of the CFPA, TILA, TISA, and FCRA. As the CFPB complaint summarized, "Even after learning of unauthorized Fifth Third consumer-financial products and services by 2008, Fifth Third failed to change its sales practices to avoid consumer harm. Instead, Fifth Third continued to foster sales practices that were likely to cause unauthorized products and services." Thus, Fifth Third "failed to take steps to determine and address a root cause of unauthorized accounts, which was consistently said by employees to be intense sales pressure," and it "failed to close known loopholes in its collection of proof of consumer authorization, thereby making it easy for employees to open accounts without

valid signature cards for deposit accounts or applications for credit products. . . .  In short, Fifth

Third focused on its own financial interests to the detriment of consumers."

### D. The Wells Fargo Fake Account Scandal Places Fifth Third's Illicit Business Practices at the Forefront of Defendants' Minds

64.    The CFPB investigation into Fifth Third's unauthorized accounts occurred in the

shadow of an analogous scandal engulfing one of the Bank's primary competitors, Wells Fargo.

Referred to by former SEC Chairman Arthur Levitt as a "scandal of almost unimaginable

proportions," the revelation that Wells Fargo employees had opened unauthorized accounts on behalf

of employees resulted in the collapse of the price of Wells Fargo securities, a host of lawsuits,

settlements and fines, and the ignominious exit of several senior Wells Fargo executives, including

its former CEO and Chairman John Stumpf ("Stumpf").  Defendants received the first CFPB CID

just two months after news of Wells Fargo's unauthorized account scandal broke and just one month

after the termination of Stumpf.  In other words, the Individual Defendants received the first CFPB

CID in the wake of one of the most notorious banking scandals of all time, and after Fifth Third had

already ***admitted*** to analogous misconduct during the Bureau's 2015 examination.  The Wells Fargo

scandal would have been top-of-mind for Fifth Third and the Individual Defendants when they made

their misleading statements and omissions during the Class Period, knowing as they did that Fifth

Third had also used an analogous unauthorized-accounts scheme to illegally increase consumer sales

and engagement for years and that the Bank was in extreme legal and regulatory peril as the target of

a sweeping CFPB investigation.

65.    On September 8, 2016, the CFPB published an enforcement action and Consent Order

against Wells Fargo & Company.  The CFPB, joined by other regulators, sought to punish Wells

Fargo for its "illegal practice of secretly opening unauthorized deposit and credit card accounts."

The CFPB's announcement of the enforcement action noted that the underlying facts were known to

Wells Fargo prior to the CFPB probe and that an internal investigation had revealed fraudulent practices. Specifically, the CFPB found that Wells Fargo had:

(1) opened unauthorized deposit accounts for existing customers and transferred funds to those accounts without the customers' knowledge or consent;

(2) submitted applications for credit cards in customers' names without the customers' knowledge or consent;

(3) enrolled customers in online banking services they did not request; and

(4) ordered and activated debit cards using customers' information without their knowledge or consent.

66. The CFPB's September 8, 2016 announcement also noted that Wells Fargo had "compensation incentive programs for its employees that encouraged them to sign up existing clients for deposit accounts, credit cards, debit cards, and online banking" and that "Wells Fargo employees illegally enrolled consumers in these products and services without their knowledge or consent in order to obtain financial compensation for meeting sales targets." CFPB Director Richard Cordray remarked, ""***Today's action should serve notice to the entire industry that financial incentive programs, if not monitored carefully, carry serious risks that can have serious legal consequences***."" As senior executives in the banking industry, this "notice" was directed at Carmichael and Tuzun, among other banking executives.

67. Confirming the material risk posed by such illicit business practices to financial institutions like Fifth Third, as a result of the CFPB action the price of Wells Fargo stock dropped $1.18 per share on Friday, September 9, 2016, from $49.90 to $48.72, and then continued dropping the following week.

68. Following the filing of the CFPB action, a September 16, 2016 *Reuters* article reported that, "A phantom account scandal at Wells Fargo & Co. has put the U.S. bank's disclosure policies under a harsh spotlight." Under the heading "Material Or Not?" the *Reuters* article noted

that, "The tactics deployed in its branches were not a surprise for Wells." The bank had been looking into them since 2011, but "[n]o mention is made of the bank's internal probe, or authorities' probes in the 'legal actions' section of [Wells Fargo's] latest quarterly or annual securities filings. . . . Experts said Wells Fargo would have been wise to at least flag the issue earlier." The article also quoted former SEC Chairman Arthur Levitt saying, "It is a scandal of almost unimaginable proportions" and "'[y]ou cannot hold management immune from its consequences.'"

69.  Later in September 2016, Wells Fargo's CEO and Chairman, Stumpf, testified under oath before the Senate Committee on Banking, Housing, and Urban Affairs and the House Financial Services Committee. During his testimony, Stumpf claimed, "We never directed nor wanted our . . . team members, to provide products and services to customers that they did not want or need." But under questioning from members of Congress, Stumpf admitted that he and bank executives had been aware of unethical practices in the retail banking segment of Wells Fargo for several years prior to September 2016, as well as regulatory investigations into those unethical practices.

70.  During his testimony, Stumpf tried to downplay the fake account issue, claiming it "was not a material event" and that the bank just "had some indication that we had one percent of our people who were doing the wrong thing." But in response to Pennsylvania Senator Pat Toomey's question, "When did you begin to disclose in SEC filings that you had this potentially material adverse set of circumstances that could certainly have huge damage to your reputational value?" Stumpf said, "I don't know." Senator Toomey continued: "Well, we haven't been able to discover such a disclosure and *the SEC very clearly requires disclosure of material adverse circumstances. And I don't know how this could not be deemed material. . . . [T]he reputational damage done to the bank is clearly material*."

71.  Two weeks after his Congressional testimony, Wells Fargo fired Stumpf as CEO and Chairman and announced he would have to forfeit $41 million in previously awarded compensation.

- 30 -

### E.    Defendants Fail to Disclose Fifth Third's Illicit Business Practices or the CFPB Investigation to Investors

72.    Despite knowing of illicit business practices at the Bank dating back to 2008, admitting in 2015 that Fifth Third had opened unauthorized credit cards, receiving the CFPB CID on November 3, 2016 notifying Defendants of specific illegal activities under investigation, the fact that these activities were analogues to the catastrophic Wells Fargo fake account scandal, and Defendants' numerous subsequent admissions of employee misconduct as detailed herein, Defendants failed to publicly disclose the existence of either the investigation or the illegal business practices at the Bank.  To the contrary, in statements to investors between the end of 2016 and early 2020, Defendants repeatedly spoke about "taking advantage of cross-sell opportunities" generated by synergies formed by the Company's business segments and touted the Company's growth strategy for its consumer business, while omitting any mention of the CFPB investigation or the unauthorized accounts that Defendants used to boost the Bank's consumer business.

73.    Defendants also routinely highlighted Fifth Third's robust compliance and risk management practices, claiming that "Fifth Third focuses on managing regulatory compliance risk in accordance with [its] integrated risk management framework, which ensures consistent processes for identifying, assessing, managing, monitoring, and reporting risks"; that "[t]o mitigate compliance risk, Compliance Risk Management provides independent oversight to ensure consistency and sufficiency, and ensures that lines of business, regions and support functions are adequately identifying, assessing and monitoring compliance risks and adopting proper mitigation strategies"; and that "[a]dditionally, Compliance Risk Management implements key compliance programs and processes including but not limited to, risk assessment, key risk indicators, issues tracking, [and] regulatory compliance testing and monitoring."  Similarly, Fifth Third's Code of Business Conduct and Ethics, which was publicly filed, repeatedly claimed that "Unethical business practices are

strictly prohibited," including "Incentive gaming," "Falsifying documents or inflating performance results," and "Opening bogus or fake accounts," telling investors "[t]here is zero tolerance for internal fraud within Fifth Third's organization."

74.     Even as the CFPB investigation and the use of unauthorized accounts were already known to them, Defendants purported to warn investors about the ***potential*** risk that "a violation of law or regulation by another financial institution ***may give rise*** to an inquiry or investigation by regulators or other authorities of the same or similar practices by Fifth Third," but they failed to disclose that Fifth Third and the Individual Defendants knew that the Bank's employees had been engaging in a host of illicit practices since at least 2008, that the Bank was the subject of a CFPB investigation into those practices, including practices analogous to the Wells Fargo fake account scandal, and that the Bank had already ***admitted*** to the Bureau that its employees had opened unauthorized accounts on behalf of consumers and engaged in numerous other illicit business practices over a several year period.

**F.     Defendants Misrepresent Fifth Third's Business Practices and Risk Management Framework**

75.     Rather than disclose these adverse facts, Defendants misled investors by assuring them that the Bank "[a]cted with integrity in all activities," did "not offer products or services that are not appropriate for its customers," and conducted its business in "compliance with all applicable laws, rules and regulations and in alignment with internal policies and procedures."

76.     Defendants also told investors that the Bank's purportedly "robust and active risk management practices" ensured Fifth Third would have known about such issues and that the issues would have been escalated to senior management and the Board of Directors.  For example, every year in Fifth Third's SEC Forms 10-K and Forms 10-Q, Defendants highlighted Fifth Third's "risk management framework, which ensures consistent processes for identifying, assessing, managing,

monitoring, and reporting risks" and their "***focus[] on the reporting and escalating of compliance***
***issues to senior management and the Board***." Similarly, in the Company's Code of Business
Conduct and Ethics, which was publicly disseminated on March 16, 2016, September 25, 2017,
September 24, 2018 and September 20, 2019, Fifth Third told investors that "[e]very Fifth Third
employee has a responsibility to communicate situations that could cause risk or harm to Bancorp or
our customers," including "[o]pening accounts . . . without customer authorization," that Fifth Third
"investigates every concern that employees report through any channel," and that "[e]very report of a
violation is taken seriously."

77.     While Defendants were misleading investors by telling them that the Bank did "not
offer products or services that are not appropriate for its customers" and conducted its business in
"compliance with all applicable laws, rules and regulations and in alignment with internal policies
and procedures," they also extolled the importance of Fifth Third's consumer banking segment. For
example, at Fifth Third's December 7, 2017 Investor Day conference, the Company's Executive
Vice President and Head of Regional Banking, Phil McHugh, emphasized how crucial consumer
banking was to the Company: "Today, we comprise roughly 38% of our loan portfolio and we
account for 60% of the total deposits. We generate nearly 50% of the total revenue for the
company." Similarly, at a December 7, 2016 Goldman Sachs US Financial Services Conference,
defendant Carmichael stated the Bank was "looking for a more balanced growth between our
consumer and our commercial businesses. To that end, we are focused on growing our credit card
and unsecured personal lending businesses." Likewise, defendant Tuzun told investors at the March
7, 2018 RBC Capital Markets Conference that the Company's "fundamental metric is household
growth," stating that "[a]s long as we can grow households, then we are achieving what we need to
achieve."

- 33 -

4825-7546-1374.v1

### G. Defendants Capitalize on Their Fraud

78. By failing to disclose the truth to investors about the CFPB investigation or Fifth Third's illicit business practices, Defendants introduced and maintained artificial inflation in the price of Fifth Third common stock throughout the Class Period, reaching a high of over $34 per share. Defendants took advantage of Fifth Third's inflated stock price to facilitate a massive stock offering and complete one of the largest banking acquisitions in Chicago's history. Specifically, in September 2019, Fifth Third sold 10 million preferred shares in a $250 million offering. And in May 2019, Fifth Third issued approximately 131 million shares of common stock to complete a $4.7 billion acquisition of MB Financial.

79. The Individual Defendants also personally benefitted from the fraud. Between 2017 and 2019, defendants Carmichael and Tuzun pocketed more than $24.3 million and $6.2 million in incentive compensation, respectively, which was tied in substantial part to their compliance and risk management activities and purported adherence to and promotion of the Bank's "core values" of integrity and accountability. In addition to his incentive compensation, Carmichael also profited from insider trading, selling 197,374 shares of his Fifth Third stock for over $5.8 million in insider trading proceeds.

### H. The Retirement of Fifth Third's Chief Risk Officer Is Announced in January 2020

80. On January 30, 2020, Fifth Third announced that its Chief Risk Officer, Frank Forrest, was leaving his position "effective immediately" and would officially retire from the Company by the end of the year. Forrest had served as Chief Risk Officer since 2014. But in the three years since Fifth Third received the CFPB's CID notice, and while Defendants failed to disclose the CFPB investigation or the illicit business practices underlying that investigation, Forrest had sold over $3 million worth of Fifth Third stock.

- 34 -

I.    **The Truth About the CFPB Investigation and Fifth Third's Illicit Business Practices Is Revealed in March 2020**

81.    On March 2, 2020, less than five weeks after Fifth Third reported that its Chief Risk Officer was exiting the Company, the Company filed its Annual Report on Form 10-K for FY 2019 with the SEC.  In the Form 10-K, Fifth Third disclosed for the first time that "the CFPB staff has notified Fifth Third that it intends to file an enforcement action in relation to alleged unauthorized account openings. . . .  The impact of this potential enforcement action has been reflected in our reasonably possible losses."  After the close of the market on March 2, 2020, Barclays Capital issued a report on Fifth Third titled "2019 10-K Review:  CFPB Action for Unauthorized Account Openings."  Based on the Form 10-K, the report stated that "CFPB staff notified FITB [Fifth Third] that it intends to file an enforcement action in relation to alleged unauthorized account openings."  The report also identified that in conjunction with the disclosure of the CFPB action, Fifth Third had more than doubled its reserve for "reasonably possible . . . losses related to legal and regulatory proceedings," in 3Q 2019 from $27 million to $56 million.

82.    Despite Fifth Third's burying of the information about the CFPB action in the Form 10-K, members of the media uncovered and reported the negative news.  For example, on March 4, 2020, the online publisher *housingwire.com* published an article titled "Fifth Third facing its own fake account fiasco: Bank discloses that CFPB plans enforcement action."  The same day, *American Banker* issued an article titled "Fifth Third latest bank in CFPB crosshairs over phony accounts."  And on March 6, 2020, *Axios* issued a story reporting that "[t]he banking industry's fake account scheme may have been widespread" and that "the CFPB is targeting [Fifth Third] for 'alleged unauthorized account openings.'"

83.    In substantial part as a result of the disclosure about the CFPB enforcement action, the price of Fifth Third common stock dropped from a close of $25.72 on March 2, 2020 to a close

- 35 -

of $24.44 on March 3, 2020, a $1.28 per share decline on unusually high volume. The price of Fifth Third stock continued to drop in the days following the disclosure of the CFPB action, falling to $22.20 by March 6, 2020, a loss of $3.52 per share, or 14%, over four trading days.

