# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

HEAVY & GENERAL LABORERS'   )
LOCAL 472 & 172 PENSION AND   )
ANNUITY FUNDS et al., individually   )
and on behalf of all others similarly situated,   )
   )
      Plaintiff,   )
   )      No. 20 C 2176
      v.   )
   )      Judge Sara L. Ellis
FIFTH THIRD BANCORP, GREG D.   )
CARMICHAEL, and TAYFUN TUZUN,   )
   )
      Defendants.   )

## OPINION AND ORDER

An individual shareholder brought this putative securities class action lawsuit on behalf of herself and all others who purchased common stock in Fifth Third Bancorp ("Fifth Third") from November 9, 2016 through March 6, 2020 (the "Class Period"), alleging that Defendants Fifth Third and its officers Greg D. Carmichael and Tayfun Tuzun engaged in federal securities fraud. After the Court appointed putative class member Heavy & General Laborers' Local 472 & 172 Pension and Annuity Funds as Lead Plaintiff, it filed a consolidated complaint, in which it alleged that Defendants Fifth Third, Carmichael, and Tuzun violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), codified at 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. The Court dismissed the consolidated complaint for failure to sufficiently allege scienter. Lead Plaintiff filed an amended consolidated complaint, which Defendants now move to dismiss. Because Lead Plaintiff fails to sufficiently plead false statements or omissions and fails to allege facts that give rise to a strong inference of

scienter on the part of any Defendant, the Court grants Defendants' motion to dismiss with prejudice.

## BACKGROUND[1]

### I.     The Parties

Heavy & General Laborers' Local 472 & 172 Pension and Annuity Funds is based in Newark, New Jersey, and the Court appointed it Lead Plaintiff on June 29, 2020.  Lead Plaintiff purchased shares of Fifth Third common stock during the Class Period.

Fifth Third, headquartered in Cincinnati, provides financial services to corporations, individuals, and non-profits, including an assortment of checking, savings, and money market accounts, wealth management solutions, payments and commerce solutions, insurance services, and credit products such as commercial loans and leases, mortgage loans, credit cards, installment loans, and auto loans.  Fifth Third also operates full-service banking centers and ATMs across Ohio, Kentucky, Indiana, Michigan, Illinois, Florida, Tennessee, West Virginia, Georgia, North Carolina, and South Carolina.

During the Class Period, Carmichael served as Fifth Third's President and Chief Executive Officer.  He also took over as the Chairman of the Board of Directors in January 2018. Likewise, Tuzun served as Fifth Third's Executive Vice President and Chief Financial Officer during the Class Period.

### II.    The Consumer Financial Protection Bureau (the "CFPB") Investigation into Fifth Third's Sales Practices

During a 2015 CFPB investigation, Fifth Third disclosed that bank employees had opened unauthorized credit card accounts.  In November 2016, the CFPB issued a Civil

---

[1] The Court takes the facts in the background section from Lead Plaintiff's amended consolidated complaint and presumes them to be true for the purpose of resolving Defendants' motion to dismiss.  *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).

Investigation Demand ("CID") addressed to Carmichael that notified Fifth Third of an investigation into its sales practices. The CID sought information on sales practices including, "opening an account for any product or service offered by the Company without the knowledge and consent of a consumer," "changing, without the consumer's knowledge and consent, the type of account or service in which the consumer is enrolled," and "engaging in unauthorized transactions on behalf of a consumer." Doc. 75 ¶ 60. Between 2017 and 2019, the CFPB issued five additional CIDs to Fifth Third requesting information on the use of unauthorized accounts and predatory consumer practices.

Fifth Third responded by providing nearly a half-billion data points, thousands of documents, and witness testimony—"an immense effort that necessitated the active involvement of both Carmichael and Tuzan." *Id.* ¶ 61. In 2017, Fifth Third admitted to the CFPB that it had opened consumer financial products without authorization every year from 2010 to 2017. As part of the investigation, Fifth Third admitted to: (1) knowing, by at least 2010, that employees had opened unauthorized accounts; and (2) detecting, from 2010 to 2017, around 1,100 unauthorized accounts; and identifying (during the course of the CFPB investigation) an additional 800 consumers entitled to relief for unauthorized accounts. Fifth Third also admitted to almost 400 instances of (1) changing consumer account-types without consent; (2) falsely representing terms and conditions to induce consumers to accept, change, or enroll in products or services; (3) using consumer credit reports without an authorized purpose; or (4) falsifying consumer-contact information and assigning personal-identification numbers without authorization to further unauthorized customer enrollment. Fifth Third further admitted unauthorized customer enrollment in services and products, including overdraft protection and prepaid debit cards, in the years 2015 and 2016.

### III.    The CFPB Enforcement Action

In 2020, the CFPB filed an enforcement action against Fifth Third, seeking to stop ongoing violations of consumer protection statutes.  In the complaint, the CFPB alleged that "[e]ven after learning of unauthorized Fifth Third consumer-financial products by 2008, Fifth Third failed to change its sales practices to avoid consumer harm." *Id.* ¶ 63.  Instead, Fifth Third: "continued to foster sales practices that were likely to cause unauthorized products and services;" "failed to take steps to determine and address a root cause of unauthorized accounts, which was consistently said by employees to be intense sales pressure;" and "failed to close known loopholes in its collection of proof of consumer authorization, thereby making it easy for employees to open accounts without" valid customer approval.  *Id.*  The complaint alleged that Fifth Third used a "cross-sell" strategy to increase the total number of products and services to existing customers and "an incentive-compensation program that rewarded managers and their subordinate employees for selling new products and services to existing customers."  *Id.* ¶ 86. The CFPB complaint also stated that, by 2010 at the latest, Fifth Third "was aware that employees were opening" unauthorized customer products and services "in order to achieve sales goals or obtain incentive rewards."  *Id.*  The CFPB also claimed that Fifth Third opened deposit and credit card accounts without customers' knowledge or consent and imposed "aggressive" sales goals for its employees to enroll consumers in its online banking services.  *Id.* ¶ 87.

The CFPB asserted that by 2009, Fifth Third noticed an increase in unauthorized credit cards issued to consumers.  It also stated that Fifth Third knew of the practice of opening lines of credit on consumers' deposit accounts without knowledge or consent by June 2010, "when senior management was notified of an increase in the number of calls by employees to the internal whistleblower hotline regarding the unauthorized opening of . . . lines of credit."  *Id.* ¶ 88.  The

4

complaint further alleged that, even after learning of the unauthorized consumer-financial products and services, Fifth Third continued to push sales practices that likely would cause the opening of unauthorized services or products.

CFPB filed an amended pleading in the enforcement action detailing additional allegations against Fifth Third, including that Fifth Third knew that its admissions "understate the real number of unauthorized account openings and other improper sales conduct" and that there are "hundreds of thousands" of accounts "that bear indicia of non-authorization." *Id.* ¶ 94. The amended complaint states: "Fifth Third admitted in 2017 that it had opened consumer-financial products without consumer authorization during each year from 2010 to 2017" and that Fifth Third disclosed unauthorized credit card accounts during the CFPB's investigation in 2015. *Id.* The amended complaint alleges that, by at least 2010, senior management had notice of unauthorized lines of credit from an increase in employee calls to a whistleblower hotline. *Id.* ¶ 95. Furthermore, according to the amended complaint, members of Fifth Third's senior management knew of internal data that would have been useful to identify unauthorized accounts "for at least years 2010 to 2021," but "chose not to attempt to identify unauthorized consumer-financial products" beyond those previously disclosed "because greater identification might cause Fifth Third reputational and financial harm." *Id.* The amended complaint also discusses internal correspondence from executives within Carmichael's direct line of report that details illicit sales practices and states that such practices were widely known. *Id.*

According to Lead Plaintiff, the CFPB also concluded that Fifth Third failed to take remedial action and created obstacles to identifying the unauthorized accounts, such as relying on customers to report the fraud, recording the conduct as improper only if it was vetted through a lengthy process, and knowing that employees feared retaliation for reporting. *Id.* ¶ 41. Fifth

Third has acknowledged that certain indicia—including minimum funding, fake email addresses, statement suppression and new-account funding from an existing account, all of which Lead Plaintiff alleges occurred here—could indicate a potentially unauthorized deposit.

## IV. Revelations Concerning Fifth Third's Sales Practices as a Result of the CFPB Investigation

In conjunction with a venue dispute in the CFPB lawsuit, the parties publicly disclosed portions of Fifth Third documents and witness testimony in redacted form. For example, the CFPB highlighted a June 2010 internal email from an individual the CFPB identified as Fifth Third's "head of retail banking" that the Chicago "leadership team have a reputation of less than desirable sales management practices" and that "[b]ullying and threats are often used to achieve results." *Id.* ¶ 98. The email further stated that "there have been consistent problems around unauthorized credit card sales in Chicago." *Id.* An additional email from a former regional manager of Fifth Third stated that "[Fifth Third] had a fraud issue within the Center and upon investigation discovered that [redacted name] had knowledge and allowed other employees to use each other's terminals and IDs to conduct transactions (in some cases for themselves)." *Id.* ¶ 99. In a resignation letter that the CFPB identified as sent to "bank management," a Fifth Third employee discussed "witnessing unethical and predatory banking practices." *Id.* ¶ 100. The banker specifically told Fifth Third's management, "I would consider many of the sales practices and tactics used [at Fifth Third] to be predatory. Many of these sales practices were brought to us by the regional and market management. They are openly discussed on our conference calls." *Id.* The letter also identified "[p]olicies such as 'everyone should have 2-3 checking accounts', or people 'upgrading' (switching existing MasterCard customers to Visa rewards) credit cards for customer[s] without telling them they are applying for new credit" and noted that Fifth Third was "becoming a 'predatory' institution." *Id.*

6

Further, the CFPB summarized deposition testimony as showing that Fifth Third internally investigated cases of what it called "gaming," which includes "opening unauthorized accounts but is broadly defined as the 'manipulation or concealment of accounts or activities with intent to deceive either customer or bank for personal gain,' including 'goal attainment, financial gain, retention of position, etc.'"  *Id.* ¶ 101.  The CFPB also identified that "Fifth Third admits that from 2010 to 2016 it opened more than 1,000 accounts without . . . authorization," further commenting that "[t]here is substantial evidence that Fifth Third's admission understates its problem, and Fifth Third continued to drive sales without implementing a systematic way to detect unauthorized accounts."  *Id.*  As with the documents filed in conjunction with the venue dispute, the parties also withheld deponents' names.