84.     On Monday, March 9, 2020, the CFPB issued a press release titled "Consumer Financial Protection Bureau Files Suit Against Fifth Third Bank, National Association for Allegedly Opening Unauthorized Accounts and Enrolling Consumers in Unauthorized Products and Services" and filed its complaint alleging Fifth Third had violated a variety of banking laws and regulations.

85.     The CFPB press release revealed that "for several years Fifth Third, without consumers' knowledge or consent: opened deposit and credit-card accounts in consumers' names; transferred funds from consumers' existing accounts to new, improperly opened accounts; enrolled consumers in unauthorized online-banking services; and activated unauthorized lines of credit on consumers' accounts." The press release further disclosed that "for years and continuing through at least 2016, Fifth Third used a 'cross-sell' strategy to increase the number of products and services it provided to existing customers; used an incentive-compensation program to reward selling new products; conditioned employee-performance ratings and, in some instances, continued employment on meeting ambitious sales goals"; and that, "despite knowing since at least 2008 that employees were opening unauthorized consumer-financial accounts, Fifth Third took insufficient steps to detect and stop the conduct and to identify and remediate harmed consumers." Linked to the press release was the filed version of the CFPB complaint.

86.     The CFPB complaint, initially filed in the United States District Court for the Northern District of Illinois and later transferred to the Southern District of Ohio, alleged eight counts against Fifth Third for violations of various banking laws and implementing regulations. According to the CFPB complaint, "Fifth Third used a 'cross-sell' strategy to increase the total number of products and services it provided to existing customers" and "also used an incentive-

- 36 -

compensation program that rewarded managers and their subordinate employees for selling new products and services to existing customers." The CFPB complaint further stated that, "By 2010, at the latest, Fifth Third was aware that employees were opening products and services in consumers' names without those consumers' knowledge or consent in order to achieve sales goals or obtain incentive rewards."

87. The CFPB complaint further alleged that Fifth Third opened both deposit accounts and credit card accounts without customers' knowledge or consent. For example, the CFPB complaint alleged that "Fifth Third imposed aggressive sales goals for its employees to sell credit cards to consumers, and its incentive-compensation program rewarded employees for selling new credit cards." As a result, "By 2009, at the latest, Fifth Third noticed a spike in unauthorized credit cards being issued to consumers." Nevertheless, "Fifth Third continued to emphasize sales and to maintain credit-card sales goals and incentive compensation."

88. According to the CFPB complaint, Fifth Third also "imposed aggressive sales goals for its employees to enroll consumers in its online-banking services." The CFPB complaint stated that in order to hit these goals, "From at least 2010 through at least 2016, Fifth Third enrolled consumers in online-banking services without their knowledge or consent." Similarly, for Fifth Third's "Early Access" program – a fee-based line of credit that allows funds to be withdrawn before they have been deposited in an account – the Company "imposed aggressive sales goals for its employees . . . and its incentive-compensation program rewarded employees for enrolling consumers in 'fee-based products,' including Early Access." The CFPB complaint continued in pertinent part as follows:

> Fifth Third also opened Early Access lines of credit on consumers' deposit accounts without customers' knowledge or consent. Fifth Third was aware of this practice by June 2010, when senior management was notified of an increase in the number of calls by employees to the internal whistleblower hotline regarding the unauthorized opening of Early Access lines of credit.

- 37 -

89.     As the CFPB complaint emphasized, "Even after learning of unauthorized Fifth Third consumer-financial products and services by 2008, Fifth Third failed to change its sales practices to avoid consumer harm.  Instead, Fifth Third continued to foster sales practices that were likely to cause unauthorized products and services."  According to the CFPB complaint, Fifth Third "failed to take steps to determine and address a root cause of unauthorized accounts, which was consistently said by employees to be intense sales pressure," and "failed to close known loopholes in its collection of proof of consumer authorization, thereby making it easy for employees to open accounts without valid signature cards for deposit accounts or applications for credit products."  "In short," as the CFPB alleged, "Fifth Third focused on its own financial interests to the detriment of consumers."

90.     The CFPB press release and complaint immediately generated national news.  For example, on March 9, 2020, *Reuters* published an article titled "U.S. consumer watchdog charges Fifth Third Bank on opening phony accounts" that reported, "The U.S. Consumer Financial Protection Bureau (CFPB) said on Monday it charged Fifth Third Bank, National Association, with creating fake client deposit and credit-card accounts and transferring clients' funds to those accounts without consent, citing an abuse of fair lending and savings laws."  Similarly, *The New York Times* published an article on March 9, 2020 about the CFPB action headlined "Fifth Third Bank Opened Fraudulent Accounts, Consumer Bureau Says:  For more than eight years the bank ignored signs that employees were opening unauthorized accounts to meet aggressive sales goals, a federal regulator said in a lawsuit." The article reported, "A person familiar with the bank's operations said it had begun investigating potential unauthorized transactions in 2010, after its internal compliance systems raised alarms."  This is at a time that Carmichael was overseeing the Bank's retail operations as COO.  The same day, *The Wall Street Journal* published an article titled "CFPB Says Fifth Third Employees Opened Accounts Without Customer Consent: Lawsuit alleges bank didn't do enough to

- 38 -

monitor or adjust sales goals." And the following day, *DealBreaker* published an article about the Fifth Third unauthorized account scandal titled "Fake Accounts Were Such a Good Idea, They Thought Of It Twice."

91.     The day after Fifth Third's disclosure of the CFPB complaint, during a Senate Committee on Banking, Housing, and Urban Affairs hearing, Ohio Senator Sherrod Brown remarked, "'FDIC Chair Jelena McWilliams would have known about the fake accounts. She was legal officer at Fifth Third for a couple-year period. Leonard Chanin was also her deputy at Fifth Third before he became a deputy at FDIC. He would have known about the bureau's fake-account investigation of Fifth Third.'"[2]

92.     In substantial part as a result of the disclosures about Fifth Third's unauthorized account scandal, the price of Fifth Third common stock dropped from a close of $22.20 on Friday, March 6, 2020 to a close of $18.30 on Monday, March 9, 2020, a $3.90 per share decline. While the entire market was declining on March 9, 2020, the price of Fifth Third stock fell substantially more than the market as a whole (as reflected by the S&P 500) and the stock price of peer banks. Fifth Third's share price continued to drop in the days following the filing of the CFPB action, falling to $15.90 by March 12, 2020, a loss of $6.30 per share or 28% in four days. Indeed, prior to the market opening on March 10, 2020, a *CNBC* article identified Fifth Third as one of the "biggest movers in the premarket" and reported, "The bank was charged by the Consumer Financial Protection Bureau with opening new accounts without customer consent, in order to meet sales goals." An article published on *The Motley Fool* website titled "Why Fifth Third's Stock Plunged Over 20% in the Last Week," reported:

---

[2]     Jelena McWilliams was Fifth Third's Chief Legal Officer and Corporate Secretary from January 2017 to May 2018, under Carmichael who was CEO at the time.

On top of those two strong headwinds [the Covid-19 pandemic and the Federal Reserve lowering interest rates], Fifth Third got hit with a lawsuit from the Consumer Financial Protection Bureau (CFPB) on March 9 for alleged illegal practices. . . . All this adds up to tough times for Fifth Third as the stock is down about 27% in the past five trading days during trading on Tuesday, and 54% year-to-date.

93. An April 5, 2020 article, also published on *The Motley Fool* website, similarly reported, "Fifth Third's stock probably wouldn't have fallen nearly as much in March, but it had the added headwind of being sued by the Consumer Financial Protection Bureau (CFPB) on March 9, which accused Fifth Third of opening fake accounts, not unlike the scandal that enveloped Wells Fargo (NYSE:WFC) in 2016."

94. Since filing the initial CFPB Action, the CFPB has detailed in an amended pleading additional facts about the massive scope and duration of Fifth Third's misconduct and the intentional failure of the Bank and its senior leadership (including the Individual Defendants) to reform systemic issues at the Bank. For example, the CFPB amended complaint alleges that "Fifth Third knows or consciously disregards that its admissions and claims understate the real number of unauthorized account openings and other improper sales conduct" and that there are in fact "**hundreds of thousands of Fifth Third accounts that bear indicia of non-authorization**," with misconduct by Bank employees and deficient Bank practices dating from 2008 until at least 2020. The CFPB has also revealed that "Fifth Third **admitted** in 2017 that it had opened consumer-financial products without consumer authorization during each year from 2010 to 2017" – *i.e.*, when Carmichael and Tuzun were running the Bank as CEO and CFO, respectively. Additionally, Fifth Third has represented in the litigation that "Fifth Third disclosed unauthorized credit card accounts **during the Bureau's examination in 2015**."

95. The CFPB amended complaint further alleges that "Fifth Third was aware" of misconduct "by June 2010, when **senior management** was notified of an increase in the number of

- 40 -

calls by employees to the internal whistleblower hotline regarding the unauthorized opening of Early Access lines of credit." This included Carmichael, who led the Company's retail banking operations at the time, and likely also Tuzun, who was responsible for gathering and reporting on the Company's financial and operational results impacted by the misconduct. Similarly, the CFPB amended complaint states that, "Fifth Third has, and ***members of Fifth Third's senior management are and have been familiar with***, data and other information that would be useful in implementing available unauthorized-account-identification methods for at least years 2010 to 2021." The CFPB amended complaint likewise states that "Fifth Third, ***through its senior management, chose*** not to attempt to identify unauthorized consumer-financial products beyond those Fifth Third has admitted to opening because greater identification might cause Fifth Third reputational and financial harm." The CFPB amended complaint also details internal correspondence from executives in Carmichael's direct line of report contemporaneously detailing illicit sales practices at the Bank and stating that they were widely known within the organization. For the avoidance of doubt, the CFPB amended complaint singles out Carmichael as the person "***responsible*** for reviewing or overseeing Fifth Third's retail-banking business, its data maintenance and use, and its sales and investigative practices" when the misconduct was occurring.

96.     In fact, the CFPB believes its allegations and Fifth Third's admissions so overwhelmingly establishing violations of law at Fifth Third under the leadership of Carmichael and Tuzun that the Bureau has moved for a partial judgment on the pleadings.

> **J.     Documents and Allegations from the CFPB Action and Confidential Witness Allegations Corroborate the Scope of Fifth Third's Unethical and Illegal Practices and Establish the Knowledge and Involvement of the Individual Defendants**

97.     In the course of the CFPB investigation, Fifth Third produced nearly a half-***billion*** data points to the CFPB, including thousands of Company documents, and provided extensive

witness testimony to regulators regarding consumer accounts and products. While those documents have been shielded from the public, a small number of e-mails were filed in June 2020, in redacted form, in connection with a venue dispute in the CFPB action. Those e-mails evidence both the severity and knowledge of the use of unauthorized accounts at Fifth Third.

98.     In June 2010, an individual the CFPB identified as the Bank's "head of retail banking" (names and e-mails addresses were redacted from the court filings) wrote in an internal Fifth Third email that the Chicago "leadership team have a reputation of less than desirable sales management practices"; that "Bullying and threats are often used to achieve results"; and, "As you probably know, there have been consistent problems around unauthorized credit card sales in Chicago."

99.     Another email identifies a former regional manager of Fifth Third who was promoted after "reports that she did not engage in ethical sales practices with customers" and states, "We had a fraud issue within the Center and upon investigation discovered that [redacted name] had knowledge and allowed other employees to use each other's terminals and IDs to conduct transactions (in some cases for themselves)."

100.    In a four-page resignation letter that the CFPB identified as sent to "bank management," a Fifth Third employee discussed "witnessing unethical and predatory banking practices." This banker had "tried to raise concerns through the ethics hotline, however it doesn't appear that anything has come of it." Specifically, the banker told Fifth Third's management, "I would consider many of the sales practices and tactics used [at Fifth Third] to be predatory. Many of these sales practices were brought to us by the regional and market management. They are openly discussed on our conference calls." The letter identifies "[p]olicies such as 'everyone should have 2-3 checking accounts', or people 'upgrading' (switching existing MasterCard customers to Visa rewards) credit cards for customer[s] without telling them they are applying for new credit" and

- 42 -

concludes, "We are becoming a 'predatory' institution." The letter to Fifth Third's management further stated, "The most common thing I see is customers that have 2 or 3 other checking accounts that they didn't even know they had. . . . One of the 'plays' (sales tactics) in our region is to get everyone to have a second or third checking account. . . . Uneducated customers of ours are being target[ed] to get sales; this is subsequently causing more unnecessary overdrafts by spreading out a customer's funds and also service fees for many customers." "The motivation for these practices is simple," wrote the Fifth Third banker, "if you don't meet your goal you get fired. That's what I've been told, and that's what other employees have been told, they are pushing the ethical envelope in order to save their jobs."

101. Citing to deposition testimony, the CFPB briefing ("Opposition to Motion to Transfer Venue") also states that "Fifth Third . . . internally investigated cases of what it called 'gaming.' Gaming, according to Fifth Third, includes opening unauthorized accounts but is broadly defined as the 'manipulation or concealment of accounts or activities with intent to deceive either customer or bank for personal gain,' including 'goal attainment, financial gain, retention of position, etc.'" The CFPB briefing also states that "Fifth Third admits that from 2010 to 2016 it opened more than 1,000 accounts without . . . authorization," and notes, "There is substantial evidence that Fifth Third's admission understates its problem, and Fifth Third continued to drive sales without implementing a systematic way to detect unauthorized accounts." Because the CFPB believes the issues are still ongoing, the first demand for relief alleged in the CFPB complaint is to "permanently enjoin Fifth Third from, without the consumer's consent: (1) opening any deposit account; (2) issuing any credit card; (3) enrolling the consumer in online banking services; and (4) opening any line of credit."

102. Former employees of Fifth Third have provided additional details of the unauthorized account activities and other illicit business activities at the Bank. For example, according to a former Fifth Third employee who worked at the Bank from July 2001 to July 2020 at branches in

Illinois, several of Fifth Third's regional bank and branch managers encouraged the practice of "gaming," which was the practice of opening false credit card and bank accounts to meet sales goals. According to this employee, the practice of gaming was ongoing during their tenure but the practice ramped up when former Wells Fargo employees were hired by the Company beginning in 2010.