Former Fifth Third employees also described unethical practices driven by sales-goal pressure.  According to a former Fifth Third employee who worked from July 2001 to July 2020 at branches in Illinois, as late as 2020, Fifth Third's regional bank managers used financial incentives to entice branch managers to meet sales goals for credit card applications.  Another unidentified former employee also asserted that employees who did not reach their goals were under threat of losing their jobs and that employees knew that the only way to meet new account goals was to open fake accounts.  This former employee also reported on unethical practices linked to opening unauthorized credit cards.

## V.      Fifth Third's Stock Sales and Acquisition of MB Financial

In March 2019, Fifth Third completed a $4.7 billion acquisition of MB Financial, a Chicago-based company.  MB Financial shareholders approved the acquisition in part based on Fifth Third's Registration Statement, which highlighted the historical performance of its common stock.  Fifth Third had to use that common stock to fund 90% of the $4.7 billion

acquisition price because Fifth Third did not have sufficient capital to complete the acquisition with cash. As such, Fifth Third issued approximately 131 million new shares of common stock that, as of March 22, 2019, traded at the price of $24.62 per share.

In that same year, in September, Fifth Third sold 10 million preferred shares at $25.00 per share. The prospectus for the offering incorporated risk factors from Fifth Third's FY 2018 Form 10-K and noted that Fifth Third would use the proceeds from the offering for general corporate purposes, including repurchases of shares of its common stock. As a result of this offering, Fifth Third raised $242 million.

Fifth Third disclosed the CFPB investigation and anticipated lawsuit in its FY 2019 Form 10-K on March 2, 2020. Fifth Third's stock price dropped from $22.20 on March 6 to $18.30 on March 9, a $3.90 per share decline. Although the market was declining on March 9, Fifth Third's stock price fell more than the market as a whole and the stock price of peer banks. Fifth Third's stock continued to decline, losing 28% per share between March 9 and March 12.

## VI. Carmichael and Tuzun's Incentive Compensation and Stock Sales

According to the 2017 Definitive Proxy Statement, Fifth Third's executive compensation structure used pay-for-performance incentive compensation, with stock price growth, performance relatives to peers, and a risk performance assessment the key components in determining executives' incentive compensation.

The incentive compensation Carmichael received for 2016, 2017, and 2018 exceeded his annual salary. In total, during the Class Period, Carmichael collected over $23.4 million in incentive-based compensation, representing more than 88% of his total compensation. As of March 2020, Fifth Third cut Carmichael's incentive compensation by $2.4 million when compared to the $9,849,976 he received in incentive compensation and stock awards in 2019.

The incentive compensation Tuzun received for 2016, 2017, and 2018 also exceeded his annual salary. During the Class Period, Tuzun collected a total of $6.2 million in incentive-based compensation, representing more than 79% of his total compensation.

During the Class Period, Carmichael sold more than $5.8 million of his Fifth Third stock, 26% in total. As reflected in the chart below, Carmichael sold his Fifth Third stock at prices that were 22% to 104% higher than where the stock price traded following the March 2020 disclosure of the CFPB investigation and lawsuit.

| Date | Number of Shares | Share Price | Total Proceeds |
|---|---|---|---|
| Nov. 10, 2016 | 17,689 | $23.45 | $414,807 |
| Nov. 16, 2016 | 36,821 | $25.11 | $924,575 |
| Feb. 13, 2018 | 87,613 | $32.37 | $2,836,033 |
| Oct. 29, 2019 | 55,251 | $29.59 | $1,634,877 |
| **Total** | **197,374** | | **$5,810,292** |

*Id.* ¶ 191. Over the eighteen months before the start of the Class Period and in the six months following the end of the Class Period, however, Carmichael did not sell any of his Fifth Third stock.

## VII.    Defendants' Allegedly False and Misleading Statements and Omissions

During the Class Period, which began on November 9, 2016, when Fifth Third filed its Form 10-Q quarterly report with the SEC, Lead Plaintiff alleges that Defendants made false and misleading statements and material omissions concerning Fifth Third's: (1) business practices and risk management systems; (2) Code of Business Conduct and Ethics; (3) product cross-selling and consumer business; (4) employee incentive compensation; and (5) risk disclosures.

A. **Fifth Third's Risk Management Practices**

Lead Plaintiff first asserts that Defendants made misleading statements and material

omissions in Fifth Third's Form 10-Qs and Form 10-Ks concerning its purported risk practices

for managing regulatory compliance risk.  In its 3Q 2016 Form 10-Q, Fifth Third stated:

> Regulatory compliance risk is defined as the risk of legal or
> regulatory sanctions, financial loss, or damage to reputation as a
> result of noncompliance with (i) applicable laws, regulations, rules
> and other regulatory requirements (including but not limited to the
> risk of consumers experiencing economic loss or other legal harm
> as a result of noncompliance with consumer protection laws,
> regulations and requirements); (ii) . . . codes of conduct; and
> (iii) principles of integrity and fair dealing applicable to Fifth
> Third's activities and functions.

*Id.* ¶ 106.  In that same form, Fifth Third listed its risk management practices as

follows:

- Fifth Third focuses on managing regulatory compliance risk in
  accordance with the Bancorp's integrated risk management
  framework, which ensures consistent processes for identifying,
  assessing, managing, monitoring, and reporting risks.

- The current regulatory environment, including heightened
  regulatory expectations and material changes in laws and
  regulations, increases compliance risk.

- To mitigate compliance risk, Compliance Risk Management
  provides independent oversight to ensure consistency and
  sufficiency in the execution of the program, and ensures that lines
  of business, regions and support functions are adequately
  identifying, assessing and monitoring compliance risks and
  adopting proper mitigation strategies. . . .  Additionally,
  Compliance Risk Management implements key compliance
  programs and processes including but not limited to, risk
  assessments, key risk indicators, issues tracking, regulatory
  compliance testing and monitoring . . .

- Compliance Risk Management provides independent oversight to
  ensure that an enterprise-wide framework, including processes and
  procedures, are in place to comply with applicable laws,
  regulations, rules and other regulatory requirements; internal

10

> policies and procedures; and principles of integrity and fair dealing
> applicable to the Bancorp's activities and functions. The Bancorp
> focuses on managing regulatory compliance risk in accordance
> with the Bancorp's integrated risk management framework, which
> ensures consistent processes for identifying, assessing, managing,
> monitoring and reporting risks.

*Id.* ¶ 107.

On February 24, 2017, Fifth Third filed its FY 2016 Form 10-K, signed by Carmichael

and Tuzun. The form contained the same statements about the bank's regulatory compliance risk

management practices as in the 3Q 2016 Form 10-Q. The Company's FY 2017 and 2018 Form

10-Ks also contained nearly identical statements about Fifth Third's purported regulatory

compliance risk management practices.

Fifth Third's FY 2017 Form 10-K further identified the "core principles of risk

management that are used to ensure [Fifth Third] is operating in a safe and sound manner." *Id.*

¶ 109. The form identified these "core principles" of risk management as:

- Ensur[ing] Fifth Third's products and services are designed,
  delivered and maintained to provide value and benefit to its
  customers and to Fifth Third, and that potential opportunities
  remain aligned to the core customer base. The Bancorp does not
  offer products or services that are not appropriate for its customers

- Act[ing] with integrity in all activities.

- Focus[ing] on providing operational excellence by providing
  reliable, accurate and efficient services to meet customer's needs.

- Conduct[ing] business in compliance with all applicable laws,
  rules and regulations and in alignment with internal policies and
  procedures.

*Id.*.

Lead Plaintiff alleges that these statements were materially false and misleading and

omitted material facts because Defendants failed to disclose: (1) the unauthorized accounts and

sales practices and the CFPB investigation, "which had been ongoing since at least 2008 and necessitated the intervention of corporate headquarters (including the involvement of the Individual Defendants)"; (2) senior management's failure to remediate these illegal sales practices; (3) the CFPB investigation and "Defendants' conscious failure to remediate" the sales practices "since November 2016;" (4) Fifth Third's admission of the opening of unauthorized accounts during the CFPB investigation in 2015 and 2017; and (5) the likely CFPB enforcement action and "extreme regulatory, legal, reputational and financial peril" to Fifth Third because of the investigation, admissions, and failure to remediate. *Id.* ¶ 112.

**B.  Fifth Third's Code of Business Conduct and Ethics**

As of 2016, Fifth Third maintained a Code of Business Conduct and Ethics, which it amended several times during the Class Period and filed with the SEC on Current Report Form 8-Ks so that investors were informed of its practices. The Code applied to all officers, directors, and employees of Fifth Third, including but not limited to Fifth Third's principal executive officer (Carmichael), principal financial officer (Tuzun), principal accounting officer, and controller.

The purported misleading statements in the 2016 Code, filed with the SEC on Current Report Form 8-K on March 16, 2016, were, in pertinent part:

- We must all deal honestly, ethically, fairly and in good faith with Fifth Third's customers, shareholders, employees, suppliers, regulators, business partners, competitors and others. We may not take unfair advantage of anyone through manipulation, concealment, abuse of privileged or confidential information, misrepresentation, fraudulent behavior or any other unfair dealing practice.

- Employees, customers, shareholders and communities must know that Fifth Third conducts all activities with the highest standards and unquestioned integrity. They have to know by our actions that

they can trust us, and we have to show by our actions that we provide something different; something of value.

- Our Purpose is to listen to customers and inspire them with smart financial solutions that continually improve their lives and the well-being of our communities. Relationships are at the heart of our Purpose, and what could be more personal than that? This is not a mere collection of words, but rather a blueprint for how we are to conduct ourselves. We ask questions. We listen. We inspire. We focus on continual improvement – for customers, for communities and for ourselves.

- Employees are expected and required to take appropriate steps to address issues that subject the bank to risk of potential regulatory, reputational or legal harm.

*Id.* ¶ 114.

Fifth Third adopted an amended and restated Code on September 19, 2017, which it filed as an exhibit to the 2017 Form 8-K filed with the SEC. The 2017 Code included a statement from Carmichael, noting, "Doing the right thing is central to our ability to achieve our Vision to be the One Bank people most value and trust. It's a commitment that inspires us to create a great customer experience . . . . It is a commitment that forms the bedrock of Fifth Third's reputation as a respected corporate citizen. And it is a commitment that begins with each Fifth Third employee." *Id.* ¶ 115. The alleged misleading statements in the 2017 Code were:

- Fifth Third believes that fair and honest business practices are essential to keeping our customer at the center of everything we do. We should always act in the best interest of our customers. Unethical business practices, such as incentive gaming, falsifying documents or inflating performance results, are strictly prohibited. You are prohibited from manipulating records, opening accounts without customer authorization, offering customers unnecessary products and falsifying records or applications in order to benefit yourself or other employees of Fifth Third.