103.    Another former employee, who was a Fifth Third Financial Center Manager and held other positions from 2004 to 2015, reported that when former Wells Fargo executives joined Fifth Third up until the time this employee left in 2015, bank manager incentive compensation for opening new accounts dramatically increased, including bonuses of $10,000 per quarter for hitting set account goals.  Employees who did not reach their goals were under threat of losing their jobs. According to this former employee, although they were not expressly told to do so, it was internally known that the only way to meet new account goals was to open bogus accounts.  This former employee also reported on unethical practices with regard to opening credit cards.  For example, if a customer reported a lost or stolen credit card, unbeknownst to the customer, the account would not be closed but rather rendered inactive and then a new account would be opened, resulting in the customer having two accounts.  Another unethical practice employees used to boost their numbers occurred when a customer applied for and received a home equity loan.  The bank, without the customer's knowledge, applied for a credit card for the customer, or two credit cards if there were joint owners of the home.  Similarly, this practice was also used with regular bank accounts.  If a customer opened a checking account, they would automatically be given a savings account without their authorization.  These practices were known and used by employees to meet otherwise unobtainable production goals set by management.

104.    Former Company employees described other unethical practices employed by Fifth Third employees due to pressures imposed by the Bank to obtain sales goals, including selling products to customers (such as additional checking and savings accounts) that the customers did not

- 44 -

actually need. A former branch manager who had been with Fifth Third from July 2002 to November 2009 reported that they were trained to mislead customers. For example, branch employees were instructed to pressure customers to open several separate accounts as either a budgeting tool or to pay different loans even though the accounts were not necessary. This employee also reported the routine practice of using customers' credit scores, without their knowledge, to increase credit card account openings. For instance, when a customer came into the branch for routine business, branch employees were instructed to check their credit scores, and if the score was good, the customer would be advised that their current Fifth Third credit card was compromised and the Bank would send the customer a new card with a new account number.

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS MADE DURING THE CLASS PERIOD

105. During the Class Period, Defendants made false and misleading statements and material omissions concerning Fifth Third's: (1) business practices and risk management systems; (2) Code of Business Conduct and Ethics; (3) product cross-selling and consumer business; (4) employee incentive compensation; and (5) purported risk disclosures.

### A. Defendants' Misleading Statements and Material Omissions Regarding Fifth Third's Business Practices and Risk Management System

106. On November 9, 2016, Fifth Third filed its 3Q 2016 Form 10-Q, signed by defendants Carmichael and Tuzun. The 3Q 2016 Form 10-Q addressed Fifth Third's purported operational practices and risk management and compliance systems and practices. According to the Form 10-Q:

> Regulatory compliance risk is defined as the risk of legal or regulatory sanctions, financial loss, or damage to reputation as a result of noncompliance with (i) applicable laws, regulations, rules and other regulatory requirements (including but not limited to the risk of consumers experiencing economic loss or other legal harm as a result of noncompliance with consumer protection laws, regulations and

- 45 -

requirements); (ii) . . . codes of conduct; and (iii) principles of integrity and fair dealing applicable to Fifth Third's activities and functions.

107. Defendants' misleading statements in the 3Q 2016 Form 10-Q pertaining to Fifth Third's operational practices for managing regulatory compliance risk were, in pertinent part, as follows:

a. "Fifth Third focuses on managing regulatory compliance risk in accordance with the Bancorp's integrated risk management framework, which ensures consistent processes for identifying, assessing, managing, monitoring, and reporting risks."

b. "The current regulatory environment, including heightened regulatory expectations and material changes in laws and regulations, increases compliance risk. To mitigate compliance risk, Compliance Risk Management provides independent oversight to ensure consistency and sufficiency in the execution of the program, and ensures that lines of business, regions and support functions are adequately identifying, assessing and monitoring compliance risks and adopting proper mitigation strategies. . . . Additionally, Compliance Risk Management implements key compliance programs and processes including but not limited to, risk assessments, key risk indicators, issues tracking, regulatory compliance testing and monitoring, . . ."

c. "Compliance Risk Management provides independent oversight to ensure that an enterprise-wide framework, including processes and procedures, are in place to comply with applicable laws, regulations, rules and other regulatory requirements; internal policies and procedures; and principles of integrity and fair dealing applicable to the Bancorp's activities and functions. The Bancorp focuses on managing regulatory compliance risk in accordance with the Bancorp's integrated risk management framework, which ensures consistent processes for identifying, assessing, managing, monitoring and reporting risks."

108. On February 24, 2017, Fifth Third filed its Form 10-K annual report with the SEC, signed by defendants Carmichael and Tuzun, reporting the Company's fourth quarter and 2016 results. The 2016 Form 10-K contained the following misleading statements about Fifth Third's purported operational practices, stating in pertinent part:

a. "Fifth Third focuses on managing regulatory compliance risk in accordance with the Bancorp's integrated risk management framework, which ensures consistent processes for identifying, assessing, managing, monitoring, and reporting risks."

b. "The current regulatory environment, including heightened regulatory expectations and material changes in laws and regulations, increases compliance risk. To mitigate compliance risk, Compliance Risk Management provides independent oversight to ensure consistency and sufficiency in the execution of the program, and ensures that

- 46 -

lines of business, regions and support functions are adequately identifying, assessing and monitoring compliance risks and adopting proper mitigation strategies. . . . Additionally, Compliance Risk Management implements key compliance programs and processes including but not limited to, risk assessments, key risk indicators, issues tracking, regulatory compliance testing and monitoring, . . ."

c.   "Compliance Risk Management provides independent oversight to ensure that an enterprise-wide framework, including processes and procedures, are in place to comply with applicable laws, regulations, rules and other regulatory requirements; internal policies and procedures; and principles of integrity and fair dealing applicable to the Bancorp's activities and functions. The Bancorp focuses on managing regulatory compliance risk in accordance with the Bancorp's integrated risk management framework, which ensures consistent processes for identifying, assessing, managing, monitoring and reporting risks."

109.   On February 28, 2018, Fifth Third filed its Form 10-K annual report with the SEC, signed by defendants Carmichael and Tuzun, reporting the Company's 4Q and 2017 results. The 2017 Form 10-K identified Fifth Third's "core principles of risk management that are used to ensure the [Company] is operating in a safe and sound manner." Defendants' misleading statements regarding its "core" operational "principles" were, in pertinent part, as follows:

- Ensure Fifth Third's products and services are designed, delivered and maintained to provide value and benefit to its customers and to Fifth Third, and that potential opportunities remain aligned to the core customer base. [The Bancorp does not offer products or services that are not appropriate for its customers.]

        *        *        *

- Act with integrity in all activities.

- Focus on providing operational excellence by providing reliable, accurate and efficient services to meet customer's needs.

        *        *        *

- Conduct business in compliance with all applicable laws, rules and regulations and in alignment with internal policies and procedures.

110.   The Company's 2017 Form 10-K also contained the following misleading statements about Fifth Third's purported operational practices, stating in pertinent part:

- 47 -

    a.      "Fifth Third focuses on managing regulatory compliance risk in accordance with the Bancorp's integrated risk management framework, which ensures consistent processes for identifying, assessing, managing, monitoring, and reporting risks."

    b.      "The current regulatory environment, including heightened regulatory expectations and material changes in laws and regulations, increases compliance risk. To mitigate compliance risk, Compliance Risk Management provides independent oversight to ensure consistency and sufficiency in the execution of the program, and ensures that lines of business, regions and support functions are adequately identifying, assessing and monitoring compliance risks and adopting proper mitigation strategies. . . . Additionally, the Chief Compliance Officer is responsible for establishing and overseeing the Compliance Risk Management program which implements key compliance processes including but not limited to, risk assessments, key risk indicators, issues tracking, regulatory compliance testing and monitoring, . . . ."

111.    On March 1, 2019, Fifth Third filed its Form 10-K annual report with the SEC, signed by defendants Carmichael and Tuzun, reporting the Company's 4Q and 2018 results. The 2018 Form 10-K contained the following misleading statements about Fifth Third's purported operational practices, stating in pertinent part:

    a.      "Fifth Third focuses on managing regulatory compliance risk in accordance with the Bancorp's integrated risk management framework, which ensures consistent processes for identifying, assessing, managing, monitoring, and reporting risks."

    b.      The current regulatory environment, including heightened regulatory expectations and material changes in laws and regulations, increases compliance risk. "To mitigate compliance risk, Compliance Risk Management provides independent oversight to ensure consistency and sufficiency in the execution of the program, and ensures that lines of business, regions and support functions are adequately identifying, assessing and monitoring compliance risks and adopting proper mitigation strategies. . . . Additionally, the Chief Compliance Officer is responsible for establishing and overseeing the Compliance Risk Management program which implements key compliance processes, including but not limited to, . . . risk assessments, key risk indicators, issues tracking, regulatory compliance testing and monitoring, . . ."

112.    The statements identified in ¶¶107-111, were materially false and misleading and omitted material facts because Defendants failed to disclose: (i) the illicit business practices detailed in ¶¶35-58, *supra*, and by the CFPB which had been ongoing since at least 2008 and necessitated the intervention of corporate headquarters (including the involvement of the Individual Defendants); (ii)

- 48 -

that Fifth Third's senior management had knowingly failed to remediate these illicit business practices; (iii) that Fifth Third had been the target of a CFPB investigation into these known illicit business practices and Defendants' conscious failure to remediate them since November 2016; (iv) that Fifth Third had *already admitted* to certain of the most severe misconduct in 2015 and 2017 in response to CFPB inquiries (including the opening of unauthorized consumer financial products analogous to the Wells Fargo fake account scandal); and (v) that, as a result of the foregoing, the Bank was likely to be the subject of a CFPB enforcement action and faced extreme regulatory, legal, reputational and financial peril.

**B.      Defendants' Misleading Statements and Material Omissions
          Regarding Fifth Third's Code of Business Conduct and Ethics**

113.    At the start of the Class Period, Fifth Third maintained a Code of Business Conduct and Ethics, which was amended several times during the Class Period.  Fifth Third publicly filed the Code and the amendments with the SEC on Current Report Form 8-Ks so investors were informed of the Company's purported practices.  The Code was applicable to all officers, directors and employees of Fifth Third, including but not limited to Fifth Third's principal executive officer (defendant Carmichael), principal financial officer (defendant Tuzun), principal accounting officer and controller.

114.    The Code of Business Conduct and Ethics in effect at the start of the Class Period through September 18, 2017 was filed with the SEC on Current Report on Form 8-K on March 16, 2016 ("2016 Code").  The misleading statements in the 2016 Code were, in pertinent part:

a.      "We must all deal honestly, ethically, fairly and in good faith with Fifth Third's customers, shareholders, employees, suppliers, regulators, business partners, competitors and others.  We may not take unfair advantage of anyone through manipulation, concealment, abuse of privileged or confidential information, misrepresentation, fraudulent behavior or any other unfair dealing practice."

b.      "Employees, customers, shareholders and communities must know that Fifth Third conducts all activities with the highest standards and unquestioned integrity.  They

- 49 -

have to know by our actions that they can trust us, and we have to show by our actions that we provide something different; something of value."

c. "Our Purpose is to listen to customers and inspire them with smart financial solutions that continually improve their lives and the well-being of our communities. Relationships are at the heart of our Purpose, and what could be more personal than that? This is not a mere collection of words, but rather a blueprint for how we are to conduct ourselves. We ask questions. We listen. We inspire. We focus on continual improvement – for customers, for communities and for ourselves."

d. "Employees are expected and required to take appropriate steps to address issues that subject the bank to risk of potential regulatory, reputational or legal harm."

115. On September 25, 2017, Fifth Third filed a Current Report on Form 8-K with the SEC to which the Company appended as an exhibit an amended and restated Code, adopted and approved by the Company's Board, including defendant Carmichael, on September 19, 2017 ("2017 Code"). The 2017 Code included a message from Carmichael stating, "Doing the right thing is central to our ability to achieve our Vision to be the One Bank people most value and trust. It's a commitment that inspires us to create a great customer experience . . . . It is a commitment that forms the bedrock of Fifth Third's reputation as a respected corporate citizen. And it is a commitment that begins with each Fifth Third employee." The misleading statements in the 2017 Code were, in pertinent part:

a. "Fifth Third believes that fair and honest business practices are essential to keeping our customer at the center of everything we do. We should always act in the best interest of our customers. Unethical business practices, such as incentive gaming, falsifying documents or inflating performance results, are strictly prohibited. You are prohibited from manipulating records, opening accounts without customer authorization, offering customers unnecessary products and falsifying records or applications in order to benefit yourself or other employees of Fifth Third."

b. "Fifth Third is committed to providing customers with financial products and services in ways that avoid the use of any practices that could be deemed predatory, unfair, deceptive or abusive."

c. "Fifth Third Bancorp is committed to minimizing the impact of internal and external fraud to both Fifth Third and our customers. Every employee at every level of the Bancorp is accountable and expected to do their part to protect Fifth Third and our customers from fraudulent activity. There is zero tolerance for internal fraud within Fifth Third's organization and internal fraudulent activity must be referred to Bank

- 50 -

Protection when suspected. Failure to report fraudulent activity exposes Fifth Third to regulatory and compliance violations and could lead to significant financial penalties and additional fraud losses."

d. "Employees must not engage in deceptive or dishonest business practices, such as misrepresenting products or offering customers inaccurate or insufficient information about products in order to benefit personally."

e. "A fundamental part of our commitment to integrity is adhering to the letter and the spirit of applicable laws, regulations and Bancorp policies. All employees are required to fully comply with all applicable laws, rules and regulations, as well as with all Fifth Third policies and procedures."

116. On September 24, 2018, Fifth Third filed a Current Report on Form 8-K with the SEC to which Defendants appended as an exhibit an amended and restated Code, adopted and approved by the Company's Board, including defendant Carmichael, on September 19, 2018 ("2018 Code"). The 2018 Code included the same message from Carmichael as alleged in ¶115. The misleading statements in the 2018 Code were, in pertinent part:

a. "Fifth Third believes that fair and honest business practices are essential to keeping our customer at the center of everything we do. We should always act in the best interest of our customers." "Unethical business practices are strictly prohibited. Examples of such activities include, but are not limited to":

- Incentive gaming

- Falsifying documents or inflating performance results

- Manipulating records

- Opening bogus or fake accounts

- Opening accounts or selling products without customer authorization

- Offering customers unnecessary products

- Falsifying records or applications in order to benefit yourself or other employees of Fifth Third

b. "Fifth Third is committed to providing customers with financial products and services in ways that avoid the use of any practices that could be deemed predatory, unfair, deceptive or abusive."