- Fifth Third is committed to providing customers with financial products and services in ways that avoid the use of any practices that could be deemed predatory, unfair, deceptive or abusive.

13

- Fifth Third Bancorp is committed to minimizing the impact of internal and external fraud to both Fifth Third and our customers. Every employee at every level of the Bancorp is accountable and expected to do their part to protect Fifth Third and our customers from fraudulent activity. There is zero tolerance for internal fraud within Fifth Third's organization and internal fraudulent activity must be referred to Bank Protection when suspected. Failure to report fraudulent activity exposes Fifth Third to regulatory and compliance violations and could lead to significant financial penalties and additional fraud losses.

- Employees must not engage in deceptive or dishonest business practices, such as misrepresenting products or offering customers inaccurate or insufficient information about products in order to benefit personally.

- A fundamental part of our commitment to integrity is adhering to the letter and the spirit of applicable laws, regulations and Bancorp policies. All employees are required to fully comply with all applicable laws, rules and regulations, as well as with all Fifth Third policies and procedures.

*Id*. ¶ 115.

In September 2018, Fifth Third amended the Code again, which it filed with its 2018 and 2019 Current Report Form 8-Ks. The 2018 Code included the same message from Carmichael as found in the 2017 Code and further stated:

- Fifth Third believes that fair and honest business practices are essential to keeping our customer at the center of everything we do. We should always act in the best interest of our customers.

- Unethical business practices are strictly prohibited. Examples of such activities include, but are not limited to:

  - Incentive gaming
  - Falsifying documents or inflating performance results
  - Manipulating records
  - Opening bogus or fake accounts
  - Opening accounts or selling products without customer authorization
  - Offering customers unnecessary products
  - Falsifying records or applications in order to benefit yourself or other employees of Fifth Third

14

- Fifth Third is committed to providing customers with financial products and services in ways that avoid the use of any practices that could be deemed predatory, unfair, deceptive or abusive.

- Fifth Third Bancorp is committed to minimizing the impact of internal and external fraud to both Fifth Third and our customers. Every employee at every level of the Bancorp is accountable and expected to do [their] part to protect Fifth Third and our customers from fraudulent activity. There is zero tolerance for internal fraud within Fifth Third's organization and internal fraud activity must be referred to Bank Protection when suspected. Failure to report fraudulent activity exposes Fifth Third to regulatory and compliance violations and could lead to significant financial penalties and additional fraud losses.

*Id.* ¶ 116.

Lead Plaintiff alleges that these statements were false and misleading and omitted material facts because the assertedly prohibited unethical practices were already taking place at Fifth Third and the CFPB was already investigating the same. Lead Plaintiff also alleges that these statements were false because Defendants failed to disclose the same five factors enumerated for the business practices and risk management statements. *Compare id.* ¶ 112 *with* ¶ 118.

### C. Product Cross-Selling, Consumer Business, and Customer Relations

Lead Plaintiff also asserts that Defendants made false and misleading statements concerning Fifth Third's product cross-selling, consumer business, and customer relations. Fifth Third's FY 2016, 2017, and 2018 Form 10-Ks, all signed by Carmichael and Tuzun, stated that Fifth Third was "taking advantage of cross-sell opportunities" generated by synergies formed by its business segments. *Id.* ¶ 119–121.

On December 7, 2016, Carmichael and Tuzun presented at the Goldman Sachs US Financial Services Conference. Carmichael spoke to investors regarding Fifth Third's consumer

growth strategy, stating that Fifth Third was "looking for a more balanced growth between our consumer and our commercial businesses" and "[t]o that end, we are focused on growing our credit card and unsecured personal lending businesses. Both of these businesses have attractive return profiles and growth potential." *Id.* ¶ 122.

On January 24, 2017, Fifth Third hosted an earnings conference call to discuss the Company's 4Q 2017 financial results, in which Carmichael talked about how Fifth Third's consumer growth strategy of growing credit cards and consumer loans would "allow us to achieve a better balance between commercial and consumer loan growth." *Id.* ¶ 123. During the call, Carmichael commented:

> [W]e have a great business model. We have the right businesses that we are in, right, and we do a fantastic job of going to the market and our people do a fantastic job of going to the market really as one bank – Fifth Third.
>
> And it is really about harvesting the full relationships of the customer relationships on the consumer side, on the commercial side. It is about providing the right products and services to our customers and really being the one bank our customers most value and trust. We have worked hard to put that model in place across our franchise. So we feel very good about that.
>
> And really our strong brand and our footprint is extremely important to us and we are going to continue to focus on our brand equity in the marketplace. But when you look at it across the board we have strong earnings capacity, we have a great team in place, we have invested heavily in the right products. We made some strategic moves recently that position us well for the future. And I think we will have the products, the services and the team to deliver on that in the market.

*Id.*

On March 7, 2017, Carmichael and Tuzun presented at the RBC Capital Markets Financial Institutions Conference, where Carmichael again discussed with analysts and investors Fifth Third's consumer growth strategy, stating, "[g]rowth in credit cards and other consumer

16

loans should allow us to achieve a better balance between commercial and consumer loan growth." *Id.* ¶ 124. He also stated that Fifth Third "takes pride in" its ranking "as the second most trusted company for retail banking," noting that Fifth Third "believe[s] in putting the customer at the center of everything we do" and that "[i]n addition to being a trusted partner, we have received high customer satisfaction scores and our mobile offerings have received a number of accolades." *Id.*

On December 7, 2017, Fifth Third hosted an Investor Day for analysts and investors. During the conference, Carmichael discussed the customer experience, stating that "[i]t starts with the financial needs analysis, and we dive deep into understanding the needs of that customer. . . . Once again, we can't be a great bank if we don't focus on taking care of the customer, and we measure this very carefully. We got to make sure that we have products that are seamless, convenient, fast, that they're tailored to meet the customer needs*." Id.* ¶ 125. Carmichael also emphasized that "[v]alue and trust is extremely important." *Id.* During that same call, Philip McHugh, a Fifth Third executive vice president, emphasized the bank's customer-focus for sales, and Frank R. Forrest, Fifth Third's Chief Risk Officer, discussed at length the Company's risk management practices. He stated:

- We have enhanced risk management programs and processes across the firm. And through all these actions, we are now achieving strong and consistent results, and we are exceptionally well positioned to perform through the next cycle.

- [W]e are managing the risk across the company today exceptionally well.

- We've improved expertise in the most significant areas of risk that face our industry and our company. That includes . . . customer practices. . . .

- I'm now going to talk a little bit about culture and how we manage conduct risk. We all know that conduct risk, ethics, how we

handle our customer relationships, how we treat our employees, it's all been headline risk. We've read a lot about it. Conduct risk at Fifth Third Bank is well managed, and it's in alignment with our core values. It is foundational in everything we do to have a strong risk culture and a One Bank strategy that Greg just covered. We have a corporate responsibility and reputation office that provides oversight in governance of key areas that drive our culture, and that includes ethics and diversity and community commitment and safeguarding the reputation of the company, which is one of my primary responsibilities. All of these areas are critical elements of our company's culture, and we closely monitor these activities and report them to the Board and to management and to our regulators.

- The last consumer portfolio I want to talk briefly about is card. It's $2.2 billion today. It's 6% of our overall consumer portfolio. But we have a strategy that you'll hear about to grow this portfolio within our appetite with a measured and a managed approach. We've been actually recruiting industry experts recently to help us grow the business within our defined risk profile, and we see some opportunity here, and we are advancing the use of analytics to improve our credit decisioning on the card business.

*Id.* ¶¶ 126–127. Carmichael and Tuzun participated on the call and did not correct these statements by McHugh and Forrest.

Fifth Third hosted an earnings conference call with investors on October 23, 2018, which Carmichael and Tuzun attended, to discuss its 3Q 2018 financial results. During the call, Carmichael told investors that "[o]ur third priority is to pursue profitable organic growth opportunities in our key businesses. In addition to our branch network optimization initiative to drive improved household, deposit, and revenue growth across our retail footprint, we're also prioritizing organic growth opportunities across all areas of the franchise.*" Id.* ¶ 129. On January 22, 2019, Fifth Third again hosted an earnings conference call with investors to discuss its 4Q and 2018 financial results, with Carmichael stating that "we continue to invest in organic growth opportunities, including the previously communicated branch network optimization." *Id.* ¶ 130.

Lead Plaintiff alleges that these statements were false and misleading and omitted material facts because Defendants failed to disclose the same five factors enumerated for the business practices statements, risk management statements, and the Code. *Compare id.* ¶¶ 112, 118, *with* ¶ 131.

> **D.** **Incentive Compensation**

Lead Plaintiff also asserts that Defendants made false and misleading statements concerning Fifth Third's incentive compensation. On March 9, 2017, Fifth Third filed a Proxy Statement with the SEC, reviewed by Carmichael and Tuzun, that stated:

- The Company endeavors to attract and retain the best people in the financial services industry and motivate them to fulfill the Company's Vision of becoming the One Bank that people most value and trust. We intend to accomplish this in the way that we consider our shareholders' long-term interests, by establishing compensation programs that reward our people for delivering products our customers highly value, and avoiding excessive risk. Our compensation philosophy comprises the following guiding principles:

  - Manage risk effectively within incentive programs designed to pay for performance.
  - Align compensation with long-term shareholder interests.
  - Provide strong oversight of executive pay.
  - Conduct recurring processes that ensure strategic and fiscal soundness along with balanced risk taking.

- We incorporate formulaic and discretionary risk-balancing mechanisms, which outline specific metrics for modifying payouts to discourage unnecessary or imprudent risk-taking actions.

- In December 2015, the Committee, in conjunction with the Risk and Compliance Committee, reviewed our executive and other incentive programs. Based on the provisions and actions above, the Committee concluded that their design and/or metrics do not encourage unnecessary and/or inappropriate risk taking.

*Id.* ¶ 132.

The 2018 Proxy Statement, which Carmichael and Tuzun again reviewed, discussed Fifth

Third's compensation plan in similar terms, stating in part:

- At Fifth Third, we endeavor to attract and retain the best people and motivate them to fulfill the Company's Vision of becoming the One Bank that people most value and trust. We intend to accomplish this in the way that we consider our shareholders' long-term interests, by establishing compensation programs that reward our people for delivering products and services our customers highly value, and for avoiding excessive risk.