- 51 -

c. "Fifth Third Bancorp is committed to minimizing the impact of internal and external fraud to both Fifth Third and our customers. Every employee at every level of the Bancorp is accountable and expected to do [their] part to protect Fifth Third and our customers from fraudulent activity. There is zero tolerance for internal fraud within Fifth Third's organization and internal fraud activity must be referred to Bank Protection when suspected. Failure to report fraudulent activity exposes Fifth Third to regulatory and compliance violations and could lead to significant financial penalties and additional fraud losses."

117. On September 20, 2019, Fifth Third filed a Current Report on Form 8-K with the SEC to which Defendants appended as an exhibit an amended and restated Code, adopted and approved by the Company's Board of Directors, including defendant Carmichael, on September 16, 2019 ("2019 Code"). The 2019 Code included the same message from Carmichael as alleged in ¶115. The misleading statements in the 2019 Code were, in pertinent part:

a. "Fifth Third believes that fair and honest business practices are essential to keeping our customer at the center of everything we do. We should always act in the best interest of our customers." "Unethical business practice are strictly prohibited. Examples of such activities include, but are not limited to":

- Incentive gaming

- Falsifying documents or inflating performance results

- Manipulating records

- Opening bogus or fake accounts

- Opening accounts or selling products without customer authorization

- Offering customers unnecessary products

- Falsifying records or applications in order to benefit yourself or other employees of Fifth Third

b. "Fifth Third is committed to providing customers with financial products and services in ways that avoid any practices that could be deemed predatory, unfair, deceptive or abusive."

c. "Fifth Third Bancorp is committed to minimizing the impact of internal and external fraud to both Fifth Third and our customers. Every employee at every level of the Bancorp is accountable and expected to do [their] part to protect Fifth Third and our customers from fraudulent activity. There is zero tolerance for internal fraud within Fifth Third's organization and internal fraud activity must be referred to Bank

- 52 -

Protection when suspected. Failure to report fraudulent activity exposes Fifth Third to regulatory and compliance violations and could lead to significant financial penalties and additional fraud losses."

118. The statements in ¶¶114-117, were false and misleading and omitted material facts because the unethical practices Defendants asserted were prohibited by Fifth Third's Code of Business Conduct and Ethics were already taking place at Fifth Third and the Company was under investigation by the CFPB for the very practices that the Code identified as unethical. Furthermore, Defendants failed to disclose: (i) the illicit business practices detailed in ¶¶35-58, *supra*, and by the CFPB which had been ongoing since at least 2008 and necessitated the intervention of corporate headquarters (including the involvement of the Individual Defendants); (ii) that Fifth Third's senior management had knowingly failed to remediate these illicit business practices; (iii) that Fifth Third had been the target of a CFPB investigation into these known illicit business practices and Defendants' conscious failure to remediate them since November 2016; (iv) that Fifth Third had *already admitted* to certain of the most severe misconduct in 2015 and 2017 in response to CFPB inquiries (including the opening of unauthorized consumer financial products analogous to the Wells Fargo fake account scandal); and (v) that, as a result of the foregoing, the Bank was likely to be the subject of a CFPB enforcement action and faced extreme regulatory, legal, reputational and financial peril.

C.   **Defendants' False and Misleading Statements and Omissions Regarding Fifth Third's Product Cross Selling, Consumer Business Practices and Customer Relations**

119. On February 24, 2017, Fifth Third filed its 2016 Form 10-K, signed by defendants Carmichael and Tuzun, which stated that Fifth Third was "taking advantage of cross-sell opportunities" generated by synergies formed by the Company's business segments.

120. On February 28, 2018, Fifth Third filed its 2017 Form 10-K, signed by defendants Carmichael and Tuzun, which contained substantively the same misleading statement as set forth in

- 53 -

¶119, stating that Fifth Third was "taking advantage of cross-sell opportunities" generated by synergies formed by the Company's business segments.

121.    On March 1, 2019, Fifth Third filed its 2018 Form 10-K, signed by defendants Carmichael and Tuzun, which contained substantively the same misleading statement as set forth in ¶119, stating that Fifth Third was "taking advantage of cross-sell opportunities" generated by synergies formed by the Company's business segments.

122.    On December 7, 2016, defendants Carmichael and Tuzun presented at the Goldman Sachs US Financial Services Conference.  During the conference Carmichael spoke to investors about Fifth Third's consumer growth strategy, stating that the Company was "looking for a more balanced growth between our consumer and our commercial businesses" and "[t]o that end, we are focused on growing our credit card and unsecured personal lending businesses.  Both of these businesses have attractive return profiles and growth potential."

123.    On January 24, 2017, Fifth Third hosted an earnings conference call, attended by Carmichael and Tuzun, to discuss the Company's 4Q 2017 financial results.  Carmichael talked again about Fifth Third's consumer growth strategy, which was to grow credit cards and consumer loans to "allow us to achieve a better balance between commercial and consumer loan growth." During the conference call analysts asked Carmichael about Fifth Third's strategy and "what is going to make you different than just being a good bank?"  Carmichael responded:

> . . . we have a great business model.  We have the right businesses that we are in, right, and we do a fantastic job of going to the market and our people do a fantastic job of going to the market really as one bank – Fifth Third.
>
> And it is really about harvesting the full relationships of the customer relationships on the consumer side, on the commercial side.  It is about providing the right products and services to our customers and really being the one bank our customers most value and trust.  We have worked hard to put that model in place across our franchise.  So we feel very good about that.

And really our strong brand and our footprint is extremely important to us and we are going to continue to focus on our brand equity in the marketplace. But when you look at it across the board we have strong earnings capacity, we have a great team in place, we have invested heavily in the right products. We made some strategic moves recently that position us well for the future. And I think we will have the products, the services and the team to deliver on that in the market.

124.    On March 7, 2017, defendants Carmichael and Tuzun presented at RBC Capital Markets Financial Institutions Conference. Carmichael again discussed with analysts and investors Fifth Third's consumer growth strategy, stating, "Growth in credit cards and other consumer loans should allow us to achieve a better balance between commercial and consumer loan growth." During the call, Carmichael boasted about Fifth Third's ranking as "the second most trusted company for retail banking" and told investors that the Company takes "pride in this because we believe in putting the customer at the center of everything we do. In addition to being a trusted partner, we have received high customer satisfaction scores and our mobile offerings have received a number of accolades."

125.    On December 7, 2017, Fifth Third hosted an Investor Day for analysts and investors, which was attended by defendants Carmichael and Tuzun. During the conference, Carmichael talked about the customer experience and providing customers with the products they need. Carmichael stated: "It starts with the financial needs analysis, and we dive deep into understanding the needs of that customer. . . . Once again, we can't be a great bank if we don't focus on taking care of the customer, and we measure this very carefully. We got to make sure that we have products that are seamless, convenient, fast, that they're tailored to meet the customer needs." During the same call Carmichael also emphasized that "Value and trust is extremely important" to Fifth Third's business.

126.    During the same call Philip McHugh, a Fifth Third executive vice president, also talked about the customer experience, stating:

- 55 -

First, we focus on the customer, right? We want to understand their state of mind, their situation, their needs, emotionally how can we connect with them? Then, we utilize fundamental selling skills. We ask thought-provoking questions to clarify their needs. We teach our teams to listen, stop talking, listen. Let the customer tell us what they want, then we earn the right to advance with those customers by explaining what we heard, confirming but also displaying significant product knowledge and how we can help them and then we provide solutions based on those needs.

127. During the investor call, Frank R. Forrest, Fifth Third's Chief Risk Officer, discussed at length the Company's purported risk management practices, stating:

- "We have enhanced risk management programs and processes across the firm. And through all these actions, we are now achieving strong and consistent results, and we are exceptionally well positioned to perform through the next cycle."

- "[W]e are managing the risk across the company today exceptionally well."

- "We've improved expertise in the most significant areas of risk that face our industry and our company. That includes . . . customer practices. . . ."

- "I'm now going to talk a little bit about culture and how we manage conduct risk. We all know that conduct risk, ethics, how we handle our customer relationships, how we treat our employees, it's all been headline risk. We've read a lot about it. Conduct risk at Fifth Third Bank is well managed, and it's in alignment with our core values. It is foundational in everything we do to have a strong risk culture and a One Bank strategy that Greg just covered. We have a corporate responsibility and reputation office that provides oversight in governance of key areas that drive our culture, and that includes ethics and diversity and community commitment and safeguarding the reputation of the company, which is one of my primary responsibilities. All of these areas are critical elements of our company's culture, and we closely monitor these activities and report them to the Board and to management and to our regulators."

- "The last consumer portfolio I want to talk briefly about is card. It's $2.2 billion today. It's 6% of our overall consumer portfolio. But we have a strategy that you'll hear about to grow this portfolio within our appetite with a measured and a managed approach. We've been actually recruiting industry experts recently to help us grow the business within our defined risk profile, and we see some opportunity here, and we are advancing the use of analytics to improve our credit decisioning on the card business."

128.     Although Carmichael and Tuzun participated on the call and had the ability to correct the foregoing statements by McHugh and Forrest, the Individual Defendants failed to correct these material misrepresentations.

129.     On October 23, 2018, Fifth Third hosted an earning conference call with investors, which was attended by Carmichael and Tuzun, to discuss the Company's 3Q 2018 financial results. During the call, Carmichael told investors that organic growth was a top priority for the Company, stating, "Our third priority is to pursue profitable organic growth opportunities in our key businesses. In addition to our branch network optimization initiative to drive improved household, deposit, and revenue growth across our retail footprint, we're also prioritizing organic growth opportunities across all areas of the franchise."

130.     On January 22, 2019, Fifth Third hosted an earnings conference call with investors, which was attended by Carmichael and Tuzun, to discuss the Company's 4Q and 2018 financial results.   During the call Carmichael stated that "we continue to invest in organic growth opportunities, including the previously communicated branch network optimization."

131.     The statements identified in ¶¶119-130, were materially false and misleading and omitted material facts because Defendants failed to disclose:  (i) the illicit business practices detailed in ¶¶35-58, *supra*, and by the CFPB which had been ongoing since at least 2008 and necessitated the intervention of corporate headquarters (including the involvement of the Individual Defendants); (ii) that Fifth Third's senior management had knowingly failed to remediate these illicit business practices; (iii) that Fifth Third had been the target of a CFPB investigation into these known illicit business practices and Defendants' conscious failure to remediate them since November 2016; (iv) that Fifth Third had already admitted to certain of the most severe misconduct in 2015 and 2017 in response to CFPB inquiries (including the opening of unauthorized consumer financial products analogous to the Wells Fargo fake account scandal); and (v) that, as a result of the foregoing, the

- 57 -

Bank was likely to be the subject of a CFPB enforcement action and faced extreme regulatory, legal, reputational and financial peril.

### D. Defendants' False and Misleading Statements Concerning Fifth Third's Incentive Compensation

132. On March 9, 2017, Fifth Third filed a Proxy Statement with the SEC, which was reviewed by defendants Carmichael and Tuzun. The Proxy Statement discussed the Company's compensation plan, stating in pertinent part:

    a.    "The Company endeavors to attract and retain the best people in the financial services industry and motivate them to fulfill the Company's Vision of becoming the One Bank that people most value and trust. We intend to accomplish this in the way that we consider our shareholders' long-term interests, by establishing compensation programs that reward our people for delivering products our customers highly value, and avoiding excessive risk. Our compensation philosophy comprises the following guiding principles":

- Manage risk effectively within incentive programs designed to pay for performance.

- Align compensation with long-term shareholder interests.

- Provide strong oversight of executive pay.

- Conduct recurring processes that ensure strategic and fiscal soundness along with balanced risk taking.

    b.    "We incorporate formulaic and discretionary risk-balancing mechanisms, which outline specific metrics for modifying payouts to discourage unnecessary or imprudent risk-taking actions."

    c.    "In December 2015, the Committee, in conjunction with the Risk and Compliance Committee, reviewed our executive and other incentive programs. Based on the provisions and actions above, the Committee concluded that their design and/or metrics do not encourage unnecessary and/or inappropriate risk taking."

133. On March 6, 2018, Fifth Third filed a Proxy Statement with the SEC, which was reviewed by defendants Carmichael and Tuzun. The Proxy Statement discussed the Company's compensation plan, stating in pertinent part:

    a.    "At Fifth Third, we endeavor to attract and retain the best people and motivate them to fulfill the Company's Vision of becoming the One Bank that people most value

- 58 -

and trust. We intend to accomplish this in the way that we consider our shareholders' long-term interests, by establishing compensation programs that reward our people for delivering products and services our customers highly value, and for avoiding excessive risk."

b.    "We believe it is critical to bring a multi-faceted strategy toward mitigating risk in incentive plans. We incorporate formulaic and discretionary risk-balancing mechanisms, which include specific metrics for modifying payouts to discourage taking unnecessary or imprudent risks."

c.    "In February 2017, the Committee, in conjunction with the Risk and Compliance Committee, reviewed our executive and other incentive programs. Based on the provisions and actions above, the Committee concluded that their design and/or metrics do not encourage taking unnecessary or inappropriate risk."

134.    On March 6, 2019, Fifth Third filed a Proxy Statement with the SEC, which was reviewed by defendants Carmichael and Tuzun. The Proxy Statement discussed the Company's compensation plan, stating in pertinent part:

a.    "Our compensation methodology and structure centers on our compensation philosophy, which comprises the following guiding principles":

• Manage risk effectively within incentive programs designed to pay for performance.

• Align compensation with long-term shareholder interests.

• Provide strong oversight of executive compensation.

• Conduct recurring processes that ensure strategic and fiscal soundness along with balanced risk taking.

b.    "We believe it is critical to bring a multi-faceted strategy toward mitigating risk in our compensation programs and incentive plans. We incorporate formulaic and discretionary risk-balancing mechanisms, which include specific metrics for modifying payouts to discourage taking unnecessary or imprudent risks."

c.    "In December 2018, the Committee met jointly with the Risk and Compliance Committee to review our executive and other incentive programs. Based in part on the provisions and actions above, the Committee concluded that the design and/or metrics of such programs do not encourage taking unnecessary or inappropriate risk."

135.    The statements identified in ¶¶132-134, were materially false and misleading and omitted material facts because Defendants failed to disclose that Fifth Third used incentive

compensation programs that rewarded managers and their subordinate employees for selling new products and services to existing customers. Fifth Third also failed to disclose that these incentive compensation plans were not properly implemented and monitored and were therefore creating incentives for Fifth Third employees to engage in misconduct in order to meet goals and earn additional compensation. Furthermore, Defendants failed to disclose: (i) the illicit business practices detailed in ¶¶35-58, *supra*, and by the CFPB which had been ongoing since at least 2008 and necessitated the intervention of corporate headquarters (including the involvement of the Individual Defendants); (ii) that Fifth Third's senior management had knowingly failed to remediate these illicit business practices; (iii) that Fifth Third had been the target of a CFPB investigation into these known illicit business practices and Defendants' conscious failure to remediate them since November 2016; (iv) that Fifth Third had already ***admitted*** to certain of the most severe misconduct in 2015 and 2017 in response to CFPB inquiries (including the opening of unauthorized consumer financial products analogous to the Wells Fargo fake account scandal); and (v) that, as a result of the foregoing, the Bank was likely to be the subject of a CFPB enforcement action and faced extreme regulatory, legal, reputational and financial peril.