- We believe it is critical to bring a multi-faceted strategy toward mitigating risk in incentive plans. We incorporate formulaic and discretionary risk-balancing mechanisms, which include specific metrics for modifying payouts to discourage taking unnecessary or imprudent risks.

- In February 2017, the Committee, in conjunction with the Risk and Compliance Committee, reviewed our executive and other incentive programs. Based on the provisions and actions above, the Committee concluded that their design and/or metrics do not encourage taking unnecessary or inappropriate risk.

*Id.* ¶ 133.

The 2019 Proxy Statement, reviewed by Carmichael and Tuzun, contained similar

information on Fifth Third's compensation plan, stating:

- Our compensation methodology and structure centers on our compensation philosophy, which comprises the following guiding principles:

  - Manage risk effectively within incentive programs designed to pay for performance.
  - Align compensation with long-term shareholder interests.
  - Provide strong oversight of executive compensation.
  - Conduct recurring processes that ensure strategic and fiscal soundness along with balanced risk taking.

- We believe it is critical to bring a multi-faceted strategy toward mitigating risk in our compensation programs and incentive plans. We incorporate formulaic and discretionary risk-balancing

mechanisms, which include specific metrics for modifying payouts to discourage taking unnecessary or imprudent risks.

- In December 2018, the Committee met jointly with the Risk and Compliance Committee to review our executive and other incentive programs. Based in part on the provisions and actions above, the Committee concluded that the design and/or metrics of such programs do not encourage taking unnecessary or inappropriate risk.

*Id.* ¶ 134.

Lead Plaintiff alleges that these statements were false and misleading and omitted material facts because Defendants failed to disclose incentive compensation programs that rewarded managers and employees for selling new products and services to existing customers, and that those incentive plans were not properly implemented and monitored and therefore created incentives for misconduct. Lead Plaintiff also alleges that these statements were false because Defendants failed to disclose the same five factors as the other categories of alleged false statement. *Compare id.* ¶¶ 112, 118, 131, *with* ¶ 135.

E. **Fifth Third's Risk Disclosures**

Lead Plaintiff also asserts that Defendants made misleading statements and material omissions in its Form 10-Qs and 10-Ks regarding the risks Fifth Third faced. Fifth Third filed its 3Q 2016 Form 10-Q, which Carmichael and Tuzun signed, shortly after it received the CFPB's CID. The 3Q 2016 Form 10-Q stated that there "have been no material changes made during the third quarter of 2016 to any of the risk factors as previously disclosed in the Bancorp's most recent annual report and subsequent periodic reports as filed with the SEC*." Id.* ¶ 136. Fifth Third had most recently listed its risk factors in its FY 2015 Form 10-K (filed February 25, 2016) and 2Q 2016 Form 10-Q (filed August 5, 2016). These forms included the following language with respect to risk factors:

21

- Fifth Third's actual or alleged conduct in activities, such as lending practices, data security, corporate governance and acquisitions, may result in negative public opinion and may damage Fifth Third's reputation. Actions taken by government regulators and community organizations may also damage Fifth Third's reputation.

- Fifth Third and/or its affiliates are or may become involved from time to time in information-gathering requests, reviews, investigations and proceedings (both formal and informal) by governmental regulatory agencies and law enforcement authorities, as well as self-regulatory agencies, regarding their respective businesses.

- Compliance with the rules and policies adopted by the CFPB may limit the products Fifth Third may permissibly offer to customers, or limit the terms on which those products may be issued, or may adversely affect Fifth Third's ability to conduct its business as previously conducted.

- Like other large financial institutions and companies, Fifth Third is also subject to risk from potential employee misconduct, including noncompliance with policies and improper use or disclosure of confidential information.

- [T]he CFPB . . . [has] the authority to compel or restrict certain actions by Fifth Third and its banking subsidiary, Fifth Third Bank. . . . In the wake of the most recent global financial crisis, Fifth Third and other financial institutions more generally have been subjected to increased scrutiny from government authorities, including bank regulatory authorities, stemming from broader systemic regulatory concerns, including with respect to . . . consumer compliance and other prudential matters and efforts to ensure that financial institutions take steps to improve their risk management and prevent future crises.

- [G]overnment authorities, including the bank regulatory agencies, are also pursuing aggressive enforcement actions with respect to compliance and other legal matters involving financial activities, which heightens the risks associated with actual and perceived compliance failures.

*Id*. ¶ 136.

Fifth Third made substantially similar representations in its 2016 Form 10-K (filed February 24, 2017), 2017 Form 10-K (filed February 28, 2018), and 2018 Form 10-K (filed March 1, 2019), all of which Carmichael and Tuzun signed.

Lead Plaintiff alleges that these statements were false and misleading and omitted material facts because Defendants discussed future, potential risks while failing to disclose material adverse facts that were known and had already occurred. As an example, Lead Plaintiff alleges that Defendants disclosed risk from potential employee misconduct, while failing to disclose that Defendants: (1) "had been forced to intervene in the Bank's Chicago operations as a result of widespread consumer abuses;" (2) "had known about more than 1,000 unauthorized account openings since 2010;" (3) admitted to illegal business practices in 2015 and 2017; and (4) knew the CFPB was investigating these and other issues. *Id.* ¶ 139. Lead Plaintiff also alleges that these statements were false because Defendants failed to disclose the same five factors as for the other categories of alleged false statements. *Compare id.* ¶¶ 112, 118, 131, 135 *with* ¶ 138.

## VIII.   Additional Scienter Allegations

Lead Plaintiffs allege that scienter may be inferred from Carmichael and Tuzun's roles at Fifth Third. Carmichael was COO from 2006 to 2015, Bank President in 2012, and CEO in 2015. Carmichael joined the Board in 2015 and became Chairman of the Board in 2018. As COO, Carmichael was responsible for Fifth Third's "risk environment and growth, customer service levels, . . . and promotion of core values of accountability." *Id.* ¶ 156. As CEO, Carmichael was similarly responsible for, among other things, Fifth Third's risk environment and promoting core values. Lead Plaintiffs allege that Fifth Third "held [Carmichael] out to investors as the person in charge of promoting fair and honest business practices in the Bank's

consumer business," citing his introductory messages in the 2017, 2018, and 2019 Codes that stated "[d]oing the right thing is central to our ability to achieve our Vision to be the One Bank people most value and trust." *Id.* ¶ 158. Carmichael also informed investors in conference calls during the Class Period that his focus was on growing Fifth Third's credit card business, providing the right products and services, and being a bank that consumers value and trust. Carmichael was part of the Enterprise Risk Management Committee of the Board, "to which Defendants told investors the Bank reported and escalated all compliance issues and suspicious activity by its employees." *Id.* ¶ 159. Tuzun held a series of roles including: Senior Vice President and Assistant Treasurer (2010); Treasurer (2011-2013); and CFO (2013 to 2010). As CFO, Tuzun was responsible for, among other things, Fifth Third's risk management and compliance and promotion of core values of accountability and integrity. Lead Plaintiff cites Fifth Third's 10-K and 10-Q forms for the statement that the bank reported and escalated compliance issues to senior management and the Board. Carmichael and Tuzun's annual incentive compensation was "set in reference to risk management and compliance goals and fealty to the Bank's purported 'core values' of integrity and accountability." *Id.* ¶ 160. Both Carmichael and Tuzun signed the 2017 10-K, "which told investors that the Bank's 'core' operational 'principles' included, among other purported core business practices, 'not offer[ing] products or services that are not appropriate for [Fifth Third's] customers." *Id.*

Lead Plaintiff also alleges that scienter can be inferred from Carmichael and Tuzun's roles in investigating employee misconduct. Carmichael was COO, leading Fifth Third's Retail Bank and affiliate offices. "[A]s early as 2010," Carmichael had a role in "responding internally to widespread employee misconduct at the Bank." *Id.* ¶ 161. Lead Plaintiff cites a June 2010

internal email from "Fifth Third's head of retail banking,"[2] acknowledging problems at the Chicago office including "less than desirable sales management practices," bullying and threats, and "consistent problems around unauthorized credit card sales." *Id.* The CFPB identifies Carmichael as overseeing Fifth Third's retail banking, data maintenance and use, and sales and investigative practices in 2010. Tuzun was Assistant Treasurer in 2010, involved in gathering, reporting, and reviewing financial results from Chicago offices, and "thus, he would have likely been apprised of the undisclosed illicit sales scandal." *Id.* ¶ 162. The CFPB concluded that by June 2010 senior management had been notified of an increase in internal whistleblower hotline calls about unauthorized lines of credit and that the bank, by 2010, was aware that employees were opening unauthorized consumer products to achieve sales goals or incentives. The CFPB amended complaint alleges that senior management were aware of data that could have identified unauthorized accounts (for at least years 2010 to 2021) but chose not to identify additional accounts to avoid reputational and financial harm.

Lead Plaintiff further alleges that scienter can be inferred from Carmichael and Tuzun's roles in responding to the CFPB's investigation. The 2016 to 2019 CIDs were addressed to Carmichael personally and informed him of the specific sales practices at issue. Fifth Third produced "a half-billion data points, thousands of documents, and extensive witness testimony" in response to the CIDs. *Id.* ¶ 163. Fifth Third responded to the investigation by admitting, in 2017, that it had opened unauthorized consumer products every year from 2010 to 2017, which, Lead Plaintiff alleges, "confirms that the Individual Defendants knew about the Bank's unauthorized consumer-financial products problem before and during the class period." *Id.* ¶ 164. Fifth Third also admitted that it: (1) received hundreds of customer complaints about

---

[2] Lead Plaintiff does not allege that Carmichael was this "head of retail banking" or that he received this email.

illicit sales practices; (2) knew contemporaneously that its employees opened more than 1,000 unauthorized accounts from 2010 to 2016 (the CFPB investigation found that number to be substantially understated); (3) knew of more than 400 instances of misuse of email addresses to facilitate sales of unauthorized products; and (4) enrolled customers in overdraft protection without their consent in 2015 and 2016. In 2015, Fifth Third disclosed unauthorized credit card accounts to the CFPB. Lead Plaintiff alleges "it is highly implausible that Carmichael – responsible for overseeing the Bank's regulatory response and broader risk management activities at the time – was not involved in Fifth Third's written admissions of misconduct to the CFPB," and that Tuzun, as CFO, would almost certainly have known of the admissions or was directly involved. *Id.* ¶ 166.