### E. Defendants' Misleading Statements and Material Omissions Regarding the Risk Environment Facing Fifth Third

136. On November 9, 2016, Fifth Third filed its Form 10-Q quarterly report with the SEC, signed by defendants Carmichael and Tuzun, reporting the Company's 3Q 2016 results. The 3Q 2016 Form 10-Q stated, "There have been no material changes made during the third quarter of 2016 to any of the risk factors as previously disclosed in the Bancorp's most recent annual report and subsequent periodic reports as filed with the SEC." Prior to the filing of the 3Q 2016 Form 10-Q, Fifth Third's most recent SEC reports to contain the Company's risk factors were Fifth Third's FY 2015 Form 10-K (filed February 25, 2016) and 2Q 2016 Form 10-Q (filed August 5, 2016). The

following purported risk factors in Fifth Third's 2015 Form 10-K and 2Q 2016 Form 10-Q, incorporated by reference in the Company's 3Q 2016 Form 10-Q, were materially misleading, in pertinent part:

a. "Fifth Third's actual or alleged conduct in activities, such as lending practices, data security, corporate governance and acquisitions, may result in negative public opinion and may damage Fifth Third's reputation. Actions taken by government regulators and community organizations may also damage Fifth Third's reputation."

b. "Fifth Third and/or its affiliates are or may become involved from time to time in information-gathering requests, reviews, investigations and proceedings (both formal and informal) by governmental regulatory agencies and law enforcement authorities, as well as self-regulatory agencies, regarding their respective businesses."

c. "Compliance with the rules and policies adopted by the CFPB may limit the products Fifth Third may permissibly offer to customers, or limit the terms on which those products may be issued, or may adversely affect Fifth Third's ability to conduct its business as previously conducted."

d. "Like other large financial institutions and companies, Fifth Third is also subject to risk from potential employee misconduct, including noncompliance with policies and improper use or disclosure of confidential information."

e. "[T]he CFPB . . . [has] the authority to compel or restrict certain actions by Fifth Third and its banking subsidiary, Fifth Third Bank. . . ." "In the wake of the most recent global financial crisis, Fifth Third and other financial institutions more generally have been subjected to increased scrutiny from government authorities, including bank regulatory authorities, stemming from broader systemic regulatory concerns, including with respect to . . . consumer compliance and other prudential matters and efforts to ensure that financial institutions take steps to improve their risk management and prevent future crises."

f. "[G]overnment authorities, including the bank regulatory agencies, are also pursuing aggressive enforcement actions with respect to compliance and other legal matters involving financial activities, which heightens the risks associated with actual and perceived compliance failures."

137. Substantially similar representations where made in Fifth Third's 2016 Form 10-K (filed with the SEC on February 24, 2017), Fifth Third's 2017 Form 10-K (filed with the SEC on February 28, 2018), and Fifth Third's 2018 Form 10-K (filed with the SEC on March 1, 2019), which were signed by defendants Carmichael and Tuzun.

- 61 -

138. The statements identified in ¶¶136-137, were materially false and misleading and omitted material facts because Defendants failed to disclose; (i) the illicit business practices detailed in ¶¶35-58, *supra*, and by the CFPB which had been ongoing since at least 2008 and necessitated the intervention of corporate headquarters (including the involvement of the Individual Defendants); (ii) that Fifth Third's senior management had knowingly failed to remediate these illicit business practices; (iii) that Fifth Third had been the target of a CFPB investigation into these known illicit business practices and Defendants' conscious failure to remediate them since November 2016; (iv) that Fifth Third had already admitted to certain of the most severe misconduct in 2015 and 2017 in response to CFPB inquiries (including the opening of unauthorized consumer financial products analogous to the Wells Fargo fake account scandal); and (v) that, as a result of the foregoing, the Bank was likely to be the subject of a CFPB enforcement action and faced extreme regulatory, legal, reputational and financial peril.

139. Furthermore, Defendants misleadingly discussed future, potential "risks" yet failed to disclose material adverse facts that had *already* occurred and that were known to Defendants. For example, Defendants stated that Fifth Third "[l]ike other large financial institutions and companies" was "subject to *risk* from *potential* employee misconduct," but failed to disclose that Defendants: (i) had been forced to intervene in the Bank's Chicago operations as a result of widespread consumer abuses; (ii) had known about more than 1,000 unauthorized account openings since 2010; (iii) *admitted* to such illicit business practices to the CFPB in 2015 and later in 2017; and (iv) knew that Fifth Third was then the target of a wide-ranging CFPB probe into this admitted misconduct, which was analogous to the fake account scandal which had recently ravaged Wells Fargo and that company's investors. In short, this purported "risk" materially misrepresented the true state of affairs – specifically that misconduct at Fifth Third was not "like other large financial institutions" and was not "potential" but had been *admitted* by the Bank, and it did not pose an ordinary "risk" of

adverse regulatory actions, but a known and imminent threat that Fifth Third would be exposed as having perpetrated illicit business practices for more than a decade analogous to one of the most notorious banking scandals of all time as part of an active investigation into admitted misconduct by one of the Bank's primary regulators.

## VI.    THE TRUTH BEGINS TO BE REVEALED

140.    On March 2, 2020, less than five weeks after it was reported that Fifth Third's Chief Risk Officer Frank Forrest was retiring, the Company filed its Annual Report on Form 10-K for FY 2019 with the SEC.  In the Form 10-K, Fifth Third disclosed for the first time that "the CFPB staff has notified Fifth Third that it intends to file an enforcement action in relation to alleged unauthorized account openings. . . .  The impact of this potential enforcement action has been reflected in our reasonably possible losses."  After the close of the market on March 2, 2020, Barclays Capital issued a report on Fifth Third titled "2019 10-K Review:  CFPB Action for Unauthorized Account Openings."  Based on the Form 10-K, the report stated that "CFPB staff notified FITB [Fifth Third] that it intends to file an enforcement action in relation to alleged unauthorized account openings."  The report also stated that in conjunction with the disclosure of the CFPB action, Fifth Third had more than doubled its reserve for "reasonably possible . . . losses related to regulatory proceedings," from $27 million in 3Q 2019 to $56 million.

141.    Despite burying the information about the CFPB action in the Form 10-K, members of the media uncovered and reported the negative news.  For example, on March 4, 2020, the online publisher *housingwire.com* published an article titled "Fifth Third facing its own fake account fiasco: Bank discloses that CFPB plans enforcement action."  The same day, *American Banker* issued an article titled "Fifth Third latest bank in CFPB crosshairs over phony accounts."  And on March 6, 2020, *Axios* issued a story reporting that "[t]he banking industry's fake account scheme may have

been widespread" and that "the CFPB is targeting [Fifth Third] for 'alleged unauthorized account openings.'"

142.    As a result of the disclosure about the CFPB enforcement action, the price of Fifth Third common stock dropped from a close of $25.72 on March 2, 2020 to a close of $24.44 on March 3, 2020, a $1.28 per share decline on unusually high volume.  The Fifth Third share price continued to drop in the days following the disclosure of the CFPB action, falling to $22.20 by March 6, 2020, a loss of $3.52 per share, or 14%, in four trading days.

143.    On Monday, March 9, 2020, the CFPB issued a press release titled "Consumer Financial Protection Bureau Files Suit Against Fifth Third Bank, National Association for Allegedly Opening Unauthorized Accounts and Enrolling Consumers in Unauthorized Products and Services." The CFPB press release revealed that "for several years Fifth Third, without consumers' knowledge or consent: opened deposit and credit-card accounts in consumers' names; transferred funds from consumers' existing accounts to new, improperly opened accounts; enrolled consumers in unauthorized online-banking services; and activated unauthorized lines of credit on consumers' accounts."  The press release further disclosed that "for years and continuing through at least 2016, Fifth Third used a 'cross-sell' strategy to increase the number of products and services it provided to existing customers; used an incentive-compensation program to reward selling new products; and conditioned employee-performance ratings and, in some instances, continued employment on meeting ambitious sales goals"; and "despite knowing since at least 2008 that employees were opening unauthorized consumer-financial accounts, Fifth Third took insufficient steps to detect and stop the conduct and to identify and remediate harmed consumers."  Linked to the press release was the filed version of the CFPB complaint.

144.    The CFPB complaint alleged eight counts against Fifth Third for violations of banking law and implementing regulations.  According to the CFPB complaint, "Fifth Third used a

- 64 -

'cross-sell' strategy to increase the total number of products and services it provided to existing customers" and "also used an incentive-compensation program that rewarded managers and their subordinate employees for selling new products and services to existing customers." The CFPB identified, "By 2010, at the latest, Fifth Third was aware that employees were opening products and services in consumers' names without those consumers' knowledge or consent in order to achieve sales goals or obtain incentive rewards."

145. The CFPB complaint further alleged that Fifth Third employees had opened both deposit accounts and credit card accounts without customers' knowledge or consent. For example, "Fifth Third imposed aggressive sales goals for its employees to sell credit cards to consumers, and its incentive-compensation program rewarded employees for selling new credit cards." The CFPB complaint alleged, as a result, "By 2009, at the latest, Fifth Third noticed a spike in unauthorized credit cards being issued to consumers." Nevertheless, "Fifth Third continued to emphasize sales and to maintain credit-card sales goals and incentive compensation."

146. According to the CFPB complaint, Fifth Third also "imposed aggressive sales goals for its employees to enroll consumers in its online-banking services," and in order to hit these goals "[f]rom at least 2010 through at least 2016, Fifth Third enrolled consumers in online-banking services without their knowledge or consent." Similarly, for Fifth Third's "Early Access" program – a fee-based line of credit that allows funds to be withdrawn before they have been deposited in an account – the Company "imposed aggressive sales goals for its employees… and its incentive-compensation program rewarded employees for enrolling consumers in 'fee-based products,' including Early Access." According to the CFPB complaint:

> Fifth Third opened Early Access lines of credit on consumers' deposit accounts without their knowledge or consent. Fifth Third was aware of this by June 2010, when senior management was notified of an increase in the number of calls by employees to the internal whistleblower hotline regarding the unauthorized opening of Early Access lines of credit.

- 65 -

147.     As the CFPB complaint stated, "Even after learning of unauthorized Fifth Third consumer-financial products and services by 2008, Fifth Third failed to change its sales practices to avoid consumer harm.  Instead, Fifth Third continued to foster sales practices that were likely to cause unauthorized products and services."  According to the CFPB complaint, Fifth Third "failed to take steps to determine and address a root cause of unauthorized accounts, which was consistently said by employees to be intense sales pressure" and "failed to close known loopholes in its collection of proof of consumer authorization, thereby making it easy for employees to open accounts without valid signature cards for deposit accounts or applications for credit products."  "In short," as the CFPB alleged, "Fifth Third focused on its own financial interests to the detriment of consumers."

148.     The CFPB press release and complaint immediately generated national news.  For example, on March 9, 2020, *Reuters* published an article titled "U.S. consumer watchdog charges Fifth Third Bank on opening phony accounts" that reported, "The U.S. Consumer Financial Protection Bureau (CFPB) said on Monday it charged Fifth Third Bank, National Association, with creating fake client deposit and credit-card accounts and transferring clients' funds to those accounts without consent, citing an abuse of fair lending and savings laws."  Similarly, *The New York Times* published an article on March 9, 2020 about the CFPB action headlined "Fifth Third Bank Opened Fraudulent Accounts, Consumer Bureau Says:  For more than eight years the bank ignored signs that employees were opening unauthorized accounts to meet aggressive sales goals, a federal regulator said in a lawsuit."  The same day *The Wall Street Journal* published an article titled "CFPB Says Fifth Third Employees Opened Accounts Without Customer Consent: Lawsuit alleges bank didn't do enough to monitor or adjust sales goals."  And the following day, *DealBreaker* published an article about the Fifth Third unauthorized account scandal titled "Fake Accounts Were Such a Good Idea, They Thought Of It Twice."

- 66 -

149.    In a substantial part as a result of the disclosures about Fifth Third's unauthorized account scandal, the Company's stock price dropped from a close of $22.20 on March 6, 2020 to a close of $18.30 on March 9, 2020, a $3.90 per share decline.  While the entire market was declining on March 9, 2020, Fifth Third's stock price fell substantially more than the market as a whole (as reflected by the S&P 500) and the stock price of peer banks.  Fifth Third's share price continued to drop in the days following the filing of the CFPB action, falling to $15.90 by March 12, 2020, a loss of $6.30 per share or 28% in four days.  Indeed, prior to the market opening on March 10, 2020, a *CNBC* article identified Fifth Third as one of the "biggest movers in the premarket" and reported, "The bank was charged by the Consumer Financial Protection Bureau with opening new accounts without customer consent, in order to meet sales goals."  An article published on *The Motley Fool* website titled "Why Fifth Third's Stock Plunged Over 20% in the Last Week" reported:

> On top of those two strong headwinds [the Covid-19 pandemic and the Federal Reserve lowering interest rates], Fifth Third got hit with a lawsuit from the Consumer Financial Protection Bureau (CFPB) on March 9 for alleged illegal practices. . . .  All this adds up to tough times for Fifth Third as the stock is down about 27% in the past five trading days during trading on Tuesday, and 54% year-to-date.

150.    An April 5, 2020 article, also published on *The Motley Fool* website, similarly reported, "Fifth Third's stock probably wouldn't have fallen nearly as much in March, but it had the added headwind of being sued by the Consumer Financial Protection Bureau (CFPB) on March 9, which accused Fifth Third of opening fake accounts, not unlike the scandal that enveloped Wells Fargo (NYSE:WFC) in 2016."