Lead Plaintiff also alleges that scienter can be inferred from Fifth Third's public statements throughout the Class Period, which included risk management statements in Form 10-Qs and 10-Ks explaining that compliance issues were escalated to senior management and the Board, as well as Carmichael and Tuzun's certifications of the Forms 10-K and 10-Q that they had evaluated the Bank's risk management processes and had disclosed any material weakness therein or any fraud "that involves management or other employees who have a significant role in [Fifth Third's] internal control over financial reporting." *Id.* ¶ 172. Lead Plaintiff further alleges that Fifth Third's Code, filed with the SEC, discussing reporting and compliance creates an inference of scienter, especially because Fifth Third added a prohibition on "[o]pening bogus or fake accounts" in the 2019 iteration and did not disclose that it had already admitted to the CFPB that it had opened unauthorized accounts. *Id.* ¶ 181. Lead Plaintiff further alleges that statements made by the Bank's Chief Risk Officer Frank Forrest at a December 2017 investor day assuring investors that "we closely monitor" risk and report it to the Board and regulators, in

the wake of the Wells Fargo unauthorized account scandal, creates an inference of scienter.  The 2020 Proxy Statement also stated Carmichael's role in reporting and escalating risk issues: "he drove accountability for a culture of strong risk management and regulatory results."  *Id.* ¶ 182.

Finally, Lead Plaintiff pleads that scienter can be inferred from the departure of numerous senior executives, including: Chief Risk Officer Frank Forrest in January 2020 (less than three months before the CFPB enforcement action was disclosed); Chairman and CEO of Fifth Third Bank (Chicago) Mitchell Feiger in May 2020; Director Jerry W. Burris in July 2020; Executive Vice President and former Head of the Consumer Bank Phil McHugh in October 2020; and CFO Tuzun in November 2020 (who resigned to become CFO at BMO Financial Group).  Forrest sold $3 million in Fifth Third stock in the three years after the first CFPB CID.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits.  Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).  In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor.  *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016).  To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

27

Securities fraud claims must also satisfy Rule 9(b)'s particularity requirement, which requires a party to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019); *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614–15 (7th Cir. 2011). "This ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank*, 649 F.3d at 615 (citation omitted).

Congress further heightened the pleading standards for securities fraud claims when it enacted the Private Securities Litigation Reform Act ("PSLRA") "[a]s a check against abusive litigation by private parties" in securities fraud suits. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* ("*Tellabs II*"), 551 U.S. 308, 313 (2007). The PSLRA requires "complaints alleging securities fraud [to] 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Cornielsen*, 916 F.3d at 598–99 (quoting 15 U.S.C. § 78u-4(b)(2)(A)). The PSLRA also requires "[a]ny complaint alleging a material misstatement or omission [to] 'specify each statement alleged to have been misleading' and the 'reason or reasons why the statement is misleading.'" *Id.* at 599 (quoting 15 U.S.C. § 78u-4(b)(1)). On motion by a defendant, the Court must dismiss a complaint that does not meet these requirements. 15 U.S.C. § 78u-4(b)(3)(A).

## ANALYSIS

Lead Plaintiff's amended consolidated complaint sets forth two claims: first, Lead Plaintiff alleges that all Defendants have violated § 10(b) of the Exchange Act and SEC Rule 10b-5 and second, Lead Plaintiff seeks to hold Carmichael and Tuzun individually liable under

§ 20(a) of the Exchange Act as "controlling persons" of Fifth Third.  Defendants move to dismiss both claims.

## I.  Section 10(b) Claim (Count I)

Defendants argue that Lead Plaintiff does not satisfy the pleading requirements to assert its claim for securities fraud under § 10(b) of the Exchange Act.  Section 10(b) and SEC Rule 10b-5 "prohibit fraudulent or misleading statements of material fact in connection with the purchase or sale of a security."  *Walleye Trading LLC v. AbbVie Inc.*, 962 F.3d 975, 977 (7th Cir. 2020).  Section 10(b) prohibits the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of" the SEC's rules and regulations.  15 U.S.C. § 78j(b).  Relevant here, Rule 10b-5 implements § 10(b) by making it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(b).

To state a claim under § 10(b) and Rule 10b-5(b), a plaintiff must allege that "(1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages."  *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 896 (N.D. Ill. 2020) (citations omitted).  Defendants seek dismissal of the § 10(b) claim on the basis that Lead Plaintiff fails to sufficiently plead any actionable misstatement or omission of material fact and on the independent and sufficient basis that Lead Plaintiff does not allege facts to support a strong inference of scienter on the part of any Defendant.

29

### A.      Material Misrepresentation or Omission

Lead Plaintiff must sufficiently allege that Fifth Third made materially misleading statements.  The allegedly fraudulent statements, made in Fifth Third's public SEC filings and investor calls, fall into four categories: (1) business practices, risk management systems, and risk environment; (2) Code of Business Conduct and Ethics; (3) product cross-selling and consumer practices and relations; and (4) incentive compensation.  Lead Plaintiff's theory is that these statements were false when made because Fifth Third had a duty to disclose: the CFBP investigation; the bank's admissions, during the course of the investigation, of unauthorized sales practices; and the conscious failure of senior management to identify additional misconduct and remediate those practices.

"[F]irms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose."  *Gallagher v. Abbott Lab'ys*, 269 F.3d 806, 808 (7th Cir. 2001).  A duty may arise when a defendant chooses to make a statement.  *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995) ("If one speaks, he must speak the whole truth." (quoting *Ackerman v. Schwartz*, 947 F.2d 841, 848 (7th Cir. 1991))).  "An omission renders a statement materially misleading when it creates an 'impression of a state of affairs that differs in a material way from the one that actually exists.'"  *Kelsey v. Allin*, No. 14 C 7837, 2016 WL 825236, at *4 (N.D. Ill. Mar. 2, 2016) (citation omitted); *see* 17 C.F.R. § 240.10b-5(b) (prohibiting "omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading").  This is an objective inquiry, considering whether a reasonable investor would have received a false impression from the statement given the context and manner in which Defendants presented the

statement. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186–87 (2015).

As an initial matter, Fifth Third did not have a general duty to disclose the CFPB investigation. The existence of the CFPB investigation, on its own, "does not trigger a generalized duty to disclose." *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016). "[S]ecurities laws generally do not impose [] a duty upon publicly traded corporations to confess to uncharged, unadjudicated claims of wrongdoing." *Société Générale Sec. Servs., GbmH v. Caterpillar, Inc.*, No. 17 CV 1713, 2018 WL 4616356, at *6 (N.D. Ill. Sept. 26, 2018) (citing *Anderson v. Abbott Lab'ys.*, 140 F. Supp. 2d 894, 906 (N.D. Ill.), *aff'd sub nom. Gallagher v. Abbott Lab'ys.*, 269 F.3d 806 (7th Cir. 2001)). Similarly, Fifth Third did not have a duty to disclose that it participated in the investigation by providing information and documents and identifying unauthorized activity. *Lewis v. YRC Worldwide Inc.*, No. 1:19-CV-0001, 2020 WL 1493915, at *10 (N.D.N.Y. Mar. 27, 2020) (participation in nine-year DOJ investigation, including providing "hundreds of thousands of pages of documents" and engaging in settlement discussions, did not create a generalized disclosure duty). Rather, Lead Plaintiff must identify "with particularity the facts—known to the speaker at the time—that render [each] statement false or misleading." *Constr. Workers Pension Fund-Lake Cnty. & Vicinity v. Navistar Int'l Corp.*, 114 F. Supp. 3d 633, 651 (N.D. Ill. 2015).

### 1. Business Practices, Risk Management System, Risk Environment

Lead Plaintiff argues that Fifth Third "repeatedly represented the effectiveness of the Company's risk management practices," yet failed to state that these risk management practices were not sufficient because employees opened unauthorized accounts (as disclosed to the CFPB in 2015 and 2017). In specific, Lead Plaintiff first points to a statement in Fifth Third's 3Q 2016

31

Form 10-Q (repeated in its 2016 10-K, 2017 10-K, and 2018 10-K), which, when read in its

entirety, states:

> To mitigate compliance risk, Compliance Risk Management
> provides independent oversight to ensure consistency and
> sufficiency in the execution of the program, and ensures that lines
> of business, regions and support functions are adequately
> identifying, assessing and monitoring compliance risks and
> adopting proper mitigation strategies . . . .

Doc. 85 at 14 (citing Doc. 75 ¶ 107b). Lead Plaintiff emphasizes the two uses of "ensure" as

indicating that these are misrepresentations as to the effectiveness of Fifth Third's risk

management practices. However, this statement about an oversight program designed to

"mitigate" compliance risk through consistent business practices is general and aspirational, and

therefore not actionable. *See City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.

4th 592, 595 (7th Cir. 2021) (statement not misleading when it did not make any "concrete

assertion"); *Singh v. Cigna Corp.*, 918 F.3d 57, 63–64 (2d Cir. 2019) ("simple and generic

assertions about having 'policies and procedures' and allocating 'significant resources'" would

not mislead a reasonable investor). In fact, this statement clearly acknowledges the potential for

noncompliance (something that needs to identified, mitigated, and monitored), and it does not

present the type of specific, factual statement of compliance that courts have found to be

misleading.[3] *See Ross v. Career Educ. Corp.*, No. 12 C 276, 2012 WL 5363431, at *6–7 (N.D.

Ill. Oct. 30, 2012) (statements that regulatory problems were "behind us," when placed in context

of alleged continuing problematic practices, sufficiently alleged falsity).

Second, Lead Plaintiff alleges that Fifth Third's stated core principles that it will:

"conduct business in compliance with all applicable laws, rules and regulations;" act "with

---

[3] The parties dispute the number of unauthorized accounts opened within the Class Period, and Lead
Plaintiff's allegations in this respect are not clear (*see* discussion, *infra*.). However, even assuming a
large portion of the "hundreds of thousands" of potentially unauthorized accounts fell within the Class
Period, this general statement about risk management procedures is not specific enough to be actionable.

integrity in all activities;" and not "offer products or services that are not appropriate for its customers," were false because of the unauthorized accounts. But again, these are the kinds of non-specific "puffery" on which no reasonable investor would rely. *See Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F. 4th 90, 103 (2d Cir. 2021) ("'General declarations about the importance of acting lawfully and with integrity' are inactionable puffery, especially when expressed in aspirational terms." (citation omitted)); *Singh*, 918 F.3d at 60 ("[B]anal and vague corporate statements affirming the importance of regulatory compliance . . . . do not invite reasonable reliance. They are not, therefore, *materially* misleading, and so cannot form the basis of a fraud case."); *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) ("The statements are too general to cause a reasonable investor to rely upon them.").