151.    On June 16, 2021, the CFPB filed an amended pleading with additional facts detailing the massive scope and duration of Fifth Third's misconduct and the Defendants' intentional failure to reform systemic unauthorized consumer-financial product issues at the Bank, which, according to the CFPB, occurred on the watch and under the leadership of the Individual Defendants.  For

- 67 -

example, the CFPB amended complaint alleges that "Fifth Third knows or consciously disregards that its admissions and claims understate the real number of unauthorized account openings and other improper sales conduct" and notes that there are in fact "**hundreds of thousands of Fifth Third accounts that bear indicia of non-authorization**," with misconduct by Bank employees dating from 2008 until at least 2020. The CFPB amended complaint also revealed that "Fifth Third **admitted** in 2017 that it had opened consumer-financial products without consumer authorization during each year from 2010 to 2017" – *i.e.*, when Carmichael and Tuzun were running the Bank as CEO and CFO, respectively. In response to these allegations, Fifth Third has admitted that "Fifth Third disclosed unauthorized credit card accounts **during the Bureau's examination in 2015**."

152.    The CFPB amended complaint further alleges that "Fifth Third was aware" of the misconduct "by June 2010, when **senior management** was notified of an increase in the number of calls by employees to the internal whistleblower hotline regarding the unauthorized opening of Early Access lines of credit." Similarly, the amended complaint alleges that, "Fifth Third has, and **members of Fifth Third's senior management are and have been familiar with**, data and other information that would be useful in implementing available unauthorized-account-identification methods for at least years 2010 to 2021." The amended complaint further states that "Fifth Third, **through its senior management, chose** not to attempt to identify unauthorized consumer-financial products beyond those Fifth Third has admitted to opening because greater identification might cause Fifth Third reputational and financial harm." The amended complaint also details internal correspondence from executives in Carmichael's direct line of report contemporaneously detailing illicit sales practices at the Bank and stating that they were widely known within the organization. In fact, the amended complaint singles out Carmichael as the person "**responsible** for reviewing or overseeing Fifth Third's retail-banking business, its data maintenance and use, and its sales and investigative practices" when the misconduct was occurring.

- 68 -

153.    On August 13, 2021, the CFPB moved for a partial judgment on the pleadings, demonstrating its confidence that the Bureau's allegations and Fifth Third's subsequent admissions establish clear violations of law.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

154.    By virtue of the facts set forth herein, it may be compellingly inferred that Defendants knew, or at the very least recklessly disregarded, that the statements set forth in §V, *supra*, were misleading to investors and omitted material information.

### A.    The Individual Defendants Were in Charge of and Directly Involved with the Banking Operations at Issue

155.    The Individual Defendants' roles at Fifth Third further demonstrate scienter by showing their responsibility for and knowledge of the Bank's admitted misconduct concerning unauthorized consumer-financial products.

156.    Carmichael was Fifth Third's COO from 2006 to 2015, and he became the Bank's President in 2012.  In 2015, Carmichael was promoted to Fifth Third's CEO—a position he still holds—joining its Board that same year before becoming the Chairman of the Board in 2018.  As Fifth Third's COO, Carmichael was (according to the Bank's 2016 Proxy Statement), among other things, responsible for the Bank's "***risk environment and growth***, ***customer service levels***, team work across divisional and functional areas, ***and promotion of core values of accountability***, integrity, respect and inclusion, and teamwork and collaboration."  As CEO, Carmichael was responsible for (according to the 2017 Proxy), among other things, the Bank's "***risk environment***, customer and employee index goals, 'One Bank' success, and ***promotion of the Bank's Core Values of Accountability, Integrity***, Respect and Inclusion, and Teamwork and Collaboration."

157.    Tuzun was Fifth Third's Senior Vice President and Assistant Treasurer in 2010 before becoming the Bank's Treasurer in 2011, a position he held until 2013, when he was promoted to

Fifth Third's CFO.  Tuzun was Fifth Third's CFO from 2013 to 2020.  As Treasurer, Tuzun oversaw the Bank's funding and liquidity, capital management, asset liability and balance sheet management, among other roles.  As CFO, Tuzun was responsible for, among other things, the Bank's "*risk management and compliance*, credit loss management, *operational excellence*, maintaining a strong financial team, and *promotion of core values of accountability*, *integrity*, respect and inclusion, and teamwork and collaboration."

158.    Given Carmichael's key responsibility for the Bank's risk management and "core values" of "integrity" and "accountability," it is not surprising that Fifth Third held him out to investors as the person in charge of promoting fair and honest business practices in the Bank's consumer business.  For example, the 2017, 2018, and 2019 Codes – which together told investors that "Fifth Third is committed to providing customers with financial products and services in ways that avoid the use of any practices that could be deemed predatory, unfair, deceptive or abusive" and that the Bank "prohibited . . . [o]pening accounts or selling products without customer authorization"  – included an introductory message from Carmichael stating that "[d]oing the right thing is central to our ability to achieve our Vision to be the One Bank people most value and trust."

159.    Carmichael also told investors in conference calls during the Class Period that the Bank's focus under his leadership was growing Fifth Third's credit card business and "providing the right products and services to our customers and really being the one bank our customers most value and trust."  Similarly, during a March 2017 investor call, Carmichael boasted to investors that Fifth Third, under his leadership had become "the second most trusted company for retail banking."  Carmichael was also part of the Enterprise Risk Management Committee of the Board, to which Defendants told investors the Bank reported and escalated all compliance issues and suspicious activities by its employees.

4825-7546-1374.v1

160.     As CFO, Tuzun was responsible for risk management and compliance issues at Fifth Third, as well as promoting the Bank's core values of integrity and accountability.  For example, every year in Fifth Third's SEC Forms 10-K and Forms 10-Q, Defendants told investors that their operational practices "ensure[] [a] consistent processes for identifying, assessing, managing, monitoring, and reporting risks" by "reporting and escala[ting] . . . compliance issues to **senior management and the Board**."   In addition, Tuzun, like Carmichael, had his annual incentive compensation set in reference to risk management and compliance goals and fealty to the Bank's purported "core values" of integrity and accountability. Both Individual Defendants also signed the Company's 2017 10-K, which told investors that the Bank's "core" operational "principles" included, among other purported core business practices, "not offer[ing] products or services that are not appropriate for [Fifth Third's] customers."

### B.     The Individual Defendants' Role in Investigating the Misconduct Confirms Their Knowledge of the Undisclosed but Admitted Consumer Abuses

161.     Carmichael's knowledge of Fifth Third's abusive consumer practices is established as early as 2010 by his role in responding internally to widespread employee misconduct at the Bank, including the opening of unauthorized consumer accounts and implementation of overly aggressive and improper sales practices.  At the time, Carmichael was COO and, according to a Bank press release, "leading [Fifth Third's] Retail Bank" and affiliate offices.  Under his watch, consumer abuses had gotten so bad at the Bank's Chicago offices that they necessitated corporate intervention, including an investigation and personnel changes.  Those practices were referenced in an internal June 2010 email from Fifth Third's head of retail banking, who acknowledged that the Chicago "leadership team have a reputation of less than desirable sales management practices"; that "Bullying and threats are often used to achieve results"; and "As you probably know, there have been consistent problems around unauthorized credit card sales in Chicago."

- 71 -

162.    At the time of the above 2010 email, Carmichael was the Bank's executive with primary responsibility for and oversight of its retail banking operations and regional financial centers.  The CFPB has even identified Carmichael as the person "*responsible for reviewing or overseeing Fifth Third's retail-banking business, its data maintenance and use, and its sales and investigative practices*."  Similarly, Tuzun served as Fifth Third's assistant treasurer at the time and was involved in gathering, reviewing, and reporting the Company's financial results from the Chicagoland area; thus, he would have likely been apprised of the undisclosed illicit sales scandal impacting one of the Bank's largest regional markets.   The CFPB, based on its extensive investigation, has concluded that "*by June 2010 . . . . senior management*" (which at the time included both Carmichael and Tuzun) had been "*notified* of an increase in the number of calls by employees to the internal whistleblower hotline regarding the unauthorized opening of Early Access lines of credit."  Similarly, the CFPB has concluded that "*By 2010, at the latest, Fifth Third was aware* that employees were opening products in consumers' names without those consumers' knowledge or consent in order to achieve sales goals or obtain incentive rewards."

163.    Carmichael and Tuzun's roles in responding to the CFPB's wide-ranging investigation further confirm their knowledge of the Bank's illicit business practices.  The November 2016 CID was personally addressed to Carmichael and informed him that the CFPB was investigating "Specific Sales Practices" at the Bank, including many of the same illicit practices of which he was already aware as CEO and formerly COO, such as "opening an account for any product or service offered by the Company without the knowledge and consent of a consumer," "changing, without the consumer's knowledge and consent, the type of account or service in which a consumer is enrolled," and "engaging in unauthorized transactions on behalf of a consumer." Between 2016 and 2019, the CFPB issued five additional CIDs to Fifth Third regarding

unauthorized accounts and predatory consumer practices at the Company, generating a half-***billion*** data points, thousands of documents, and extensive witness testimony produced by the Bank.

164.     Moreover, in responding to the CFPB's investigation, Fifth Third ***admitted in 2017 that it had opened consumer financial products without authorization every year from 2010 to 2017***, which confirms that the Individual Defendants knew about the Bank's unauthorized consumer-financial products problem before and during the Class Period.  Fifth Third has also ***admitted*** to the CFPB that the Bank: (i) received hundreds of customer complaints regarding illicit sales practices by its employees; (ii) that it knew ***contemporaneously*** that its employees opened more than 1,000 unauthorized accounts (a number the CFPB's investigation found Fifth Third substantially understated) during the 2010 to 2016 time period; (iii) knew of more than 400 instances of illicit practices such as creating email addresses or using inaccurate email addresses in order to facilitate unauthorized enrollment of consumers in Bank products; and (iv) enrolled consumers in overdraft protection without their consent in 2015 and 2016.  The CFPB finds these allegations so overwhelming in establishing that violations of law occurred at Fifth Third on Carmichael and Tuzun's watch that the Bureau moved on August 13, 2021 for partial judgment on the pleadings.

165.     During the above 2010 to 2017 period, Carmichael was variously COO, President, CEO, and on the Bank's Board; Tuzun was a treasurer and then CFO.  Given their roles and responsibilities at the Bank, the severity of the illicit business practice problems at the Bank, the scope and intensity of the CFPB investigation, and the Bank's admissions of wrongdoing to one of its primary regulators, the Individual Defendants knew, or at the very least were reckless in not knowing, of the misconduct detailed herein.  For example, it is simply implausible that Fifth Third could admit in 2017 that its employees had opened unauthorized accounts over a seven year period to one of its primary regulators – especially on the heels of an analogous Wells Fargo fake account scandal that had forced that bank's CEO and Chairman out and put the entire banking sector on

- 73 -

notice of the severe consequences of engaging in such misconduct – without the knowledge and approval of Carmichael as Fifth Third's CEO and a Board member and Tuzun as CFO.

166.    Even before CFPB's first CID, in November 2016, the Bank's problems with unauthorized credit cards were so well-known within the Company, and its violations of law so internally obvious, that Fifth Third disclosed them in writing to the CFPB during a 2015 Bureau examination.  These 2015 disclosures were so conspicuous that the Company has now argued that they provided the CFPB with "*actual-not just constructive-notice of its claim for unauthorized credit card accounts*."  It is highly implausible that Carmichael – responsible for overseeing the Bank's regulatory response and broader risk management activities at the time – was not involved in Fifth Third's written admissions of misconduct to the CFPB.  Tuzun, who was CFO in 2015 and responsible for "risk management and compliance," would also almost certainly have been apprised, and more likely directly involved in, any admissions of misconduct to the CFPB at this time.

167.    Indeed, the CFPB amended complaint confirms Carmichael and Tuzun's knowledge by alleging that "Fifth Third was aware" of specific misconduct "by June 2010, when *senior management* was notified of an increase in the number of calls by employees to the internal whistleblower hotline regarding the unauthorized opening of Early Access lines of credit."  Similarly, the CFPB amended complaint alleges, "Fifth Third has, and members of Fifth Third's *senior management* are and have been familiar with, data and other information that would be useful in implementing available unauthorized-account-identification methods *for at least years 2010 to 2021*."  The CFPB amended complaint further alleges that "Fifth Third, through its *senior management*, chose not to attempt to identify unauthorized consumer-financial products beyond those Fifth Third has admitted to opening because greater identification might cause Fifth Third reputational and financial harm."  The CFPB amended complaint also alleges that there are in fact "hundreds of thousands of Fifth Third accounts that bear indicia of non-authorization" and that

- 74 -

"Fifth Third knows or consciously disregards that its admissions and claims understate the real number of unauthorized account openings and other improper sales conduct," with misconduct by Bank employees dating from 2008 until at least 2020. Fifth Third also knew, according the CFPB amended complaint, that many consumers did not detect Fifth Third's improper acts or practices and that many others did not lodge a complaint. The Bank also knew, according to the CFPB, that many of Fifth Third's employees feared retribution for alleging improper conduct.

168.    Carmichael was not just a Fifth Third senior executive at the time, but expressly tasked with overseeing the Fifth Third retail banking operations at issue. For the avoidance of doubt, the amended CFPB complaint singles out Carmichael as the person "***responsible for reviewing or overseeing Fifth Third's retail-banking business, its data maintenance and use, and its sales and investigative practices***" at the time of the alleged misconduct. The amended CFPB complaint also details internal correspondence from executives in Carmichael's direct line of report ***contemporaneously*** detailing illicit sales practices at the Bank and stating that they were widely known within the organization. Tuzun was another senior manager, responsible as Treasurer for gathering and reporting on the Company's financial results, which would have been impacted by the misconduct, and subsequently for the Bank's risk management and compliance practices and reporting obligations as CFO.

### C.    Defendants' Additional Public Comments Contribute to a Compelling Inference of Scienter

169.    In addition to the Individual Defendants' demonstrated knowledge of Fifth Third's illicit and admitted business practices, as detailed above (*i.e.*, the Individual Defendants' personal and direct involvement in the operations impacted by the illicit business practices, the fact that the Bank was targeted by the CFPB because of these illicit business practices, and the Company's subsequent admissions to some of these practices under the leadership of the Individual Defendants),

- 75 -

and their receipt of the CFPB CID in November 2016, Defendants' public statements throughout the Class Period provide more evidence that they knew, or recklessly disregarded, the Bank's illicit business practices and the imminent regulatory and legal peril faced by the Bank during the Class Period.