Lead Plaintiff also points to Chief Risk Officer Frank Forrest's statements at December 2017 Investor Day to the effect that Fifth Third was doing a good job managing risk, arguing that these statements were misleading. Doc 75 ¶ 127 ("[W]e are managing the risk across the company today exceptionally well"; "Conduct risk at Fifth Third Bank is well managed, and it's in alignment with our core values."). But Forrest's statements are generalized, generic opinions and could not be the basis of a reasonable investor's decision. *City of Warren Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, No. 19 C 5782, 2020 WL 6118571, at *6 (N.D. Ill. Oct. 16, 2020) (statements that system was "functioning really well" and "working well for us" were optimistic puffery); *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 649–650 (N.D. Ill. 2020) (characterizations of portfolio's strength and growth potential were nonactionable opinion). Furthermore, Lead Plaintiff does not allege that Forrest did not

33

honestly believe that opinion when he gave it in December 2017. *Conagra*, 495 F. Supp. 3d at 650 (explaining that a statement of opinion is only false if not honestly held).

Lead Plaintiff argues that Fifth Third's risk disclosure statements such as "Fifth Third is also subject to risk from potential employee misconduct" materially misled investors because Fifth Third knew at the time about unauthorized accounts. Again, this statement is too general to be actionable. And it is true on its face: employee misconduct potentially puts an institution at risk. *Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*, No. 15-CV-3187, 2016 WL 5720375, at *6 (N.D. Ill. Sept. 30, 2016) ("[D]efendants' statement was that there were measures to 'mitigate' the risk, not to 'eliminate' it."). No reasonable investor would conclude that, in making this disclosure, Fifth Third promised that no employee misconduct had ever occurred. *See Howard v. Arconic Inc.*, 395 F. Supp. 3d 516, 552 (W.D. Pa. 2019) ("[A] reasonable investor reading the 10-K risk disclosures would not conclude that [defendant] faced *no* legal or compliance risks, or that the risk management and compliance programs [defendant] had adopted were completely adequate to prevent all such risks." (emphasis in original)).

Finally, Lead Plaintiff argues the CFPB complaint's allegations that Fifth Third "senior management" chose not to fully identify and remediate the unauthorized accounts make the bank's statements about risk management false. This allegation is vague, and neither the CFPB nor Lead Plaintiff plead that Carmichael or Tuzun personally participated in this scheme to consciously undercount unauthorized accounts, much less that either of them knew of the scheme when he signed the SEC filings. The stronger inference from Fifth Third's participation in the years long CFPB investigation (and the multiple disclosures during that investigation) is that the bank was actively identifying unauthorized accounts.

## 2.    Code of Business Conduct and Ethics

Lead Plaintiff argues that statements in Fifth Third's 2016 to 2019 Code of Business

Conduct and Ethics, adopted by the Board (which included Carmichael), were misleading

because Fifth Third did not contemporaneously disclose the employee misconduct and senior

management's willful ignorance of its scope.  The Code is a guide for Fifth Third employees,

and it lays out expectations for employee conduct in line with corporate principles.  Doc. 86-4.[4]

Lead Plaintiff points to statements such as "There is zero tolerance for internal fraud within Fifth

Third's organization" and the strict prohibition on "[o]pening bogus or fake accounts," calling

them unqualified, specific, and outright false.

However, when placed in context, these statements are aspirational, general prohibitions

on employee behavior and therefore not actionable: "Fifth Third is committed to minimizing the

impact of internal and external fraud to both Fifth Third and our customers . . . . There is zero

tolerance for internal fraud . . . and internal fraudulent activity must be referred to Bank

Protection when suspected;" "Fifth Third believes that fair and honest business practices are

essential . . . . Unethical business practices, such as incentive gaming . . . are strictly prohibited.

You are prohibited from manipulating records, opening accounts without customer authorization

. . . ."  *Id.* at 7, 8; *see In re Braskew S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 755 (S.D.N.Y. 2017)

(explaining "statements within such codes tend to be explicitly aspirational" and qualified).  The

2016 Code statement—"Employees, customers, shareholders and communities must know that

Fifth Third conducts all activities with the highest standards and unquestioned integrity," Doc.

75 ¶ 114(b))—is similarly general and would not be interpreted by a reasonable investor as any

---

[4] Defendants attach excerpts from the Code to their reply in support of their motion to dismiss.  Although the Court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment, *Jackson v. Curry*, 888 F.3d 259, 263 (7th Cir. 2018), the Court may consider "documents that are central to the complaint and are referred to in it" in ruling on a motion to dismiss, *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

kind of guarantee. *See Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 859 (N.D. Ill. 2009) (agreeing that "a company's adoption and publication of a code of ethics does not imply that all of its directors and officers are in compliance with that code"); *Singh*, 918 F.3d at 63 ("Ethics statements, which amount to general declarations about the importance of acting lawfully and with integrity" are "inactionable puffery"); *Emps. Ret. Sys. of Providence v. Embraer S.A.*, 16 Civ. 6277, 2018 WL 1725574, at *4 (S.D.N.Y. Mar. 30, 2018) ("Because a code of ethics is inherently aspirational, it simply cannot be that every time a violation of that code occurs, a company is liable under federal law for having chosen to adopt the code at all." (citation omitted) (internal quotation marks omitted)).

Lead Plaintiff argues that these statements are specific enough to be actionable. However, these are not the kinds of factual representations that courts have found support a claim of materiality. *See Flynn v. Exelon Corp.*, No. 19 C 8209, 2021 WL 1561712, at *9 (N.D. Ill. Apr. 21, 2021) (statements such as "'We never request, offer or accept any form of payment or incentive intended to improperly influence a decision.' . . . . take the Code of Conduct and Corporate Guidelines out of the realm of nonactionable aspirational statements and into the realm of statements regarding the Company's conduct and implies compliance"); *Holwill v. AbbVie, Inc.*, No. 1:18-CV-06790, 2020 WL 5235005, at *4 (N.D. Ill. Sept. 1, 2020) (code statement that "We never offer or provide anything of value to healthcare professionals or other individuals to inappropriately influence their medical judgment or purchasing or prescribing practices in favor of an AbbVie product" was material in light of allegations of kickback scheme); *Zebra*, 8 F. 4th at 595 (CEO's statement was "vague optimism," not a "concrete assertion"); *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728, 2018 WL 6167889, at *17 (S.D.N.Y. Nov. 26, 2018) (statements that company based employment decisions solely on merit

36

and had a confidential reporting process were misleading in light of allegations of sexual harassment and retaliation). The highlighted statements from Fifth Third's Code do not assert that the bank was in compliance or that employees had not opened unauthorized accounts; rather, these proscriptions for employee behavior, couched in "belief," "expectations," and "commitment," Doc. 86-4 at 4, 7, 10, are aspirational and therefore not actionable.

### 3. Product Cross-Selling and Consumer Practices and Relations

Next, Lead Plaintiff argues that Fifth Third's statements about its consumer-growth strategy, which included expanding its credit card business and "harvesting" customer relationships, while "putting the customer at the center of everything we do," were misleading because the bank did not disclose the unauthorized account activity "instrumental to those strategies." Doc. 85 at 28. Fifth Third's general statements reflecting an intent to grow its business ("we are focused on growing our credit card business"; "we are prioritizing organic growth opportunities," Doc. 75 ¶¶ 122, 129) and commitment to its customers are the kind of vague, optimistic statements that do not support a securities fraud claim. *See, e.g., In re Ford Motor Co. Sec. Litig., Class Action*, 381 F. 3d 563, 570–71 (6th Cir. 2004) (corporate statements about commitment to quality and consumer-focus not material); *Conagra*, 495 F. Supp. 3d at 651–52 (general statements promising growth not specific enough to be material); *St. Lucie Cnty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*, No. 10 C 427, 2011 WL 814932, at *8 (N.D. Ill. Feb. 28, 2011) ("The Court finds Zander's general commitment to growth to be immaterial corporate puffery."); *Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 872 (N.D. Ill. 2011) ("empty" statements predicting growth did not contain substantive information sufficient to base an investment decision).

37

Lead Plaintiff asserts Carmichael's statement (in SEC quarterly and annual reports) that Fifth Third was "taking advantage of cross-sell opportunities generated by synergies formed by the Company's business segments," Doc. 75 ¶¶ 119–121, was false because the bank failed to disclose that employees were opening unauthorized accounts to meet cross-sell goals. Defendants dispute the context of this statement, arguing that it refers to cross-selling opportunities "across different business segments" such as Consumer Lending and Wealth and Asset Management, rather than a retail cross-sell strategy. Lead Plaintiff does not address this contention directly; rather, again relying on the CFPB amended complaint, it clarifies that it alleges Fifth Third's retail cross-sell goals were designed to increase revenue and consumer retention rather than to meet customer needs.[5] The Court does not need to address the context dispute to conclude that the "cross-sell" statement is not specific enough to make it material. Lead Plaintiff seeks to analogize this statement to the Wells Fargo fake-accounts scandal; however, there plaintiffs alleged that Wells Fargo repeatedly "attributed its financial success to its cross-selling strategy," while knowingly citing falsified numbers (that reflected millions of unauthorized accounts) as proof. *See Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 WL 1070116, at *6 (N.D. Cal. Feb. 27, 2018). Carmichael's statement about "opportunities" and "synergies" does not rise to that level. Fifth Third's statement describes "taking advantage" of a business strategy. It does not make concrete representations that might make it the kind of substantive statement upon which an investor would rely. *See, e.g.*, *Holwill*, 2020 WL 5235005, at *6 (statements attributing drug's success to sales and marketing misleading in light of kickback scheme); *In re CenturyLink Sales Pracs. & Sec. Litig.*, 403 F. Supp. 3d 712, 720 (D.

---

[5] Lead Plaintiff cites additional CFPB allegations about Fifth Third's failure to tell consumers about the cross-sell goals and that the bank was working in its own financial interest, not theirs. Doc. 85 at 29. However, these allegations come from the CFPB amended complaint, and Lead Plaintiff did not incorporate them into its own amended consolidated complaint. It is therefore inappropriate for the Court to consider them here.

Minn. 2019) (repeated attribution of sales growth to legitimate practice misleading because the illegal practice "was widespread, systemic and knowingly encouraged by CenturyLink's impossible-to-meet quota system").