170.    For example, Defendants assured investors that compliance issues and suspect activities were escalated to senior management and the Board of Directors as a matter of course. Fifth Third's 3Q 2016 Form 10-Q, filed with the SEC on November 9, 2016, stated that Fifth Third "focuses on managing regulatory compliance risk in accordance with the Bancorp's integrated risk management framework, which ensures consistent processes for identifying, assessing, managing, monitoring, and reporting risks."  Accordingly, the Form 10-Q stated that employees reported and escalated all issues and facts implicating the Bank's compliance with regulations to senior management and the Board:

> Fifth Third also focuses on the reporting and escalation of compliance issues to senior management and the Board.  The Management Compliance Committee is the key committee that oversees and supports Fifth Third in the management of compliance risk across the enterprise.  The Management Compliance Committee oversees Fifth Third-wide compliance issues, industry best practices, legislative developments (in coordination with the Regulatory Change Management Committee), regulatory concerns, and other leading indicators of compliance risk. The Management Compliance Committee reports to the Enterprise Risk Management Committee,[3] which reports to the Risk and Compliance Committee of the Board of Directors.

171.    Defendants repeated substantively identical statements concerning Fifth Third's processes for reporting and escalating such issues, which would include the historical adverse facts at issue here, in the Bank's FY 2016 Form 10-K, filed February 24, 2017.

---

[3]     At all times during the Class Period, Carmichael was a member of the Enterprise Risk Management Committee ("ERMC").

172. Furthermore, Carmichael and Tuzun both signed the Company's Forms 10-K and Forms 10-Q filed during the Class Period and certified them pursuant to the Sarbanes-Oxley Act ("SOX"). These SOX certifications also evidence that Defendants knew or recklessly disregarded the Bank's predatory banking practices, stating that Carmichael and Tuzun were "responsible for establishing and maintaining disclosure controls and procedures," that they "designed" and "[e]valuated the effectiveness of" Fifth Third's "disclosure controls and procedures," and that they have "disclosed" "[a]ll significant deficiencies and material weaknesses" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting."

173. In Fifth Third's 1Q 2017 Form 10-Q, filed May 5, 2017, Defendants repeated statements substantively identical to those in Fifth Third's prior SEC reports concerning the Bank's processes for reporting and escalating the kind of historical adverse facts at issue here, which implicated Fifth Third's adherence to best industry practices and compliance with regulations (¶170). The Form 10-Q also described the Company's purported operational practices, assuring investors that they "provide[] a consistent and integrated approach for managing risks and ensuring appropriate risk mitigants and controls are in place, and risks and issues are appropriately escalated." The Form 10-Q further explained how the Company escalated compliance-related facts to the Bank's senior management and the Board (*i.e.*, the Individual Defendants) in detail:

> The Bancorp's risk governance structure includes management committees operating under delegation from, and providing information directly or indirectly to, the Board. The Bancorp Board delegates certain responsibilities to Board sub-committees, including the RCC as outlined in each respective Committee Charter, which may be found on https://www.53.com. The ERMC, which reports to the RCC, comprises senior management from across the Bancorp and reviews and approves risk management frameworks and policies, oversees the management of all risk types to ensure that aggregated risks remain within the Bancorp's risk appetite, and fosters a risk culture to ensure appropriate escalation and transparency of risks.

174.     Defendants repeated substantively identical statements concerning Fifth Third's operational practices in the 2Q and 3Q 2017 Form 10-Qs, filed August 8, 2017, and November 6, 2017, respectively.  In summary, Fifth Third repeatedly stated that the Individual Defendants were among those senior managers kept regularly apprised of and responsible for Fifth Third's compliance and regulatory practices, maintenance of high operating standards, investigations into suspicious activities, and similar aspects of the Bank's operations in which the illicit business practices occurred and were responded to by the Bank.

175.     Defendants also filed and published Fifth Third's Code of Business Conduct and Ethics with the SEC on September 25, 2017.  The 2017 Code evidences that Defendants would have known about, or recklessly disregarded, the unauthorized account issues and the CFPB investigation that they omitted from their public statements to investors.  The 2017 Code mandated reporting of any suspected fraud and compliance violations across the entire Company.  Indeed, in prohibiting "unethical business practices" and telling investors that "Fifth Third is fully committed to maintaining non-abusive and anti-predatory lending practices," the 2017 Code enumerated the exact type of unauthorized account practices at issue here, but claimed such practices were prohibited:

> Unethical business practices, such as ***incentive gaming***, falsifying documents or inflating performance results, are strictly prohibited.  You are prohibited from manipulating records, ***opening accounts without customer authorization, offering customers unnecessary products*** and falsifying records or applications in order to benefit yourself or other employees of Fifth Third.

176.     The 2017 Code further held each employee "accountable for . . . [r]eporting any potential violations or ethical concerns promptly and in an appropriate manner."  Fifth Third managers were warned that they "must respond to misconduct and report violations as soon as you witness them or are made aware."  And the Company insisted that "[e]very Fifth Third employee has a responsibility to communicate situations that could cause risk or harm to the Bank or our customers" – "manager and non-manager alike" – even if the employee "may not have all the

- 78 -

information." Citing Fifth Third's purported commitment to "adhering to the letter and the spirit of applicable laws, regulations and Bancorp policies," the 2017 Code further stated that "[a]ll employees are required to fully comply with all applicable laws, rules and regulations, as well as with all Fifth Third policies and procedures." To facilitate such reporting and escalating, the 2017 Code required Fifth Third employees and executives to "refer all cases of suspected fraud through the appropriate channels," which included a 24-hour a day ethics hotline, a Fraud Hotline, and a Fraud Referral Form. The 2017 Code also affirmed that issues identified through this mandatory reporting were investigated and thus escalated: "The Bancorp investigates every concern that employees report through any channel" and that "[e]very report of a violation is taken seriously."

177. The 2017 Code also assured investors that Fifth Third was committed to "the integrity and accuracy" of its "[b]usiness and financial records," which it described as "critical to Fifth Third Bancorp's operations," including "those filed and/or produced with the Securities Exchange Commission." To ensure these records "are complete, fair, accurate, clear and transparent," Fifth Third emphasized its "Disclosure Council and Disclosure Council Guidelines that govern filing and disclosures."

178. During Fifth Third's December 2017 investor day, the Bank's Chief Risk Officer Frank Forrest further extolled the Company's "strong proactive risk management" and stated, "Risk management at Fifth Third is embedded in our culture, in everything we do." In the context of "headline risk" in the banking sector shortly after Wells Fargo's unauthorized account scandal was disclosed, Forrest assured investors that "***we closely monitor these activities and report them to the Board and to management and to our regulators***."

179. Defendants filed Fifth Third's FY 2017 Form 10-K with the SEC on February 28, 2018. In it, Defendants repeated the statements from the Bank's earlier SEC filings concerning its "effective" operational practices for reporting and escalation of illicit business practices like the ones

- 79 -

at issue here to senior managers such as the Individual Defendants (¶¶170, 173).  After reaffirming that Fifth Third's operational practices "ensure[] consistent processes for identifying, assessing, managing, monitoring, and reporting risks" and "foster[] a risk culture to ensure appropriate escalation," the 2017 Form 10-K added that "escalat[ing] risks and issues" was a "***core principle[]*** *that "ensure[d] the Bancorp is operating in a safe and sound manner*."

180.     In Fifth Third's subsequent quarterly and annual reports during the Class Period – filed May 4, 2018, August 8, 2018, November 6, 2018, March 1, 2019, May 10, 2019, August 8, 2019, November 8, 2019, and March 2, 2020 – Defendants repeated the statements from the Bank's 2017 Form 10-K concerning the robust operational practices and escalation process nearly verbatim. And beginning with the 2Q 2019 Form 10-Q, filed August 8, 2019, Defendants added to Fifth Third's filings the unequivocal statement that the Bank's operational practices "***ensure" that "risks*** *and issues are appropriately escalated . . . to the Bancorp's management and Board*."

181.     Fifth Third updated its Code of Business Conduct & Ethics in 2018 and 2019, filing these updates with the SEC and publishing them on September 24, 2018, and September 18, 2019, respectively.  The 2018 and 2019 Codes were identical to each other and nearly identical to the 2017 Code (including the mandatory requirements for reporting and escalating risks and issues) with one addition, a purported prohibition on "***[o]pening bogus or fake accounts*.***"  The 2018 and 2019 Codes also stated that "Fifth Third is committed to providing customers with financial products and services in ways that avoid any practices that could be deemed predatory, unfair, deceptive or abusive."  Notably, at the time this addition was made ***Fifth Third*** (***under the leadership of Carmichael and Tuzun***) ***had already admitted to the CFPB that its employees had opened a significant number of bogus and fake accounts, yet Defendants did not disclose this adverse fact to investors***.

182.     Defendants filed Fifth Third's 2020 Proxy Statement with the SEC on March 4, 2020. The 2020 Proxy Statement assured investors that "[t]he Bancorp's risk governance structure ensures proper oversight of risk across the firm and provides a path for escalation of risks and issues to management and board-level committees to drive effective risk decisioning." The 2020 Proxy Statement further emphasized defendant Carmichael's role in reporting and escalating risks and issues, stating that "he drove accountability for a culture of strong risk management and regulatory results" and "was also responsible for customer experience results."

### D. The Individual Defendants Collect over $35.4 Million in Incentive Compensation and Insider Trading

183.     The Individual Defendants were incentivized to conceal the unauthorized account practices at Fifth Third and the fact that the Bank had been caught by the CFPB because a significant portion of their compensation was performance-based. According to Fifth Third's Definitive Proxy Statement dated March 9, 2017, the executive compensation structure largely comprised "pay for performance" incentive compensation, with "stock price growth," "performance relative to [banking] peers," and a "risk performance assessment" the key factors in determining the executive's incentive compensation. Both Individual Defendants' compensation was set by promoting and complying with, among other things, the Bank's objectives concerning risk environment and its "core values" of "integrity" and "accountability."

184.     According to the Bank's 2016 Proxy Statement, Carmichael's compensation as COO depended on, among other things, promoting and complying with objectives concerning the Bank's "managed risk environment, customer service levels, . . . and promotion of [the] core values of accountability [and] integrity . . . ." According to the Bank's 2019 Proxy Statement, Carmichael's compensation as CEO depended on, among other things, promoting and complying with objectives

- 81 -

concerning the Bank's "core values," as well as "customer experience results" and "strong risk management and regulatory results."

185.    According to the 2016 Proxy Statement, Tuzun's compensation as CFO depended on, among other things, promoting and complying with objectives concerning the Bank's "risk management and compliance, credit loss management, operational excellence . . . and promotion of core values of accountability [and] integrity. . . ."

186.    By failing to disclose the use of fake accounts at Fifth Third and the CFPB's investigation of the Company's practices, defendants Carmichael and Tuzun artificially inflated the price of Fifth Third common stock and obfuscated known risks facing the Bank.  Furthermore, the Individual Defendants managed to conceal their failure to meet incentive-based components of their compensation.  As a result, they were able to collect significant incentive compensation during the Class Period to which they would not otherwise be entitled.

187.    As set forth in the chart below, Carmichael's incentive compensation for each of 2016, 2017 and 2018 (paid in 2017, 2018 and 2019, respectively) was both significant and far exceeded his annual salary:

| Year | Salary | Incentive Compensation and Stock Awards | Incentive Compensation as a % of Salary |
|---|---|---|---|
| 2016 | $994,287 | $6,250,004 | 629% |
| 2017 | $1,000,064 | $7,324,998 | 732% |
| 2018 | $1,088,531 | $9,849,976 | 905% |

188.    In total, during the Class Period and while the truth about Fifth Third's predatory banking practices and the CFPB investigation were kept hidden from investors, Carmichael collected over $23.4 million in incentive-based compensation, which represented more than 88% of his total compensation.  As of March 2020, when the truth about the unauthorized accounts and CFPB

- 82 -

investigation began to be revealed, Carmichael's incentive compensation was cut by $2.4 million relative to what he collected in 2019.

189. As set forth in the chart below, Tuzun's incentive compensation for each of 2016, 2017 and 2018 (paid in 2017, 2018 and 2019, respectively) was also both significant and far exceeded his annual salary:

| Year | Salary | Incentive Compensation and Stock Awards | Incentive Compensation as a % of Salary |
|------|--------|------------------------------------------|------------------------------------------|
| 2016 | $519,342 | $1,900,000 | 366% |
| 2017 | $553,426 | $2,030,003 | 367% |
| 2018 | $586,015 | $2,350,011 | 401% |

190. In total, during the Class Period and while the truth about Fifth Third's unauthorized account practices and the CFPB investigation were kept hidden from investors, Tuzun collected over $6.2 million in incentive-based compensation, which represented more than 79% of his total compensation. As of March 2020, as the truth about the unauthorized accounts and CFPB investigation began to be revealed Tuzun's incentive compensation was cut by over 12% ($285,000) relative to what he collected in 2019.

191. In addition to his $23.4 million in incentive compensation, during the Class Period Carmichael sold more than $5.8 million of his Fifth Third stock while in possession of material nonpublic information about the Bank's illicit business practices and the imminent threat posed by the CFPB investigation. As reflected in the chart below, Carmichael sold his Fifth Third stock at prices that were $3.57 to $16.47 per share (22% to 104%) higher than where the stock price traded following the March 2020 disclosures of the truth.

- 83 -

| Date | Number of Shares | Share Price | Total Proceeds |
|---|---|---|---|
| Nov. 10, 2016 | 17,689 | $23.45 | $414,807 |
| Nov. 16, 2016 | 36,821 | $25.11 | $924,575 |
| Feb. 13, 2018 | 87,613 | $32.37 | $2,836,033 |
| Oct. 29, 2019 | 55,251 | $29.59 | $1,634,877 |
| **Total** | **197,374** | | **$5,810,292** |

192.    Based on the Form 4 that was filed in conjunction with Carmichael's October 29, 2019 stock sale, Carmichael continued to hold 567,440 shares of Fifth Third stock. Accordingly, during the Class Period, Carmichael sold 26% of his Fifth Third stock. Carmichael's stock sales during the Class Period were also inconsistent with his transactions before and after the Class Period. In the 18 months before the start of the Class Period and in the six months following the end of the Class Period, Carmichael did not sell any of his Fifth Third stock.

### E.    Defendants Complete a $250 Million Offering of Fifth Third Securities

193.    On September 17, 2019, while Fifth Third's common stock price continued to trade at artificially inflated levels and investors were unaware of the CFPB investigation or unauthorized account scandal, Defendants sold 10 million preferred shares at $25 per share for $250 million in gross proceeds, $242 million of which went to the Bank after underwriting fees and expenses. The prospectus for the offering incorporated the misleading risk factors from Fifth Third's March 1, 2019 Form 10-K (¶¶136-137, *supra*) and stated that the proceeds from the offering would be used "for general corporate purposes, which may include repurchases of shares of our common stock." The success of the offering depended on both keeping the price of Fifth Third securities artificially inflated and in keeping the CFPB investigation and predatory banking practices concealed from investors. As a result of the September 2019 offering, Defendants were able to raise $242 million for the Bank.