### 4. Incentive Compensation

Lead Plaintiff alleges that Fifth Third's statements in SEC Proxy Statements that its incentive compensation was aligned with shareholder interests and did not encourage inappropriate risk was misleading because the bank did not properly implement or monitor the compensation system, which in fact rewarded unauthorized account openings.  Defendants argue that these statements, when placed in their proper context as a description of executive compensation, do not implicate the alleged incentivizing of branch employees.  The Court agrees.  The 2019 Proxy Statement discusses Fifth Third's executive compensation program, its methodology and structure, and risk-mitigation features.  Lead Plaintiff argues that certain phrases such as "executive and other incentive programs" and "reward[ing] our people" make this Statement section apply to branch-level employees.  However, a review of the entire document makes clear that it refers to executive compensation.  *Omnicare*, 575 U.S. at 190 ("[A]n investor reads each statement within such a document, whether of fact or of opinion, in light of all its surrounding text[.]").  The phrase "executive and other incentive programs" occurs within a description of a Committee that "focuses on the attraction and retention of key executives" that met with the Compliance Committee to review "executive and other incentive programs."  Doc. 84-12 at 6.  This does not "on its face" describe branch-level employees as Lead Plaintiff suggests.  Doc. 85 at 30.  And "reward[ing] our people" is too general to convert this executive compensation disclosure into an actionable statement that could have misled investors about retail account incentives.

Lead Plaintiff has not sufficiently alleged that Fifth Third made materially misleading statements.

### B.      Scienter

To meet the scienter requirement, Lead Plaintiff must allege with particularity facts giving rise to a strong inference that each defendant acted with the required state of mind. *Cornielsen*, 916 F.3d at 601–02.  For the § 10(b) claim, "that state of mind is 'an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false.'"  *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018) (quoting *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007)).  Courts define "recklessness" in this context as "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *City of Livonia Emps.' Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.*, 711 F.3d 754, 756 (7th Cir. 2013) (citations omitted).  "Alleging that a defendant should have known about fraud is not enough to show that the defendant was reckless."  *In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 435 F. Supp. 3d 845, 861 (N.D. Ill. 2020).

The PSLRA requires a plaintiff to "satisfy a heightened standard of plausibility" in pleading scienter.  *Kohl's*, 895 F.3d at 936.  The plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" for "*each* act or omission alleged to violate this chapter."  15 U.S.C. § 78u-4(b)(2)(A) (emphasis added).  To meet this "strong inference" standard, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs II*, 551 U.S. at 314.  In determining whether a

40

complaint has met this standard, the Court must account for "plausible, nonculpable explanations for the defendant's conduct" and weigh them against the strength of the inferences in favor of scienter. *Id.* at 323–24; *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008). In the end, the Court must determine whether all the facts set forth in the amended consolidated complaint, accepted as true and taken collectively, "give rise to a strong inference of scienter." *Tellabs II*, 551 U.S. at 322–23, 326.

As discussed above, Lead Plaintiff argues that Defendants made false and misleading statements and material omissions concerning Fifth Third's (1) business practices, risk management systems, and risk disclosures; (2) Code of Business Conduct and Ethics; (3) product cross-selling and consumer business; and (4) employee incentive compensation. It must allege facts showing that Defendants "had the requisite scienter at the time that they made each allegedly fraudulent statement." *In re NeoPharm, Inc. Sec. Litig.*, No. 02 C 2976, 2007 WL 625533, at *6 (N.D. Ill. Feb. 23, 2007). Moreover, because Lead Plaintiff contends that Fifth Third, Carmichael, and Tuzun all violated § 10(b), it must plead a strong inference of scienter with respect to *each* Defendant. *See Cornielsen*, 916 F.3d at 601–02 ("PSLRA references to 'the defendant' may only reasonably be understood to mean 'each defendant' in multiple defendant cases." (citation omitted) (internal quotation marks omitted)); *Pugh*, 521 F.3d at 692–95, 697–98 (where the plaintiffs alleged that both a corporate defendant and its executive officers violated § 10(b), addressing separately whether the plaintiffs had adequately pleaded scienter for the individual officers and the corporate defendant).

"[T]he corporate scienter inquiry must focus on 'the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like)

41

rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.'" *Pugh*, 521 F.3d at 697 (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.* ("*Tellabs III*"), 513 F.3d 702, 708 (7th Cir. 2008)). Because the only relevant actors here are Carmichael and Tuzun[6], the Court does not separately address Fifth Third's scienter. Rather, to the extent that the Court concludes that Lead Plaintiff has sufficiently pleaded the required scienter for either Carmichael or Tuzun, the Court finds that that it can also infer Fifth Third's scienter from the same allegations. The Court, therefore, proceeds to consider Lead Plaintiff's asserted bases for scienter.

### 1. Knowledge of or Reckless Disregard for Class Period Misconduct

As discussed above, Lead Plaintiff must allege facts sufficient to allow a "strong inference" of scienter—i.e. knowledge or reckless disregard of the falsehood of—each purported misleading statement by each Defendant at the time the statement was made. *See Cornielsen*, 916 F.3d at 601–02; *Pugh*, 521 F.3d at 692–95, 697–98. Lead Plaintiff argues that the amended consolidated complaint raises a strong inference that Defendants "knew of a persistent unauthorized account problem fostered by abusive sales-management practices," Doc. 85 at 30, and that such knowledge made Fifth Third's public statements about risk management and sales practices fraudulent.

To support the inference of knowledge, Lead Plaintiff points to the following alleged facts:

---

[6] The amended consolidated complaint also includes statements by former Chief Risk Officer Forrest and former Executive Vice President Philip McHugh. Because Lead Plaintiff does not discuss scienter with respect to these officers in its opposition to Defendants' motion to dismiss, the Court only considers arguments regarding the scienter of Carmichael and Tuzun. *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 825 (7th Cir. 2015) ("[A] party generally forfeits an argument or issue not raised in response to a motion to dismiss.").

- A June 2010 internal email to "corporate headquarters" about unauthorized credit card sales in Chicago and undesirable sales practices;

- Fifth Third received hundreds of customer complaints about illegal sales practices between 2010 and 2016, and these complaints likely underreport the problem;

- Fifth Third disclosed more than 1,000 unauthorized accounts to the CFPB during a 2015 investigation;

- CFPB CIDs in 2016 through 2019, addressed to Carmichael, addressed unauthorized account openings and sales practices;

- Fifth Third disclosed to the CFPB, in 2017, that it had opened unauthorized customer products every year from 2010 to 2017;

- "Throughout that time [2010 to 2017], Defendants fostered (or at minimum tolerated) the sales-management practices and incentive policies that spawned unauthorized accounts, which continued until at least 2020 (¶18)."

Doc. 85 at 32.

As an initial matter, the June 2010 email, 2015 disclosure of 1,000 unauthorized accounts, and 2010 to 2016 consumer complaints all occurred before (or, some unknown number of consumer complaints just within) the Class Period, and therefore cannot support a strong inference that Carmichael or Tuzun knew that public statements made during the Class Period were materially false. *Smallen v. Western Union Co.*, 950 F.3d 1297, 1314 (10th Cir. 2020) (pre-class period statement did not allow inference of knowledge of on-going, class period legal violations). And while knowledge of pre-class period facts can be relevant to the analysis, *see In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (considering pre-class period sales data as relevant to what executives should have predicted for class period sales), these facts, even taken together, simply do not support Lead Plaintiff's conclusion that there were persistent account problems or a culture of abusive sales practices. The fact of unauthorized accounts

(1,000 or an unknown number opened over seven years) and hundreds of customers complaints only supports the inference that a relatively small number of unauthorized accounts existed, rather than a bank-wide, persistent problem that would have been escalated to Carmichael or Tuzun. *See Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*, No. 10 C 7031, 2012 WL 1030474, at *10 (N.D. Ill. Mar. 27, 2012) ("diffuse" allegations of fraudulent activity insufficient). That Fifth Third disclosed these accounts while also producing documents and testimony in the CFPB investigation undercuts Lead Plaintiff's assertion that Fifth Third consciously underreported or refused to look for instances of misconduct. *See Pugh,* 521 F.3d at 694 (rejecting plaintiff's conclusory allegation about weak internal controls as "fraud by hindsight").

Finally, the allegation that Carmichael or Tuzun fostered sales-management practices that encouraged unauthorized accounts is wholly conclusory, without any facts to link this allegation to either Defendant, much less to explain what actions they took, when, or how they encouraged an illegal sales culture. Even a non-PSLRA fraud case requires the 'who, what, when, where, and how' of the fraud." *AnchorBank*, 649 F.3d at 615 (citation omitted).

To its amended consolidated complaint, Lead Plaintiff adds the new allegation (copied from the CFPB's amended complaint) that "hundreds of thousands of Fifth Third accounts bear indicia of non-authorization," including accounts minimally funded and deactivated within 90 days, credit cards issued but never activated, and products opened with Fifth Third email addresses. Doc 75 ¶¶ 43, 52, 55, 56, 94. That is a more substantial allegation than hundreds of complaints or 1,000 accounts. However, Lead Plaintiff does not explain exactly when these accounts were opened. *Compare id.* ¶ 94 (citing "deficient bank practices" from 2008 to at least 2020), *with id.* ¶¶ 52, 55, 57, 58 (alleging problems "since 2010" and in 2013, 2015, and 2017).

This requires the Court to speculate as to what percentage of these accounts fall within the Class Period. *See Wolfe v. Aspenbio Pharma, Inc.*, 587 F. App'x 493, 498 (10th Cir. 2014) (refusing to "speculate" or "stack" inferences). The CFPB's accusation of accounts with "indicia of non-authorization" does not support a strong inference that Carmichael or Tuzun knew about those unauthorized accounts. *Higginbotham*, 495 F.3d at 758 ("Accusations differ from proof; business executives are not charged with 'knowing' the truth of whatever any public official anywhere in the world may assert."). Lead Plaintiff also pleads the new allegation that, during the CFPB investigation, Fifth Third identified an additional 800 consumers with unauthorized accounts and 400 instances of abusive practices. Doc. 75 ¶ 62. Again, the amended consolidated complaint in this litigation does not state whether these additional 800 accounts were opened during the Class Period.