- 84 -

**F.      Defendants Issued 131 Million Shares of Fifth Third Common Stock
to Complete the $4.3 Billion Acquisition of MB Financial**

194.    On March 22, 2019, in its largest deal in 20 years, Fifth Third completed the $4.7

billion acquisition of Chicago-based MB Financial.  To complete the acquisition, Defendants needed

to convince MB Financial shareholders to vote for the acquisition.  The Registration Statement used

to solicit the vote of MB Financial shareholders highlighted "the historical performance of Fifth

Third common stock," but failed to disclose the unauthorized account issues at Fifth Third or the fact

that Fifth Third had been caught by the CFPB.  The Registration Statement also incorporated the

false and misleading risk disclosures, identified above, in Fifth Third's FY 2017 Form 10-K (¶¶136-

137, *supra*).  Unaware of the material facts about Fifth Third's illicit business practices and CFPB

investigation, MB Financial shareholders approved the acquisition.

195.    Defendants also needed to fund the $4.7 billion acquisition of MB Financial.  Because

Fifth Third did not have sufficient capital to complete the acquisition with cash, Defendants had to

use the Company's common stock to fund 90% of the acquisition price.  Accordingly, Defendants

issued approximately 131 million new shares of Fifth Third common stock that, as of March 22,

2019, was trading at the artificially inflated price of $24.62 per share.

196.    Had the truth been known about the unauthorized account scandal and CFPB

investigation, Defendants would not have been able to complete the acquisition of MB Financial or,

if it had been approved, the Bank would have had to issue substantially more stock to fund the

acquisition.  Indeed, based on Fifth Third's stock price on March 12, 2020, following the disclosures

of Defendants' fraudulent conduct, Fifth Third would have had to issue 71.8 million more shares of

Fifth Third stock – or 54% – than the Bank did by completing the MB Financial acquisition while

the Company's stock price was artificially inflated.

### G. The Large Number of Executive Departures Bolsters an Already Compelling Inference of Scienter

197.     The departure of numerous senior executives at Fifth Bank further bolsters an already compelling inference of scienter.  On January 30, 2020 – less than three months before the CFPB enforcement proceedings were disclosed – Fifth Third announced that its Chief Risk Officer, Frank Forrest, was leaving his position "effective immediately" and would officially retire from the Company by the end of the year.  Forrest had served as Chief Risk Officer since 2014.  Notably, Forrest was responsible for risk and compliance activities at the Bank and in the three years since Fifth Third received the CFPB's first CID, Forrest sold over $3 million worth of Fifth Third stock. Similarly, on May 8, 2020, Fifth Third announced that Mitchell Feiger, the chairman and CEO of Fifth Third Bank (Chicago), would retire by the end of the month.  On June 15, 2020, Jerry W. Burris notified the Board of his resignation as a director of the Company.  In October 2020, Fifth Third's Executive Vice President and former Head of its Consumer Bank, Phil McHugh, left the Company.  Shortly thereafter, on November 9, 2020, Fifth Third announced that defendant Tuzun had resigned to become CFO at BMO Financial Group earlier in the month and that a new CFO would take over the position "effective immediately."

## VIII.   LOSS CAUSATION AND ECONOMIC LOSS

198.     During the Class Period, as detailed herein, Defendants made misleading statements and material omissions and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Fifth Third common stock and operated as a fraud or deceit on Class Period purchasers of Fifth Third common stock.  Defendants' false and misleading statements had their intended effect and directly and proximately caused Fifth Third common stock to trade at artificially inflated levels, reaching a Class Period high of $34.26 per share.

- 86 -

199. As a result of Defendants' fraudulent conduct as alleged herein, the price at which Fifth Third common stock traded was artificially inflated throughout the Class Period. When Plaintiff and other members of the Class purchased their Fifth Third common stock, the true value of such common stock was substantially lower than the prices actually paid. As a result of purchasing Fifth Third common stock during the Class Period at artificially inflated prices, Plaintiff and other members of the Class suffered economic loss, *i.e.,* damages, under the federal securities laws, when such artificial inflation dissipated.

200. As a result of Defendants' misleading statements and material omissions, Plaintiff, and other members of the Class relied, to their detriment, on such statements and documents, and/or the integrity of the market, in purchasing their Fifth Third common stock at artificially inflated prices during the Class Period. Had Plaintiff and other members of the Class known the truth, they would not have taken such actions.

201. The misrepresentations and omissions that Defendants had concealed from the market were disclosed beginning on March 2, 2020. On that date, Fifth Third filed its Annual Report on Form 10-K for FY 2019 with the SEC. In the Form 10-K, Fifth Third disclosed for the first time that "the CFPB staff has notified Fifth Third that it intends to file an enforcement action in relation to alleged unauthorized account openings. . . . The impact of this potential enforcement action has been reflected in our reasonably possible losses." As set forth above in ¶¶82, 141, analysts and reporters promptly reported on the disclosure.

202. As a result of the disclosure about the CFPB enforcement action, the price of Fifth Third common stock dropped from a close of $25.72 on March 2, 2020 to a close of $24.44 on March 3, 2020, a $1.28 per share decline. The price of Fifth Third common stock continued to drop in the days following the disclosure of the CFPB action, falling to $22.20 by March 6, 2020, a loss of $3.52 per share, or 14%, over four trading days.

- 87 -

203.    Then, on March 9, 2020, the CFPB issued a press release titled "Consumer Financial Protection Bureau Files Suit Against Fifth Third Bank, National Association for Allegedly Opening Unauthorized Accounts and Enrolling Consumers in Unauthorized Products and Services" and filed a complaint alleging Fifth Third had violated a host of consumer banking laws and regulations. As set forth above in ¶¶90, 148, the CFPB press release and complaint generated national news.

204.    In substantial part as a result of the disclosures about Fifth Third's fake account scandal, the price of Fifth Third common stock dropped from a close of $22.20 on March 6, 2020 to a close of $18.30 on March 9, 2020, a $3.90 per share decline. While the entire market was declining on March 9, 2020, the price of Fifth Third common stock fell substantially more than the market as a whole (as reflected by the S&P 500) and the stock price of peer banks. Fifth Third's share price continued to drop in the days following the filing of the CFPB action, falling to $15.90 by March 12, 2020, a loss of $6.30 per share, or 28%, over four days.

205.    The timing and magnitude of the decline in the price of Fifth Third common stock negates any inference that losses suffered by Plaintiff and other Class members were fully caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. As discussed above, from the initial disclosure about the CFPB action disclosure on March 2, 2020 until March 6, 2020, the price of Fifth Third common stock fell 14%. In comparison, the closing price of the S&P 500 only dropped 3.8% over the same period. Similarly, from the March 9, 2020 disclosure of the CFPB complaint through March 12, 2020, the price of Fifth Third common stock fell 28%. Over those same days, which included a sharp negative reaction to emerging news about the Covid-19 pandemic, the S&P 500 fell 16%. The following chart compares the change in price of Fifth Third common stock during this time period to the S&P 500 and also the KBW Nasdaq Bank Index:

- 88 -



206.   In total, the price of Fifth Third common stock declined ***more than 50%*** from its

Class Period high, as reflected in the following chart:



207.    As a result of their purchases of Fifth Third common stock during the Class Period

and the subsequent decline in the value of those shares when the truth was revealed to the market,

Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal

securities laws.

## IX.    PRESUMPTION OF RELIANCE

208.    At all relevant times, the market for Fifth Third common stock was an efficient

market for the following reasons, among others:

(a)    Fifth Third common stock met the requirements for listing and was listed and

actively traded on the Nasdaq Global Select Market, a highly efficient and automated market;

4825-7546-1374.v1

       (b)     according to the Company's 2019 Form 10-K, the Company had more than 709 million shares of common stock outstanding as of January 31, 2020, demonstrating a very active and broad market for Fifth Third common stock;

       (c)     as a regulated issuer, Fifth Third filed periodic public reports with the SEC;

       (d)     Fifth Third regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

       (e)     Fifth Third was followed by numerous securities analysts employed by major brokerage firms, who wrote reports that were distributed to the brokerage firms' sales forces and the public.

209.    As a result of the foregoing, the market for Fifth Third common stock promptly digested current information regarding Fifth Third from publicly available sources and reflected such information in Fifth Third's common stock price. Under these circumstances, a presumption of reliance applies to Plaintiff's and Class Members' purchases of Fifth Third common stock.

210.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's claims are based on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Fifth Third's predatory banking practices and the CFPB investigation of those practices, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material omissions set forth above, that requirement is satisfied here.

## X.    NO SAFE HARBOR

211.    The false and misleading statements alleged herein were not forward-looking.  To the extent any of the alleged false and misleading statements were forward-looking, the federal statutory safe harbor for forward-looking statements under certain circumstances does not apply.  Many of the specific statements alleged were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements accompanying them.  To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Such cautions were absent from Fifth Third's Class Period filings and oral disclaimers.

212.    Alternatively, to the extent that the statutory safe harbor could apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because, at the time each of those forward-looking statements were made, the speaker knew that the particular forward-looking statement was false or misleading and the forward-looking statement was authorized and approved by an executive officer of Fifth Third who knew that those statements were false or misleading when made.

213.    Moreover, to the extent that Defendants issued any disclosures designed to warn or caution investors of certain risks, those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned of and/or because Defendants had actual knowledge of material adverse facts undermining such disclosures.

## XI.    CLASS ACTION ALLEGATIONS

214.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all purchasers of Fifth Third common stock during the Class Period.  Excluded from the Class are: Defendants, the current and Class

Period officers and directors of the Company, the members of the immediate families and the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, and any entity in which such excluded persons have or had a controlling interest.

215.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Fifth Third common stock was actively traded on the Nasdaq Global Select Market.  According to the Company's 2019 Form 10-K, the Company had more than 700 million shares of common stock outstanding as of January 31, 2020.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number at least in the hundreds, if not thousands, and that they are geographically dispersed.

216.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's and all the Class members' damages arise from and were caused by the same representations and omissions made by or chargeable to Defendants.  Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

217.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

218.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     Whether statements made by or chargeable to Defendants during the Class Period misrepresented or omitted material facts;

(c)     Whether the price of Fifth Third common stock was artificially inflated during the Class Period; and

(d)     To what extent the members of the Class have sustained damages and the proper measure of damages.

219.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for members of the Class to individually redress the wrongs done to them.  Plaintiff is not aware of any difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5 Against Fifth Third and the Individual Defendants

220.    Plaintiff incorporates the foregoing paragraphs by reference.

221.    During the Class Period, Fifth Third and the Individual Defendants disseminated or approved the misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

222.    These Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and other members of the Class in connection with their purchases of Fifth Third common stock.

223.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases of Fifth Third common stock during the Class Period, because, in reliance on the integrity of the market, Plaintiff and other members of the Class paid artificially inflated prices for Fifth Third common stock and experienced losses when the artificial inflation was released from Fifth Third common stock as a result of the leakage and disclosure of information and price declines detailed herein.  Plaintiff and other members of the Class would not have purchased Fifth Third common stock at the prices paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements and material omissions.

224.     By virtue of the foregoing, Fifth Third and the Individual Defendants have each violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against Defendants Carmichael and Tuzun

225.     Plaintiff incorporates the foregoing paragraphs by reference.

226.     Defendants Carmichael and Tuzun acted as controlling persons of Fifth Third within the meaning of §20(a) of the Exchange Act.

227.     By virtue of their high-level positions, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's disclosures, Carmichael and Tuzun had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  Carmichael and Tuzun were provided with, or had unlimited access to copies of, the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

228.     As set forth above, Fifth Third violated §10(b) and Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this complaint.  By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, defendants Carmichael and Tuzun are liable pursuant to §20(a) of the Exchange Act for the §10(b) violations.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from the Company's stock.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.     Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and b(3) of the Federal Rules of Civil Procedure and certifying Lead Plaintiff as Class Representative and Robbins Geller Rudman & Dowd LLP as Class Counsel;

B.      Awarding compensatory damages in favor of Lead Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff reasonable costs and expenses incurred in this action, including attorneys' fees, experts' fees, and other costs and disbursements; and

D.      Awarding such further relief, including any equitable/injunctive relief, as the Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

DATED:  October 8, 2021                 ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                        BRIAN E. COCHRAN (IL Bar # 6329016)


                                              s/ Brian E. Cochran
                                         BRIAN E. COCHRAN

                                        200 South Wacker Drive, 31st Floor
                                        Chicago, IL  60606
                                        Telephone:  312/674-4674
                                        312/674-4676 (fax)
                                        bcochran@rgrdlaw.com

                                        ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                        TOR GRONBORG
                                        LAURIE L. LARGENT
                                        CHRISTOPHER R. KINNON
                                        655 West Broadway, Suite 1900
                                        San Diego, CA  92101
                                        Telephone:  619/231-1058
                                        619/231-7423 (fax)
                                        torg@rgrdlaw.com
                                        llargent@rgrdlaw.com
                                        ckinnon@rgrdlaw.com

- 97 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARK T. MILLKEY
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mmillkey@rgrdlaw.com

Lead Counsel for Lead Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on October 8, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Brian E. Cochran
BRIAN E. COCHRAN

ROBBINS GELLER RUDMAN
  & DOWD LLP
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)

E-mail:  bcochran@rgrdlaw.com

# Mailing Information for a Case 1:20-cv-02176 Heavy & General Laborers' Local 472 & 172 Pension and Annuity Funds et al v. Fifth Third Bancorp et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Brian E. Cochran**
  BCochran@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Anthony Fata**
  afata@caffertyclobes.com

- **Carol V Gilden**
  cgilden@cohenmilstein.com,lhoeksema@cohenmilstein.com,efilings@cohenmilstein.com

- **Tor Gronborg**
  torg@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com,ashmatkova@pomlaw.com,abarbosa@pomlaw.com

- **Christopher R. Kinnon**
  Ckinnon@rgrdlaw.com

- **Marcella Louise Lape**
  marcella.lape@skadden.com,chdocket@skadden.com

- **Laurie Largent**
  LLargent@rgrdlaw.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,tcrockett@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,abarbosa@pomlaw.com

- **Katherine Fletcher Morgan**
  katherine.morgan@skadden.com,chdocket@skadden.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Daniel James Scime**
  daniel.scime@skadden.com,chdocket@skadden.com

- **Elizabeth Anne Simon**
  elizabeth.simon@skadden.com,chdocket@skadden.com

- **Charles F. Smith , Jr**
  cfsmith@skadden.com,chdocket@skadden.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)