However, even if these new allegations, combined with the previously pled disclosure of unauthorized accounts, can be said to show persistent, large-scale problems in the Class Period, the amended consolidated complaint does not support a reasonable inference, much less a strong one, that Carmichael or Tuzun personally knew about these problems. The only direct link to either Defendant is that the CFPB CIDs were addressed to Carmichael. But all Carmichael's assumed receipt of the CIDs demonstrates is that he knew of the investigation, not necessarily of the problem itself. *See Higginbotham*, 495 F.3d at 758 ("[T]here is a big difference between knowing about the reports . . . and knowing that the reports are false.").

Similarly, the Court cannot infer scienter based on Carmichael and Tuzun's executive positions, Board committee membership, or job responsibilities. "[S]cienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." *Arbitrage Event-Driven Fund v. Tribune Media Co.*, No. 18 C 6175, 2020

45

WL 60186, at *10 (N.D. Ill. Jan. 6, 2020) (citation omitted); *accord Plumbers & Pipefitters Loc.*

*Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 673 F. Supp. 2d 718, 747 (S.D. Ind. 2009)

("[R]espective positions within the company prove nothing about fraud or knowledge thereof but

rather are exactly the type of generalized allegations the court must disregard under the PSLRA."

(citation omitted)), *aff'd*, 679 F.3d 952 (7th Cir. 2012).  Lead Plaintiff's generalized allegations

that Carmichael sat on the Enterprise Risk Management Committee and CFO Tuzun was

responsible for risk management compliance do not support a strong inference of knowledge of

unauthorized sales practices, much less the required scienter that Fifth Third's challenged public

statements were false.  *Cf. Hedick v. Kraft Heinz Co.*, No. 19-cv-1339, 2021 WL 3566602, at *12

(N.D. Ill. Aug. 11, 2021) (detailed allegations of information presented at board meetings

attended by defendants supported inference of scienter); *Desai*, 654 F. Supp. 2d at 860 (when

"the company's very survival was at stake," defendants were presumed to know whether or not

the company could "refinance its looming debt").  Likewise, Carmichael and Tuzun's signatures

on SEC filings and certifications, without additional details supporting knowledge that the

statements were false, "add nothing substantial to the scienter calculus."  *In re Baxter Int'l Inc.*

*Sec. Litig.*, 19 C 7786, 2021 WL 100457, at *15 (N.D. Ill. Jan. 12, 2021).  The amended

consolidated complaint does not present sufficient facts to create an inference that Carmichael or

Tuzun had knowledge of the alleged sales activity.

### 2.    CFPB Litigation

Lead Plaintiff next argues that the CFPB's ongoing litigation against Fifth Third supports

an inference of scienter.  Government investigations can help to reinforce allegations of scienter.

*See In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) ("That the SEC and

DOJ initiated investigations provides additional support for finding that scienter has been

adequately pleaded.").  But making such an inference on its own strikes the Court as improperly

inferring fraud by hindsight.  *See Société Générale*, 2018 WL 4616356, at *3 (the PSLRA's

heightened pleading requirements are intended "to discourage claims of so-called fraud by

hindsight" (citations omitted) (internal quotation marks omitted)); *see also W. Palm Beach

Firefighters' Pension Fund v. Conagra Brands, Inc.*, No. 19-CV-01323, 2020 WL 6118605, at

*25 (N.D. Ill. Oct. 15, 2020) ("The Seventh Circuit has emphasized that 'hindsight' cannot be

the 'only basis' of a proposed scienter inference, since there is no 'fraud by hindsight.'" (citing

*Higginbotham*, 495 F.3d at 759)).  "Courts in this district have declined to allow plaintiffs to use

a must have known theory as an end-run around the requirement that plaintiffs set forth

particularized facts to suggest that defendants acted knowingly or recklessly."  *Conagra*, 2020

WL 6118605, at *25 (citations omitted).  Further, Lead Plaintiff points to nothing in the CFPB

litigation that suggests that Carmichael or Tuzun had personal knowledge of any problematic

practices at the time they made the statements at issue.  Lead Plaintiff characterizes the CFPB as

presenting "conclusions" and "findings" in its amended complaint; however, the Court does not

find it appropriate to give the CFPB complaint any additional weight or to infer scienter from

conclusory allegations made in another litigation, especially statements that do not specifically

name Carmichael or Tuzun or detail their personal knowledge.  *See In re Herbal Supplements

Mktg. & Sales Pracs. Litig.*, No. 15-CV-5070, 2017 WL 2215025, at *6 (N.D. Ill. May 19, 2017)

(treating factual allegations from government investigation as properly pleaded allegations in

private complaint); *K.H. Through Murphy v. Morgan*, 914 F.2d 846, 848 (7th Cir. 1990)

("reminding the reader that allegations in a complaint are not proven facts").

### 3. Motive

Lead Plaintiff further argues that Carmichael and Tuzun had a financial motive to conceal the fraud, and that these motive allegations contribute to a strong inference of scienter. A plaintiff may use "motive and opportunity or circumstantial evidence to establish scienter under the PSLRA, as long as those facts support a strong inference that the defendant acted recklessly or knowingly." *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815, 823 (N.D. Ill. 2000) (citations omitted). Lead Plaintiff first focuses on Carmichael and Tuzun's incentive compensation, arguing that they stood to profit from concealing ongoing problems with unauthorized accounts and the resulting CFPB investigation. The amended consolidated complaint shows that, in addition to their regular compensation, Carmichael collected nearly $23.4 million in incentive-based compensation during the Class Period, whereas Tuzun made $6.2 million. When Fifth Third disclosed the account problems and the resulting CFPB investigation in March 2020, Carmichael's incentive compensation for 2019 dropped by $2.4 million and Tuzun's by 12%.

But these allegations do not contribute to a strong inference of scienter. Allegations regarding a corporate officer's motivation to earn bonuses, stock, or other compensation "are too common among corporations and their officers to be considered evidence of scienter." *In re Bally Total Fitness Sec. Litig.*, No. 04 C 3530, 2006 WL 3714708, at *9 (N.D. Ill. July 12, 2006); *see Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012) (an alleged incentive to improve bonuses and increase the value of stock options was "too generic to satisfy" *Tellabs II*). Rather, if courts accepted the motive to reap higher compensation "as sufficient to establish scienter, most corporate executives would be subject to such allegations, and the heightened pleading requirements for these claims would be meaningless." *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 714 (N.D. Ill. 2005); *see also Kohl's*,

895 F.3d at 939–40 ("[A] generalized motive common to all corporate executives is not enough to establish scienter. Otherwise, 'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'" (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009))). Indeed, "[t]he desire to increase the value of a company and attain the benefits that result, such as meeting analyst expectations and reaping higher compensation, are basic motivations not only of fraud, but of running a successful corporation." *Davis*, 385 F. Supp. 2d at 714. Therefore, because Lead Plaintiff does not tie Carmichael and Tuzun's incentive compensation specifically to the challenged practices, with it instead just generally tied to the overall value of the company, the Court cannot infer scienter from Fifth Third's incentive compensation plan.

Lead Plaintiff also advances the theory that Carmichael's stock trades evidence his motive to commit fraud. "Insider trading alone does not raise an inference of scienter," however. *Id.*; *see also Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 WL 4360648, at *13 (N.D. Ill. Sept. 23, 2008). Instead, "[t]he sale must be suspicious in scope or timing" to support such an inference. *Davis*, 385 F. Supp. 2d at 715. Carmichael's sales within the Class Period do not meet this criteria. Although Lead Plaintiff points out that Carmichael sold a quarter of his shares during the Class Period, it includes no allegations to suggest why that sale should be suspect. And although Carmichael did not trade eighteen months before or six months afterwards, the sales during the Class Period show similar gaps of time in between trades. Lead Plaintiff points out that Carmichael sold an additional 155,143 shares after the Class Period (before the CFPB filed its amended complaint), but again, Lead Plaintiff has failed to tie the timing of the sale to any specific misleading or false statements or to allege anything specific except that a sale was made. Without additional context to suggest that Carmichael's stock sales were suspicious or

49

unusual, the Court does not find they support a strong inference of scienter. *See Higginbotham*, 495 F.3d at 759 ("[A]bsence of sales by other managers . . . implied that nothing was thought to be out of the ordinary."); *Davis*, 385 F. Supp. 2d at 714–15 ("The strength of an inference depends on how closely it follows from a fact. Without more, an executive's sale of stock does not lead to the conclusion that he engaged in fraud.").

Having examined Lead Plaintiff's arguments concerning scienter individually and collectively, the Court cannot find sufficient allegations giving rise to a strong inference of scienter on either Carmichael's or Tuzun's part. As a result, the Court also cannot impute scienter to Fifth Third.

## II.    Section 20(a) Claim (Count II)

Lead Plaintiff also alleges that Carmichael and Tuzun violated § 20(a) of the Exchange Act as "controlling persons" of Fifth Third. "Section 20(a) provides a basis for holding individuals liable for acts of securities fraud if they control other individuals or businesses that violate the securities laws." *Allscripts-Misys Healthcare*, 778 F. Supp. 2d at 886 (citing 15 U.S.C. § 78t). However, "to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws—here, a violation of § 10(b) and Rule 10b-5." *Pugh*, 521 F.3d at 693. Because Lead Plaintiff has failed to adequately plead its § 10(b) claim, its claim for control person liability under § 20(a) also fails at this stage. *Id.* at 698 ("[B]ecause the plaintiffs have not adequately alleged the direct liability of any defendant [under § 10(b) and Rule 10b-5], their § 20(a) claim was also correctly dismissed."); *Fryman*, 462 F. Supp. 3d at 891, 905 (dismissing § 20(a) claims against the corporate defendant's CEO and CFO where the plaintiffs failed to adequately plead § 10(b) claims).

### III.      Dismissal With Prejudice

Because Lead Plaintiff has had several opportunities to state a valid claim and further amendment would be futile, the Court dismisses the amended consolidated complaint with prejudice. *See Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 734–35 (7th Cir. 2014) (affirming dismissal with prejudice of first amended complaint after initial complaint was dismissed without prejudice); *Pirelli Armstrong Tire Corp., Retiree Med. Benefits Tr. v. Walgreen Co.*, No. 09 C 2046, 2010 WL 624709, at *1 (N.D. Ill. Feb. 18, 2010) (dismissing amended complaint with prejudice after previous dismissal of ICFA and unjust enrichment claims without prejudice), *aff'd*, 631 F.3d 436 (7th Cir. 2011).

### CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss [83]. The Court dismisses the amended consolidated complaint with prejudice. The Court enters judgment for Defendants and terminates this case.

Dated: May 24, 2022

_____
SARA L. ELLIS
United States District Judge

51